Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
: 
**In re**                                 :       **Chapter 11 Case No.**
: 
**GENERAL MOTORS CORP.,** *et al.*,    :      **09-_____ (___)**
: 
                **Debtors.**        :      **(Jointly Administered)**
: 
---------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 363(b), (f), (k), AND (m),**
**AND 365 AND FED. R. BANKR. P. 2002, 6004, AND 6006, TO (I) APPROVE**
**(A) THE SALE PURSUANT TO THE MASTER SALE AND PURCHASE AGREEMENT**
**WITH VEHICLE ACQUISITION HOLDINGS LLC, A U.S. TREASURY-SPONSORED**
**PURCHASER, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER**
**INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES; AND (C) OTHER RELIEF;**
**AND (II) SCHEDULE SALE APPROVAL HEARING**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

General Motors Corporation ("GM") and certain of its subsidiaries, as

debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"

or the "Company"), respectfully represent:

### Overview

1. By this Motion, the Company seeks entry of two orders. First, the

Company requests entry of an order (the "Sale Procedures Order"), pursuant to 11 U.S.C.

§§ 105(a) and 363 and Fed. R. Bankr. P. 2002 and 6004, (i) authorizing and approving certain proposed procedures to govern the sale process and provide for the submission of any competing bids for substantially all the Debtors' assets and the form and manner of notices of (a) the hearing to consider authorization and approval of the sale, (b) the assumption and assignment of executory contracts and unexpired leases of personal property and of nonresidential real property (collectively, the "Leases") pursuant to 11 U.S.C. § 365, and (c) the approval of the UAW Retiree Settlement Agreement,[1] and (ii) setting a hearing to consider the sale on June 30, 2009. Second, subject to the terms of the Sale Procedures Order and the entry of an order (the "Sale Order"), pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), and 365 and Fed. R. Bankr. P. 6004 and 6006, authorizing and approving, among other things, (i) the sale of the Debtors' assets pursuant to the proposed Master Sale and Purchase Agreement and related agreements (the "MPA") among the Debtors (the "Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury"), free and clear of liens, claims, encumbrances, and other interests (the "363 Transaction"), (ii) the assumption and assignment of certain executory contracts and Leases, and (iii) the approval of UAW Retiree Settlement Agreement.

2.     The instant Motion requests approval of a sale transaction that embodies the objective of the Debtors to implement the only available means to preserve and maximize the value, viability, and continuation of the Company's business and, by extension, preserve and provide jobs for the Company's employees and others and

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed thereto in the MPA and/or the Affidavit of Frederick A. Henderson Pursuant to Local Bankruptcy Rule 1007-2, filed contemporaneously herewith.

enhance the interests of its economic stakeholders through a sale that is made possible only because it also is a critical element of the program adopted by the United States Government to preserve the domestic automotive industry. The result of the sale will be the continuation of the business represented by the assets to be sold that will make the Purchaser (sometimes referred to as "New GM") a lynchpin of the domestic automotive industry so this nation once again can assume its place as the domicile of one of the leading automotive manufacturers in the world. The proposed sale is the only viable alternative that will permit the realization of the going concern value of the assets to be sold and effect the transformation of the Purchased Assets to be the foundation for an efficient, productive, and economically viable business that will be competitive and a source of pride and employment for hundreds of thousands of workers. At the same time, it will avoid systemic failure in the automotive industry and other sectors of the economy as well as offer hope for thousands of other businesses and their employees that supply or otherwise are dependent upon the Company, together with the countless communities in which those businesses and their employees are located.

3.     These chapter 11 cases are the result of the economic collapse and liquidity crisis that began to surface during the end of 2007 and exploded in 2008 that materially and adversely affected the Debtors' business. Prior to the commencement of these chapter 11 cases, the exigent economic circumstances compelled the Company to seek financial assistance from the federal government in order to sustain its operations and avoid a potentially fatal systemic failure, a failure that would have prejudiced not only the Company itself, but also other entities and hundreds of thousands of persons employed by them in the automotive industry.

4.       As GM's largest secured creditor, the United States Government has dedicated substantial time and effort negotiating with the Company to preserve the going concern value of the GM enterprise to achieve the objectives noted above in the national interest.  The transaction for which this Motion seeks approval is the result of those efforts.

5.       The success of an automotive manufacturing company depends on the ultimate retail sale of the vehicles it manufactures.  Consumers must have confidence in GM's products, i.e., that a new GM will exist in the future so that it can stand behind its products.  It is in this context that the timing of the transformation of the assets, in connection with the approval of the sale, becomes critical.

6.       To instill confidence on the part of consumers, employees, suppliers, and other stakeholders that a New GM – one that is viable and competitive – will quickly emerge from bankruptcy, the proposed sale of substantially all of the Company's assets to the Purchaser under 11 U.S.C. § 363 must be expeditiously pursued and approved.  Implementation of the sale will best serve the interests of the Company's economic stakeholders, as the only other alternative will result in little or no recoveries from the Company's assets as well as severe economic consequences for the domestic automotive industry and the nation.

7.       New GM, to be established under the 363 Transaction, will be a new, reshaped business that is not entangled by financial and operating distress or bankruptcy and that (a) will be competitive and profitable, both here and abroad, (b) will demonstrate to consumers the existence of a viable business that manufactures competitive and attractive products, (c) satisfies the goals of the U.S. Government, and

(d) has the full backing of the U.S. Treasury, the Government of Canada and the Government of Ontario, through Export Development Canada ("EDC"), Canada's export trading agency, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW").  Importantly, the 363 Transaction will restore confidence on the part of consumers that they can purchase a GM vehicle without concerns regarding residual value, replacement parts, warranty obligations, and maintenance.  Employees, suppliers, dealers, and communities will be able to depend on New GM as an economically viable and competitive enterprise.

8.      It is imperative that the 363 Transaction be expeditiously approved.  Any delay in the consideration of this Motion will result in continuing and increasing revenue erosion and further loss of market share to other domestic and foreign manufacturers that are not suffering aggravated financial distress.  Absent prompt confirmation that the sale has been approved and that the transfer of the assets will be implemented, it is highly probable that GM will have to liquidate.  There are no realistic alternatives available.  There are no merger partners, acquirers, or investors willing and able to acquire GM's business.  Other than the U.S. Treasury and EDC, there are no lenders willing and able to finance the Company's continued operations.  Similarly, there are no lenders willing and able to finance the Company in a prolonged chapter 11 case. Even if funding were available for an extended bankruptcy case, many consumers would not consider purchasing a vehicle from a manufacturer whose future is uncertain and that is entangled in the vagaries and vicissitudes of the bankruptcy process.  Even a short delay would have a serious and immediate detrimental impact on the Company's supply

chain, dealers, hundreds of thousands of employees of such suppliers and dealers, as well as upon GM's competitors that purchase parts from such suppliers.

9.      Uncertainty as to the Company's future must be eliminated now if the Company's failure and systemic consequences are to be avoided .  A lengthy chapter 11 case for the Debtors is not an option.  No debtor in possession financing is available in the absence of the 363 Transaction.  No entity – other than the U.S. Treasury – has the wherewithal or the inclination to provide such financing.  Moreover, even if such an entity should suddenly surface, it would be unable to provide the U.S. Treasury with adequate protection for the U.S. Treasury's currently outstanding approximate $19.7 billion secured claim.

10.      The U.S. Treasury, now GM's largest secured creditor and the sponsor of the Purchaser under the 363 Transaction, became a secured creditor in order to serve the national interest in preserving the Company's business.  The U.S. Government fully supports the 363 Transaction in order to assist in stabilizing the economy and preserving the basic domestic automotive industry and its jobs.  The U.S. Treasury is willing and able to take the necessary steps to transform and maintain the viability of the Company's business via the proposed 363 Transaction.  However, it is only willing to continue providing such financial assistance if the bankruptcy process serves the goal of preserving the going concern value of the assets by concluding the sale expeditiously.  It is unwilling to make an open-ended commitment of billions of taxpayer dollars to support a traditional chapter 11 case – or to sponsor the purchase of what may be left of the Company at the end of such a case.  The Debtors, in the exercise of sound business judgment, and the U.S. Treasury have concluded that the 363 Transaction is the only

means of preserving value and continuing the transformed business for the benefit of all economic stakeholders and in the national interest.

11.     The 363 Transaction is consistent with President Obama's remarks on the American automotive industry in that it "is our best chance to make sure that the cars of the future are built where they've always been built – in Detroit and across the Midwest – to make America's auto industry in the 21st century what it was in the 20th century – unsurpassed around the world."  Barack H. Obama, U.S. President, Remarks on the American Automotive Industry at 7 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

## Historical Background

12.     On the date hereof (the "Commencement Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11, United States Code (the "Bankruptcy Code").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.

13.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

14.     The facts and circumstances that resulted in the commencement of these chapter 11 cases are set forth in the Affidavit of Frederick A. Henderson, the President and Chief Executive Officer of GM, pursuant to Local Bankruptcy Rule 1007-2

(the "First Day Affidavit" or "Henderson Affidavit"), filed contemporaneously with this Motion, and are incorporated herein as if fully and at length set forth.

**The Master Sale and Purchase Agreement**

15.     Subject to approval and the submission of any higher or better offers, the Sellers have reached an agreement with the Purchaser (together with the Sellers, the "Parties")[2] as embodied in the proposed MPA.  The MPA is the result of extensive, arm's-length negotiations among the parties.  It is an essential part of the program adopted by the U.S. Treasury to revitalize the U.S. automotive industry.

16.     The 363 Transaction, as embodied in the MPA, contemplates that substantially all of the Sellers' assets, including substantially all of the equity interests of their directly-held subsidiaries and joint ventures (other than certain excluded entities) (the "Purchased Assets"), will be sold and transferred to the Purchaser, and that certain liabilities of the Sellers (the "Assumed Liabilities") will be assumed by the Purchaser. Any assets excluded from the sale will be administered in the chapter 11 cases, and sufficient cash is to be made available to GM to fund the wind-down or other disposition of the Sellers' assets.

17.     Pursuant to a Transition Services Agreement to be entered into at or prior to the Closing, from and after the Closing, the Purchaser or one or more of its subsidiaries will provide the Sellers and their respective subsidiaries with certain

---

[2] The proposed MPA, substantially in the form annexed hereto as Exhibit "A," is without schedules and exhibits.  The Debtors will file with the Bankruptcy Court a copy of the MPA with all schedules and exhibits thereto (excluding certain commercially sensitive information) and make the same available for review, free of charge, on the website of the Debtors' proposed claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com.  Copies of the MPA with all schedules and exhibits thereto (excluding certain commercially sensitive information) may also be obtained from the Debtors' proposed claims and noticing agent, The Garden City Group, Inc., by contacting them by (i) regular mail at 105 Maxess Road, Melville, New York 11747, or (ii) telephone for U.S. and international callers at 703-286-6401.

transition services and support functions, as reasonably required by the Sellers to (i) wind down and liquidate under the Bankruptcy Code and (ii) operate in chapter 11 prior to liquidation.

18. The purchase price for the Purchased Assets is equal to the sum of

- a section 363(k)[3] credit bid in an amount equal to (i) the amount of Indebtedness of Parent and its Subsidiaries owed to the Purchaser as of the Closing pursuant to the UST Credit Facilities and the DIP Facility, *less* (ii) approximately $7.7 billion of indebtedness under the DIP Facility;

- the UST Warrant;

- the issuance by the Purchaser to GM of 10% of the Common Stock of the Purchaser as of the Closing);

- Warrants to purchase up to 15% of the shares of common stock of the Purchaser, with the initial exercise prices for equal amounts of the warrants based on $15 billion and $30 billion equity values of the Purchaser. The warrants will be exercisable through the seventh and tenth anniversaries of issuance, respectively, and GM can elect partial and cashless exercises; and

- the assumption by the Purchaser of the Assumed Liabilities.

In addition, in the event the Bankruptcy Court determines that the estimated amount of allowed prepetition general unsecured claims against the Debtors exceeds $35 billion, then the Purchaser will issue an additional 2% of the outstanding common stock of the Purchaser as of the Closing.

---

[3] Section 363(k) of the Bankruptcy Code provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).

19.     The MPA requires the Sellers to use their reasonable efforts to enter into Participation Agreements that would modify the Sellers' Continuing Brand Dealer Agreements with certain dealers associated with Continuing Brands.  Each Continuing Brand Dealer Agreement, as modified by the Participation Agreement, would constitute an Assumable Executory Contract under the MPA.  All dealers associated with Continuing Brands who are not offered the opportunity, or who are extended an opportunity but decline, to enter into a Participation Agreement, will be given the opportunity to enter into short-term deferred voluntary termination agreements (the "Deferred Termination Agreements").

20.     The MPA requires the Sellers to use their reasonable best efforts to enter into Deferred Termination Agreements with (i) all dealers associated with Continuing Brands who were not offered the opportunity (or who were extended the opportunity and declined) to enter into a Participation Agreement and (ii) all dealers associated with Discontinued Brands.  Each Deferred Termination Agreement will be an Assumable Executory Contract under the MPA.  In the absence of a Deferred Termination Agreement with the applicable counterparty, the dealer agreements will constitute Rejectable Executory Contracts under the MPA.

21.     After the Closing, the Purchaser would have responsibility for the administration, management, and payment of all liabilities arising under express written emission and limited warranties delivered in connection with the sale of new vehicles or parts manufactured or sold by the Sellers at or prior to the Closing or the Purchaser after the Closing.

22.     Substantially all the executory contracts associated with direct suppliers are likely to be assumed by the Sellers and assigned to the Purchaser at or following the Closing.

23.     Any payments that are made to the Debtors' creditors in connection with the 363 Transaction (other than payments of Cure Amounts in connection with the assumption and assignment of Assumable Executory Contracts) will be voluntarily made by New GM.

24.     Effective as of the Closing Date, the Purchaser will make an offer of employment to all of the Sellers' non-unionized employees and unionized employees represented by the UAW (including those on an approved leave of absence).

25.     The U.S. Treasury and EDC will provide a debtor in possession credit facility to the Sellers in order to fund operations pending the sale of the Purchased Assets.  Notably, EDC has agreed to participate in the DIP financing to assure the long-term viability of GM's North American enterprise.  The Debtors have filed a separate motion seeking approval of the DIP financing.

26.     Finally, as part of the 363 Transaction, the Purchaser and the UAW have reached a resolution addressing the ongoing provision of certain employee and retiree benefits.  Under the UAW Retiree Settlement Agreement, the Purchaser has agreed to provide, among other things:  (i) shares of common stock of the Purchaser representing 17.5% of the Purchaser's total outstanding common stock, (ii) a note of the Purchaser in the principal amount of $2.5 billion, (iii) shares of cumulative perpetual preferred stock of the Purchaser in the amount of $6.5 billion, (iv) warrants to acquire 2.5% of the Purchaser's equity, and (v) the assets held in a voluntary employees'

beneficiary association trust sponsored by the Sellers and to be transferred to the Purchaser as part of the 363 Transaction, in each case to a new voluntary employees' beneficiary association sponsored by an employees beneficiary association (the "<u>New VEBA</u>"), which will have the obligation to fund certain retiree benefits for the Debtors' retirees and surviving spouses represented by the UAW (the "<u>UAW-Represented Retirees</u>").

27.     In connection with the foregoing, the UAW has agreed to be the authorized representative for UAW-Represented Retirees for purposes of section 1114 of the Bankruptcy Code and will enter into the UAW Retiree Settlement Agreement effective upon the Closing of the 363 Transaction.  The class representatives, on behalf of the class members, by and through class counsel in certain class actions previously filed against GM on behalf of UAW-Represented Retirees regarding health care benefits (the "<u>Class Representatives</u>") have acknowledged and confirmed the UAW Retiree Settlement Agreement.  As part of the  363 Transaction, the Purchaser also will assume modified and duly ratified collective bargaining agreements entered into by and between the Debtors and the UAW (the "<u>UAW CBA Assignment</u>").

28.     In addition, GM, the UAW, and the Class Representatives have entered into an agreement, dated May 29, 2009 (the "<u>UAW Claims Agreement</u>"), pursuant to which the UAW and the Class Representatives have agreed, subject to the consummation of the 363 Transaction and the UAW Retiree Settlement Agreement becoming effective following approval by the Court, to take further actions to release claims against GM and its subsidiaries, and their employees, officers, directors, and agents, relating to retiree medical benefits pursuant to the Settlement Agreement, dated

February 21, 2008, between the Company and the UAW, the Memorandum of

Understanding Post-Retirement Medical Care, dated September 26, 2007, between the

Company and the UAW ("MOU"), and the Agreement between the UAW and General

Motors Corporation, dated September 26, 2007 (effective October 15, 2007); *provided*

that such claims may be reinstated if the rights or benefits of the UAW-Represented

Retirees under the UAW Retiree Settlement Agreement are adversely impacted by reason

of any reversal or modification of the Court's approval of the 363 Transaction or the

UAW Retiree Settlement Agreement.  Accordingly, the Debtors seek approval of the

UAW Retiree Settlement Agreement and the assumption by GM of the UAW Claims

Agreement, in each case as an agreement with the UAW, as the authorized representative

of the UAW-Represented Retirees.

29.     The Debtors have proposed the UAW Special Retiree Notice (as

defined below) for individual retirees covered by the UAW Retiree Settlement

Agreement and, with respect to such retirees, seek approval of the UAW Retiree

Settlement Agreement to afford them an opportunity to be heard.

**The 363 Transaction Is the Only Option**

30.     There is no viable alternative to the 363 Transaction.  In light of

the substantial secured indebtedness of the Company totaling approximately $27 billion,

the only entity that has the wherewithal and is qualified to acquire the Purchased Assets

to assure the continued operation of the business is the U.S. Treasury-sponsored

Purchaser.

31.     Since the onset of the economic collapse that has engulfed the

world economy, General Motors has struggled to overcome the deteriorating worldwide

economic conditions and the credit crunch that has negatively affected the Company. As described in the Henderson Affidavit, the Company has expended significant time and effort exploring numerous operational, financing, and other transactional options regarding how to best transform its obligations and, if necessary, its operations to create a more efficient, productive, and viable business that would be competitive in the industry.

32. The financial and operational distress confronting the Company has been well publicized. It has been, and continues to be, the subject of substantial media attention. The decline in the value of GM's shares of common stock from $93.62 per share as of April 28, 2000 to $1.09 per share as of May 15, 2009, and the dramatic decrease in market capitalization of approximately $59.5 billion, is illustrative of the public market's appreciation of GM's distress. The basic elements of the 363 Transaction likewise have been widely reported. Notwithstanding, there have been no credible proposals to purchase or invest in any of the Company's assets or to purchase the Company's total business.

33. The 363 Transaction is the only realistic alternative for the Company to avoid liquidation of its assets that would severely undermine the automotive industry. The 363 Transaction preserves the value of the Purchased Assets and the benefits that result from the ongoing business operations. The Purchaser is the only entity capable of purchasing the Purchased Assets and closing the 363 Transaction.

## Time Is of the Essence

34. The Debtors, their employees and creditors, and others that rely upon the Company's continuing business will suffer immediate and irreparable harm if the 363 Transaction is not approved on an expedited basis. The immediate

consummation of the 363 Transaction is necessary and appropriate to maximize the value of the Debtors' assets, particularly given the wasting nature of the Purchased Assets and an automotive business tainted with an unresolved bankruptcy case. The 363 Transaction must be approved and consummated speedily.

35.     Any delay in the transfer of the Debtors' business and assets will have a substantial negative impact on the Company's revenue and market share. Time is of the essence because the value of the Purchased Assets is fragile and subject to substantial deterioration as consumers move to other bankruptcy-free brands. Even a short delay in the consummation of the 363 Transaction would have a detrimental impact on the Company's dealer networks, its suppliers, and their respective employees, as well as the confidence of the Company's customers and its own employees. In particular, the failure of one or more of its suppliers would have a serious effect not only on the Debtors' business, but also upon competitors that rely on the same suppliers. Thus, the unique circumstances related to the Purchased Assets necessitate the expedited approval of the 363 Transaction to avoid the permanent damage that would ensue from any delay.

36.     <u>Consumer Confidence</u>. The success of the Company's business is dependent on the sale of cars and trucks. To survive as a viable business, and to achieve success in selling cars and trucks, consumers must have confidence in the manufacturer of the car or truck so that they can have confidence that they will receive value, reliability, warranty protection, and future servicing through an integrated dealer system.

37.     The purchase or lease of a new car or truck represents the second largest expenditure of the typical American household. Not surprisingly, then, information compiled by, or at the direction of, the Company confirms that the mere

threat of a bankruptcy filing has depressed GM's sales and that, in an extended period of a bankruptcy case, the sales reductions and customer defections can be expected to be even more significant. Indeed, in the days following the announcement of the U.S. Treasury Loan Agreement, GM immediately began to suffer a sharp reduction in market share, while at the same time there was a corresponding increase in sales of vehicles manufactured by some of the Company's competitors, notwithstanding the absence of favorable financial reports applicable to those competitors.

38. Consumers have little confidence in purchasing a vehicle from a bankrupt original equipment manufacture ("OEM"). It is self-evident, then, that the longer it takes for New GM to begin operations, the more likely it will be that consumers will decline to purchase a car or truck from that entity. That, in turn, will make the Company's assets even less valuable in a sale – and may even eliminate a going concern sale as a viable alternative. The only recourse would then be a forced liquidation, which would be disastrous for all the Debtors' economic stakeholders.

39. Restoring consumer confidence in the Company's products and stability is a prerequisite to a successful future for New GM. The U.S. Treasury's willingness to sponsor the purchase of the Purchased Assets to retain a major domestic industry is expressly conditioned on the recognition that crucial time is passing and that any delay in the consummation of the 363 Transaction, and the attendant creation of New GM, will prolong consumer resistance to the Company's products. Such delay may be fatal not only to the Company, but also to countless parts suppliers, with consequent implications for the entire U.S. automotive industry. The 363 Transaction represents a window of opportunity to sell the Purchased Assets and thereby maximize value.

Elimination of any uncertainty as to future viability of New GM is the *sine qua non* of implementing the U.S. Government's objective to sustain a basic domestic automotive industry.

40. <u>Suppliers and Dealers</u>. An expeditious approval of the 363 Transaction is also necessary in order to address the tenuous financial condition of the numerous independent businesses that make up the Company's supply chain. The deepening crisis in the national economy and the automobile industry has not only affected General Motors, but also thousands of suppliers and vendors that supply products and material to General Motors. In light of the credit crisis and the precipitous decline in automobile sales, many suppliers are unable to access credit and are facing growing uncertainty about the prospects for their businesses. Thus, immediately following the commencement of chapter 11 cases by Chrysler LLC, six major suppliers were placed on watch by Standard & Poor's. *See* Liam Denning, Surveying Chrysler as Wheels Fall Off, Wall St. J. (May 1, 2009).

41. Consistent with industry practice, General Motors operates on a "just-in-time" inventory delivery system. Components and parts from suppliers typically are assembled onto vehicles within a few hours of the delivery of the parts to GM assembly facilities. To achieve the economies of scale required to compete in the automotive industry, General Motors, as well as its competitors in the industry, generally use a single supplier for specific parts for each vehicle line. As the Company frequently purchases all of its requirements for a particular part from one supplier, a sole-source supplier's ability to survive and make scheduled shipments is of material importance to each of General Motors' vehicle production lines.

42.     Many of these suppliers are entirely dependent, and countless

others are substantially dependent, on the Company for their survival, and many of them

already are in severe financial distress.  As recently observed in the Report to

Congressional Committees prepared by the United States Government Accountability

Office:

> More than 500,000 workers are employed by companies in the United States that manufacture parts and components used by automakers – both domestic automakers and transplants.   According to the Motor and Equipment Manufacturers Association, many suppliers are in severe financial distress, with a number having filed for bankruptcy in 2008.  Some members of our panel said that because many of these suppliers have relatively high costs and depend on the business of the Detroit 3, some of them may not have enough revenue to survive if one of the automakers were to cease production.  This, in turn, could affect the automakers' ability to obtain parts needed to manufacture vehicles.  *This dynamic has the potential to affect all automakers with production facilities in the United States, regardless of home country.*

U.S. Govt. Accountability Office, Report to Congressional Comm.:  Auto Industry:

Summary of Government Efforts and Automakers' Restructuring to Date at 6 (Apr. 2009)

[hereinafter *GAO Report*].

43.     The domestic automobile industry is interdependent, with an

estimated 80% overlap in supplier networks.  *See* Ford Motor Company Business Plan

Submitted to the Senate Banking Committee at 2 (Dec. 2, 2008) ("Our industry is an

interdependent one.  We have 80 percent overlap in supplier networks.").  Therefore, the

collapse of GM would affect the other OEMs because it could impact the ability of

shared suppliers to continue operations.  *See generally GAO Report* at 33 ("according to

the automakers and some panelists, the collapse of one or more of the domestic

automakers would affect the remaining automakers because, among other things, such a collapse could impact the ability of shared suppliers to continue operations").

44.     Manifestly, any delay in the approval of the 363 Transaction would have a disastrous impact on the supply chain, as well as the employees of such suppliers, dealers, and their employees, and the other OEMs that obtain parts and other components from such suppliers.  The domino effect is patent:  the financial condition of suppliers would further deteriorate; more suppliers would need to cease operations and/or commence bankruptcy cases; the employees of such suppliers would lose their jobs; dealers would no longer have a continuous supply of service parts to maintain and repair vehicles; the employees of the dealers would lose their jobs; and other OEMs with production facilities in the United States would suffer as they would no longer to be able to obtain the necessary parts and components to maintain their manufacturing lines.

45.     An expedited approval of the 363 Transaction, however, will avoid the occurrence of such potential systemic failure.  Under the 363 Transaction, most supplier agreements will be assumed and assigned to the Purchaser, who will cure any existing defaults.  In addition, the 363 Transaction will enable New GM, as an economically viable enterprise, to assist the ability of suppliers to remain in business with the attendant benefits to their employees and other parties in interest.

### Extraordinary Provisions Under the Guidelines

46.     The MPA contains the following provisions which may be considered "Extraordinary Provisions" under the Guidelines for the Conduct of Asset Sales established by the Bankruptcy Court on September 5, 2006 pursuant to General Order M-331):

- <u>Deadlines that Effectively Limit Notice</u>.  The timeline proposed for the Sale Procedures Hearing and the Sale Hearing (each as hereinafter defined) may limit the notice period that may otherwise be afforded parties in interest under the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules for the Southern District of New York.  Nevertheless, given the exigent circumstances described herein and in the Henderson Affidavit, as well as the fact that it has been widely known that the Company's assets and businesses have been available for sale and that the Debtors' precarious financial and operational condition have been widely reported in the media on a daily basis for the past few months, due process is not hindered as a result of the proposed shortening of the applicable notice periods.

- <u>No Good Faith Deposit</u>.  The Purchaser has not furnished the Sellers with a good faith deposit in connection with the MPA.  Inasmuch as the Purchaser is sponsored by the U.S. Treasury, which is also the Debtors' largest secured creditor and the lender under the DIP financing, and given the extensive prepetition negotiations and the substantial investment of time and resources by the U.S. Treasury, there is no need for a good faith deposit.

- <u>Record Retention</u>.  Pursuant to the MPA, all books, records, documents and other materials used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, except for those relating exclusively to the Excluded Assets or Retained Liabilities, constitute Purchased Assets that are required to be delivered to the Purchaser at or prior to the Closing.  However, the Parties are required to preserve all books and records that they own immediately after the Closing relating to the Purchased Assets, the Assumed Liabilities, and the Sellers' operation of the business relating thereto prior to the Closing for a period of six (6) years following the Closing Date or for such a longer period as may be required by applicable Law, unless disposed of in good faith pursuant to a document retention policy.  During such period, the Sellers will have reasonable access to examine and copy such books and records (subject to certain exceptions relating to attorney-client privilege), thereby enabling them to administer these chapter 11 cases in an orderly and efficient manner

- <u>Sale of Avoidance Actions</u>.  The MPA contemplates the sale to the Purchaser of potential avoidance Claims relating to or in connection with any payments by or to, or other transfers or assignments by or to, any Purchased Subsidiary.

- <u>Requested Findings as to Successor Liability</u>.  The MPA and the Sale Order contemplate entry of certain findings by the Court as to successor liability.  The MPA contemplates the transfer of the Purchased Assets free and clear of all liens, claims, encumbrances, and interests.  As such, the findings set forth in the Sale Order comply with applicable principles of sales free and clear of liens, claims, encumbrances, and interests pursuant to section 363(f) of the Bankruptcy Code.  The notice to be provided via the Publication Notice is reasonably calculated to provide all parties in interest (including parties with contingent claims) with the

necessary information concerning the 363 Transaction, the Sale Hearing, and the Sale Order, including the requested finding as to successor liability, because providing notice to these parties by mail is not practicable.

- Relief from Bankruptcy Rule 6004(h). For the reasons set forth herein, the Debtors request relief from the ten-day stay imposed by Bankruptcy Rule 6004(h). Given the likelihood that the Debtors' assets will rapidly diminish in value if the 363 Transaction is not immediately approved and promptly consummated, legitimate reasons exist to warrant this Court's approval of an order waiving the requirements of Bankruptcy Rule 6004(h).

## Jurisdiction

47. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

48. The Debtors request entry of (i) the Sale Procedures Order, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004, authorizing and approving certain proposed procedures to govern the submission of competing bids for substantially all of the Sellers' assets and the form and manner of notices of (a) the date, time, and place of the hearing to consider the sale, (b) the assumption and assignment of executory contracts and Leases, and (c) the UAW Retiree Settlement Agreement; and (ii) the Sale Order, a copy of which is annexed hereto as Exhibit "B," pursuant to sections 105, 363(b), (f), (k), and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006, authorizing and approving, among other things, the (i) sale of the Purchased Assets pursuant to the MPA free and clear of liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, (ii) assumption and assignment of certain

executory contracts and Leases, including the UAW CBA Assignment, and (iii) the UAW Retiree Settlement Agreement.

## Proposed Sale Procedures and Notice

49.     The sale of the Purchased Assets pursuant to the MPA is subject to higher or better offers.  The MPA provides certain terms and procedures (collectively, the "<u>Sale Procedures</u>") to govern the submission of any competing offers based upon the MPA.  The Sale Procedures are set forth in the MPA and in the proposed Sale Procedures Order, a copy of which is annexed hereto as Exhibit "C," and provide for the following:

- The hearing to consider the sale of the Purchased Assets (the "<u>Sale Hearing</u>") will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in Courtroom __ of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, on June 30, 2009, at __:__ _.m. (Eastern Time), or as soon thereafter as counsel may be heard;

- In order to participate in the sale process, a person interested in acquiring the Purchased Assets (a "<u>Potential Bidder</u>") must first deliver to the Debtors by the Bid Deadline (as hereinafter defined) (with a copy to the Purchaser):  (i) an executed confidentiality agreement that is reasonably satisfactory to the Debtors; and (ii) the most current audited and latest unaudited financial statements (collectively, the "<u>Financials</u>") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of purchasing the Purchased Assets, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure acceptable to the Debtors, and (y) the written commitment acceptable to the Debtors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with purchasing the Purchased Assets;

- A "<u>Qualified Bidder</u>" is a Potential Bidder whose Financials (or the Financials of its equity holder(s), if applicable) demonstrate the financial capability to consummate the sale of the Purchased Assets and who the Debtors, in their discretion but after consulting with the UAW and any statutory committee of unsecured creditors appointed in these chapter 11 cases (the "<u>Creditors Committee</u>"), determine will be likely to consummate the sale of the Purchased Assets, if selected as the successful bidder, after taking into account all relevant legal, regulatory, and business considerations.  Within two (2) days after the Debtors and the Purchaser timely receive from a Potential Bidder all the materials required in the preceding paragraph, the Debtors will determine, in consultation

with their advisors, the UAW, and the Creditors Committee, and will notify the Purchaser and the Potential Bidder in writing whether the Potential Bidder is a Qualified Bidder. The Purchaser is a Qualified Bidder and is not required to make a good faith deposit;

- If the Debtors, in their business judgment, determine that a Qualified Bidder that has submitted a written nonbinding expression of interest regarding the 363 Transaction is reasonably likely to make a bona fide offer that would result in greater value being received for the benefit of the Sellers' creditors than under the MPA, then the Debtors shall afford such Qualified Bidder reasonable due diligence, including the ability to access information from a confidential electronic data room concerning the Purchased Assets (the "Data Room");

- The deadline for submitting bids by a Qualified Bidder will be June 22, 2009, at 5:00 p.m. (Eastern Time) (the "Bid Deadline");

- Prior to the Bid Deadline, a Qualified Bidder that desires to make a bid will deliver (i) one written copy of its bid, and (ii) two copies of the MPA that has been marked to show amendments and modifications to the MPA, including price and terms, that are being proposed by the Qualified Bidder (a "Marked Agreement"), to: (a) the Debtors, (b) the attorneys for the Debtors, (c) the Purchaser, (d) the attorneys for the Purchaser, (e) EDC, (f) the UAW, (g) the attorneys for the UAW, and (h) the attorneys for the Creditors Committee;

- The Debtors and their advisors shall be entitled to due diligence from a Qualified Bidder, upon execution of a confidentiality agreement that is reasonably satisfactory to the Debtors. Each Qualified Bidder will comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors. Failure by a Qualified Bidder to fully comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by the Qualified Bidder is not a Qualified Bid;

- A bid must be a written irrevocable offer from a Qualified Bidder (i) stating that the Qualified Bidder offers to consummate the sale of the Purchased Assets pursuant to the Marked Agreement; (ii) confirming that the offer will remain open until the closing of the sale of the Purchased Assets to the Successful Bidder (as defined below); (iii) enclosing a copy of the proposed Marked Agreement; (iv) accompanied with a certified or bank check, or wire transfer, in the amount of $500 million to be held in escrow as a good faith deposit (a "Good Faith Deposit");

- A bid must provide that the Qualified Bidder (i) agrees to the assumption by the Debtors and assignment to such Qualified Bidder of any collective bargaining agreements entered into by and between the Debtors and the UAW with the exception of (a) the agreement to provide certain retiree medical benefits

specified in the Memorandum of Understanding Post-Retirement Medical Care, dated September 26, 2007, between the Company and the UAW, and (b) the Settlement Agreement, dated February 21, 2008, between the Company and the UAW; and (ii) will enter into the UAW Retiree Settlement Agreement;

- In addition to the foregoing requirements, a bid or bids must: (a) be on terms that are not materially more burdensome or conditional than the terms of the MPA; (b) not be conditioned on obtaining financing or the outcome of unperformed due diligence by the bidder; (c) not request or entitle the bidder to any breakup fee, expense reimbursement, or similar type of payment; and (d) fully disclose the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid and the complete terms of any such participation.

- A bid received from a Qualified Bidder and that meets the requirements set forth in the preceding two paragraphs will be considered a "Qualified Bid" if the Debtors, the UAW, and the Creditors Committee reasonably believe that such bid would be consummated if selected as the Successful Bid. For all purposes hereof, the Purchaser's offer to acquire the Purchased Assets pursuant to the MPA shall constitute a Qualified Bid.

- If the Sellers receive any Qualified Bids, the Sellers shall have the right to select, and seek final approval of the Bankruptcy Court for, the highest or otherwise best Qualified Bid(s) from the Qualified Bidders, which will be determined by considering, among other things, the (i) identity of the Qualified Bidder, (ii) number, type, and nature of any changes to the MPA requested by the Qualified Bidder, (iii) extent to which the identity of the Bidder or such modifications are likely to delay closing of the sale of the Purchased Assets and Assumed Liabilities to the Qualified Bidder and the cost to the Sellers of such modifications or delay, (iv) extent to which the Qualified Bid covers less than or more than all the Purchased Assets and Assumed Liabilities, and (v) financial strength of the Qualified Bidder and the availability of committed financing for the Qualified Bidder that would enable the Qualified Bidder to purchase the Purchased Assets and assume the Assumed Liabilities. All other considerations being equal, the Sellers shall strongly favor Qualified Bids for all the Purchased Assets. The Qualified Bidder making the highest or best Qualified Bid (the "Successful Bid") will be designated as the "Successful Bidder"; the next highest or otherwise best offer after the Successful Bid will be designated the "Next Highest Bid."

- If, however, no Qualified Bid (other than the Purchaser's) is received by the Bid Deadline, the MPA shall be the highest or best Qualified Bid, i.e., the Successful Bid, and the Purchaser shall be the Successful Bidder, and, at the Sale Hearing, the Debtors will seek approval of and authority to consummate the 363 Transaction contemplated by the MPA.

- The Debtors shall notify the Bankruptcy Court of the Successful Bid at the Sale Hearing, at which certain findings will be sought from the Bankruptcy Court, including that consummation of the 363 Transaction contemplated by the Successful Bid will provide the highest or otherwise best value for the Purchased Assets and is in the best interests of the Sellers and the Debtors' estates. In the event that, for any reason, the Successful Bidder fails to close the 363 Transaction contemplated by its Successful Bid, then, without notice to any other party or further Court order, the Debtors shall be authorized to close with the Qualified Bidder that submitted the Next Highest Bid.

- Except as otherwise provided in this paragraph with respect to the Successful Bidder and the Next Highest Bidder, the Good Faith Deposits of all Qualified Bidders required to submit such a deposit under the Sale Procedures shall be returned upon or within one (1) business day after entry of the Sale Order. The Good Faith Deposit of the Successful Bidder shall be held until the closing of the 363 Transaction and applied in accordance with the Successful Bid. The Good Faith Deposit of the Next Highest Bidder shall be retained in escrow until 48 hours after the closing of the 363 Transaction. Pending the closing of the 363 Transaction, the Good Faith Deposit of the Successful Bidder and the Next Highest Bidder shall be maintained in an interest-bearing escrow account. If the closing does not occur, the disposition of the Good Faith Deposits shall be as provided in the Successful Bid and Next Highest Bid, as applicable.

- The Sellers are required to reimburse the Purchaser for the Purchaser's reasonable out-of-pocket costs and expenses in connection with the 363 Transaction in the event that the MPA is terminated because the Court approves an Alternative Transaction, among other reasons.

50.     Under Bankruptcy Rule 2002(a) and (c) and Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York, the Debtors are required to notify their creditors of the proposed sale of the Purchased Assets, including the terms and conditions of the Sale Procedures and the time set for filing objections. The Debtors request notice of this Motion and of the relief requested be deemed adequate and sufficient if:

- The Debtors (or their agent) serve, within three (3) days after entry of the Sale Procedures Order (the "<u>Mailing Deadline</u>"), by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, a copy of the Sale Procedures Order upon: (i) the attorneys for the U.S. Treasury, (ii) the attorneys for Export Development Canada, (iii) the attorneys for the agent under the Debtors' prepetition secured term loan agreement, (iv) the attorneys for the agent

under the Debtors' prepetition amended and restated secured revolving credit agreement, (v) the attorneys for the Creditors Committee (if no statutory committee of unsecured creditors has been appointed, the holders of the fifty largest unsecured claims against the Debtors on a consolidated basis), (vi) the attorneys for the UAW, (vii) the attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America, (viii) the United States Department of Labor, (ix) the attorneys for the National Automobile Dealers Association, (x) the attorneys for the ad hoc bondholders committee, (xi) any party who, in the past three years, expressed in writing to the Debtors an interest in the Purchased Assets and who the Debtors and their representatives reasonably and in good faith determine potentially have the financial wherewithal to effectuate the transaction contemplated in the MPA, (xii) non-Debtor parties to the Assumable Executory Contracts, (xiii) all parties who are known to have asserted any lien, claim, encumbrance, or interest in or on the Purchased Assets, (xiv) the Securities and Exchange Commission, (xv) the Internal Revenue Service, (xvi) all applicable state attorneys general, local environmental enforcement agencies, and local regulatory authorities, (xvii) all applicable state and local taxing authorities, (xviii) the Federal Trade Commission, (ix) all applicable state attorneys general, (xx) United States Attorney General/Antitrust Division of the Department of Justice, (xxi) the U.S. Environmental Protection Agency and similar state agencies, (xxii) the United States Attorney's Office, (xxiii) all dealers with current agreements for the sale or leasing of GM brand vehicles, (xxiv) the Office of the United States Trustee for the Southern District of New York, and (xxv) all entities that requested notice in these chapter 11 cases under Bankruptcy Rule 2002; and

- On or before the Mailing Deadline, the Debtors (or their agent) serve by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, a notice of the Sale Hearing (the "Sale Notice"), substantially in the form annexed hereto as Exhibit "D," upon (i) all other known creditors and (ii) all equity security holders of the Debtors of record as of May 27, 2009.

- On or before the Mailing Deadline, the Debtors (or their agent) serve by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, a notice of the assumption and assignment of the Assumable Executory Contracts and the proposed cure amounts relating to the Assumable Executory Contracts (the "Assumption and Assignment Notice"), substantially in the form annexed hereto as Exhibit "E," upon the non-Debtor parties to the Assumable Executory Contracts.

- On or before the Mailing Deadline, the Debtors (or their agent) serve by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, a notice of the 363 Transaction and the UAW Retiree Settlement, as well as a cover letter from the UAW describing the UAW Retiree Settlement Agreement and communicating the UAW's support of the 363 Transaction, including the UAW

Retiree Settlement Agreement (collectively, the "UAW Retiree Notice"), substantially in the form annexed hereto as Exhibit "F," upon (i) the UAW, (ii) the attorneys for the UAW, and (iii) all of the UAW-Represented Retirees.  On the Mailing Deadline or as soon as practicable thereafter, the Debtors will cause the MPA, the Motion, the Sale Procedures Order, the UAW Retiree Notice, and the UAW Retiree Settlement Agreement, including all exhibits thereto (other than those containing commercially sensitive information), to be published on the website of the Debtors' proposed claims and noticing agent, The Garden City Group, Inc., at http:/www.gmcourtdocs.com, in an area dedicated to retiree-related information (this website disclosure and the UAW Retiree Notice, collectively the  "UAW Special Retiree Notice").

51.     The Debtors also propose, pursuant to Bankruptcy Rule 2003(d) and 2002(*l*), that publication of the Sale Notice (the "Publication Notice"), substantially in the form annexed hereto as Exhibit "G," on the Mailing Deadline or as soon as practicable thereafter (i) once in (a) the global edition of *The Wall Street Journal*, (b) the national edition of *The New York Times*, (c) the global edition of *The Financial Times*, (d) the national edition of *USA Today*, (e) *Detroit Free Press/Detroit News*, (f) *Le Journal de Montreal*, (g) *Montreal Gazette*, (h) *The Globe and Mail*, and (i) *The National Post*, and (ii) on the website of the Debtors' proposed claims and noticing agent, The Garden City Group, Inc., at http://www.gmcourtdocs.com, be deemed proper notice to any other interested parties whose identities are unknown to the Debtors.

### The Sale Procedures Should Be Approved

52.     Good and sufficient cause exists to approve the Sale Procedures. The Sale Procedures are in the best interests of the Debtors and their economic stakeholders and other parties because they will enable the Company to realize the maximum value from the sale of the Purchased Assets.  Additionally, the Sale Procedures include appropriate noticing procedures to ensure all parties in interest will receive adequate notice of all relevant information.

53.     <u>Expeditious Nature of Sale Procedures</u>.  The expeditious nature of the proposed Sale Procedures is reasonable and justified.  As set forth above and in the Henderson Affidavit, GM's precarious financial and operational condition has been widely reported in all media on a daily basis for many months.  Nevertheless, no significant offers for any of the Company's assets have been received other than that of the 363 Transaction.  The Sale Procedures will provide an additional procedural safeguard and market check that will enable any potentially qualified interested parties with an opportunity to come forward and make a competitive bid.

54.     <u>Notice</u>.  The Debtors submit that the notice set forth in the Sale Procedures constitutes good and sufficient notice of the Sale Procedures, the Sale Hearing, the 363 Transaction, the UAW CBA Assignment, and the UAW Retiree Settlement Agreement, and that no other or further notice need be given.

55.     The notice to be provided via the Publication Notice is reasonably calculated to provide all parties in interest (including parties with contingent claims) with the necessary information concerning the Sale Procedures (the "<u>Sale Procedures Hearing</u>"), the Sale Hearing, and the 363 Transaction.  Providing notice to these parties by mail is not practicable.  Accordingly, the proposed Publication Notice is appropriate and sufficient under the circumstances.

56.     The UAW Special Retiree Notice is reasonably calculated to provide UAW-Represented Retirees with proper notice of the Sale Procedures, the Sale Hearing, and the 363 Transaction, including, but not limited to, the sale of the Purchased Assets free and clear of any lien, claim, encumbrance, or other interest the UAW or

UAW-Represented Retirees may have in the Purchased Assets, and of the UAW Retiree Settlement Agreement.

57.     The Publication Notice, the Sale Notice, the Assumption and Assignment Notice, and the UAW Retiree Notice, and the UAW Special Retiree Notice, and the method of service described herein and provided in the Sale Procedures Order, fully comply with Bankruptcy Rule 2002 and constitute good and sufficient notice of the Sale Procedures, the Bid Deadline, the 363 Transaction, the assumption and assignment of executory contracts and Leases, the UAW Retiree Settlement Agreement, the relevant objection deadlines, the Sale Hearing, and all matters related thereto. Accordingly, the Company requests that the Court approve the form and manner of such notices substantially in the form of Exhibits "C" through "G," annexed hereto.

## Sale of the Purchased Assets

58.     In accordance with Bankruptcy Rule 6004(f)(1), sales of property rights outside the ordinary course of business may be by private sale or public auction. The Debtors have determined that a private sale of the Purchased Assets in accordance with the proposed Sale Procedures will enable them to obtain the highest or best offer for the Purchased Assets, thereby maximizing the value of their estates, and is in the best interests of the Debtors and their creditors and other stakeholders.

59.     Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To obtain court approval to sell property under section 363(b), the Debtors must show a legitimate business justification for the proposed action. *See Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983). As this Court has

stated, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

60.     As discussed more fully in the Debtors' Memorandum of Law in Support of the Motion (the "Memorandum of Law"), if a valid business justification exists, the applicable principle of law embeds the debtor's decision to sell property out of the ordinary course of business with a strong presumption that "'in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). A section 363 sale should be approved if the Court is satisfied that the debtor has exercised sound business judgment; provided adequate notice; the purchaser has proceeded in good faith; and the purchase price is fair. The 363 Transaction satisfies each condition. *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

61.     It is well established that a chapter 11 debtor may sell all or substantially all its assets pursuant to section 363(b) prior to confirmation of a chapter 11 plan, provided the court finds an articulated business reason for the proposed sale, such as exists in the cases at bar. *See Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.)*, 980 F.2d 165, 169 (2d Cir. 1992) (in

considering sale outside plan of reorganization, "'a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the [Bankruptcy] Code'") (quoting *Lionel* at 1069); *see also Licensing By Paolo, Inc. v. Sinatra* (*In re Gucci*), 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate . . . may be conducted if a good business reason exists to support it."); *Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp.* (*In re Chateaugay Corp.*), 973 F.2d 141, 144 (2d Cir. 1992) (approval of subsidiary's sale of its assets before confirmation of plan was not abuse of discretion).

62.    The 363 Transaction is the best and only way for the Company's assets to retain going concern value, provide employment opportunities, and create a viable domestic OEM in the interests of all stakeholders.  New GM, which will emerge from the 363 Transaction, will have the ability to successfully compete with other OEMs both in this nation and abroad.

63.    As the Company's largest secured creditor, the U.S. Treasury, and recently together with EDC, engaged in arm's-length negotiations with the Debtors in the formulation of the 363 Transaction and its financing.  As a secured creditor and a financer, the U.S. Treasury together with EDC have set out a series of actions and conditions that the Company had to undertake before they would provide further financing.  As set forth in the Henderson Affidavit, the Company explored various options in its attempt to achieve long-term viability.  The Company determined that it is in the best interests of all economic stakeholders to pursue the 363 Transaction  as the only viable means to accomplish the survival of an operating, economically sound

business.  The U.S. Treasury and EDC, as the source of necessary and required financing, and the U.S. Treasury as the largest secured creditor, have concurred in the Company's business judgment.

64.     No financing is available for any other transaction, inside or outside of bankruptcy.  No party other than the U.S. Treasury and EDC is willing to provide the necessary debtor in possession financing.  GM's financial situation is dire.  Its survival during the past five months has been completely dependent on the financing it received from the U.S. Treasury.  Without that support, the Company would not have had the money to continue operations.  Without continued government support, the Company will be constrained to liquidate its assets at forced sales.  In that context, it is critical to note that the proposed DIP financing is only available *if* there is an expedited 363 Transaction.

65.     The creation of New GM will result in a formidable, essentially new, efficient, competitive domestic manufacturer in the automotive industry.  The transition services structure is designed to ensure a seamless continuity of operations for the benefit of employees, customers, suppliers, and employees of suppliers.  Thus, approval of the 363 Transaction pursuant to the Sale Procedures and the MPA is in the best interests of the Company, its economic stakeholders, and the national interest, as expressed by President Obama.

### The 363 Transaction Must Be Free and Clear of Liens, Claims, Encumbrances, and Interests, Including Rights or Claims Based on Successor or Transferee Liability

66.     It is appropriate that the Purchased Assets be sold free and clear of liens, claims, encumbrances, and interests, including rights or claims based on any successor or transferee liability, pursuant to sections 105(a) and 363(f) of the Bankruptcy

Code, except those liabilities assumed by Purchaser or a successful bidder, with any such

liens, claims, encumbrances, or interests to attach to the net sale proceeds of the

Purchased Assets. Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> > (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> >
> > (2) such entity consents;
> >
> > (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> >
> > (4) such interest is in bona fide dispute; or
> >
> > (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

67.     To facilitate the sale of the Purchased Assets and the resultant

viable New GM, it is necessary to authorize the sale of the Purchased Assets free and

clear of any and all liens, claims, encumbrances, or interests, including rights or claims

based on any successor or transferee liability (other than the liabilities assumed by

Purchaser or any other successful bidder), with any such liens, claims, encumbrances, or

interests to transfer to and attach to the net proceeds of the sale with the same rights and

priorities therein.

68.     The liens, claims, encumbrances, and interests held by creditors

whose claims do not constitute Assumed Liabilities may be satisfied by at least one of the

five conditions set forth in section 363(f), and any such liens, claims, encumbrances, and

interests will be adequately protected by transfer to and attachment to the net proceeds of the sale of the Purchased Assets, subject to any claims and defenses the Debtors may possess with respect thereto. Each of the parties holding liens on the Purchased Assets could be compelled to accept a monetary satisfaction of such interests, satisfying section 363(f)(5) of the Bankruptcy Code. In addition, certain holders of liens have consented, or may be deemed to have consented, to the sale of the Purchased Assets, thereby satisfying section 363(f)(2) of the Bankruptcy Code. Thus, the sale of the Purchased Assets free and clear of liens, claims, encumbrances, and interests, including rights or claims based on any successor or transferee liability, except for the liabilities assumed by the Purchaser or any other successful bidder, will satisfy the statutory prerequisites of sections 105(a) and 363(f) of the Bankruptcy Code. Accordingly, the Purchased Assets should be transferred to Purchaser free and clear of all liens, claims, encumbrances, and interests, except for Assumed Liabilities, with such liens, claims, encumbrances, and interests to be transferred to and attach to the net sale proceeds of the Purchased Assets.

### Assumption and Assignment of Certain
### Executory Contracts and Unexpired Leases

69. The MPA establishes procedures for assuming and assigning executory contracts or Leases to the Purchaser. Specifically, the Purchaser has the right to designate as an "Assumable Executory Contract," any Executory Contract or Lease that it may want to assume, subject to the following procedures and the continuing review process (the "Assumption and Assignment Procedures") set forth below.

Determination of Assumable Executory Contracts

- The Sellers shall maintain a schedule (the "Schedule") of Executory Contracts and Leases that the Purchaser has designated as Assumable Executory

Contracts.[4]  From the date of the MPA until thirty (30) days after the Closing Date (or a later date if mutually agreed upon by the Sellers and the Purchaser) (the "Executory Contract Designation Deadline"), the Purchaser may (i) designate any additional Executory Contracts or Leases as Assumable Executory Contracts and add such Assumable Executory Contracts to the Schedule or (ii) remove any Assumable Executory Contract from the Schedule, in which case the Executory Contract or Lease shall cease to be an Assumable Executory Contract.  The right of the Purchaser to add or remove Executory Contracts and Leases from the Schedule is subject to certain exceptions.[5]

- For each Assumable Executory Contract, the Purchaser must determine, prior to the Executory Contract Designation Deadline, the date on which it seeks to have the assumption and assignment become effective, which date may be the Closing Date or a later date (the "Proposed Assumption Effective Date").

- In addition to the Schedule, the Sellers shall maintain a secure website (the "Contract Website") that the non-Debtor counterparty to an Assumable Executory Contract can access to find current information about the status of its respective Executory Contract or Lease.  The Contract Website contains, for each Assumable Executory Contract, (i) an identification of each Assumable Executory Contract that the Purchaser has designated for assumption and assignment and the status of assumption and (ii) the Cure Amounts that must be paid to cure any prepetition defaults under such respective Assumable Executory Contract as of the Commencement Date. The information on the Contract Website shall be made available to the non-Debtor counterparty to the Assumable Executory Contract (the "Non-Debtor Counterparty"), but shall not otherwise be publicly available.

Procedures for Providing Notice of Assumption and Assignment

- Following the designation of an Executory Contract or Lease as an Assumable Executory Contract, the Debtors shall provide notice (the "Assumption and Assignment Notice") to the Non-Debtor Counterparty to the Assumable Executory Contract, substantially in the form annexed hereto as Exhibit "D," setting forth (i) instructions for accessing the information on the Contract Website relating to such Non-Debtor Counterparty's Assumable Executory Contract and (ii) the procedures for objecting to the proposed assumption and assignment of the Assumable Executory Contract.

---

[4] There are currently approximately 400,000 Assumable Executory Contracts on the Schedule.

[5] For example, if an Assumable Executory Contract has already been assumed and assigned, it cannot be removed from the Schedule.

<u>Procedures for Filing Objections to Assumption and Assignment and Cure Amounts</u>

- Objections, if any, to the proposed assumption and assignment of the Assumable Executory Contracts (the "<u>Contract Objections</u>") must be made in writing, filed with the Court, and served on the Objection Deadline Parties (as defined below) so as to be received no later than ten (10) days after the date of the Assumption and Assignment Notice (the "<u>Contract Objection Deadline</u>") and must specifically identify in the objection the grounds therefor.  The "<u>Objection Deadline Parties</u>" are (i) the Debtors, c/o General Motors Corporation, 300 Renaissance Center, Detroit, Michigan 48265 (Attn: Lawrence S. Buonomo, Esq.); (ii) Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, New York 10153 (Attn:  Harvey R. Miller, Esq., Stephen Karotkin, Esq., and Joseph H. Smolinsky, Esq.); (iii) the U.S. Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn:  Matthew Feldman, Esq.); (iv) Cadwalader, Wickersham & Taft LLP, attorneys for the Purchaser, One World Financial Center, New York, New York 10281 (Attn:  John J. Rapisardi, Esq.); (v) the attorneys for the Creditors Committee; (vi) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn:  Michael J. Edelman, Esq. and Michael L. Schein, Esq.); and (vii) the Office of the United States Trustee for the Southern District of New York (Attn:  Diana G. Adams, Esq.), 33 Whitehall Street, 21st Floor, New York, New York 10004.

- Unless a Contract Objection is filed and served before the Contract Objection Deadline, the Non-Debtor Counterparty shall be deemed to have consented to the assumption and assignment of its respective Assumable Executory Contract and the respective Cure Amount and shall be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts against the Sellers, their estates, or the Purchaser.

<u>Procedures for Resolving Objections</u>

- If a timely Contract Objection is filed solely as to the Cure Amount (a "<u>Cure Objection</u>"), then the Assumable Executory Contract shall nevertheless be assumed and assigned to the Purchaser on the Assumption Effective Date, the Purchaser shall pay the undisputed portion of the Cure Amount on or as soon as reasonably practicable after the Assumption Effective Date, and the disputed portion of the Cure Amount shall be determined as follows and paid as soon as reasonably practicable following resolution of such disputed Cure Amount:  To resolve the Cure Objection, the Debtors, the Purchaser, and the objecting Non-Debtor Counterparty may meet and confer in good faith to attempt to resolve any such objection without Court intervention.  A call center has been established by the Debtors for this purpose.  If the Debtors determine that the Cure Objection cannot be resolved without judicial intervention, then the Cure Amount will be determined as follows:  (a) with

respect to Assumable Executory Contracts pursuant to which the non-Debtor counterparty has agreed to an alternative dispute resolution procedure, then, according to such procedure; and (b) with respect to all other Assumable Executory Contracts, by the Court at the discretion of the Debtors either at the Sale Hearing or such other date as determined by the Court.

- If a timely Contract Objection is filed that objects to the assumption and assignment on a basis other than the Cure Amount, the Debtors, the Purchaser, and the objecting Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention. If the Debtors determine that the objection cannot be resolved without judicial intervention, then, at the discretion of the Sellers and the Purchaser, the objection shall be determined by the Court at the Sale Hearing or such other date as determined by the Court. If the Court determines at such hearing that the Assumable Executory Contract should not be assumed and assigned, then such Executory Contract or Lease shall no longer be considered an Assumable Executory Contract.

- If the Debtors, the Purchaser, and the non-Debtor Counterparty resolve any Contract Objection, they shall enter into a written stipulation (the "Assumption Resolution Stipulation"), which stipulation is not required to be filed with or approved by the Court.

Effective Date of Assumption

- All Assumable Executory Contracts will be assumed and assigned to the Purchaser on the date (the "Assumption Effective Date") that is the later of (i) the Proposed Assumption Effective Date and (ii) the Assumption Resolution Date (as defined below). The "Assumption Resolution Date" shall be, (i) if no Contract Objection has been filed on or prior to the Contract Objection Deadline or the only Contract Objection that has been filed on or prior to the Contract Objection Deadline is a Cure Objection, the business day after the Contract Objection Deadline, or (ii) if a Contract Objection other than a Cure Objection has been filed on or prior to the Contract Objection Deadline, the date of the Assumption Resolution Stipulation or the date of a Court order authorizing the assumption and assignment to the Purchaser of the Assumable Executory Contract.

- Contingent upon the approval of the 363 Transaction and concurrently with the consummation of the 363 Transaction (without prejudice to the conditions set forth in the MPA), (i) the UAW Collective Bargaining Agreement shall be deemed to be an Assumable Executory Contract as to which the Assumption and Assignment Notice need not be sent and which will not be listed on the Schedule or the Contract Website (ii) the Debtors shall assume and assign the UAW Collective Bargaining Agreement to the Purchaser as of the Closing Date, and each non-Debtor party to the UAW Collective Bargaining

Agreement shall be deemed to have consented to such assumption and assignment.

70.     Section 365(a) of the Bankruptcy Code provides a debtor in possession "subject to the court's approval may assume or reject any executory contracts or unexpired leases of the debtor."  11 U.S.C. § 365(a).  Upon finding that debtors have exercised their sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

71.     Section 365(b) of the Bankruptcy Code requires that a debtor in possession meet certain additional requirements to assume a lease:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b).  This section does not apply to a default that is a breach of a provision relating to

> (A) the insolvency or financial condition of the debtor at any time before the closing of the case;

        (B) the commencement of a case under this title;

        (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or

        (D) the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

*Id.* § 365(b)(2).

72.      Section 365(b)(1) of the Bankruptcy Code requires that the Debtors cure, or provide adequate assurance that it will promptly cure, any outstanding defaults under the Assumable Executory Contracts in connection with the assumption and assignment of these agreements to Purchaser.

73.      Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor in possession may assign an executory contract or Lease if

        (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

        (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

*Id.* § 365(f)(2).

74.      The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

75.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

76.     The financial credibility, willingness, and ability of the U.S. Treasury-sponsored Purchaser to perform under the Assumable Executory Contracts cannot be credibly disputed.  The Sale Hearing will provide the Court and other interested parties the opportunity to evaluate the ability of the Purchaser or, indeed, any other successful bidder to provide adequate assurance of future performance under the Assumable Executory Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code.

77.     The Assumption and Assignment Procedures are reasonably calculated to provide all counterparties to the Assumable Executory Contracts with proper notice of the potential assumption and assignment of their executory contracts or Leases, any cure costs relating thereto, and the deadline to object to cure amounts.

**Unenforceability of Anti-Assignment Provisions**

78.     To assist in the assumption, assignment, and sale of the Assumable Executory Contracts, the Sale Order should provide that certain anti-assignment provisions shall not restrict, limit, or prohibit, the assumption, assignment, and sale of the Assumable Executory Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

79.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign executory contracts and Leases free from such anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1).

80.     Section 365(f) prohibits three distinct types of anti-assignment provisions that are not enforceable in the context of assignments effected under section 365 of the Bankruptcy Code:  (i) provisions that "prohibit" the assignment of an executory contract or unexpired lease are unenforceable; (ii) provisions that seek to "restrict" the ability of a debtor to assume and assign an executory contract or unexpired lease are not given effect; and (iii) provisions that "condition" the ability of a debtor to assume and assign an executory contract or unexpired lease are unenforceable.

81.     Section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. *See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.),* 127 F.3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365").

82.     Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  11 U.S.C. § 365(f)(3).  *See, e.g., In re Jamesway Corp.,* 201 BR 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is

being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

83.     Many courts have recognized that provisions that have the effect of restricting assignments cannot be enforced.  *See In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."), *aff'd,* 209 F.3d 291 (3d Cir.), *cert. denied,* 531 U.S. 873 (2000).

84.     Similarly, in *In re Mr. Grocer, Inc.,* the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves *ipso facto* anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).  Consequently, any anti-assignment provisions should  not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumable Executory Contracts and should be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

**Good Faith Purchaser**

85.     The Purchaser has been and is acting in good faith and is entitled to the protections of a good faith purchaser *under* section 363(m) of the Bankruptcy Code.

86.     Section 363(m) *of* the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

87.     The terms and provisions of the MPA were negotiated by the Sellers and the Purchaser at arm's length, without *collusion*, and in good faith.  The MPA represents substantial value to the Debtors and provides for fair consideration for the Purchased Assets.  Moreover, the Purchaser does not hold any interests in the Debtors.  The Purchaser's sponsor is the holder of secured claims and will provide DIP financing for the Debtors' chapter 11 cases as well as financing of New GM.  In addition, it will be the majority holder of equity interests in New GM.  The Purchaser and its sponsor are not affiliated with the Debtors, their officers, or directors.

88.     Accordingly, the *Purchaser* should be found to be acting in good faith and entitled to the protections afforded under section 363(m).

**The Appointment of a Consumer Privacy Ombudsman Is Necessary**

89.     Section 363(b)(1) of the Bankruptcy Code provides that if the Debtors "in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals [and] such policy is in effect on the date of the commencement of the case," then the Debtors "may not sell . . . personally identifiable information to any person unless" the sale is "consistent with such policy" or a "consumer privacy ombudsman" is appointed.

11 U.S.C. § 363(b)(1). The term "personally identifiable information," defined in section 101(41A) of the Bankruptcy Code, means private information about a debtor's customers that "if disclosed, will result in contacting or identifying [an] individual physically or electronically" (e.g., name, address, telephone number, social security number, credit card account number, birth date). *Id.* § 101(41A).

90. Section 332 of the Bankruptcy Code governs the appointment of a consumer privacy ombudsman and *provides* that the Court "shall order the United States trustee to appoint, not later than 5 days before the commencement of the [sale] hearing, 1 disinterested person . . . to serve as the consumer privacy ombudsman in the case and shall require that notice of such hearing be timely given to such ombudsman." *Id.* § 332(a). The consumer privacy ombudsman "may appear and be heard at [the sale] hearing and shall provide to the [C]ourt information to assist the [C]ourt in its consideration of the facts, circumstances, and conditions of the proposed sale . . . of personally identifiable information." *Id.* § 332(b).

91. The Debtors currently maintain certain privacy policies that govern the use of personally identifiable information in conducting their business operations. The 363 Transaction may contemplate *the* transfer of certain personally identifiable information to a third party who is not an affiliate of the Debtors in a manner that may not be consistent with certain aspects of their existing privacy policies.

92. For example, the Debtors' current U.S. online consumer privacy statement provides, in *pertinent* part:

> The information you share with us may be used by GM, our affiliates, our licensees, and dealers. . . . It may also be shared in connection with the sale, transfer or financing of a significant part of a GM business. *We will not share your*

*personal information with third parties other than these, or*
*with any third party for their independent use without your*
*permission. . . .*

http://www.gm.com/privacy/ (emphasis added).

93.     Inasmuch as the italicized language quoted above was added to

GM's privacy policy so as to be effective May 1, 2009, the argument could be made that

it should not be applied *retroactively* to personal data collected before that date.

Therefore, to avoid any delay in consummating the 363 Transaction, the Debtors request

that the Court direct the U.S. Trustee to promptly appoint a consumer privacy

ombudsman in accordance with section 332 of the Bankruptcy Code.

### Accompanying Memorandum of Law

94.     The Debtors have contemporaneously filed the Memorandum of

Law in support of the Motion, which sets forth in greater deal the ample authority that

exists for the relief requested by this Motion and for the entry of the Sale Procedures

Order and the Sale Order.

### Request for Relief Under Bankruptcy Rules 6004(h) and 6006(d)

95.     Bankruptcy Rule 6004(h) provides that an "order authorizing the

use, sale, or lease of property other than cash collateral is stayed until the expiration of 10

days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P.

6004(h). Any order approving the sale of the Purchased Assets in accordance with the

Sale Procedures must be effective immediately upon entry of such order by providing

that the ten-day stay shall not apply. As described above, as well as in the accompanying

Memorandum of Law and the Henderson Affidavit, absent a prompt approval and

consummation of the 363 Transaction, the Purchased Assets will rapidly decline in value

as wasting assets. Therefore, it is imperative that the Sale Order be effective immediately

to permit the 363 Transaction to close without any delay.  The ten-day stay under Bankruptcy Rule 6004(h) should be waived.

96.     Bankruptcy Rule 6006(d) provides that an order authorizing the assignment of an executory contract or unexpired lease under section 365(f) is stayed until the expiration of ten days after entry of the order, unless the court orders otherwise. Fed. R. Bankr. P. 6006(d).  Any order approving the sale of the Purchased Assets, which includes approving the assumption and assignment of the Assumable Executory Contracts to the Purchaser and approving the UAW Retiree Settlement Agreement, must be effective immediately upon entry of such order by providing that the ten-day stay shall not apply.  The exigent circumstances necessitating the prompt consummation of the 363 Transaction mandates that the Sale Order, the assumption and assignment of the Assumable Executory Contracts to the Purchaser, and the UAW Retiree Settlement Agreement be effective immediately upon entry.  It is essential that the Sale Order be effective without any delay by providing that the ten-day stay under Bankruptcy Rule 6006(d) is waived.

## **Notice**

97.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the U.S. Treasury, (iii) the attorneys for EDC, (iv) the attorneys for the agent under GM's prepetition secured term loan agreement, (v) the attorneys for the agent under GM's prepetition amended and restated secured revolving credit agreement, (vi) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis), (vii) the attorneys for the UAW, (viii) the attorneys for the International Union of Electronic,

Electrical, Salaried, Machine and Furniture Workers—Communications Workers of America, (ix) the United States Department of Labor, (x) the attorneys for the National Automobile Dealers Association, and (xi) the attorneys for the ad hoc bondholders committee. In view of all the facts and circumstances, the proposed notice is sufficient and no other or further notice need be provided.

98. No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: New York, New York
June 1, 2009

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Joseph H. Smolinsky

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession