**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                      :
In re                                                 :          **Chapter 11 Case No.**
                                                      :
**MOTORS LIQUIDATION COMPANY,** *et al.,*             :          **09-50026 (REG)**
    **f/k/a General Motors Corp.,** *et al.*             :
                                                      :
        **Debtors.**                           :          **(Jointly Administered)**
                                                      :
-------------------------------------------------------------x


## DEBTORS' AMENDED JOINT CHAPTER 11 PLAN

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Debtors and
Debtors in Possession

**TABLE OF CONTENTS**

**Page**

Article I.     Definitions and Interpretation .................................................................. 1

1.1     363 Transaction.............................................................................. 1

1.2     Administrative Expenses ................................................................ 1

1.3     ADR Procedures ............................................................................ 2

1.4     Allowed.......................................................................................... 2

1.5     Asbestos Claimants' Committee.................................................... 2

1.6     Asbestos Claims............................................................................. 3

1.7     Asbestos Insurance Assets ............................................................ 3

1.8     Asbestos Insurance Assets Trust................................................... 3

1.9     Asbestos Personal Injury Claim.................................................... 3

1.10    Asbestos Property Damage Claim ................................................. 4

1.11    Asbestos Trust................................................................................ 4

1.12    Asbestos Trust Administrator(s) .................................................... 4

1.13    Asbestos Trust Agreement.............................................................. 4

1.14    Asbestos Trust Assets .................................................................... 4

1.15    Asbestos Trust Claim..................................................................... 5

1.16    Asbestos Trust Distribution Procedures......................................... 5

1.17    Asbestos Trust Transfer Date......................................................... 5

1.18    Avoidance Action ........................................................................... 5

1.19    Avoidance Action Trust.................................................................. 5

1.20    Avoidance Action Trust Administrative Cash................................ 5

1.21    Avoidance Action Trust Administrator .......................................... 5

1.22    Avoidance Action Trust Agreement ............................................... 6

1.23    Avoidance Action Trust Assets ...................................................... 6

1.24    Avoidance Action Trust Claims Reserve........................................ 6

1.25    Avoidance Action Trust Monitor.................................................... 6

1.26    Avoidance Action Trust Transfer Date........................................... 6

1.27    Ballot.............................................................................................. 6

1.28    Bankruptcy Code ........................................................................... 6

i

# TABLE OF CONTENTS
## (continued)

1.29    Bankruptcy Court ................................................................................. 6

1.30    Bankruptcy Rules ................................................................................ 7

1.31    Budget ................................................................................................ 7

1.32    Business Day ...................................................................................... 7

1.33    Cash ................................................................................................... 7

1.34    Causes of Action ............................................................................... 7

1.35    Chapter 11 Cases ............................................................................... 7

1.36    Claim ................................................................................................. 7

1.37    Claim Settlement Procedures ............................................................. 7

1.38    Class .................................................................................................. 7

1.39    Collateral ........................................................................................... 8

1.40    Commencement Date ......................................................................... 8

1.41    Confirmation Date ............................................................................. 8

1.42    Confirmation Hearing ........................................................................ 8

1.43    Confirmation Order ............................................................................ 8

1.44    Creditors' Committee ......................................................................... 8

1.45    Debtors .............................................................................................. 8

1.46    Demand ............................................................................................. 8

1.47    DIP Credit Agreement ....................................................................... 8

1.48    DIP Credit Agreement Claims ........................................................... 8

1.49    DIP Lenders ....................................................................................... 8

1.50    DIP Lenders' Avoidance Actions ....................................................... 9

1.51    DIP Lenders' Avoidance Assets ......................................................... 9

1.52    DIP Lenders' Collateral ..................................................................... 9

1.53    Disclosure Statement ......................................................................... 9

1.54    Disputed ............................................................................................ 9

1.55    Distribution Record Date ................................................................... 9

1.56    District Court ..................................................................................... 10

1.57    EDC ................................................................................................... 10

| | | |
|---|---|---|
| 1.58 | Effective Date | 10 |
| 1.59 | ENCORE | 10 |
| 1.60 | Encumbrance | 10 |
| 1.61 | Entity | 10 |
| 1.62 | Environmental Action | 10 |
| 1.63 | Environmental Laws | 10 |
| 1.64 | Environmental Response Trust | 10 |
| 1.65 | Environmental Response Trust Administrative Funding Account | 11 |
| 1.66 | Environmental Response Trust Administrative Trustee | 11 |
| 1.67 | Environmental Response Trust Agreement | 11 |
| 1.68 | Environmental Response Trust Assets | 11 |
| 1.69 | Environmental Response Trust Consent Decree and Settlement Agreement | 11 |
| 1.70 | Environmental Response Trust Parties | 12 |
| 1.71 | Environmental Response Trust Properties | 12 |
| 1.72 | Environmental Response Trust Transfer Date | 12 |
| 1.73 | Equity Interest | 12 |
| 1.74 | Eurobond Claim | 12 |
| 1.75 | Final Order | 12 |
| 1.76 | Fiscal and Paying Agency Agreements | 13 |
| 1.77 | Fiscal and Paying Agents | 13 |
| 1.78 | Future Claimants' Representative | 13 |
| 1.79 | General Unsecured Claim | 13 |
| 1.80 | Governmental Authorities | 13 |
| 1.81 | GUC Trust | 13 |
| 1.82 | GUC Trust Administrative Fund | 13 |
| 1.83 | GUC Trust Administrator | 14 |
| 1.84 | GUC Trust Agreement | 14 |
| 1.85 | GUC Trust Assets | 14 |
| 1.86 | GUC Trust Monitor | 14 |

**TABLE OF CONTENTS**
**(continued)**

Page

1.87     GUC Trust Transfer Date ......................................................................... 14

1.88     GUC Trust Units ...................................................................................... 14

1.89     Indentures ................................................................................................ 14

1.90     Indenture Trustee/Fiscal and Paying Agent Reserve Cash ..................... 16

1.91     Indenture Trustees .................................................................................. 16

1.92     Indirect Asbestos Claim .......................................................................... 16

1.93     Initial Debtors ......................................................................................... 17

1.94     Medical Liens .......................................................................................... 17

1.95     MLC ........................................................................................................ 17

1.96     MSPA ...................................................................................................... 17

1.97     New GM .................................................................................................. 17

1.98     New GM Securities ................................................................................. 17

1.99     New GM Stock ........................................................................................ 17

1.100    New GM Warrants ................................................................................... 18

1.101    Note Claim .............................................................................................. 18

1.102    Nova Scotia Guarantee Claims ............................................................... 18

1.103    Nova Scotia Wind-Up Claim .................................................................. 19

1.104    Person ..................................................................................................... 19

1.105    Plan ......................................................................................................... 19

1.106    Plan Supplement ..................................................................................... 19

1.107    Post-Effective Date MLC ....................................................................... 20

1.108    Priority Non-Tax Claim .......................................................................... 20

1.109    Priority Order Sites ................................................................................. 20

1.110    Priority Order Sites Consent Decrees and Settlement Agreements ......... 20

1.111    Priority Tax Claim .................................................................................. 20

1.112    Pro Rata Share ........................................................................................ 20

1.113    Property or Properties ............................................................................. 20

1.114    Property Environmental Claim ............................................................... 20

1.115    Protected Party ....................................................................................... 20

# TABLE OF CONTENTS
## (continued)

1.116 REALM .................................................................................................. 21

1.117 Registered Holder ..................................................................................... 22

1.118 Residual Wind-Down Assets ..................................................................... 22

1.119 Schedules .................................................................................................. 22

1.120 Secured Claim ............................................................................................ 22

1.121 Solicitation Procedures .............................................................................. 22

1.122 Tax Code ................................................................................................... 22

1.123 Term Loan Avoidance Action .................................................................... 22

1.124 Term Loan Avoidance Action Beneficiaries .............................................. 22

1.125 Trusts ........................................................................................................ 22

1.126 Unliquidated Litigation Claim ................................................................... 23

1.127 U.S. Treasury ............................................................................................ 23

1.128 U.S. Trustee .............................................................................................. 23

1.129 Voting Deadline ........................................................................................ 23

Article II.    Administrative Expenses and Priority Tax Claims ................................. 23

2.1    Administrative Expenses ............................................................................ 23

2.2    Compensation and Reimbursement Claims ................................................ 23

2.3    Priority Tax Claims .................................................................................... 24

2.4    DIP Credit Agreement Claims .................................................................... 24

2.5    Special Provisions Regarding Fees and Expenses of Indenture
       Trustees and Fiscal and Paying Agents .................................................... 25

Article III.   Classification of Claims and Equity Interests ....................................... 26

Article IV.    Treatment of Claims and Equity Interests ............................................ 26

4.1    Class 1 – Secured Claims ........................................................................... 26

4.2    Class 2 - Priority Non-Tax Claims .............................................................. 27

4.3    Class 3 - General Unsecured Claims ........................................................... 27

4.4    Class 4 – Property Environmental Claims ................................................... 30

4.5    Class 5 – Asbestos Personal Injury Claims ................................................. 30

4.6    Class 6 - Equity Interests in MLC ............................................................... 31

Article V.    Provisions Governing Distributions ...................................................... 31

| | | |
|---|---|---|
| 5.1 | Distribution Record Date | 31 |
| 5.2 | Method of Distributions Under the Plan | 31 |
| | a. Payments and Transfers on Effective Date | 31 |
| | b. Repayment of Excess Cash to DIP Lenders | 32 |
| | c. Payment of Cash or Certain Assets to Charitable Organizations | 33 |
| | d. Distributions of Cash | 33 |
| | e. Sale of New GM Warrants About to Expire | 33 |
| 5.3 | Delivery of Distributions and Undeliverable Distributions | 34 |
| 5.4 | Withholding and Reporting Requirements | 35 |
| 5.5 | Time Bar to Cash Payments | 35 |
| 5.6 | Minimum Distributions and Fractional Shares or Units | 35 |
| 5.7 | Setoffs | 36 |
| 5.8 | Transactions on Business Days | 36 |
| 5.9 | Allocation of Plan Distribution Between Principal and Interest | 36 |
| 5.10 | Surrender of Existing Publicly-Traded Securities | 36 |
| 5.11 | Class Proofs of Claim | 37 |
| Article VI. | Means for Implementation and Execution of the Plan | 37 |
| 6.1 | Substantive Consolidation | 37 |
| 6.2 | The GUC Trust | 38 |
| | a. Execution of GUC Trust Agreement | 38 |
| | b. Purpose of GUC Trust | 38 |
| | c. GUC Trust Assets | 38 |
| | d. Governance of GUC Trust | 39 |
| | e. GUC Trust Administrator and GUC Trust Monitor | 39 |
| | f. Role of GUC Trust Administrator | 39 |
| | g. Role of GUC Trust Monitor | 39 |
| | h. Transferability of GUC Trust Interests | 40 |
| | i. Cash | 40 |
| | j. Costs and Expenses of GUC Trust Administrator | 40 |

k.    Compensation of GUC Trust Administrator ................................ 40

l.    Distribution of GUC Trust Assets ............................................... 40

m.    Retention of Professionals by GUC Trust Administrator and GUC Trust Monitor .................................................................. 40

n.    U.S. Federal Income Tax Treatment of GUC Trust .................... 41

o.    Dissolution ................................................................................... 41

p.    Indemnification of GUC Trust Administrator and GUC Trust Monitor ................................................................................ 42

q.    Closing of Chapter 11 Cases ....................................................... 42

6.3    The Asbestos Trust ................................................................................. 42

a.    Execution of Asbestos Trust Agreement ..................................... 42

b.    Purpose of Asbestos Trust ........................................................... 43

c.    Assumption of Certain Liabilities by Asbestos Trust ................. 43

d.    Asbestos Trust Assets .................................................................. 43

e.    Governance of Asbestos Trust ..................................................... 43

f.    The Asbestos Trust Administrator(s) ........................................... 43

g.    Role of Asbestos Trust Administrator(s) ..................................... 43

h.    Nontransferability of Asbestos Trust Interests ............................ 44

i.    Cash .............................................................................................. 44

j.    Costs and Expenses of Asbestos Trust Administrator(s) ............. 44

k.    Allowance of Asbestos Personal Injury Claims .......................... 44

l.    Distribution of Asbestos Trust Assets .......................................... 44

m.    Retention of Professionals by Asbestos Trust Administrator(s) ............................................................................. 44

n.    U.S. Federal Income Tax Treatment of Asbestos Trust .............. 44

o.    Dissolution ................................................................................... 45

p.    Indemnification of Asbestos Trust Administrator(s) ................... 45

6.4    The Environmental Response Trust ....................................................... 45

a.    Environmental Response Trust Agreement and Environmental Response Trust Consent Decree and Settlement Agreement .................................................................. 46

b.  Purpose of Environmental Response Trust ................................. 46

c.  Environmental Response Trust Assets .......................................... 47

d.  Governance of Environmental Response Trust ........................... 47

e.  Role of Environmental Response Trust Administrative
Trustee ................................................................................................. 47

f.  Nontransferability of Environmental Response Trust
Interests ............................................................................................... 48

g.  Cash ...................................................................................................... 48

h.  Indemnification of the Environmental Response Trust
Administrative Trustee .................................................................... 48

i.  U.S. Federal Income Tax Treatment of Environmental
Response ............................................................................................. 48

6.5  The Avoidance Action Trust ..................................................................... 49

a.  Execution of Avoidance Action Trust Agreement ...................... 49

b.  Purpose of Avoidance Action Trust ............................................... 49

c.  Avoidance Action Trust Assets ...................................................... 50

d.  Governance of Avoidance Action Trust ....................................... 50

e.  Avoidance Action Trust Administrator and Avoidance
Action Trust Monitor ...................................................................... 50

f.  Role of Avoidance Action Trust Administrator .......................... 50

g.  Role of Avoidance Action Trust Monitor .................................... 50

h.  Nontransferability of Avoidance Action Trust Interests ............. 51

i.  Cash ...................................................................................................... 51

j.  Distribution of Avoidance Action Trust Assets .......................... 51

k.  Costs and Expenses of Avoidance Action Trust ......................... 51

l.  Compensation of Avoidance Action Trust Administrator ........... 52

m.  Retention of Professionals by Avoidance Action Trust
Administrator and Avoidance Action Trust Monitor .................. 52

n.  U.S. Federal Income Tax Treatment of Avoidance Action
Trust ..................................................................................................... 52

o.  Dissolution ......................................................................................... 56

p.      Indemnification of Avoidance Action Trust Administrator and Avoidance Action Trust Monitor .......................................... 56

6.6      Securities Law Matters ................................................................ 57

6.7      Cancellation of Existing Securities and Agreements .............................. 57

6.8      Equity Interests in MLC Subsidiaries Held by the Debtors ..................... 58

6.9      Administration of Taxes ............................................................. 58

6.10     Dissolution of the Debtors ........................................................ 58

6.11     Determination of Tax Filings and Taxes .................................... 58

6.12     Books and Records ................................................................. 60

6.13     Corporate Action ................................................................... 61

6.14     Effectuating Documents and Further Transactions ................................. 61

6.15     Continued Applicability of Final Order Approving DIP Credit Agreement ......................................................................... 61

Article VII.    Procedures for Disputed Claims ...................................... 62

7.1      Objections to Claims and Resolution of Disputed Claims ..................... 62

7.2      No Distribution Pending Allowance ................................................ 63

7.3      Estimation ............................................................................. 63

7.4      Allowance of Disputed Claims .................................................... 64

7.5      Dividends ............................................................................. 64

Article VIII.    Executory Contracts and Unexpired Leases .......................... 64

8.1      Executory Contracts and Unexpired Leases .......................... 64

8.2      Approval of Rejection of Executory Contracts and Unexpired Leases ................................................................................. 64

8.3      Rejection Claims ................................................................... 64

Article IX.    Effectiveness of the Plan .............................................. 65

9.1      Condition Precedent to Confirmation of Plan ......................... 65

9.2      Conditions Precedent to Effective Date .................................... 65

9.3      Satisfaction and Waiver of Conditions .................................... 66

9.4      Effect of Nonoccurrence of Conditions to Consummation ..................... 66

Article X.    Effect of Confirmation ................................................ 66

| | | |
|---|---|---|
| 10.1 | Vesting of Assets | 66 |
| 10.2 | Release of Assets | 67 |
| 10.3 | Binding Effect | 67 |
| 10.4 | Term of Injunctions or Stays | 67 |
| 10.5 | Term Loan Avoidance Action; Offsets | 67 |
| 10.6 | Injunction | 67 |
| 10.7 | Injunction Against Interference with Plan | 68 |
| 10.8 | Special Provisions for Governmental Units | 68 |
| Article XI. | Retention of Jurisdiction | 68 |
| 11.1 | Jurisdiction of Bankruptcy Court | 68 |
| Article XII. | Miscellaneous Provisions | 70 |
| 12.1 | Dissolution of Committees | 70 |
| 12.2 | Substantial Consummation | 71 |
| 12.3 | Effectuating Documents and Further Transactions | 71 |
| 12.4 | Exemption from Transfer Taxes | 71 |
| 12.5 | Release | 72 |
| 12.6 | Exculpation | 72 |
| 12.7 | Post-Confirmation Date Fees and Expenses | 73 |
| | a. Fees and Expenses of Professionals | 73 |
| | b. Fees and Expenses of GUC Trust Administrator, Asbestos Trust Administrator(s), Environmental Response Trust Administrative Trustee, and Avoidance Action Trust Administrator | 73 |
| 12.8 | Payment of Statutory Fees | 73 |
| 12.9 | Modification of Plan | 74 |
| 12.10 | Revocation or Withdrawal of Plan | 74 |
| 12.11 | Courts of Competent Jurisdiction | 74 |
| 12.12 | Severability | 74 |
| 12.13 | Governing Law | 75 |
| 12.14 | Exhibits | 75 |

## TABLE OF CONTENTS
### (continued)

**Page**

12.15  Successors and Assigns...........................................................................75

12.16  Time .......................................................................................................75

12.17  Notices ..................................................................................................75

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                    :
**In re**                                            :          **Chapter 11 Case No.**
                                                    :
**MOTORS LIQUIDATION COMPANY,** *et al.*,           :          **09-50026 (REG)**
    **f/k/a General Motors Corp.,** *et al.*   :
                                                    :
           **Debtors.**              :          **(Jointly Administered)**
                                                    :
-------------------------------------------------------------x

## DEBTORS' AMENDED JOINT CHAPTER 11 PLAN

        Motors Liquidation Company (f/k/a General Motors Corporation); MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.); MLCS, LLC (f/k/a Saturn, LLC); MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation); Remediation and Liability Management Company, Inc.; and Environmental Corporate Remediation Company, Inc., the above-captioned debtors, propose the following chapter 11 plan pursuant to section 1121(a) of title 11 of the United States Code:

### ARTICLE I.

### DEFINITIONS AND INTERPRETATION

**DEFINITIONS.** The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

       **1.1**    **363 Transaction** means the sale of substantially all the assets of General Motors Corporation and certain of its Debtor subsidiaries, and the assumption of certain executory contracts and unexpired leases of personal property and nonresidential real property, to a U.S. Treasury-sponsored purchaser pursuant to section 363 of the Bankruptcy Code, as embodied in the MSPA.

       **1.2**    **Administrative Expenses** means costs or expenses of administration of any of the Chapter 11 Cases allowed under sections 503(b), 507(a)(1), and 1114(e) of the Bankruptcy Code that have not already been paid by the Debtors, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, any compensation and reimbursement of expenses to the extent allowed by Final Order under sections 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the

estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code; *provided, however*, that Administrative Expenses does not mean the Debtors' obligations and liabilities that were assumed by New GM under the MSPA, as approved by the order of the Bankruptcy Court entered July 5, 2009.

**1.3** **ADR Procedures** means the alternative dispute resolution procedures, including mandatory mediation, approved by orders of the Bankruptcy Court, pursuant to section 105(a) of the Bankruptcy Code and General Order M-390 authorizing implementation of alternative dispute procedures, including mandatory mediation, entered February 23, 2010 and April 29, 2010 (ECF Nos. 5037, 5673), with respect to the following types of unliquidated and/or litigation Claims: (i) personal injury Claims, (ii) wrongful death Claims, (iii) tort Claims, (iv) products liability Claims, (v) Claims for damages arising from the rejection of executory contracts or unexpired leases of nonresidential real property (excluding Claims for damages arising from the rejection of executory contracts as they related primarily to environmental matters), (vi) indemnity Claims (excluding tax indemnity Claims relating to leveraged fixed equipment lease transactions and excluding indemnity Claims relating to asbestos liability), (vii) lemon law Claims, to the extent applicable under section 6.15 of the MSPA, (viii) warranty Claims, to the extent applicable under section 6.15 of the MSPA, and (ix) class action Claims.

**1.4** **Allowed** means, (i) with reference to any Claim (other than an Asbestos Personal Injury Claim), (a) any Claim against any Debtor that has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (b) any (I) timely filed Claim that is no longer subject to the ADR Procedures in the case of Unliquidated Litigation Claims or (II) Claim listed on the Schedules or timely filed proof of Claim, as to which no objection to allowance has been interposed in accordance with Section 7.1 hereof or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, or (c) any Claim expressly allowed by a Final Order, pursuant to the Claim Settlement Procedures, or under this Plan, and (ii) with reference to any Asbestos Personal Injury Claim, any Asbestos Personal Injury Claim to the extent that it is Allowed in accordance with the procedures established pursuant to the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures, which shall establish the amount of legal liability against the Asbestos Trust in the amount of the liquidated value of such Asbestos Personal Injury Claim, as determined in accordance with the Asbestos Trust Distribution Procedures. The Asbestos Trust Claim shall be deemed "Allowed" when fixed by Final Order or settlement.

**1.5** **Asbestos Claimants' Committee** means the official committee of unsecured creditors holding Asbestos Personal Injury Claims appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

**1.6** **Asbestos Claims** means Asbestos Personal Injury Claims and Asbestos Property Damage Claims.

**1.7** **Asbestos Insurance Assets** means all rights arising under liability insurance policies issued to the Debtors with inception dates prior to 1986 with respect to liability for Asbestos Claims, including, but not limited to (i) rights (a) under insurance policies, (b) under settlement agreements made with respect to such insurance policies, (c) against the estates of insolvent insurers that issued such policies or entered into such settlements, and (d) against state insurance guaranty associations arising out of any such insurance policies issued by insolvent insurers, and (ii) the right, on behalf of MLC and its subsidiaries as of the Effective Date, to give a full release of the insurance rights of MLC and its subsidiaries as of the Effective Date under any such policy or settlement agreement with the exception of rights to coverage with respect to workers' compensation claims. The Asbestos Insurance Assets that shall be transferred to the Asbestos Insurance Assets Trust shall not include the transfer of any insurance policies themselves nor any rights or claims that the Debtors have or may have against any insurers with respect to amounts the Debtors have already paid on account of Asbestos Claims.

**1.8** **Asbestos Insurance Assets Trust** means the trust to be established to hold and administer the Asbestos Insurance Assets and any proceeds thereof for the benefit of the DIP Lenders, the terms of which trust shall be agreed upon between the Debtors and the DIP Lenders.

**1.9** **Asbestos Personal Injury Claim** means any Claim, remedy, liability, or Demand against the Debtors, now existing or hereafter arising, whether or not such Claim, remedy, liability, or Demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, for death, bodily injury, sickness, disease, medical monitoring, or other personal injuries (whether physical, emotional, or otherwise) to the extent caused or allegedly caused, directly or indirectly, by the presence of or exposure (whether prior to or after the Commencement Date) to asbestos or asbestos-containing products or things that are or were installed, engineered, designed, manufactured, fabricated, constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, used, removed, replaced, or disposed by any of the Debtors or an Entity for whose products or operations the Debtors allegedly have liability or for which any of the Debtors are otherwise allegedly liable, including, without express or implied limitation, any Claim, remedy, liability, or Demand for compensatory damages (such as loss of consortium, wrongful death, medical monitoring, survivorship, proximate, consequential, general, and special damages) and punitive damages, and any Claim, remedy, liability, or Demand for reimbursement, indemnification, subrogation, and contribution (including, without limitation, any Indirect Asbestos Claim with respect to an Asbestos Personal Injury Claim), and any claim under any settlement entered into by

or on behalf of the Debtors prior to the Commencement Date relating to an Asbestos Personal Injury Claim.

**1.10**   **Asbestos Property Damage Claim** means any Claim, remedy, liability, or Demand against the Debtors, now existing or hereafter arising, whether or not such Claim, remedy, liability, or Demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty, or otherwise, for property damage, including but not limited to, the cost of inspecting, maintaining, encapsulating, repairing, decontaminating, removing, or disposing of asbestos or asbestos-containing products in buildings, other structures, or other property to the extent caused or allegedly caused, directly or indirectly, by the presence of or exposure (whether prior to or after the Commencement Date) to asbestos or asbestos-containing products or things that are or were installed, engineered, designed, manufactured, fabricated, constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, used, removed, replaced, or disposed by any of the Debtors or an Entity for whose products or operations the Debtors allegedly have liability or for which any of the Debtors are otherwise allegedly liable, including, without express or implied limitation, any Claim, remedy, liability, or Demand for compensatory damages (such as loss of proximate, consequential, general, and special damages) and punitive damages, and any Claim, remedy, liability, or Demand for reimbursement, indemnification, subrogation, and contribution (including, without limitation, any Indirect Asbestos Claim with respect to an Asbestos Property Damage Claim), and any claim under any settlement entered into by or on behalf of the Debtors prior to the Commencement Date relating to an Asbestos Property Damage Claim. Asbestos Property Damage Claims do not include any Claims or Causes of Action of governmental units under Environmental Laws.

**1.11**   **Asbestos Trust** means the trust established under the Plan in accordance with the Asbestos Trust Agreement.

**1.12**   **Asbestos Trust Administrator(s)** means the Person or Persons confirmed by the Bankruptcy Court to serve as administrator(s) of the Asbestos Trust, pursuant to the terms of the Asbestos Trust Agreement, or as subsequently may be appointed pursuant to the terms of the Asbestos Trust Agreement.

**1.13**   **Asbestos Trust Agreement** means that certain Asbestos Trust Agreement executed by the Debtors and the Asbestos Trust Administrator(s), substantially in the form annexed hereto as Exhibit "A."

**1.14**   **Asbestos Trust Assets** means the Debtors' assets transferred to the Asbestos Trust in accordance with the Plan and the Asbestos Trust Agreement.  The Asbestos Trust Assets shall be comprised of (i) Cash in the amount of $2 million and (ii) the Asbestos Trust Claim (or, if fixed by Final Order or settlement prior to the Effective

Date, the distribution to which such Claim is entitled as an Allowed General Unsecured Claim).

**1.15** **Asbestos Trust Claim** means the Claim (which shall be held by the Asbestos Trust) in the amount of the Debtors' aggregate liability for Asbestos Personal Injury Claims that either will be in an amount (i) mutually agreed upon by the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative or (ii) ordered by the Bankruptcy Court, which, when fixed by Final Order or settlement, shall be treated as an Allowed General Unsecured Claim in Class 3 for purposes of distribution from the GUC Trust and the Avoidance Action Trust, as applicable. For the avoidance of doubt, prior to the determination of the Allowed amount of the Asbestos Trust Claim, the Asbestos Trust Claim is not and shall not be treated as a Disputed General Unsecured Claim, except with respect to determining the Pro Rata Share of New GM Securities to be distributed hereunder.

**1.16** **Asbestos Trust Distribution Procedures** means the distribution procedures to be implemented by the Asbestos Trust Administrator(s) pursuant to the Plan and the Asbestos Trust Agreement to process, liquidate, and pay Asbestos Personal Injury Claims, substantially in the form annexed hereto as Exhibit "B."

**1.17** **Asbestos Trust Transfer Date** means the date on which the Asbestos Trust Assets are transferred to the Asbestos Trust, which transfer shall occur on the Effective Date, or as soon thereafter as is reasonably practicable, but shall be no later than December 15, 2011.

**1.18** **Avoidance Action** means any action commenced, or that may be commenced, before or after the Effective Date pursuant to section 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code, except to the extent purchased by New GM under the MSPA or prohibited under the DIP Credit Agreement.

**1.19** **Avoidance Action Trust** means the trust established under the Plan in accordance with the Avoidance Action Trust Agreement.

**1.20** **Avoidance Action Trust Administrative Cash** means the Cash held and maintained by the Avoidance Action Trust Administrator for the purpose of paying the expenses incurred by the Avoidance Action Trust Administrator (including fees and expenses for professionals retained by the Avoidance Action Trust) in connection with the Avoidance Action Trust and any obligations imposed on the Avoidance Action Trust Administrator or the Avoidance Action Trust, including expenses relating to the performance of the Avoidance Action Trust Administrator's obligations under the Avoidance Action Trust Agreement and Section 6.5 hereof. The Debtors shall reserve $1.5 million for the Avoidance Action Trust Administrative Cash, which shall be transferred to the Avoidance Action Trust on the Avoidance Action Trust Transfer Date.

**1.21** **Avoidance Action Trust Administrator** means the entity appointed by the Debtors, with the consent of the U.S. Treasury and the Creditors' Committee, to serve

as administrator of the Avoidance Action Trust, pursuant to the terms of the Avoidance Action Trust Agreement, or as subsequently may be appointed pursuant to the terms of the Avoidance Action Trust Agreement. The identity of the Avoidance Action Trust Administrator shall be Wilmington Trust Company. The Avoidance Action Trust Administrator shall be the successor-plaintiff in the Term Loan Avoidance Action.

**1.22** **Avoidance Action Trust Agreement** means that certain Avoidance Action Trust Agreement executed by the Debtors and the Avoidance Action Trust Administrator, substantially in the form included in the Plan Supplement.

**1.23** **Avoidance Action Trust Assets** means the (i) Term Loan Avoidance Action transferred to the Avoidance Action Trust and any proceeds thereof (for the benefit of the Term Loan Avoidance Action Beneficiaries) and (ii) the Avoidance Action Trust Administrative Cash transferred to the Avoidance Action Trust.

**1.24** **Avoidance Action Trust Claims Reserve** means the Avoidance Action Trust Assets allocable to, or retained on account of, Disputed General Unsecured Claims, the Asbestos Trust Claim, and the potential General Unsecured Claims arising from any successful recovery of proceeds from the Term Loan Avoidance Action or other Avoidance Actions.

**1.25** **Avoidance Action Trust Monitor** means the entity appointed by the Debtors, with the consent of the U.S. Treasury and the Creditors' Committee, to oversee the Avoidance Action Trust, pursuant to the terms of the Avoidance Action Trust Agreement, or as subsequently may be appointed pursuant to the terms of the Avoidance Action Trust Agreement. The identity of the Avoidance Action Trust Monitor shall be FTI Consulting, Inc.

**1.26** **Avoidance Action Trust Transfer Date** means the date selected by the Debtors, with the consent of the U.S. Treasury and (a) the Creditors' Committee prior to the Effective Date or (b) the GUC Trust Administrator on or after the Effective Date, as applicable, on which the Avoidance Action Trust Assets are transferred to the Avoidance Action Trust, which transfer shall occur on or before December 15, 2011.

**1.27** **Ballot** means the form(s) distributed to holders of impaired Claims on which is to be indicated the acceptance or rejection of the Plan.

**1.28** **Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.29** **Bankruptcy Court** means the United States District Court for the Southern District of New York, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**1.30**    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

**1.31**    **Budget** means that certain budget for the post-Effective Date period agreed to by the U.S. Treasury, as a DIP Lender, the Debtors, and the Creditors' Committee detailing the funding of, among other things, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, the Indenture Trustee/Fiscal and Paying Agent Reserve Cash, and any other post-Effective Date obligations detailed in the Plan or in the GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental Response Trust Agreement, or the Avoidance Action Trust Agreement.  A copy of the Budget is annexed to the Disclosure Statement as Exhibit "B."

**1.32**    **Business Day** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

**1.33**    **Cash** means legal tender of the United States of America.

**1.34**    **Causes of Action** means the Avoidance Actions and any and all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, claims, and demands whatsoever, whether known or unknown, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part on any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Cases, including through the Effective Date, except to the extent the prosecution of any Causes of Action are prohibited by the DIP Credit Agreement.

**1.35**    **Chapter 11 Cases** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Commencement Date in the Bankruptcy Court and currently styled *In re Motors Liquidation Company, et al. f/k/a General Motors Corp. et al,* Ch. 11 Case No. 09-50026 (REG) (Jointly Administered).

**1.36**    **Claim** has the meaning set forth in section 101 of the Bankruptcy Code.

**1.37**    **Claim Settlement Procedures** means the procedures for settling Claims approved by order of the Bankruptcy Court, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b) authorizing the Debtors to (i) file omnibus Claims objections and (ii) establish procedures for settling certain Claims, entered October 6, 2009 (ECF No. 4180).

**1.38**    **Class** means any group of Claims or Equity Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

**1.39    Collateral** means any property or interest in property of the estate of any Debtor subject to a lien, charge, or other encumbrance to secure the payment or performance of a Claim, which lien, charge, or other encumbrance is not subject to avoidance under the Bankruptcy Code.

**1.40    Commencement Date** means (i) June 1, 2009 with respect to Motors Liquidation Company; MLC of Harlem, Inc.; MLCS, LLC; and MLCS Distribution Corporation and (ii) October 9, 2009 with respect to Remediation and Liability Management Company, Inc. and Environmental Corporate Remediation Company, Inc.

**1.41    Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

**1.42    Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**1.43    Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**1.44    Creditors' Committee** means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

**1.45    Debtors** means Motors Liquidation Company; MLC of Harlem, Inc.; MLCS, LLC; MLCS Distribution Corporation; Remediation and Liability Management Company, Inc.; and Environmental Corporate Remediation Company, Inc., whether prior to or on and after the Effective Date.

**1.46    Demand** means a demand for payment that (i) was not a Claim during the Chapter 11 Cases, (ii) arises out of the same or similar conduct or events that gave rise to Asbestos Personal Injury Claims addressed by the Asbestos Trust, and (iii) is to be paid or otherwise addressed by the Asbestos Trust pursuant to the Plan.

**1.47    DIP Credit Agreement** means that certain Amended and Restated Superpriority Debtor-in-Possession Credit Agreement, dated as of July 10, 2009, as amended, among Motors Liquidation Company (f/k/a General Motors Corporation), as borrower, the Guarantors (as defined therein), and the United States Department of the Treasury and Export Development Canada, as lenders, and any of the documents and instruments relating thereto or referred to therein.

**1.48    DIP Credit Agreement Claims** means all Claims arising under the DIP Credit Agreement.

**1.49    DIP Lenders** means the U.S. Treasury and EDC, as lenders under the DIP Credit Agreement.

**1.50**   **DIP Lenders' Avoidance Actions** means any actions commenced, or that may be commenced, before or after the Effective Date pursuant to sections 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code, except (i) to the extent purchased by New GM under the MSPA or prohibited under the DIP Credit Agreement and (ii) for the Term Loan Avoidance Action.

**1.51**   **DIP Lenders' Avoidance Assets** means the collections, if any, realized on the settlement or resolution of any Avoidance Actions other than the Term Loan Avoidance Actions.

**1.52**   **DIP Lenders' Collateral** means all Collateral of the DIP Lenders under the DIP Credit Agreement.

**1.53**   **Disclosure Statement** means the disclosure statement relating to the Plan, including, without limitation, all exhibits thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

**1.54**   **Disputed** means, with respect to any Claim (other than an Asbestos Personal Injury Claim) that has not been Allowed pursuant to the Plan or a Final Order,

(a) if no proof of Claim has been filed by the applicable deadline:  a Claim (other than an Asbestos Personal Injury Claim) that has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but as to which the Debtors or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; or

(b) if a proof of Claim or request for payment of an Administrative Expense has been filed by the applicable deadline:  (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules, (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but the nature or amount of the Claim as asserted in the proof of Claim varies from the nature and amount of such Claim as listed on the Schedules, (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated, or (iv) a Claim for which a timely objection or request for estimation is interposed by the Debtors or other authorized Entity which has not been withdrawn or determined by a Final Order.  Any Claim expressly allowed by a Final Order, pursuant to the Claim Settlement Procedures, or under this Plan shall be an Allowed Claim, not a Disputed Claim.

For the avoidance of doubt, if no proof of Claim has been filed by the applicable deadline and the Claim (other than an Asbestos Personal Injury Claim) has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated, such Claim shall not be valid and shall be disregarded.

**1.55**   **Distribution Record Date** means the Confirmation Date.

**1.56** **District Court** means the United States District Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

**1.57** **EDC** means the Government of Canada and the Government of Ontario, through Export Development Canada, Canada's export trading agency.

**1.58** **Effective Date** means a Business Day on or after the Confirmation Date specified by the Debtors on which the conditions to the effectiveness of the Plan specified in Section 9.2 hereof have been satisfied or otherwise effectively waived. The Debtors shall file a notice of the Effective Date with the Bankruptcy Court and with the Securities and Exchange Commission. The Debtors and/or the Creditors' Committee shall issue a press release regarding the Effective Date.

**1.59** **ENCORE** means Environmental Corporate Remediation Company, Inc., a Delaware corporation, as debtor or debtor in possession, as the context requires.

**1.60** **Encumbrance** means, with respect to any asset, any mortgage, lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such asset (including, without limitation, any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction).

**1.61** **Entity** means an individual, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, or government or any political subdivision thereof, or other Person or entity.

**1.62** **Environmental Action** means any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and operation, monitoring, and maintenance activities authorized or required under law with respect to a Property.

**1.63** **Environmental Laws** means any federal, state, or local laws, including ordinances, statutes, common law, codes, rules, regulations, orders, or decrees, now or hereinafter in effect, relating to (i) pollution, (ii) the protection or regulation of human health, natural resources, or the environment, (iii) the management of hazardous materials, or (iv) the release of hazardous materials into the environment.

**1.64** **Environmental Response Trust** means the Environmental Response Trust established under the Plan in accordance with the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.65** **Environmental Response Trust Administrative Funding Account** means the funding held by the Environmental Response Trust for the administration of the Environmental Response Trust, including property taxes, liability insurance, security, demolition costs, other plant wind-down costs, and any obligations imposed on the Environmental Response Trust or the Environmental Response Trust Administrative Trustee pursuant to the Plan, including expenses relating to the performance of the Environmental Response Trust Administrative Trustee's obligations under the Environmental Response Trust Agreement and Section 6.4 hereof. The funding of the Environmental Response Trust Administrative Funding Account and the management of such funding shall be as provided in the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.66** **Environmental Response Trust Administrative Trustee** means the trustee or trustees designated to serve in a fiduciary capacity consistent with, and in furtherance of, the Environmental Response Trust, pursuant to the terms of the Environmental Response Trust Agreement or as subsequently may be appointed pursuant to the terms of the Environmental Response Trust Agreement.

**1.67** **Environmental Response Trust Agreement** means that certain Environmental Response Trust Agreement executed by MLC, the Governmental Authorities, the United States, and the Environmental Response Trust Administrative Trustee, substantially in the form annexed to the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.68** **Environmental Response Trust Assets** means the Environmental Response Trust Administrative Funding Account and the assets transferred to the Environmental Response Trust in accordance with the Plan, the Environmental Response Trust Agreement, and the Environmental Response Trust Consent Decree and Settlement Agreement, but shall not include any New GM Securities. The Environmental Response Trust Assets shall be comprised of (i) Cash in the amount of $641,434,945, less any deductions made pursuant to Paragraph 36 of the Environmental Response Trust Consent Decree and Settlement Agreement, (ii) the Environmental Response Trust Properties, (iii) personal property, including equipment, related to certain of the Environmental Response Trust Properties set forth on Attachment A to the Environmental Response Trust Consent Decree and Settlement Agreement, (iv) all leases of manufacturing facilities with New GM, and (v) all property management contracts and contracts related to the Environmental Actions relating to the Environmental Response Trust Properties that the Debtors and the Environmental Response Trust Administrative Trustee agree should be assumed by the Environmental Response Trust.

**1.69** **Environmental Response Trust Consent Decree and Settlement Agreement** means that certain Consent Decree and Settlement Agreement among the Debtors, the Environmental Response Trust Administrative Trustee, the United States, certain States, and the St. Regis Mohawk Tribe establishing an Environmental Response Trust for certain Environmental Response Trust Properties in Delaware, Illinois, Indiana, Kansas, Louisiana, Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio,

Pennsylvania, Virginia, and Wisconsin, executed by MLC and the Governmental Authorities, in the form annexed hereto as Exhibit "C."

**1.70** **Environmental Response Trust Parties** means the Environmental Response Trust, the Environmental Response Trust Administrative Trustee, and the Environmental Response Trust's officers, directors, employees, consultants, agents, or other professionals or representatives employed by the Environmental Response Trust or the Environmental Response Trust Administrative Trustee.

**1.71** **Environmental Response Trust Properties** means the properties set forth on Attachment A to the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.72** **Environmental Response Trust Transfer Date** means the date on which the Environmental Response Trust Assets are transferred to the Environmental Response Trust, which transfer shall occur on the Effective Date.

**1.73** **Equity Interest** means the interest of any holder of an equity security of any of the Debtors, or any direct or indirect subsidiaries of the Debtors, represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in any of the Debtors, or any direct or indirect subsidiaries of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

**1.74** **Eurobond Claim** means a Claim against any of the Debtors arising under or in connection with any of the respective notes, bonds, or debentures issued under (i) that certain Fiscal and Paying Agency Agreement, dated as of July 3, 2003, among General Motors Corporation, Deutsche Bank AG London, and Banque Générale du Luxembourg S.A. and (ii) that certain Bond Purchase and Paying Agency Agreement, dated May 28, 1986, between General Motors Corporation and Credit Suisse, excluding the fees and expenses of the Fiscal and Paying Agents thereunder, which reasonable fees and expenses shall be paid pursuant to Section 2.5 hereof.

**1.75** **Final Order** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceeding for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired. The susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code shall not render a Final Order not a Final Order.

**1.76    Fiscal and Paying Agency Agreements** means (i) that certain Fiscal and Paying Agency Agreement, dated as of July 3, 2003, among General Motors Corporation, Deutsche Bank AG London, and Banque Générale du Luxembourg S.A, (ii) that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, among General Motors Nova Scotia Finance Company, General Motors Corporation, Deutsche Bank Luxembourg S.A., and Banque Générale du Luxembourg S.A., and (iii) that certain Bond Purchase and Paying Agency Agreement, dated May 28, 1986, between General Motors Corporation and Credit Suisse.

**1.77    Fiscal and Paying Agents** means the fiscal and paying agents under each of the Fiscal and Paying Agency Agreements and any and all successors or predecessors thereto.

**1.78    Future Claimants' Representative** means Dean M. Trafalet, the Legal Representative for Future Claimants appointed pursuant to the order dated and entered by the Bankruptcy Court on April 8, 2010.

**1.79    General Unsecured Claim** means any Claim against any of the Debtors that is (i) not an Administrative Expense, Priority Tax Claim, Secured Claim, Priority Non-Tax Claim, Asbestos Personal Injury Claim, or Property Environmental Claim or (ii) otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.  Upon settlement or determination by Final Order of the Asbestos Trust Claim, the Asbestos Trust Claim shall be treated as an Allowed General Unsecured Claim in Class 3 for purposes of distribution from the GUC Trust and the Avoidance Action Trust, as applicable; *provided, however*, that any General Unsecured Claims reserved in Paragraph 100 of the Environmental Response Trust Consent Decree and Settlement Agreement are General Unsecured Claims.

**1.80    Governmental Authorities** means the United States of America, on behalf of the Environmental Protection Agency; the States of Delaware, Illinois, Kansas, Louisiana, Massachusetts, Michigan, Missouri, New Jersey, New York, Ohio, Pennsylvania, Virginia, Wisconsin; and the Saint Regis Mohawk Tribe, each as parties to the Environmental Response Trust Consent Decree and Settlement Agreement.

**1.81    GUC Trust** means the trust established under the Plan in accordance with the GUC Trust Agreement.

**1.82    GUC Trust Administrative Fund** means the fund established, held, and maintained by the GUC Trust Administrator for the purpose of paying the expenses incurred by the GUC Trust Administrator (including fees and expenses for professionals retained by the GUC Trust) in connection with the GUC Trust and any obligations imposed on the GUC Trust Administrator or the GUC Trust, including expenses relating to the performance of the GUC Trust Administrator's obligations under the GUC Trust Agreement and Section 6.2 hereof.  The Debtors shall deposit $57 million into the GUC Trust Administrative Fund on the GUC Trust Transfer Date.

**1.83**    **GUC Trust Administrator** means the entity appointed by the Creditors' Committee with the consent of the Debtors to serve as administrator of the GUC Trust, pursuant to the terms of the GUC Trust Agreement, or as subsequently may be appointed pursuant to the terms of the GUC Trust Agreement.  The GUC Trust Administrator shall be Wilmington Trust Company.

**1.84**    **GUC Trust Agreement** means that certain GUC Trust Agreement executed by the Debtors and the GUC Trust Administrator, substantially in the form annexed hereto as Exhibit "D."

**1.85**    **GUC Trust Assets** means the (i) GUC Trust Administrative Fund (comprised of Cash in the amount of $57 million) and (ii) New GM Securities.

**1.86**    **GUC Trust Monitor** means the entity appointed by the Creditors' Committee with the consent of the Debtors to oversee the GUC Trust, pursuant to the terms of the GUC Trust Agreement, or as subsequently may be appointed pursuant to the terms of the GUC Trust Agreement.  The GUC Trust Monitor shall be FTI Consulting, Inc.

**1.87**    **GUC Trust Transfer Date** means the date on which the GUC Trust Assets are transferred to the GUC Trust, which transfer shall occur on the Effective Date, or as soon thereafter as is reasonably practicable, but shall be no later than December 15, 2011.

**1.88**    **GUC Trust Units** means the units of beneficial interests in the GUC Trust.

**1.89**    **Indentures** means (i) the Indenture, dated as of November 15, 1990, between General Motors Corporation, as issuer, and Wilmington Trust Company, as successor-in-interest Indenture Trustee to Citibank, N.A., as such Indenture may have been amended, supplemented, or modified, pursuant to which (a) $299,795,000 of 9.40% Debentures due July 15, 2021 were issued on July 22, 1991, (b) $600,000,000 of 8.80% Notes due March 1, 2021 were issued on March 12, 1991, (c) $500,000,000 of 7.40% Debentures due September 1, 2025 were issued on September 11, 1995, (d) $15,000,000 of 9.40% Medium Term Notes due July 15, 2021 were issued on July 22, 1991, and (e) $48,175,000 of 9.45% Medium Term Notes due November 1, 2011 were issued on December 21, 1990, (ii) the Indenture, dated as of December 7, 1995, between General Motors Corporation, as issuer, and Wilmington Trust Company, as successor-in-interest Indenture Trustee to Citibank, N.A., as such Indenture may have been amended, supplemented, or modified, pursuant to which (a) $377,377,000 of 7.75% Discount Debentures due March 15, 2036 were issued on March 20, 1996, (b) $500,000,000 of 7.70% Debentures due April 15, 2016 were issued on April 15, 1996, (c) $400,000,000 of 8.10% Debentures due June 15, 2024 were issued on June 10, 1996, (d) $600,000,000 of 6.75% Debentures due May 1, 2028 were issued on April 29, 1998, (e) $1,500,000,000 of 7.20% Notes due January 15, 2011 were issued on January 11, 2001, (f) $575,000,000 of 7.25% Quarterly Interest Bonds due April 15, 2041 were issued on April 30, 2001, (g)

$718,750,000 of 7.25% Senior Notes due July 15, 2041 were issued on July 9, 2001, (h) $690,000,000 of 7.375% Senior Notes due October 1, 2051 were issued on October 3, 2001, (i) $875,000,000 of 7.25% Senior Notes due February 15, 2052 were issued on February 14, 2002, (j) $1,150,000,000 of 4.50% Series A Convertible Senior Debentures due March 6, 2032 were issued on March 6, 2002, (k) $2,600,000,000 of 5.25% Series B Convertible Senior Debentures due March 6, 2032 were issued on March 6, 2002, (l) $1,115,000,000 of 7.375% Senior Notes due May 15, 2048 were issued on May 19, 2003, (m) $425,000,000 of 7.375% Senior Notes due May 23, 2048 were issued on May 23, 2003, (n) $3,000,000,000 of 8.375% Senior Debentures due July 15, 2033 were issued on July 3, 2003, (o) $4,300,000,000 of 6.25% Series C Convertible Senior Debentures due July 15, 2033 were issued on July 2, 2003, (p) $1,250,000,000 of 8.250% Senior Debentures due July 15, 2023 were issued on July 3, 2003, (q) $1,000,000,000 of 7.125% Senior Notes due July 15, 2013 were issued on July 3, 2003, (r) $ 720,000,000 of 7.50% Senior Notes due July 1, 2044 were issued on June 30, 2004, and (s) $1,500,000,000 of 1.50% Series D Convertible Senior Debentures due June 1, 2009 were issued on May 31, 2007, (iii) the Trust Indenture, dated as of July 1, 1995, between Michigan Strategic Fund and Law Debenture, as successor-in-interest Trustee to Dai-Ichi Kangyo Trust Company of New York, as such Indenture may have been amended, supplemented, or modified, related to $58,800,000 Michigan Strategic Fund Multi-Modal Interchangeable Rate Pollution Control Refunding Revenue Bonds Series 1995, (iv) the Indenture of Trust, dated as of July 1, 1994, between City of Moraine, Ohio and Law Debenture, as successor-in-interest Trustee to Dai-Ichi Kangyo Trust Company of New York, as such Indenture may have been amended, supplemented, or modified, related to $12,500,000 Solid Waste Disposal Revenue Bonds (General Motors Corporation Project) Series 1994, (v) the Indenture, dated as of July 1, 1999, between City of Moraine, Ohio and Law Debenture, as successor-in-interest Trustee to Dai Ichi Kangyo Trust Company of New York, as such Indenture may have been amended, supplemented, or modified, related to $10,000,000 Solid Waste Disposal Revenue Bonds (General Motors Project), Series 1999, (vi) the Trust Indenture, dated as of December 1, 2002, between City of Fort Wayne, Indiana and Law Debenture, as successor-in-interest Trustee to JPMorgan Chase Bank, and Bank One Trust Company, N.A., as Co-Trustee, as such Indenture may have been amended, supplemented, or modified, related to $31,000,000 City of Fort Wayne, Indiana Pollution Control Revenue Bonds (General Motors Corporation Project), Series 2002, (vii) the Trust Indenture, dated as of March 1, 2002, between Ohio Water Development Authority and Law Debenture, as successor-in-interest Trustee to JPMorgan Chase Bank, as such Indenture may have been amended, supplemented, or modified, related to $20,040,000 State of Ohio Pollution Control Refunding Revenue Bonds (General Motors Corporation Project), Series 2002, (viii) the Indenture of Trust, dated as of December 1, 2002, between Ohio Water Development Authority and Law Debenture, as successor-in-interest Trustee to JPMorgan Chase Bank, as such Indenture may have been amended, supplemented, or modified, related to $46,000,000 State of Ohio Solid Waste Revenue Bonds, Series 2002 (General Motors Corporation Project), and (ix) the Trust Indenture, dated as of April 1, 1984, among City of Indianapolis, Indiana and Law Debenture, as successor-in-interest Trustee to Bankers Trust Company, and the Indiana National Bank, as Co-Trustee, as such Indenture may have been

amended, supplemented, or modified, relating to $1,400,000 City of Indianapolis, Indiana Pollution Control Revenue Bonds (General Motors Corporation Project), Series 1984.

**1.90** **Indenture Trustee/Fiscal and Paying Agent Reserve Cash** means Cash in the aggregate amount of $3.8 million, which shall be used to pay or reimburse the Indenture Trustees and the Fiscal and Paying Agents for administering distributions to Registered Holders as contemplated by the Plan, including all reasonable fees and expenses related thereto (including the reasonable fees and expenses of the respective counsel, advisors, and/or agents of the Indenture Trustees and the Fiscal and Paying Agents), and for compensating for any loss, liability, or reasonable expenses incurred without negligence or bad faith on the part of the Indenture Trustees or the Fiscal and Paying Agents, as applicable, arising out of or in connection with the performance of their duties under the Indentures or Fiscal and Paying Agency Agreements, as applicable, including the reasonable costs and expenses of defending themselves against any claim of liability, from beneficial holders of the securities issued pursuant to the Indentures and Fiscal and Paying Agency Agreements, the Registered Holders, or otherwise, related thereto.

**1.91** **Indenture Trustees** means the trustees, co-trustees, agents, paying agents, distribution agents, authenticating agents, registrars, and bond registrars under the respective Indentures, and any and all successors or predecessors thereto.

**1.92** **Indirect Asbestos Claim** means any Claim or remedy, liability, or Demand against (i) the Debtors, (ii) present affiliates and divisions of the Debtors, or (iii) former affiliates and divisions of the Debtors to the extent the Claim, remedy, liability, or Demand relate to the period of time during which the Debtors operated the respective affiliates or divisions, now existing or hereafter arising, whether or not such Claim, remedy, liability, or Demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases for such Claim, remedy, liability, or Demand are known or unknown, that is (i) (A) held by (I) any Entity (other than a director or officer entitled to indemnification pursuant to Section 12.5 hereof) who has been, is, or may be a defendant in an action seeking damages for (a) death, bodily injury, sickness, disease, or other personal injuries (whether physical, emotional, or otherwise) to the extent caused or allegedly caused, directly or indirectly, by exposure to asbestos or asbestos-containing products or (b) property damage, including but not limited to, the cost of inspecting, maintaining, encapsulating, repairing, decontaminating, removing, or disposing of asbestos or asbestos-containing products in buildings, other structures, or other property, to the extent caused or allegedly caused, directly or indirectly, by the presence of or exposure (whether prior to or after the Commencement Date) to asbestos or asbestos-containing products or things that are or were installed, engineered, designed, manufactured, fabricated, constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, used, removed, replaced, or disposed by the Debtors or an Entity for whose products or operations the Debtors allegedly have liability or for which the Debtors are otherwise allegedly liable, or (II) any assignee or transferee of such Entity, and (B) on

account of alleged liability of the Debtors for reimbursement, indemnification, subrogation, or contribution of any portion of any damages such Entity has paid or may pay to the plaintiff in such action, or (ii) held by any Entity that is seeking reimbursement indemnification, subrogation, or contribution from the Debtors with respect to any surety bond, letter of credit, or other financial assurance issued by any Entity on account of, or with respect to, Asbestos Claims.

**1.93** **Initial Debtors** means MLC; MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.); MLCS, LLC (f/k/a Saturn, LLC); and MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation).

**1.94** **Medical Lien** means any lien on, or right of payment from, any distributions made hereunder to a holder of a personal injury or products liability Claim that is held or can be asserted by any public or private entity or unit, including, without limitation, Medicare and Medicaid.

**1.95** **MLC** means Motors Liquidation Company (f/k/a General Motors Corporation), a Delaware corporation, the parent debtor or debtor in possession, as the context requires.

**1.96** **MSPA** means that certain Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation and its debtor subsidiaries, as Sellers, and NGMCO, Inc., as successor in interest to Vehicle Acquisition Holdings LLC, a purchaser sponsored by the U.S. Treasury, as Purchaser, dated as of June 26, 2009, together with all related documents and agreements as well as all exhibits, schedules, and addenda thereto, as amended, restated, modified, or supplemented from time to time.

**1.97** **New GM** means General Motors Company (formerly known as General Motors Holding Company), a Delaware corporation formed as part of that certain holding company reorganization that occurred on October 19, 2009, pursuant to which all of the outstanding shares of common stock and preferred stock of the prior General Motors Company (now known as "**General Motors LLC**") were exchanged on a one-for-one basis for shares of common stock and preferred stock of the newly organized holding company that now bears the name General Motors Company. General Motors Company has a 100% ownership interest in General Motors Holdings LLC, a Delaware limited liability company, and General Motors LLC is a direct wholly-owned subsidiary of General Motors Holdings LLC.

**1.98** **New GM Securities** means the New GM Stock and the New GM Warrants, each of which was received as consideration pursuant to the 363 Transaction as embodied in the MSPA.

**1.99** **New GM Stock** means the stock of New GM, including any additional shares issued if the Bankruptcy Court determines that the estimated amount of (i)

Allowed General Unsecured Claims against the Initial Debtors and (ii) the Allowed Asbestos Trust Claim against the Initial Debtors collectively exceeds $35 billion.

**1.100** **New GM Warrants** means (i) the warrants to acquire 136,363,635 newly issued shares of New GM Stock, with an exercise price set at $10.00 per share, and (ii) the warrants to acquire 136,363,635 newly issued shares of New GM Stock, with an exercise price set at $18.33 per share.

**1.101** **Note Claim** means a Claim against any of the Debtors arising under or in connection with any Indenture and the respective notes, bonds, or debentures issued thereunder, excluding the fees and expenses of the Indenture Trustees, which reasonable fees and expenses shall be paid pursuant to Section 2.5 hereof.

**1.102** **Nova Scotia Guarantee Claims** means the Claims against any of the Debtors arising under or in connection with the guarantee of the notes, bonds, or debentures issued under that certain Fiscal and Paying Agency Agreement, dated as of July 10, 2003, among General Motors Nova Scotia Finance Company, General Motors Corporation, Deutsche Bank Luxembourg S.A., and Banque Générale du Luxembourg S.A., excluding any claims for the fees and expenses of the Fiscal and Paying Agent thereunder to the extent such fees and expenses are paid pursuant to Section 2.5 hereof. The Nova Scotia Guarantee Claims include, without limitation, Claims evidenced by the following:  (a) Proof of Claim No. 69551 filed by Greenberg Traurig, LLP (the "**Protective Claim**"); (b) Proof of Claim No. 66216 filed by Thoroughbred Fund LP; Proof of Claim No. 66217 filed by Palomino Fund LTD; Proof of Claim No. 66218 filed by Perry Partners International Inc.; Proof of Claim No. 66265 filed by Aurelius Investment LLC; Proof of Claim No. 66266 filed by Elliot International LP; Proof of Claim No. 67429 filed by Onex Debt Opportunity Fund, LTD; Proof of Claim No. 67499 filed by FCOF UB Securities LLC; Proof of Claim No. 66267 filed by The Liverpool Limited Partnership; Proof of Claim No. 66312 filed by Perry Partners LP; Proof of Claim No. 67428 filed by Drawbridge DSO Securities LLC; Proof of Claim No. 67430 filed by Redwood Master Fund LTD; Proof of Claim No. 67498 filed by Appaloosa Investment Limited Partnership I; Proof of Claim No. 67500 filed by Drawbridge OSO Securities LLC; and Proof of Claim No. 67501 filed by Thoroughbred Master LTD (collectively, the "**Specified Nova Scotia Noteholder Claims**"); and (c) Proof of Claim No. 1558 filed by Collins Stewart (CI) Ltd.; Proof of Claim No. 12042 filed by Sylvia Auerbach; Proof of Claim No. 37319 filed by Ing. Hugo Wagner; Proof of Claim No. 60567 filed by UBS AG, Zurich (Switzerland); Proof of Claim No. 61481 filed by Mr. Aly Aziz; Proof of Claim No. 63955 filed by Sirdar Aly Aziz; Proof of Claim No. 64332 filed by Josef Schmidseder; Proof of Claim No. 64340 filed by Hermann & Helene Dettmar; Proof of Claim No. 65554 filed by Claus Pedersen; Proof of Claim No. 70201 filed by Morgan Stanley & Co. International plc; Proof of Claim No. 66206 (amended by Proof of Claim No. 70201) filed by Morgan Stanley & Co., International plc; Proof of Claim No. 68705 filed by Bhalodia RV/RM/Patel RG; Proof of Claim No. 68941 filed by Red River Business Inc.; Proof of Claim No. 1556 filed by Collins Stewart (CI) Ltd.; Proof of Claim No. 23323 filed by Ulrich Seipp; Proof of Claim No. 29128 filed by Lixandroiu Anca Cristina; Proof of Claim No. 29379 filed by SPH Invest S.A.; Proof of

Claim No. 29647 filed by Consilium Treuhand AG & Beata Domus Anstalt; Proof of Claim No. 29648 filed by Maria-Dorothea Laminet; Proof of Claim No. 49548 filed by Brencourt Credit Opportunities Master, Ltd; Proof of Claim No. 60234 filed by Allianz Bank Financial Advisors SPA; Proof of Claim No. 60547 filed by Rui Manuel Antunes Goncalves Rosa; Proof of Claim No. 60566 filed by UBS AG, Zurich (Switzerland); Proof of Claim No. 61915 filed by Johanna Schoeffel; Proof of Claim No. 64298 filed by CSS, LLC; Proof of Claim No. 66769 filed by Banca delle Marche SPA; Proof of Claim No. 67345 (amended by Proof of Claim No. 70200) filed by Morgan Stanley & Co. International plc; Proof of Claim No. 70200 filed by Morgan Stanley & Co. International plc; Proof of Claim No. 69306 filed by Canyon Value Realization Fund LP; Proof of Claim No. 69307 filed by Lyxor/Canyon Value Realization Fund Limited; Proof of Claim No. 69308 filed by Canyon-GRF Master Fund, LP; Proof of Claim No. 69309 filed by The Canyon Value Realization Fund (Cayman), Ltd; Proof of Claim No. 69734 filed by Anchorage Capital Master Offshore Ltd; Proof of Claim No. 31168 filed by Credit Suisse AG; Proof of Claim No. 31868 filed by Cheviot Asset Management; Proof of Claim No. 31167 filed by Credit Suisse AG; Proof of Claim No. 65765 filed by HFR RVA Advent Global Opportunity Master Trust; Proof of Claim No. 65784 filed by The Advent Global Opportunity Master Fund; Proof of Claim No. 69552 filed by CitiGroup Global Markets Inc.; Proof of Claim No. 67244 filed by Prospect Mountain Fund Limited; and Proof of Claim No. 67245 filed by Ore Hill Credit Hub Fund Ltd (collectively, the "**Nova Scotia Individual Claims**").

**1.103** **Nova Scotia Wind-Up Claim** means the Claim filed or otherwise asserted by Green Hunt Wedlake, Inc. (the "**Nova Scotia Trustee**") under Nova Scotia law, including, without limitation, the Claim evidenced by Proof of Claim No. 66319 filed by the Nova Scotia Trustee.

**1.104** **Person** has the meaning set forth in section 101(41) of the Bankruptcy Code.

**1.105** **Plan** means this chapter 11 plan, as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

**1.106** **Plan Supplement** means the forms of documents, in a form reasonably acceptable to the U.S .Treasury, the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative, to the extent such document affects the respective party, effectuating the transactions contemplated by this Plan, which documents shall be filed with the Clerk of the Bankruptcy Court no later than ten (10) days prior to the Confirmation Hearing. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected at the Office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims and Equity Interests may obtain a copy of the Plan Supplement upon written request to the undersigned counsel. Copies of the Plan Supplement also are available on the Voting Agent's website, www.motorsliquidationdocket.com.

**1.107** **Post-Effective Date MLC** means MLC on and after the Effective Date.

**1.108** **Priority Non-Tax Claim** means any Claim, other than an Administrative Expense or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.

**1.109** **Priority Order Sites** means the non-owned sites, as set forth on Exhibit "E" hereto, that are subject to an order requiring performance of an Environmental Action.

**1.110** **Priority Order Sites Consent Decrees and Settlement Agreements** means the Consent Decrees and Settlement Agreements to be filed with the Bankruptcy Court in respect of the Priority Order Sites.

**1.111** **Priority Tax Claim** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code other than Priority Tax Claims that New GM is liable for under the MSPA.

**1.112** **Pro Rata Share** means the ratio (expressed as a percentage) of (i) the amount of any Allowed Claim in a particular Class to (ii) the sum of (x) the aggregate amount of Allowed Claims in such Class and (y) the aggregate amount of Disputed Claims in such Class. Solely for purposes of determining the Pro Rata Share with respect to any distribution from (a) the Debtors with respect to the Term Loan Avoidance Action, (b) the GUC Trust, or (c) the Avoidance Action Trust, the aggregate amount of Disputed Claims shall include (x) Disputed General Unsecured Claims, (y) the Asbestos Trust Claim in the amount set forth in the Confirmation Order until such time as the amount of the Asbestos Trust Claim is finally determined as set forth in Section 1.15 hereof, and (z) the "Maximum Amount" (as defined in the GUC Trust Agreement) of the potential General Unsecured Claims arising from any successful recovery of proceeds from the Term Loan Avoidance Action or other Avoidance Actions. The Debtors may seek a determination by the Bankruptcy Court of the amount that should be reserved in determining the Pro Rata Share on account of Disputed Claims on an individual or aggregate basis.

**1.113** **Property or Properties** means the Environmental Response Trust Properties and the Priority Order Sites.

**1.114** **Property Environmental Claim** means any civil Claim or Cause of Action by the Governmental Authorities against the Debtors under Environmental Laws with respect to the Properties except for any General Unsecured Claim reserved in Paragraph 100 of the Environmental Response Trust Consent Decree and Settlement Agreement or the Priority Order Sites Consent Decrees and Settlement Agreements.

**1.115** **Protected Party** means (i) the Debtors, (ii) any Entity that, pursuant to the Plan or after the Effective Date, becomes a direct or indirect transferee of, or successor

to, any assets of the Debtors (including, without limitation, the GUC Trust, the Environmental Response Trust, the Avoidance Action Trust, the GUC Trust Administrator, the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the GUC Trust Monitor, the Avoidance Action Trust Monitor, and their respective professionals) or the Asbestos Trust (but only to the extent that liability is asserted to exist by reason of its becoming such a transferee or successor), (iii) the holders of DIP Credit Agreement Claims, (iv) any Entity that, pursuant to the Plan or after the Effective Date, makes a loan to the Debtors, Post-Effective Date MLC, or the Asbestos Trust, or to a successor to, or transferee of, any assets of the Debtors or the Asbestos Trust (but only to the extent that liability is asserted to exist by reason of such Entity's becoming such a lender or to the extent any pledge of assets made in connection with such a loan is sought to be upset or impaired), or (v) any Entity, including, without limitation, Remy International, Inc. (f/k/a Delco Remy International, Inc. and DR International, Inc. and its wholly-owned subsidiary Remy Inc. (f/k/a Delco Remy America, Inc. and DRA Inc.)) ("**Remy**") to the extent he, she, or it is alleged to be directly or indirectly liable for the conduct of, Claims against, or Demands on the Debtors or the Asbestos Trust on account of Asbestos Personal Injury Claims by reason of one or more of the following:  (a) such Entity's ownership of a financial interest in the Debtors, a past or present affiliate of the Debtors, or a predecessor in interest of the Debtors, (b) such Entity's involvement in the management of the Debtors or any predecessor in interest of the Debtors, (c) such Entity's service as an officer, director, or employee of the Debtors, any past or present affiliate of the Debtors, any predecessor in interest of the Debtors, or any Entity that owns or at any time has owned a financial interest in the Debtors, any past or present affiliate of the Debtors, or any predecessor in interest of the Debtors, (d) such Entity's provision of insurance to the Debtors, any past or present affiliate of the Debtors, any predecessor in interest of the Debtors, or any Entity that owns or at any time has owned a financial interest in (I) the Debtors, (II) any past or present affiliate of the Debtors, or (III) any predecessor in interest of the Debtors, but only to the extent that the Debtors or the Asbestos Trust enters into a settlement with such Entity that is approved by the Bankruptcy Court and expressly provides that such Entity shall be a Protected Party under the Plan, (e) such Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the Debtors, any past or present affiliate of the Debtors, any predecessor in interest of the Debtors, or any Entity that owns or at any time has owned a financial interest in the Debtors, any past or present affiliate of the Debtors, or any predecessor in interest of the Debtors, (f) such Entity's current ownership of the assets of a former division of the Debtors or a former division of the Debtors, or (g) such Entity's lease of real property owned or formerly owned by the Debtors.  Notwithstanding the foregoing, New GM shall not be included in the definition of Protected Party herein; *provided, however*, that nothing contained in the Plan shall in any way modify or limit any protections or rights afforded to New GM under or in connection with the Bankruptcy Court order approving the 363 Transaction.

      **1.116**  **REALM** means Remediation and Liability Management Company, Inc., a Michigan corporation, as debtor or debtor in possession, as the context requires.

**1.117**   **Registered Holder** means the registered holders (or bearers, if applicable) of the securities issued pursuant to the Indentures or the Fiscal and Paying Agency Agreements.

**1.118**   **Residual Wind-Down Assets** means the Cash necessary to fund the resolution of Administrative Expenses, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims, and the Cash reserved to pay such Administrative Expenses and Claims.  If the Debtors have not resolved and paid all of the foregoing Claims and Administrative Expenses by the date of MLC's dissolution, then the Residual Wind-Down Assets (including the power to object, settle, and or satisfy such Claims and Administrative Expenses) shall be transferred to the GUC Trust.

**1.119**   **Schedules** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended through the Confirmation Date.

**1.120**   **Secured Claim** means a Claim (i) secured by Collateral, to the extent of the value of such Collateral (A) as set forth in the Plan, (B) as agreed to by the holder of such Claim and the Debtors, or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any valid rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

**1.121**   **Solicitation Procedures** means the procedures relating to the solicitation and tabulation of votes with respect to the Plan.

**1.122**   **Tax Code** means title 26 of the United States Code, as amended from time to time.

**1.123**   **Term Loan Avoidance Action** means the Avoidance Action commenced by the Creditors' Committee against JPMorgan Chase Bank, N.A., individually and as Administrative Agent, and various lenders party to a term loan agreement, dated as of November 29, 2006, between General Motors Corporation, as borrower, JPMorgan Chase Bank, N.A., as agent, and various institutions as lenders and agents, styled *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. et al.*, Adv. Pro. No. 09-00504 (Bankr. S.D.N.Y. July 31, 2009).

**1.124**   **Term Loan Avoidance Action Beneficiaries** means the holders of the DIP Credit Agreement Claims and/or the holders of Allowed General Unsecured Claims, as determined either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee or (ii) Final Order.

**1.125**   **Trusts** means the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, and any other trust created pursuant to the

Plan or the Confirmation Order and funded by Cash from (i) the DIP Lenders on which the DIP Lenders' lien remains in force or (ii) another source.

**1.126  Unliquidated Litigation Claim** means a General Unsecured Claim that qualifies for reconciliation pursuant to the ADR Procedures, regardless of whether the Claim is filed in an unliquidated amount, until it becomes an Allowed Claim.

**1.127  U.S Treasury** means the United States Department of the Treasury.

**1.128  U.S. Trustee** means the United States Trustee for the Southern District of New York.

**1.129  Voting Deadline** means the date set by the Bankruptcy Court by which all completed Ballots must be received.

**INTERPRETATION; APPLICATION OF DEFINITIONS AND RULES OF CONSTRUCTION.**

The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein.  A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

**ARTICLE II.**

**ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS**

**2.1  Administrative Expenses.**  Except to the extent that a holder of an Allowed Administrative Expense agrees to a different treatment or as provided in the subsequent sentence of this Section, on the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall pay to each holder of an Allowed Administrative Expense, in full satisfaction of such Allowed Administrative Expense, an amount in Cash equal to the Allowed amount of such Administrative Expense. Notwithstanding the foregoing, any and all liabilities of the Debtors to the Governmental Authorities under Environmental Laws associated with the Properties that otherwise would constitute Administrative Expenses shall be treated and satisfied by and in accordance with the terms of the Environmental Response Trust Consent Decree and Settlement Agreement and the Priority Order Sites Consent Decrees and Settlement Agreements.

**2.2  Compensation and Reimbursement Claims.**  All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (i)

shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Confirmation Date, and (ii) shall be paid in full in such amounts as are allowed by the Bankruptcy Court (A) on the date on which the order relating to any such Administrative Expense is entered or (B) upon such other terms as may be mutually agreed upon between the holder of such an Administrative Expense and the Debtors.

      **2.3**     **Priority Tax Claims.**  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall pay to each holder of an Allowed Priority Tax Claim, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim. Priority Tax Claims that New GM is liable for under the MSPA shall be the responsibility of New GM and shall receive no distribution under the Plan.

      **2.4**     **DIP Credit Agreement Claims.**  The DIP Lenders shall have an Allowed Administrative Expense for the total amount due under the DIP Credit Agreement as of the Effective Date, ratably in accordance with their respective interests in the DIP Credit Agreement Claims, subject to any applicable provisions of paragraph 5 of the Final Order approving the DIP Credit Agreement (ECF No. 2529). The Debtors shall pay on account of the amounts outstanding under the DIP Credit Agreement an amount equal to all Cash and Cash equivalents, if any, remaining after funding all obligations and amounts to be funded under the Plan (including the GUC Trust Administrative Fund, the Asbestos Trust, the Environmental Response Trust Administrative Account, the Avoidance Action Trust Administrative Cash, and the Indenture Trustee/Fiscal and Paying Agent Reserve Cash, and such amounts necessary to satisfy payment of and funding to reconcile Administrative Expenses, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims), subject to the terms of the Plan, the Budget, and the Confirmation Order, and shall distribute beneficial interests in the Environmental Response Trust to the DIP Lenders. To the extent it is determined that the DIP Lenders are entitled to any proceeds of the Term Loan Avoidance Action either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee or Final Order, the DIP Lenders shall receive the proceeds of the Term Loan Avoidance Action in accordance with Sections 4.3 and 6.5 hereof and the Avoidance Action Trust Agreement. Notwithstanding anything to the contrary in the Plan, (a) if any of the DIP Lenders' Collateral (including the DIP Lenders' Avoidance Assets) is not distributed pursuant to the Plan, such DIP Lenders' Collateral shall be distributed to the DIP Lenders ratably in accordance with their respective interests in the DIP Credit Agreement Claims, and (b) the DIP Lenders shall (x) have the sole right to collect on, prosecute, designate another party to prosecute, assign, or waive the DIP Lenders' Avoidance Actions and the sole right to recover from or assign the DIP Lenders' Avoidance Assets and (y) be entitled to any Cash, Cash equivalents, proceeds, or other DIP Lenders' Collateral as set forth in Section 5.2(b) hereof. The Asbestos Insurance Assets shall be held in and administered by the Asbestos Insurance Assets Trust for the benefit of the DIP Lenders as the DIP Lenders' Collateral. At such time as all payments in respect of the DIP Credit Agreement Claims have been made pursuant to

the Plan, any outstanding balance of the DIP Credit Agreement Claims shall be cancelled. Notwithstanding the foregoing, the DIP Credit Agreement Claims shall remain outstanding until such time as the Term Loan Avoidance Action Beneficiaries are determined either by (x) mutual agreement between the U.S. Treasury and the Creditors' Committee or (y) Final Order.

If any Asbestos Insurance Assets are transferred to the Asbestos Insurance Assets Trust, the Asbestos Insurance Assets Trust shall assume all liability for premiums, deductibles, retrospective premium adjustments, security or collateral arrangements, or any other charges, costs, fees, or expenses (if any) that become due to any insurer in connection with the Asbestos Insurance Assets with respect to Asbestos Personal Injury Claims, asbestos-related claims against Entities insured under policies included in the Asbestos Insurance Assets by reason of vendor's endorsements, or under the indemnity provisions of settlement agreements that the Debtors made with various insurers prior to the Commencement Date to the extent that those indemnity provisions relate to Asbestos Personal Injury Claims, and the Debtors shall have no further financial or other responsibility for any of the foregoing. Upon delivery of the Asbestos Insurance Assets to the Asbestos Insurance Assets Trust, the Debtors and their successors and assigns shall be released from all liability with respect to the delivery of such assets. The Debtors shall cooperate with the Asbestos Insurance Assets Trust and the entity appointed to serve as administrator of the Asbestos Insurance Assets Trust and use commercially reasonable efforts to take or cause to be taken all appropriate actions and do or cause to be done all things necessary or appropriate to effectuate the transfer of the Asbestos Insurance Assets to the Asbestos Insurance Assets Trust. By way of enumeration and not of limitation, the Debtors shall be obligated, to the extent practicable, to (i) provide the Asbestos Insurance Assets Trust with copies of insurance policies and settlement agreements included within or relating to the Asbestos Insurance Assets and (ii) execute further assignments or allow the Asbestos Insurance Assets Trust to pursue claims relating to the Asbestos Insurance Assets in its name (subject to appropriate disclosure of the fact that the Asbestos Insurance Assets Trust is doing so and the reasons why it is doing so), including by means of arbitration, alternative dispute resolution proceedings, or litigation, to the extent necessary or helpful to the efforts of the Asbestos Insurance Assets Trust to obtain insurance coverage under the Asbestos Insurance Assets.

**2.5** **Special Provisions Regarding Fees and Expenses of Indenture Trustees and Fiscal and Paying Agents.** The reasonable prepetition and postpetition fees and expenses of each of the Indenture Trustees and the Fiscal and Paying Agents solely in connection with their performance of their duties (which includes the reasonable fees and expenses of any counsel and/or other professionals retained by the Indenture Trustees and the Fiscal and Paying Agents in connection with such duties) shall be deemed Allowed Administrative Expenses and shall be paid in Cash on the Effective Date, or as soon thereafter as is reasonably practicable, upon submission of documented invoices (in customary form) to the Debtors, the DIP Lenders, and the Creditors' Committee, subject to a review for reasonableness by the Debtors, the DIP Lenders, and representatives of the members of the Creditors' Committee who are not Indenture

Trustees or Fiscal and Paying Agents, without the necessity of making application to the Bankruptcy Court. Notwithstanding the foregoing, under no circumstances shall any such fees and expenses (including counsel and/or other professionals) include fees and expenses associated with defending objections to Claims or associated with Avoidance Actions. Subject to Section 6.7 hereof, each Indenture Trustee's or Fiscal and Paying Agent's charging lien, if any, shall be discharged solely upon payment in full of the respective fees and expenses of the Indenture Trustees or the Fiscal and Paying Agents, as applicable, and termination of the respective Indenture Trustee's or Fiscal and Paying Agent's duties. Nothing herein shall be deemed to impair, waive, or discharge the Indenture Trustees' and the Fiscal and Paying Agent's respective charging liens, if any, for any fees and expenses not paid by the Debtors.

## ARTICLE III.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

The following table designates the Classes of Claims against and Equity Interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to reject the Plan:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Secured Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 3 | General Unsecured Claims | Impaired | Yes |
| Class 4 | Property Environmental Claims | Unimpaired | No (deemed to accept) |
| Class 5 | Asbestos Personal Injury Claims | Impaired | Yes |
| Class 6 | Equity Interests in MLC | Impaired | No (deemed to reject) |

For convenience of identification, the Plan classifies the Allowed Claims in Class 1 as a single Class. This Class is actually a group of subclasses, depending on the underlying property securing such Allowed Claims, and each subclass is treated hereunder as a distinct Class for voting and distribution purposes.

## ARTICLE IV.

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.1    Class 1 – Secured Claims.** Except to the extent that a holder of an Allowed Secured Claim agrees to a different treatment of such Claim, on the Effective Date, or as soon thereafter as is reasonably practicable, each holder of an Allowed Secured Claim shall receive, at the option of the Debtors, and in full satisfaction of such Claim, either (i) Cash in an amount equal to one hundred percent (100%) of the unpaid amount of such Allowed Secured Claim, (ii) the proceeds of the sale or disposition of the

Collateral securing such Allowed Secured Claim, net of the costs of disposition of such Collateral, (iii) the Collateral securing such Allowed Secured Claim, (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Claim is entitled, or (v) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code. In the event a Secured Claim is treated under clause (i) or (ii) of this Section, the liens securing such Secured Claim shall be deemed released.

**4.2** **Class 2 - Priority Non-Tax Claims.** Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment of such Claim, on the Effective Date, or as soon thereafter as is reasonably practicable, each such holder shall receive, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.

**4.3** **Class 3 - General Unsecured Claims.**

(a) As soon as is reasonably practicable after the Effective Date (but no earlier than the first Business Day following the Distribution Record Date), each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall receive from the GUC Trust its Pro Rata Share of (i) the New GM Securities or the proceeds thereof, if any, and (ii) the GUC Trust Units, in accordance with the terms of the GUC Trust and the GUC Trust Agreement. The GUC Trust shall make subsequent distributions of New GM Securities and GUC Trust Units to holders of Disputed General Unsecured Claims as of the Distribution Record Date whose Claims are subsequently Allowed. The GUC Trust shall make additional distributions of New GM Securities to holders of GUC Trust Units in accordance with the terms of the GUC Trust and the GUC Trust Agreement. Notwithstanding anything to the contrary in the Plan, the amount of New GM Securities to be distributed under the Plan shall be subject to the New GM Securities or proceeds thereof withheld or expended to meet the costs and expenses of administering the GUC Trust that are not otherwise funded from the Budget.

(b) If any proceeds of the Term Loan Avoidance Action are received prior to the Avoidance Action Trust Transfer Date, then, to the extent it is determined that the holders of Allowed General Unsecured Claims are entitled to any proceeds of the Term Loan Avoidance Action, either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee or (ii) Final Order, (A) each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall receive from the Debtors its Pro Rata Share of such proceeds, net of any expenses incurred by the Debtors on or after the Effective Date, and (B) the Debtors shall make subsequent distributions of the net proceeds of the Term Loan Avoidance Action to (x) holders of Disputed General Unsecured Claims as of the Distribution Record Date whose Claims are subsequently Allowed and (y) the Asbestos Trust when the amount of the Asbestos Trust Claim has been determined, as set forth in Section 1.15 hereof. Holders of Disputed General Unsecured Claims on the Distribution Record Date whose Claims are subsequently Allowed prior to the initial distribution of proceeds of the Term Loan Avoidance Action shall be deemed to be holders of Allowed General Unsecured Claims as of the

Distribution Record Date for the purpose of this Section 4.3(b). If the amount of the Asbestos Trust Claim is determined, as set forth in Section 1.15 hereof, prior to the initial distribution of proceeds of the Term Loan Avoidance Action, the holder of the Asbestos Trust Claim shall be deemed to be a holder of an Allowed General Unsecured Claim as of the Distribution Record Date for the purpose of this Section 4.3(b).

(c) As soon as is reasonably practicable after the Avoidance Action Trust Transfer Date, and to the extent (i) proceeds of the Term Loan Avoidance Action are received by the Avoidance Action Trust and (ii) it is determined that the holders of Allowed General Unsecured Claims are entitled to any proceeds of the Term Loan Avoidance Action, either by (a) mutual agreement between the U.S. Treasury and the Creditors' Committee or (b) Final Order, (x) each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall receive from the Avoidance Action Trust, to the extent not already distributed, its Pro Rata Share of such proceeds in accordance with the terms of the Avoidance Action Trust and the Avoidance Action Trust Agreement and (y) the Avoidance Action Trust shall make subsequent distributions of any proceeds of the Term Loan Avoidance Action to (A) holders of Disputed General Unsecured Claims as of the Distribution Record Date whose Claims are subsequently Allowed and (B) the Asbestos Trust when the amount of the Asbestos Trust claim has been determined as set forth in Section 1.15 hereof. The Avoidance Action Trust shall make additional distributions of any proceeds of the Term Loan Avoidance Action to the Term Loan Avoidance Action Beneficiaries in accordance with the terms of the Avoidance Action Trust and the Avoidance Action Trust Agreement. Holders of Disputed General Unsecured Claims on the Distribution Record Date whose Claims are subsequently Allowed prior to the Avoidance Action Trust Transfer Date shall be deemed to be holders of Allowed General Unsecured Claims as of the Distribution Record Date for the purpose of this Section 4.3(c). If the amount of the Asbestos Trust Claim is determined, as set forth in Section 1.15 hereof, prior to the Avoidance Action Trust Transfer Date, the holder of the Asbestos Trust Claim shall be deemed to be a holder of an Allowed General Unsecured Claim as of the Distribution Record Date for the purpose of this Section 4.3(c).

(d) Holders of Unliquidated Litigation Claims, at the option of the Debtors or the GUC Trust Administrator, as applicable, shall be subject to the ADR Procedures in order to determine the Allowed amount of their respective General Unsecured Claims.

(e) The Note Claims shall be Allowed in the respective amounts listed next to each Indenture set forth in Exhibit "F" annexed hereto (the "**Fixed Allowed Note Claims**"). The Fixed Allowed Note Claims shall override and supersede (i) any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the Note Claims and (ii) solely with respect to the Allowed amount of the Note Claims, any stipulation or agreement between the Debtors and any Indenture Trustee, Registered Holder, or beneficial owners of the debt securities with respect to the Note Claims. For the avoidance of doubt, the terms of any stipulation or agreement between the Debtors and any Indenture Trustee, Registered Holder, or beneficial owner of debt

securities with respect to the Note Claims shall continue in full force and effect except with respect to the Allowed amount of the Note Claims contained therein. Distributions to holders of Note Claims shall be made in accordance with Section 5.3(b) hereof.

(f)     The Eurobond Claims under (i) that certain Fiscal and Paying Agency Agreement, dated as of July 3, 2003, among General Motors Corporation, Deutsche Bank AG London, and Banque Générale du Luxembourg S.A. shall be Allowed in the amount of $3,772,694,419 and (ii) that certain Bond Purchase and Paying Agency Agreement, dated May 28, 1986, between General Motors Corporation and Credit Suisse, shall be Allowed in the amount of $15,745,690 (together, the "**Fixed Allowed Eurobond Claims**"). The Fixed Allowed Eurobond Claims shall override and supersede any individual Claims filed by Registered Holders or beneficial owners of debt securities with respect to the Eurobond Claims. Distributions to holders of Eurobond Claims shall be made in accordance with Section 5.3(b) hereof.

(g)     Notwithstanding anything to the contrary in the Plan, the Nova Scotia Guarantee Claims and the Nova Scotia Wind-Up Claim shall be treated as Disputed General Unsecured Claims unless and until a Final Order is entered that fixes the Allowed amount, if any, of such Claims. For the purpose of determining Pro Rata Shares for distributions to Allowed General Unsecured Claims, the aggregate dollar amount of the Disputed Nova Scotia Guarantee Claims and the Disputed Nova Scotia Wind-Up Claim shall be the lesser of (i) $2.69 billion and (ii) such other amount as may be fixed by order of the Bankruptcy Court. Distributions to holders of Nova Scotia Guarantee Claims, if Allowed, shall be made in accordance with Section 5.3(b) hereof.

(h)     Remy shall have an Allowed General Unsecured Claim in the amount of $484,978.33 as a result of Remy's agreement pursuant to Bankruptcy Rule 9019 to reduce (i) its Claim against MLC in the amount of $16,354,200 (Proof of Claim No. 43411) and (ii) its contingent Claim against ENCORE in the amount of $2,110,570 relating to property leased to DRA, Inc. by the Debtors (Proof of Claim No. 69951) in exchange for (x) the Plan providing that Remy is a Protected Party with respect to that portion of Remy's Claim against MLC relating to asbestos liability arising on or prior to the closing of that certain Asset Purchase Agreement by and among DR International, Inc., DRA, Inc., and GM, dated July 13, 1994, (y) Remy withdrawing its application for an order pursuant to Bankruptcy Rule 2004 (ECF No. 3770) to the extent it is still pending, and (z) upon request, the Debtors providing Remy with certain documents relating to remediation by the Debtors or Post-Effective Date MLC, as applicable, at sites adjacent to those leased by the Debtors to Remy or leased by Remy.

(i)     Notwithstanding anything to the contrary in this Section 4.3, all proceeds of the Term Loan Avoidance Action shall be applied first to pay the DIP Lenders (i) all amounts expended to fund the costs and expenses associated with realizing such proceeds, including, without limitation, any such amounts expended to fund the costs and expenses of professionals retained by the defendants in the Term Loan Avoidance Action and (ii) without duplication, the amount of the Avoidance Action Trust Administrative Cash.

**4.4** **Class 4 – Property Environmental Claims.** On the Effective Date, all Property Environmental Claims shall be satisfied and treated in accordance with the terms of the Environmental Response Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Priority Order Sites Consent Decrees and Settlement Agreements. All Property Environmental Claims are fully satisfied in accordance with the terms of the Environmental Response Trust Consent Decree and Settlement Agreement and the Priority Order Sites Consent Decrees and Settlement Agreements.

**4.5** **Class 5 – Asbestos Personal Injury Claims.** On the Effective Date, or as soon thereafter as is reasonably practicable, all Asbestos Personal Injury Claims shall be channeled to the Asbestos Trust and all Asbestos Personal Injury Claims shall be satisfied in accordance with the terms of the Asbestos Trust, the Asbestos Trust Distribution Procedures, and the Asbestos Trust Agreement. The sole recourse of the holders of Asbestos Personal Injury Claims shall be from the Asbestos Trust, and such holders shall have no right whatsoever at any time to assert their respective Asbestos Personal Injury Claims against any Protected Party, provided that, once Allowed, the Asbestos Trust Claim shall be entitled to the same distributions from the GUC Trust and the Avoidance Action Trust, as applicable, as an Allowed General Unsecured Claim in Class 3. Without limiting the foregoing, on the Effective Date, all Entities shall be permanently stayed, restrained, and enjoined from taking any of the following actions for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Personal Injury Claim (other than actions brought to enforce any right or obligation under the Plan, any Exhibits to the Plan, the Plan Supplement, or any other agreement or instrument between the Debtors and the Asbestos Trust, which actions shall be in conformity and compliance with the provisions hereof and other than the right of the Allowed Asbestos Trust Claim to receive distributions from the GUC Trust and the Avoidance Action Trust, as applicable): (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including, without limitation, a judicial, arbitral, administrative, or other proceeding) in any forum against any Protected Party or any property or interests in property of any Protected Party, (ii) enforcing, levying, attaching (including without limitation, any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party, (iv) setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party, and (v) proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Asbestos Trust Agreement, except in conformity and compliance therewith. Nothing in the Plan, including the fact that New GM is not included in the definition of Protected Party herein, shall in any way modify or

limit any protections or rights afforded to New GM under or in connection with the Bankruptcy Court order approving the 363 Transaction.

**4.6** **Class 6 - Equity Interests in MLC.** On the Effective Date, all Equity Interests issued by MLC shall be cancelled and one new share of MLC's common stock shall be issued to a custodian to be designated by MLC, who will hold such share for the benefit of the holders of such former Equity Interests consistent with their former economic entitlements. All Equity Interests of the other Debtors shall be cancelled when such Debtors are dissolved or merged out of existence in accordance with Section 6.10 hereof. Each holder of an Equity Interest shall neither receive nor retain any property or interest in property on account of such Equity Interest; *provided, however*, that in the event all Allowed Claims have been satisfied in full, holders of Equity Interests may receive a pro rata distribution of any remaining assets of the Debtors. On or promptly after the Effective Date, but in no event later than December 15, 2011, MLC shall file with the Securities and Exchange Commission a Form 15 for the purpose of terminating the registration of any of its publicly-traded securities. All Equity Interests in MLC outstanding after the Effective Date shall be cancelled on the date MLC is dissolved in accordance with Section 6.10 hereof. The rights of a holder of an Equity Interest or former Equity Interest issued by MLC pursuant to this Section 4.6 shall be nontransferable.

**ARTICLE V.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

**5.1** **Distribution Record Date.** Except with respect to any publicly-traded securities as to which distributions shall be treated as set forth in Section 5.10 hereof, (i) as of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors, or their agents, shall be deemed closed, (ii) there shall be no further changes in the record holders of any of such Claims or Equity Interests, and the Debtors shall have no obligation to recognize any transfer of such Claims or Equity Interests occurring on or after the Distribution Record Date, and (iii) the Debtors shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable; *provided, however*, that if the GUC Trust Units are transferable as set forth in Section 6.2(h) hereof, then the GUC Trust Administrator may set additional record dates for subsequent distributions to holders of GUC Trust Units, in accordance with the GUC Trust Agreement.

**5.2** **Method of Distributions Under the Plan.**

**(a)** **Payments and Transfers on Effective Date.** On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall (i) remit to holders of Allowed Administrative Expenses (except as otherwise provided herein), Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and, if applicable,

Allowed Secured Claims an amount in Cash equal to the Allowed amount of such Claims, (ii) transfer the GUC Trust Assets to the GUC Trust free and clear of all liens, claims, and encumbrances, but subject to any obligations imposed by the Plan, on behalf of holders of General Unsecured Claims, (iii) transfer the Asbestos Trust Assets to the Asbestos Trust free and clear of all liens, claims, and encumbrances, but subject to any obligations imposed by the Plan, on behalf of holders of Asbestos Personal Injury Claims, (iv) transfer the Environmental Response Trust Assets to the Environmental Response Trust free and clear of all liens, claims, and encumbrances (except for any statutory liens for property and ad valorem taxes not yet due and payable), but subject to any obligations imposed by the Plan, on behalf of holders of Property Environmental Claims, and (v) reserve Cash for the Indenture Trustee/Fiscal and Paying Agent Reserve Cash, which Cash shall be distributed to the Indenture Trustees and Fiscal Paying and Agents, as applicable, upon submission of documented invoices (in customary form) to the Debtors or the GUC Trust Administrator in accordance with Section 6.2(f) hereof without the necessity of making application to the Bankruptcy Court. The Debtors shall remit and transfer to the holders of Allowed DIP Credit Agreement Claims the payments and distributions provided for in Section 2.4 hereof.

(b)  **Repayment of Excess Cash to DIP Lenders.** If the Debtors have any Cash remaining after (i) transferring the GUC Trust Assets to the GUC Trust, including the funding of the GUC Trust Administrative Fund and the transfer of the Indenture Trustee/Fiscal and Paying Agent Reserve Cash in accordance with Section 6.2 hereof, (ii) transferring the Asbestos Trust Assets to the Asbestos Trust, (iii) transferring the Environmental Response Trust Assets to the Environmental Response Trust, including the funding of the Environmental Response Trust Administrative Funding Account, (iv) transferring the Avoidance Action Trust Assets to the Avoidance Action Trust, (v) the resolution (and the payment, to the extent Allowed) of all Disputed Administrative Expenses (including compensation and reimbursement of expenses under sections 330 or 503 of the Bankruptcy Code), Disputed Priority Tax Claims, Disputed DIP Credit Agreement Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims, (vi) the payment in full of all Allowed Administrative Expenses (including any compensation and reimbursement of expenses to the extent allowed by Final Order under sections 330 or 503 of the Bankruptcy Code), Allowed Priority Tax Claims, Allowed DIP Credit Agreement Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims, and (vii) completing the acts described in Section 6.10 hereof, the Debtors shall pay such Cash to the DIP Lenders by wire transfer of immediately available funds to an account designated by the U.S. Treasury and by EDC, respectively, ratably in accordance with their respective interests in the DIP Credit Agreement Claims. In the event any Cash remains in the GUC Trust Administrative Fund, the Environmental Response Trust Administrative Funding Account, the Avoidance Action Trust Administrative Cash, or the Indenture Trustee/Fiscal and Paying Agent Reserve Cash after all the obligations imposed on the GUC Trust Administrator, the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the Indenture Trustees, or the Fiscal and Paying Agents, respectively, and the GUC Trust, the Environmental Response Trust, and the Avoidance Action Trust, respectively, pursuant

to the Plan, the GUC Trust Agreement, the Environmental Response Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Avoidance Action Trust Agreement, respectively, have been satisfied, the GUC Trust Administrator, the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator, respectively, shall pay such Cash to the DIP Lenders by wire transfer of immediately available funds to an account designated by the U.S Treasury and by EDC, respectively, ratably in accordance with their respective interests in the DIP Credit Agreement Claims. If the GUC Trust Administrator determines to close the Chapter 11 Cases in accordance with Section 6.2(q) hereof, the GUC Trust Administrator shall repay the Cash from the balance of the GUC Trust Administrative Fund after reserving any amounts necessary to close the Chapter 11 Cases to the DIP Lenders by wire transfer of immediately available funds to an account designated by the U.S. Treasury and by EDC, respectively, ratably in accordance with their respective interests in the DIP Credit Agreement Claims.

(c)     **Payment of Cash or Certain Assets to Charitable Organizations.**  In the event any Cash or property remains in the Asbestos Trust after all the obligations imposed on the Asbestos Trust Administrator(s) and the Asbestos Trust pursuant to the Plan and the Asbestos Trust Agreement have been satisfied, the Asbestos Trust Administrator(s) shall pay such Cash amounts to a charitable organization exempt from U.S. federal income tax under section 501(c)(3) of the Tax Code to be selected by, and unrelated to, the Asbestos Trust Administrator(s). In the event any Asbestos Trust Assets remain in the Asbestos Trust after all Allowed Asbestos Personal Injury Claims have been satisfied pursuant to the Plan and the Asbestos Trust Agreement, the Asbestos Trust Administrator(s) shall transfer such Asbestos Trust Assets to a charitable organization exempt from U.S. federal income tax under section 501(c)(3) of the Tax Code to be selected by, and unrelated to, the Asbestos Trust Administrator(s).

(d)     **Distributions of Cash.**  At the option of the Debtors or the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, or the Avoidance Action Trust Administrator, as applicable, any Cash payment to be made under the Plan, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, as applicable, may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

(e)     **Sale of New GM Warrants About to Expire.**  During the one hundred twenty (120) days preceding the expiration of the New GM Warrants, the GUC Trust Administrator shall have the authority to sell any New GM Warrants remaining in the GUC Trust, whether held in a reserve for Disputed General Unsecured Claims or otherwise, and distribute the proceeds thereof to holders of Allowed General Unsecured Claims and/or GUC Trust Units, as applicable, consistent with, and as provided in, the Plan. Any such sale shall be made in compliance with an applicable exemption from the registration requirements of the Securities Act of 1933, as amended (the "**Securities Act**") and any equivalent securities law provisions under state law, other than section 1145(a) of the Bankruptcy Code, which is not available for such sale. For the avoidance

of doubt, any holder of an Allowed General Unsecured Claim and/or GUC Trust Unit, as applicable, that is entitled to receive such New GM Warrants shall receive only the net cash proceeds, if any, of the sold New GM Warrants that the GUC Trust Administrator received upon such sale. To the extent holders of Allowed Claims and/or GUC Trust Units, as applicable, have received a portion of the New GM Warrants to which they are entitled pursuant to the Plan, the GUC Trust Administrator shall have the authority to sell the remaining portion of New GM Warrants pursuant to this Section 5.2(e).

### 5.3    Delivery of Distributions and Undeliverable Distributions.

(a)    Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents or in a letter of transmittal unless the Debtors or the GUC Trust Administrator, the Asbestos Trust Administrator(s), or the Avoidance Action Trust Administrator, as applicable, have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different from the address reflected on such Schedules for such holder. In the event that any distribution to any holder is returned as undeliverable, no further distributions to such holder shall be made unless and until the Debtors or the GUC Trust Administrator, the Asbestos Trust Administrator(s), or the Avoidance Action Trust Administrator, as applicable, are notified of such holder's then-current address, at which time all missed distributions shall be made to such holder, without interest. All demands for undeliverable distributions shall be made on or before ninety (90) days after the date such undeliverable distribution was initially made. Thereafter, the amount represented by such undeliverable distribution shall irrevocably revert to the Debtors or the GUC Trust, the Asbestos Trust, or the Avoidance Action Trust, as applicable, and any Claim in respect of such undeliverable distribution shall be discharged and forever barred from assertion against the Debtors, the GUC Trust, the Asbestos Trust, the Avoidance Action Trust, and their respective property.

(b)    Any distribution from the Debtors, the GUC Trust, or the Avoidance Action Trust to any of the Indenture Trustees or Fiscal and Paying Agents in accordance with the Plan shall be (x) deemed a distribution to the respective Registered Holders thereunder, (y) subject to the applicable Indenture Trustee's or Fiscal and Paying Agent's right to assert its charging lien against such distributions, and (z) in accordance with Section 5.6 hereof. Distributions shall be made to the Registered Holders as follows:

(i)    Each Indenture Trustee and Fiscal and Paying Agent shall distribute, as soon as is reasonably practicable after receipt thereof and pursuant to the terms of the applicable Indenture and Fiscal and Paying Agency Agreement, the New GM Securities and the GUC Trust Units it receives from the GUC Trust in accordance with Section 4.3(a) hereof to the Registered Holders as of the Distribution Record Date. The GUC Trust shall make additional distributions of New GM Securities to holders of GUC Trust Units (and not the

Indenture Trustees and the Fiscal and Paying Agents) in accordance with the GUC Trust Agreement and Section 4.3(a) hereof.

(ii)      To the extent that it is determined that the holders of Allowed General Unsecured Claims are entitled to any proceeds of the Term Loan Avoidance Action either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee or (ii) Final Order, then each Indenture Trustee and Fiscal and Paying Agent shall distribute, as soon as is reasonably practicable after receipt thereof and pursuant to the terms of the applicable Indenture and Fiscal and Paying Agency Agreement, the net proceeds of the Term Loan Avoidance Action it receives from either (i) the Debtors in accordance with Section 4.3(b) hereof or (ii) the Avoidance Action Trust in accordance with Section 4.3(c) hereof, to the Registered Holders as of the Distribution Record Date.

**5.4**      **Withholding and Reporting Requirements.**  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.  Notwithstanding the foregoing, each holder of an Allowed Claim or Equity Interest (other than the Indenture Trustees and the Fiscal and Paying Agents) that receives a distribution under the Plan shall have responsibility for any taxes imposed by any governmental unit, including income, withholding, and other taxes, on account of such distribution.

**5.5**      **Time Bar to Cash Payments.**  Checks issued by the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator(s), or the Avoidance Action Trust Administrator, as applicable, in respect of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) days after the date of issuance thereof. Requests for re-issuance of any check shall be made to the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator(s), or the Avoidance Action Trust Administrator, as applicable, by the holder of the Allowed Claim to whom such check originally was issued.  Any Claim in respect of such a voided check shall be made on or before thirty (30) days after the expiration of the one hundred eighty (180) day period following the date of issuance of such check.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Debtors, the GUC Trust, the Asbestos Trust, or the Avoidance Action Trust, as applicable, and any Claim in respect of such voided check shall be discharged and forever barred.

**5.6**      **Minimum Distributions and Fractional Shares or Units.**  No payment of Cash less than $25 shall be made by the Debtors, the GUC Trust Administrator, or the Avoidance Action Trust Administrator, as applicable, to any holder of an Allowed Claim. No fractional shares of New GM Securities shall be distributed.  For purposes of the

initial distribution to a holder of an Allowed General Unsecured Claim, fractional shares of New GM Securities shall be rounded down to the next whole number or zero, as applicable; *provided, however*, that if an Entity's fractional shares are rounded down to zero, such Entity shall receive one share of New GM Securities if such fraction is closer to one than to zero (with one-half being closer to one for these purposes).  If an Entity holds more than one Allowed Claim, such Entity's Allowed Claims shall be aggregated for purposes of rounding pursuant to this Section 5.6.  As described in the GUC Trust Agreement, prior to the final distribution of GUC Trust Assets, any New GM Securities that are undistributable as a result of the foregoing shall, to the extent practicable, be sold by the GUC Trust Administrator, and the GUC Trust Administrator shall distribute the Cash proceeds pro rata to holders of GUC Trust Units; *provided, however*, that if the Cash proceeds from the sale of the New GM Securities is less than $150,000, such Cash shall be distributed to a charitable organization exempt from U.S. federal income tax under section 501(c)(3) of the Tax Code to be selected by, and unrelated to, the GUC Trust Administrator.

**5.7**     **Setoffs.**  The Debtors and/or the GUC Trust Administrator, the Asbestos Trust Administrator(s), and the Avoidance Action Trust Administrator, as applicable, may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors and/or the GUC Trust Administrator, the Asbestos Trust Administrator(s), or the Avoidance Action Trust Administrator, as applicable, of any such claim the Debtors may have against the holder of such Claim.  Nothing in the Plan shall limit or affect any right of the United States to offset (subject to obtaining Bankruptcy Court approval to the extent required) any obligation owed by the United States to the Debtors against any obligation owed by the Debtors to the United States.

**5.8**     **Transactions on Business Days.**  If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, the transactions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**5.9**     **Allocation of Plan Distribution Between Principal and Interest.**  All distributions in respect of any Allowed Claim shall be allocated first to the principal amount of such Allowed Claim, as determined for U.S. federal income tax purposes, and thereafter, to the remaining portion of such Claim, if any.

**5.10**     **Surrender of Existing Publicly-Traded Securities**.  On the Effective Date, or as soon thereafter as is reasonably practicable, each Registered Holder of the debt securities with respect to the Note Claims, the Eurobond Claims, or the Nova Scotia Guarantee Claims shall surrender its debt securities to the applicable Indenture Trustee or Fiscal and Paying Agent or, in the event such debt securities are held in the name, or by a nominee, of The Depository Trust Company or other securities depository (each, a

"**Depository**"), the Debtors shall seek the cooperation of the Depository to provide appropriate instructions to the applicable Indenture Trustee or Fiscal and Paying Agent. No distributions under the Plan shall be made for or on behalf of such Registered Holder unless and until (i) such debt securities are received by the applicable Indenture Trustee or Fiscal and Paying Agent or appropriate instructions from the Depository are received by the applicable Indenture Trustee or Fiscal and Paying Agent or (ii) the loss, theft, or destruction of such debt securities is established to the reasonable satisfaction of the applicable Indenture Trustee or Fiscal and Paying Agent, which satisfaction may require such Registered Holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, Post-Effective Date MLC, the GUC Trust Administrator, the Avoidance Action Trust Administrator, and the applicable Indenture Trustee or Fiscal and Paying Agent harmless in respect of such debt securities and distributions made with respect thereto. Notwithstanding the foregoing, holders of Nova Scotia Guarantee Claims shall not be required to surrender their debt securities to the applicable Fiscal and Paying Agent or provide instructions to the Depository and shall be entitled to retain their debt securities solely for the purpose of asserting their direct claims, if any, against GM Nova Scotia under the applicable Fiscal and Paying Agency Agreement. Upon compliance with this Section 5.10 by a Registered Holder of the debt securities, for all purposes under the Plan, such Registered Holder shall be deemed to have surrendered such debt securities. Any Registered Holder that fails to surrender such debt securities or satisfactorily explain the loss, theft, or destruction of such debt securities to the applicable Indenture Trustee or Fiscal and Paying Agent within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, Post-Effective Date MLC, the GUC Trust, the Avoidance Action Trust, the GUC Trust Administrator, the Avoidance Action Trust Administrator, or the applicable Indenture Trustee or Fiscal and Paying Agent in respect of such Claim and shall not participate in any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the GUC Trust by the applicable Indenture Trustee or Fiscal and Paying Agent, and any such debt securities shall be cancelled.

**5.11    Class Proofs of Claim**.  If a class proof of claim is Allowed, it shall be treated as a single Claim for purposes of Article V of this Plan.

## ARTICLE VI.

## MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

**6.1    Substantive Consolidation.**

**(a)**    Entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of MLC of Harlem, Inc.; MLCS, LLC; MLCS Distribution Corporation; Remediation and Liability Management Company, Inc.; and Environmental Corporate Remediation Company, Inc., and their respective estates, into MLC for voting, confirmation, and distribution purposes under the Plan. Solely for such purposes, on and

after the Effective Date, (i) all assets and all liabilities of the Debtors shall be deemed merged into MLC, (ii) all guaranties of any Debtor of the payment, performance, or collection of obligations of another Debtor shall be eliminated and cancelled, (iii) any obligation of any Debtor and all guaranties thereof executed by one or more of the other Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated Debtors, (iv) all joint obligations of two or more Debtors and all multiple Claims against such entities on account of such joint obligations shall be treated and allowed only as a single Claim against the consolidated Debtors, (v) all Claims between or among the Debtors shall be cancelled, and (vi) each Claim filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date.

(b)     The substantive consolidation and deemed merger effected pursuant to Section 6.1(a) hereof shall not affect (other than for purposes related to funding distributions under the Plan and as set forth in Section 6.1(a) hereof) (i) the legal and organizational structure of the Debtors, (ii) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, and (iii) distributions out of any insurance policies or proceeds of such policies.

### 6.2     The GUC Trust.

(a)     **Execution of GUC Trust Agreement.**  On or before the Effective Date, the GUC Trust Agreement, in a form acceptable to the Debtors, the Creditors' Committee, the U.S. Treasury, as a DIP Lender, and the GUC Trust Administrator, shall be executed, and all other necessary steps shall be taken to establish the GUC Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed General Unsecured Claims.  This Section 6.2 sets forth certain of the rights, duties, and obligations of the GUC Trust Administrator.  In the event of any conflict between the terms of this Section 6.2 and the terms of the GUC Trust Agreement, the terms of the GUC Trust Agreement shall govern.

(b)     **Purpose of GUC Trust.**  The GUC Trust shall be established to administer certain post-Effective Date responsibilities under the Plan, including, but not limited to, distributing New GM Securities and resolving outstanding Disputed General Unsecured Claims to determine the amount of Allowed General Unsecured Claims that will be eligible for distribution of their Pro Rata Share of New GM Securities under the Plan.  If the Residual Wind-Down Assets are transferred to the GUC Trust upon dissolution of MLC, then the GUC Trust shall administer the resolution of all Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims.  The GUC Trust has no objective to continue or engage in the conduct of a trade or business.

(c)     **GUC Trust Assets.**  The GUC Trust shall consist of the GUC Trust Assets.  On the GUC Trust Transfer Date, the Debtors shall transfer all the GUC Trust Assets to the GUC Trust free and clear of all liens, claims, and encumbrances, except to the extent otherwise provided herein.

(d)     **Governance of GUC Trust.**  The GUC Trust shall be governed by the GUC Trust Administrator and the GUC Trust Monitor.

(e)     **GUC Trust Administrator and GUC Trust Monitor.** Wilmington Trust Company shall be the GUC Trust Administrator.  The GUC Trust Administrator shall retain AP Services, LLC to manage the day-to-day operations of the GUC Trust.  FTI Consulting, Inc. shall be the GUC Trust Monitor.

(f)     **Role of GUC Trust Administrator.**  In furtherance of and consistent with the purposes of the GUC Trust and the Plan, the GUC Trust Administrator shall (i) have the power and authority to hold, manage, sell, invest, and distribute to the holders of Allowed General Unsecured Claims the GUC Trust Assets, (ii) hold the GUC Trust Assets for the benefit of the holders of Allowed General Unsecured Claims, (iii) have the power and authority to hold, manage, sell, invest, and distribute the GUC Trust Assets obtained through the exercise of its power and authority, (iv) have the power and authority to prosecute and resolve objections to Disputed General Unsecured Claims, (v) have the power and authority to perform such other functions as are provided in the Plan and the GUC Trust Agreement, (vi) have the power and authority to administer the closure of the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules, and (vii) if the Residual Wind-Down Assets are transferred to the GUC Trust upon the dissolution of MLC, then the GUC Trust Administrator shall have the authority to prosecute, resolve objections, and satisfy the Disputed Administrative Expenses, the Disputed Priority Tax Claims, the Disputed Priority Non-Tax Claims, and the Disputed Secured Claims.  The GUC Trust Administrator shall be responsible for all decisions and duties with respect to the GUC Trust and the GUC Trust Assets and shall file periodic public reports on the status of claims reconciliation and distributions.  In all circumstances, the GUC Trust Administrator shall act in the best interests of all beneficiaries of the GUC Trust and in furtherance of the purpose of the GUC Trust, and in accordance with the GUC Trust Agreement and not in its own best interest as a creditor.  Upon the dissolution of MLC, the Indenture Trustee/Fiscal and Paying Agent Reserve Cash shall be transferred to the GUC Trust and the GUC Trust Administrator shall distribute funds to the Indenture Trustees and the Fiscal and Paying Agents from the Indenture Trustee/Fiscal and Paying Agent Reserve Cash as required.

(g)     **Role of GUC Trust Monitor.**  In furtherance of and consistent with the purpose of the GUC Trust and the Plan, the GUC Trust Monitor shall oversee the activities of the GUC Trust Administrator as set forth in the GUC Trust Agreement. The GUC Trust Administrator shall report material matters to, and seek approval for material decisions from, the GUC Trust Monitor, as and to the extent set forth in the GUC Trust Agreement.  Without limiting the foregoing, the GUC Trust Administrator shall obtain the approval of the GUC Trust Monitor with respect to settlements of Disputed General Unsecured Claims above a certain threshold and present periodic reports to the GUC Trust Monitor on the GUC Trust distributions and budget.  In all circumstances, the GUC Trust Monitor shall act in the best interests of all beneficiaries of

the GUC Trust, in furtherance of the purpose of the GUC Trust, and in accordance with the GUC Trust Agreement.

(h)    **Transferability of GUC Trust Interests.**  Beneficial interests in the GUC Trust shall be transferable to the extent that the transferability thereof would not require the GUC Trust to register the beneficial interests under Section 12(g) of the Securities Exchange Act of 1934, as amended, and otherwise shall not be transferable except as provided in the GUC Trust Agreement.

(i)    **Cash.**  The GUC Trust Administrator may invest Cash (including any earnings thereon or proceeds therefrom) as would be permitted by the GUC Trust Agreement or as otherwise permitted by an order of the Bankruptcy Code, which may include the Confirmation Order.

(j)    **Costs and Expenses of GUC Trust Administrator.**  The costs and expenses of the GUC Trust, including the fees and expenses of the GUC Trust Administrator and its retained professionals, shall be paid out of the GUC Trust Administrative Fund, subject to the provisions of the Budget and the terms of the GUC Trust Agreement.

(k)    **Compensation of GUC Trust Administrator.**  The GUC Trust Administrator shall be entitled to reasonable compensation, subject to the provisions of the Budget and the terms of the GUC Trust Agreement, in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.  Such compensation shall be payable from the GUC Trust Administrative Fund, subject to the terms of the GUC Trust Agreement.

(l)    **Distribution of GUC Trust Assets.**  The GUC Trust Administrator shall distribute quarterly (to the extent there are sufficient assets available for distribution in accordance with the GUC Trust Agreement), beginning on the first Business Day following the Effective Date, or as soon thereafter as is practicable, the appropriate amount of New GM Securities (and other distributions of Cash, if any) to holders of Allowed General Unsecured Claims and/or GUC Trust Units, as applicable. The GUC Trust Administrator shall distribute in accordance with the GUC Trust Agreement Cash from the GUC Trust Administrative Fund (i) in amounts as reasonably necessary to meet contingent liabilities and otherwise address the expenses of the GUC Trust, (ii) to pay reasonable expenses (including, but not limited to, any taxes imposed on the GUC Trust or in respect of the GUC Trust Assets), and (iii) to satisfy other liabilities incurred by the GUC Trust in accordance with the Plan or the GUC Trust Agreement.

(m)    **Retention of Professionals by GUC Trust Administrator and GUC Trust Monitor.**  The GUC Trust Administrator and the GUC Trust Monitor may retain and reasonably compensate counsel and other professionals to assist in their duties as GUC Trust Administrator and GUC Trust Monitor on such terms as the GUC Trust Administrator and the GUC Trust Monitor deem appropriate without Bankruptcy Court approval, subject to notice to the U.S. Treasury, as a DIP Lender, and to the provisions of

the GUC Trust Agreement. The GUC Trust Administrator and the GUC Trust Monitor may retain any professional who represented parties in interest, including the Debtors or the Creditors' Committee, in the Chapter 11 Cases. All fees and expenses incurred in connection with the foregoing shall be payable from the GUC Trust Administrative Fund subject to the provisions of the Budget and the terms of the GUC Trust Agreement.

(n) **U.S. Federal Income Tax Treatment of GUC Trust.**

(i) **Tax Status of GUC Trust.** For all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the GUC Trust Administrator, and the holders of General Unsecured Claims) shall treat the GUC Trust as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9.

(ii) **Delivery of Statement of Transfers.** Following the funding of the GUC Trust (and in no event later than February 15th of the calendar year following the funding of the GUC Trust), MLC shall provide a "§ 1.468B-9 Statement" to the GUC Trust Administrator in accordance with Treasury Regulation section 1.468B-9(g).

(iii) **Tax Reporting.**

(1) The GUC Trust shall file (or cause to be filed) any other statements, returns, or disclosures relating to the GUC Trust that are required by any governmental unit.

(2) The GUC Trust Administrator shall be responsible for payment, out of the GUC Trust Assets, of any taxes imposed on the GUC Trust or the GUC Trust Assets.

(3) The GUC Trust Administrator may request an expedited determination of taxes of the GUC Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

(o) **Dissolution.** The GUC Trust Administrator and the GUC Trust shall be discharged or dissolved, as applicable, upon completion of their duties as set forth in the GUC Trust Agreement, including when (i) all Disputed General Unsecured Claims have been resolved, (ii) all GUC Trust Assets have been liquidated, (iii) all distributions required to be made by the GUC Trust Administrator under the Plan and the GUC Trust Agreement have been made, and (iv) if the Residual Wind-Down Assets are transferred to the GUC Trust upon dissolution of MLC, all Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims have been resolved, but in no event shall the GUC Trust be dissolved later than five (5) years from the Effective Date or such shorter or longer period

authorized by the Bankruptcy Court in order to resolve all Disputed General Unsecured Claims.

**(p)** **Indemnification of GUC Trust Administrator and GUC Trust Monitor.** The GUC Trust Administrator and the GUC Trust Monitor (and their agents and professionals) shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the GUC Trust Administrator, the GUC Trust Monitor, or the GUC Trust, except those acts found by Final Order to be arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its or their actions or inactions in its or their capacity as, or on behalf of, the GUC Trust Administrator, the GUC Trust Monitor, or the GUC Trust, except for any actions or inactions found by Final Order to be involving willful misconduct, gross negligence, bad faith, self-dealing, or *ultra vires* acts. Any indemnification claim of the GUC Trust Administrator, the GUC Trust Monitor, and the other parties entitled to indemnification under this subsection shall be satisfied first from the GUC Trust Administrative Fund and then from the GUC Trust Assets. The GUC Trust Administrator and the GUC Trust Monitor shall be entitled to rely, in good faith, on the advice of its retained professionals.

**(q)** **Closing of Chapter 11 Cases.** When all Disputed Claims (other than Asbestos Personal Injury Claims and Property Environmental Claims) filed against the Debtors have become Allowed Claims or have been disallowed by Final Order, all of the GUC Trust Assets and all Avoidance Action Trust Assets, if applicable, have been distributed in accordance with the Plan, and all Allowed Administrative Expenses (other than the DIP Credit Agreement Claims), Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims have been satisfied in accordance with the Plan, the GUC Trust Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules. If at any time the GUC Trust Administrator determines that the expense of administering the GUC Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the GUC Trust Assets remaining in the GUC Trust, the GUC Trust Administrator shall apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to close the Chapter 11 Cases, (ii) repay any Cash balance from the GUC Trust Administrative Fund to the DIP Lenders in accordance with Section 5.2(b) of the Plan, and (iii) unless the Chapter 11 Cases have been closed, close the Chapter 11 Cases in accordance with the Bankruptcy Code and Bankruptcy Rules. Notice of such application shall be given electronically, to the extent practicable, to those parties who have filed requests for notices and whose electronic addresses remain current and operating.

**6.3** **The Asbestos Trust.**

**(a)** **Execution of Asbestos Trust Agreement.** On the Effective Date, the Asbestos Trust Agreement, in a form reasonably acceptable to the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative, shall be executed, and all other necessary steps shall be taken to establish

the Asbestos Trust and the beneficial interests therein, which shall be for the benefit of the holders of Allowed Asbestos Personal Injury Claims. In the event of any conflict between the terms of this Section 6.3 and the terms of the Asbestos Trust Agreement, the terms of the Asbestos Trust Agreement shall govern.

(b)     **Purpose of Asbestos Trust.**  The Asbestos Trust shall be established to, among other things, (i) direct the processing, liquidation, and payment of all Asbestos Personal Injury Claims in accordance with the Plan, the Asbestos Trust Distribution Procedures, and the Confirmation Order and (ii) preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Asbestos Personal Injury Claims.

(c)     **Assumption of Certain Liabilities by Asbestos Trust.**  In consideration of the Asbestos Trust Assets transferred to the Asbestos Trust under the Plan and in furtherance of the purposes of the Asbestos Trust and the Plan, the Asbestos Trust shall assume all liability and responsibility for all Asbestos Personal Injury Claims and the Debtors shall have no further financial or other responsibility or liability therefor.

(d)     **Asbestos Trust Assets.**  The Asbestos Trust shall consist of the Asbestos Trust Assets.  On the Asbestos Trust Transfer Date, the Debtors shall transfer all the Asbestos Trust Assets to the Asbestos Trust free and clear of all liens, claims, and encumbrances, except to the extent otherwise provided herein.  Neither the Debtors nor the DIP Lenders shall have any obligation to provide any further funding to or on behalf of the Asbestos Trust.

(e)     **Governance of Asbestos Trust.**  The Asbestos Trust shall be governed by the Asbestos Trust Administrator(s).

(f)     **The Asbestos Trust Administrator(s).**  The Asbestos Trust Administrator(s) shall be designated on or before the Effective Date by the Debtors, with the consent of the Asbestos Claimants' Committee and the Future Claimants' Representative, and such designation shall be confirmed by the Bankruptcy Court.

(g)     **Role of Asbestos Trust Administrator(s).**  In furtherance of and consistent with the purposes of the Asbestos Trust and the Plan, the Asbestos Trust Administrator(s) shall (i) have the power and authority to hold, manage, sell, invest, and distribute the Asbestos Trust Assets to the holders of Allowed Asbestos Personal Injury Claims, (ii) hold the Asbestos Trust Assets for the benefit of the holders of Allowed Asbestos Personal Injury Claims, (iii) have the power and authority to hold, manage, sell, and distribute the Asbestos Trust Assets obtained through the exercise of its power and authority, (iv) have the power and authority to prosecute and resolve objections to Asbestos Personal Injury Claims, and (v) have the power and authority to perform such other functions as are provided in the Plan and the Asbestos Trust Agreement.  The Asbestos Trust Administrator(s) shall be responsible for all decisions and duties with respect to the Asbestos Trust and the Asbestos Trust Assets.  In all circumstances, the

Asbestos Trust Administrator(s) shall act in the best interests of all beneficiaries of the Asbestos Trust and in furtherance of the purpose of the Asbestos Trust.

        **(h)**     **Nontransferability of Asbestos Trust Interests.** The beneficial interests in the Asbestos Trust shall not be certificated and are not transferable (except as otherwise provided in the Asbestos Trust Agreement).

        **(i)**     **Cash.** The Asbestos Trust Administrator(s) may invest Cash (including any earnings thereon or proceeds therefrom).

        **(j)**     **Costs and Expenses of Asbestos Trust Administrator(s).** The costs and expenses of the Asbestos Trust, including the fees and expenses of the Asbestos Trust Administrator(s) and its retained professionals, shall, subject to the provisions of the Budget and the terms of the Asbestos Trust Agreement, be paid first out of the $2 million in Cash in the Asbestos Trust Assets and then out of the other Asbestos Trust Assets.

        **(k)**     **Allowance of Asbestos Personal Injury Claims.** With respect to any Asbestos Personal Injury Claim that is Allowed by the Asbestos Trust in accordance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures, such allowance shall establish the amount of legal liability against the Asbestos Trust in the amount of the liquidated value of such Asbestos Personal Injury Claim, as determined in accordance with the Asbestos Trust Distribution Procedures.

        **(l)**     **Distribution of Asbestos Trust Assets.** In accordance with the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures, the Asbestos Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims and Demands, or other comparable mechanisms, that provide reasonable assurance that the Asbestos Trust shall value, and be in a financial position to pay, Asbestos Personal Injury Claims and Demands that involve similar Claims in substantially the same manner.

        **(m)**     **Retention of Professionals by Asbestos Trust Administrator(s).** The Asbestos Trust Administrator(s) may retain and reasonably compensate counsel and other professionals to assist in its or their duties as Asbestos Trust Administrator(s) on such terms as the Asbestos Trust Administrator(s) deem(s) appropriate without Bankruptcy Court approval, but subject to the provisions of the Budget and the terms of the Asbestos Trust Agreement. The Asbestos Trust Administrator(s) may retain any professional who represented parties in interest in the Chapter 11 Cases.

        **(n)**     **U.S. Federal Income Tax Treatment of Asbestos Trust.**

        (i)     **Tax Status of Asbestos Trust.** For all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Asbestos Trust Administrator(s), and the holders of Asbestos Personal

Injury Claims) shall treat the Asbestos Trust as a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1.

        (ii)     **Delivery of Statement of Transfers.**  Following the funding of the Asbestos Trust (and in no event later than February 15th of the calendar year following the funding of the Asbestos Trust), MLC shall provide a "§ 1.468B-3 Statement" to the Asbestos Trust Administrator(s) in accordance with Treasury Regulation section 1.468B-3(e)

        (iii)     **Other Statements.**  The Asbestos Trust shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Asbestos Trust that are required by any governmental unit.

        (iv)     **Tax Payments.**  The Asbestos Trust Administrator(s) shall be responsible for payment, out of the Asbestos Trust Assets, of any taxes imposed on the Asbestos Trust or the Asbestos Trust Assets.

        (v)     **Expedited Determination.**  The Asbestos Trust Administrator(s) may request an expedited determination of taxes of the Asbestos Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Asbestos Trust for all taxable periods through the dissolution of the Asbestos Trust.

        **(o)**     **Dissolution.**  The Asbestos Trust Administrator(s) and the Asbestos Trust shall be discharged or dissolved, as applicable, at such time as (i) all Asbestos Personal Injury Claims have been resolved, (ii) all Asbestos Trust Assets have been liquidated, and (iii) all distributions required to be made by the Asbestos Trust Administrator(s) under the Plan and the Asbestos Trust Agreement have been made.

        **(p)**     **Indemnification of Asbestos Trust Administrator(s).**  The Asbestos Trust Administrator(s) and its or their agents and professionals shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the Asbestos Trust Administrator(s) or the Asbestos Trust, except those acts arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Asbestos Trust Administrator(s) or the Asbestos Trust, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts.  Any indemnification claim of the Asbestos Trust Administrator(s) (and the other parties entitled to indemnification under this subsection (p)) shall be satisfied first from the $2 million in Cash in the Asbestos Trust Assets and then from the Asbestos Trust Assets.  The Asbestos Trust Administrator(s) shall be entitled to rely, in good faith, on the advice of its retained professionals.

      **6.4**     **The Environmental Response Trust.**

(a) **Environmental Response Trust Agreement and Environmental Response Trust Consent Decree and Settlement Agreement.** On the Effective Date, the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement shall become effective and the Environmental Response Trust shall be established and funded. Entry of the Confirmation Order shall constitute approval of the Environmental Response Trust Consent Decree and Settlement Agreement pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019. The establishment and funding of the Environmental Response Trust and the transfer of Environmental Response Trust Assets to the Environmental Response Trust shall be in full settlement and satisfaction of all present and future civil environmental liabilities or obligations of the Debtors to the Governmental Authorities, other than the General Unsecured Claims reserved in Paragraph 100 of the Environmental Response Trust Consent Decree and Settlement Agreement, with respect to any of the Environmental Response Trust Properties listed on Attachment A to the Environmental Response Trust Consent Decree and Settlement Agreement, whether prepetition or postpetition, in accordance with this Section 6.4 and the Environmental Response Trust Consent Decree and Settlement Agreement; *provided, however*, that nothing in this sentence shall preclude additional payments to the Environmental Response Trust in the event that any of the Priority Order Sites Consent Decrees and Settlement Agreements are not approved as provided in the Priority Order Sites Consent Decrees and Settlement Agreements. In the event of any conflict between the terms of the Plan and the terms of the Environmental Response Trust Consent Decree and Settlement Agreement, the terms of the Environmental Response Trust Consent Decree and Settlement Agreement shall govern.

(b) **Purpose of Environmental Response Trust.** The purpose of the Environmental Response Trust shall be to conduct, manage, and/or fund Environmental Actions with respect to certain of the Environmental Response Trust Properties, including the migration of hazardous substances emanating from certain of the Environmental Response Trust Properties, in accordance with the provisions of the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement; to reimburse the lead agency for Environmental Actions it conducts or has agreed to pay for with respect to the Environmental Response Trust Properties; to own certain of the Environmental Response Trust Properties, carry out administrative and property management functions related to the Environmental Response Trust Properties, and pay associated administrative costs; and to try to sell or transfer the Environmental Response Trust Properties owned by the Environmental Response Trust with the objective that the Environmental Response Trust Properties be put to productive or beneficial use. After the establishment and funding of, and the conveyance of the Environmental Response Trust Properties owned by the Debtors to, the Environmental Response Trust as provided in the Environmental Response Trust Consent Decree and Settlement Agreement, the Debtors shall have no further liability, role, or residual interest with respect to the Environmental Response Trust or the Environmental Response Trust Properties.

(c) **Environmental Response Trust Assets.** The Environmental Response Trust shall consist of the Environmental Response Trust Assets, as described in the Environmental Response Trust Consent Decree and Settlement Agreement. On the Effective Date, the Debtors shall transfer all the Environmental Response Trust Assets to the Environmental Response Trust, as provided in and subject to the provisions of the Environmental Response Trust Consent Decree and Settlement Agreement. Such transfer shall include the transfer of Environmental Response Trust Cash in the amount of $641,434,945, less any deductions made pursuant to Paragraph 36 of the Environmental Response Trust Consent Decree and Settlement Agreement, which represents the aggregate amounts approved by the Bankruptcy Court to pay the costs that will be incurred by the Environmental Response Trust with respect to Environmental Actions and the costs of administering the Environmental Response Trust. In settlement and full satisfaction of the Property Environmental Claims relating to the Environmental Response Trust Properties, on or before the Effective Date, the Environmental Response Trust Administrative Trustee shall create, and the Debtors shall make payments to, accounts held by or within the Environmental Response Trust as specified and in the amounts provided in the Environmental Response Trust Consent Decree and Settlement Agreement, and the Debtors shall make the payments required under the Priority Order Sites Consent Decrees and Settlement Agreements. The Environmental Response Trust Administrative Trustee shall deposit, maintain, and use the funding in accordance with the terms of the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement for the purposes described therein. Any Environmental Response Trust Property may be sold or transferred by the Environmental Response Trust Administrative Trustee in the circumstances and in light of the considerations described in the Environmental Response Trust Consent Decree and Settlement Agreement.

(d) **Governance of Environmental Response Trust.** The Environmental Response Trust shall be governed by the Environmental Response Trust Administrative Trustee according to the terms set forth in the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.

(e) **Role of Environmental Response Trust Administrative Trustee.** The Environmental Response Trust Administrative Trustee shall be responsible for implementing the purpose of the Environmental Response Trust, including overseeing the development of budgets, retaining and overseeing professionals to conduct Environmental Actions, entering into and overseeing the implementation of all contracts binding the Environmental Response Trust, executing agreements, preparing and filing all required plans and reports with the applicable Governmental Authorities, handling accounting and legal matters for the Environmental Response Trust, establishing funding objectives, monitoring the performance of the staff, and other administrative tasks, and shall carry out and implement the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement. The

Environmental Response Trust Administrative Trustee shall not be authorized to engage in any trade or business with respect to the Environmental Response Trust Assets.

(f) **Nontransferability of Environmental Response Trust Interests.** The beneficial interests in and powers under the Environmental Response Trust shall not be certificated and are not transferable (except as otherwise provided in the Environmental Response Trust Agreement or the Environmental Response Trust Consent Decree and Settlement Agreement).

(g) **Cash.** The Environmental Response Trust Administrative Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as would be permitted by (i) section 345 of the Bankruptcy Code were the Environmental Response Trust a debtor under the Bankruptcy Code and (ii) the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.

(h) **Indemnification of Environmental Response Trust Administrative Trustee.** The potential liability of each Environmental Response Trust Party shall be limited as set forth in the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement. Each Environmental Response Trust Party shall be indemnified and protected from litigation-related expenses as set forth in the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement.

(i) **U.S. Federal Income Tax Treatment of Environmental Response Trust.**

(i) **Tax Status of Environmental Response Trust.** Except as provided in the following sentence, for all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Environmental Response Trust Administrative Trustee, the DIP Lenders, and the holders of Property Environmental Claims relating to the Environmental Response Trust Properties) shall treat the Environmental Response Trust as a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1. This provision shall not be binding on the Internal Revenue Service as to the application of Treasury Regulation section 1.468B-1 or any other tax issue with respect to the Environmental Response Trust.

(ii) **Delivery of Statement of Transfers.** Following the funding of the Environmental Response Trust (and in no event later than February 15th of the calendar year following the funding of the Environmental Response Trust), MLC shall provide a "§ 1.468B-3 Statement" to the Environmental Response Trust Administrative Trustee in accordance with Treasury Regulation section 1.468B-3(e).

(iii) **Other Statements.** The Environmental Response Trust shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Environmental Response Trust that are required by any governmental unit.

(iv) **Tax Payments**. The Environmental Response Trust Administrative Trustee shall be responsible for payment, out of the Environmental Response Trust Assets, of any taxes imposed on the Environmental Response Trust or the Environmental Response Trust Assets.

(v) **Expedited Determination.** The Environmental Response Trust Administrative Trustee may request an expedited determination of taxes of the Environmental Response Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Environmental Response Trust for all taxable periods through the dissolution of the Environmental Response Trust.

### 6.5 **The Avoidance Action Trust.**

(a) **Execution of Avoidance Action Trust Agreement.** On or before the Effective Date, the Avoidance Action Trust Agreement, in a form acceptable to the Debtors, the U.S. Treasury, and the Creditors' Committee, and the Avoidance Action Trust Administrator, shall be executed, and all other necessary steps shall be taken to establish the Avoidance Action Trust and the beneficial interests therein, which shall be for the benefit of the beneficiaries of the Avoidance Action Trust; *provided, however*, that the Avoidance Action Trust Assets shall not be transferred to the Avoidance Action Trust until the Avoidance Action Trust Transfer Date; and *further provided,* that if it is determined that the U.S. Treasury or the holders of General Unsecured Claims are not entitled to any proceeds of the Term Loan Avoidance Action either by (i) mutual agreement between the U.S. Treasury and the Creditors' Committee or (ii) Final Order, then the Avoidance Action Trust Agreement need not be in a form acceptable to the U.S. Treasury or the Creditors' Committee, as applicable. In the event of any conflict between the terms of this Section 6.5 and the terms of the Avoidance Action Trust Agreement, the terms of the Avoidance Action Trust Agreement shall govern. The Avoidance Action Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated in the Plan, but only to the extent that such powers, duties, and authorities do not adversely affect the status of the Avoidance Action Trust (or any applicable portion thereof) as a liquidating trust for federal income tax purposes, subject only to the federal income tax treatment of amounts held by the Avoidance Action Trust in respect of Disputed Claims (which amounts may comprise all or part of the assets of the Avoidance Action Trust, depending on the nature of the dispute).

(b) **Purpose of Avoidance Action Trust.** The Avoidance Action Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

(c)     **Avoidance Action Trust Assets.**  The Avoidance Action Trust shall consist of the Avoidance Action Trust Assets.  On the Avoidance Action Trust Transfer Date, if the Term Loan Avoidance Action is still pending or any recovered proceeds of the Term Loan Avoidance Action have not been distributed, the Debtors shall transfer the Avoidance Action Trust Assets to the Avoidance Action Trust.  Upon delivery of the Avoidance Action Trust Assets to the Avoidance Action Trust, the Debtors and their successors and assigns shall be released from all liability with respect to the delivery of such assets.

(d)     **Governance of Avoidance Action Trust.**  The Avoidance Action Trust shall be governed by the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor.

(e)     **Avoidance Action Trust Administrator and Avoidance Action Trust Monitor.**  Wilmington Trust Company shall be the Avoidance Action Trust Administrator, and FTI Consulting, Inc. shall be the Avoidance Action Trust Monitor.

(f)     **Role of Avoidance Action Trust Administrator.**  In furtherance of and consistent with the purpose of the Avoidance Action Trust and the Plan, the Avoidance Action Trust Administrator shall (i) have the power and authority to hold and manage the Avoidance Action Trust Assets, (ii) hold the Avoidance Action Trust Assets for the benefit of the beneficiaries of the Avoidance Action Trust, (iii) have the power and authority to prosecute and resolve, in the name of the Debtors and/or the names of the Avoidance Action Trust Administrator, the Term Loan Avoidance Action, (iv) have the power and authority to invest and distribute to the Term Loan Avoidance Action Beneficiaries any proceeds of the Term Loan Avoidance Action, and (v) have the power and authority to perform such other functions as are provided in the Plan and the Avoidance Action Trust Agreement.  The Avoidance Action Trust Administrator shall be responsible for all decisions and duties with respect to the Avoidance Action Trust and the Avoidance Action Trust Assets.  In all circumstances, the Avoidance Action Trust Administrator shall act in the best interests of the beneficiaries of the Avoidance Action Trust and in furtherance of the purpose of the Avoidance Action Trust.  Prior to the Avoidance Action Trust Transfer Date, the Term Loan Avoidance Action shall be prosecuted, resolved, and administered by the GUC Trust Administrator (who shall serve as interim successor-plaintiff in the Term Loan Avoidance Action).  All expenses incurred in connection with the prosecution of the Term Loan Avoidance Action (whether prior to or after the Avoidance Action Trust Transfer Date) shall be funded by the Avoidance Action Trust Administrative Cash, subject to the provisions of the Budget and the terms of the Avoidance Action Trust Agreement.

(g)     **Role of Avoidance Action Trust Monitor.**  In furtherance of and consistent with the purpose of the Avoidance Action Trust and the Plan, the Avoidance Action Trust Monitor shall oversee the activities of the Avoidance Action Trust Administrator as set forth in the Avoidance Action Trust Agreement.  The Avoidance Action Trust Administrator shall report material matters to, and seek approval for material decisions from, the Avoidance Action Trust Monitor, as and to the extent set

forth in the Avoidance Action Trust Agreement.  Without limiting the foregoing, the Avoidance Action Trust Administrator shall obtain the approval of the Avoidance Action Trust Monitor with respect to settlements of the Avoidance Action Trust Assets and present periodic reports to the Avoidance Action Trust Monitor on the Avoidance Action Trust distributions and budget.  In all circumstances, the Avoidance Action Trust Monitor shall act in the best interests of the beneficiaries of the Avoidance Action Trust, in furtherance of the purpose of the Avoidance Action Trust, and in accordance with the Avoidance Action Trust Agreement.

**(h)** **Nontransferability of Avoidance Action Trust Interests.**  The beneficial interests in the Avoidance Action Trust shall not be certificated and shall not be transferable (except as otherwise provided in the Avoidance Action Trust Agreement).

**(i)** **Cash.**  The Avoidance Action Trust Administrator may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by the Avoidance Action Trust Agreement or as otherwise permitted by an order of the Bankruptcy Court, which may include the Confirmation Order; *provided, however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

**(j)** **Distribution of Avoidance Action Trust Assets.**  The Avoidance Action Trust shall distribute at least annually and in accordance with the Avoidance Action Trust Agreement any amount of Cash proceeds from the Term Loan Avoidance Action to the Term Loan Avoidance Action Beneficiaries (treating as Cash for purposes of this Section 6.5(j) any permitted investments under Section 6.5(i) hereof) except such amounts, if any, (i) as would be distributable to (x) a holder of a Disputed General Unsecured Claim if such Disputed General Unsecured Claim had been Allowed prior to the time of such distribution (but only until such Claim is resolved), (y) the Asbestos Trust Claim if such Claim had been Allowed in the amount set forth in the Confirmation Order prior to the time of such distribution (but only until the Asbestos Trust Claim is determined, as set forth in Section 1.15 hereof), and (z) the "Maximum Amount" (as defined in the GUC Trust Agreement) of the potential General Unsecured Claims arising from any successful recovery of proceeds from the Term Loan Avoidance Action or other Avoidance Actions, (ii) as are reasonably necessary to meet contingent liabilities and maintain the value of the Avoidance Action Trust Assets during liquidation, (iii) necessary to pay reasonable incurred and anticipated expenses (including, but not limited to, any taxes imposed on the Avoidance Action Trust or in respect of the Avoidance Action Trust Assets), and (iv) necessary to satisfy other liabilities incurred and anticipated by the Avoidance Action Trust in accordance with the Plan or the Avoidance Action Trust Agreement.

**(k)** **Costs and Expenses of Avoidance Action Trust.**  The costs and expenses of the Avoidance Action Trust, including the fees and expenses of the Avoidance Action Trust Administrator and its retained professionals, shall be paid out of the Avoidance Action Trust Assets, subject to the provisions of the Budget and the terms

of the Avoidance Action Trust Agreement. Fees and expenses incurred in connection with the prosecution and settlement of the Term Loan Avoidance Action shall be considered costs and expenses of the Avoidance Action Trust, subject to the provisions of the Budget and the terms of the Avoidance Action Trust Agreement.

(l) **Compensation of Avoidance Action Trust Administrator.** The Entities serving as or comprising the Avoidance Action Trust Administrator shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, subject to the provisions of the Budget and the terms of the Avoidance Action Trust Agreement.

(m) **Retention of Professionals by Avoidance Action Trust Administrator and Avoidance Action Trust Monitor.** The Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor may retain and compensate attorneys and other professionals to assist in their duties as Avoidance Action Trust Administrator and Avoidance Action Trust Monitor on such terms as the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor deem appropriate without Bankruptcy Court approval, subject to the provisions of the Budget and the terms of the Avoidance Action Trust Agreement. Without limiting the foregoing, the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor may retain any professional that represented parties in interest in the Chapter 11 Cases.

(n) **U.S. Federal Income Tax Treatment of Avoidance Action Trust.**

(i) **Treatment of Avoidance Action Trust Assets.** For all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Avoidance Action Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) shall treat the transfer of the Avoidance Action Trust Assets to the Avoidance Action Trust in a manner consistent with the remainder of this Section 6.5(n)(i).

(1) If all of the beneficiaries of the Avoidance Action Trust have not been identified on or prior to the Avoidance Action Trust Transfer Date either by (x) mutual agreement between the U.S. Treasury and the Creditors' Committee or (y) Final Order, then the Avoidance Action Trust Administrator shall treat the Avoidance Action Trust for U.S. federal income tax purposes as either (A) a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (including, if required, timely so electing) or (B) if permitted under applicable law and at the option of the Avoidance Action Trust Administrator, a "complex trust."

(2) If all of the beneficiaries of the Avoidance Action Trust have been identified on or prior to the Avoidance Action Trust Transfer Date, or upon identification of all of the beneficiaries of the Avoidance Action Trust after the Avoidance Action Trust Transfer Date,

the Avoidance Action Trust Assets shall be treated as being transferred (A) directly to the beneficiaries of the Avoidance Action Trust; *provided, however*, that to the extent Avoidance Action Trust Assets are allocable to Disputed Claims, such Avoidance Action Trust Assets shall be treated as being transferred to the Avoidance Action Trust Claims Reserve, followed by (B) the transfer by such beneficiaries of the Avoidance Action Trust of the Avoidance Action Trust Assets (other than the Avoidance Action Trust Assets allocable to the Avoidance Action Trust Claims Reserve) in exchange for beneficial interests in the Avoidance Action Trust. Accordingly, beneficiaries of the Avoidance Action Trust receiving beneficial interests in the Avoidance Action Trust shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Avoidance Action Trust Assets (other than any Avoidance Action Trust Assets allocable to the Avoidance Action Trust Claims Reserve). Any determination made pursuant to this Section 6.5(n)(i) shall be conclusive and binding on all parties (including the Debtors, the Avoidance Action Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) for U.S. federal, state, and local income tax purposes. Accordingly, to the extent permitted by applicable law, all parties shall report consistently with the federal income tax treatment of the Avoidance Action Trust by the Avoidance Action Trust Administrator for state and local income tax purposes. For the avoidance of doubt, the Avoidance Action Trust Administrator shall, to the fullest extent permitted by law, be indemnified from all liability for any and all consequences resulting from its determination under this Section 6.5(n)(i).

      (ii)    **Tax Reporting.**

      (1)    If the Avoidance Action Trust Administrator elects to treat the Avoidance Action Trust in its entirety or, if otherwise applicable, the Avoidance Action Trust Claims Reserve as a disputed ownership fund within the meaning of Treasury Regulation section 1.468B-9, then following the Avoidance Action Trust Transfer Date (but in no event later than February 15th of the calendar year following the funding of the Avoidance Action Trust), MLC shall provide a "§ 1.468B-9 Statement" to the Avoidance Action Trust Administrator in accordance with Treasury Regulation section 1.468B-9(g).

      (2)    From and after the date on which Section 6.5(n)(i)(2) hereof applies, the Avoidance Action Trust Administrator shall file returns for the Avoidance Action Trust treating the Avoidance Action Trust (except the Avoidance Action Trust Claims Reserve) as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with the applicable provisions of this Section 6.5(n). The Avoidance Action Trust Administrator also shall annually send to each

Term Loan Avoidance Action Beneficiary a separate statement setting forth such Term Loan Avoidance Action Beneficiary's share of items of income, gain, loss, deduction, or credit of the Avoidance Action Trust and shall instruct all such Term Loan Avoidance Action Beneficiaries to report such items on their respective U.S. federal income tax returns or to forward the appropriate information to their respective beneficial holders with instructions to report such items on their U.S. federal income tax returns. The Avoidance Action Trust Administrator also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Avoidance Action Trust that are required by any governmental unit.

(A)     Allocations of the Avoidance Action Trust's taxable income among the Term Loan Avoidance Action Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Avoidance Action Trust had distributed all of its other assets (valued at their tax book value and other than assets attributable to the Avoidance Action Trust Claims Reserve) to the Term Loan Avoidance Action Beneficiaries, in each case up to the tax book value of the assets treated as contributed by such Term Loan Avoidance Action Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Avoidance Action Trust. Similarly, taxable loss of the Avoidance Action Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Avoidance Action Trust Assets. The tax book value of the Avoidance Action Trust Assets for this purpose shall equal their fair market value on the date on which Section 6.5(n)(i)(2) hereof applies, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury regulations, and other applicable administrative and judicial authorities and pronouncements.

(B)     If the Avoidance Action Trust previously was treated for U.S. federal income tax purposes as a disputed ownership fund within the meaning of Treasury Regulation section 1.468B-9 or a complex trust pursuant to Section 6.5(n)(i) hereof, the Avoidance Action Trust Administrator shall continue to treat the Avoidance Action Trust Claims Reserve in the same manner. If Section 6.5(n)(i)(2) hereof is applicable as of the Avoidance Action Trust Transfer Date, the Avoidance Action Trust Administrator shall (x) treat the Avoidance Action Trust Claims

Reserve for U.S. federal income tax purposes as either (i) a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 by timely so electing or (ii) a "complex trust" and (y) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Any determination made pursuant to this Section 6.5(n)(ii)(2)(B) shall be conclusive and binding on all parties (including the Debtors, the Avoidance Action Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) for U.S. federal, state, and local income tax purposes. For the avoidance of doubt, the Avoidance Action Trust Administrator shall, to the fullest extent permitted by law, be indemnified from all liability for any and all consequences resulting from its determination under this Section 6.5(n)(ii)(2)(B).

(C)     As soon as practicable after the Avoidance Action Trust Transfer Date, and, if applicable, at any later date on which Section 6.5(n)(i)(2) hereof applies, the Avoidance Action Trust Administrator shall make a good-faith valuation of the Avoidance Action Trust Assets, and such valuation shall be made available from time to time, to the extent relevant, and shall be used consistently by all parties (including, without limitation, the Debtors, the Avoidance Action Trust Administrator, the holders of the DIP Credit Agreement Claims, and the holders of Allowed General Unsecured Claims) for all U.S. federal and applicable state and local income tax purposes.

(3)     The Avoidance Action Trust Administrator shall be responsible for payment, out of the Avoidance Action Trust Assets, of any taxes imposed on the Avoidance Action Trust or the Avoidance Action Trust Assets, including the Avoidance Action Trust Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Avoidance Action Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims or (ii) to the extent such Disputed Claims subsequently have been resolved, deducted from any amounts otherwise distributable by the Avoidance Action Trust Administrator as a result of the resolution of such Disputed Claims.

(4)     The Avoidance Action Trust Administrator may request an expedited determination of taxes of the Avoidance Action Trust, including the Avoidance Action Trust Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on

behalf of, the Avoidance Action Trust for all taxable periods through the dissolution of the Avoidance Action Trust.

(o) **Dissolution.** The Avoidance Action Trust Administrator and the Avoidance Action Trust shall be discharged or dissolved, as applicable, at such time as (i) all of the Avoidance Action Trust Assets have been distributed pursuant to the Plan and the Avoidance Action Trust Agreement, (ii) the Avoidance Action Trust Administrator determines, in its sole discretion, that the administration of the Avoidance Action Trust Assets is not likely to yield sufficient additional Avoidance Action Trust Assets to justify further pursuit, and (iii) all distributions required to be made by the Avoidance Action Trust Administrator under the Plan and the Avoidance Action Trust Agreement have been made, but in no event shall the Avoidance Action Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the third (3rd) anniversary (or at least six (6) months prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Avoidance Action Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Avoidance Action Trust Assets. If at any time the Avoidance Action Trust Administrator determines, in reliance upon such professionals as the Avoidance Action Trust Administrator may retain, that the expense of administering the Avoidance Action Trust so as to make a final distribution to the beneficiaries of the Avoidance Action Trust is likely to exceed the value of the Avoidance Action Trust Assets remaining in the Avoidance Action Trust, the Avoidance Action Trust Administrator may apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to dissolve the Avoidance Action Trust, (ii) transfer the balance to the DIP Lenders and/or the GUC Trust as determined either by (A) mutual agreement between the U.S. Treasury and the Creditors' Committee or (B) Final Order, or donate any balance to a charitable organization described in section 501(c)(3) of the Tax Code and exempt from U.S. federal income tax under section 501(a) of the Tax Code that is unrelated to the Debtors, the Avoidance Action Trust, and any insider of the Avoidance Action Trust Administrator, and (iii) dissolve the Avoidance Action Trust.

(p) **Indemnification of Avoidance Action Trust Administrator and Avoidance Action Trust Monitor.** The Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor (and their agents and professionals) shall not be liable for actions taken or omitted in its or their capacity as, or on behalf of, the Avoidance Action Trust Administrator, the Avoidance Action Trust Monitor, or the Avoidance Action Trust, except those acts found by Final Order to be arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Avoidance Action Trust Administrator, the Avoidance Action Trust Monitor, or the Avoidance Action Trust, except for any actions

or inactions found by Final Order to be involving willful misconduct, gross negligence, bad faith, self-dealing, or *ultra vires* acts. Any indemnification claim of the Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor (and the other parties entitled to indemnification under this subsection) shall be satisfied first from the Avoidance Action Trust Administrative Cash and then from the Avoidance Action Trust Assets. The Avoidance Action Trust Administrator and the Avoidance Action Trust Monitor shall be entitled to rely, in good faith, on the advice of their retained professionals.

**6.6** **Securities Law Matters.** In reliance upon section 1145(a) of the Bankruptcy Code, the offer and/or issuance of the New GM Securities (but, for the avoidance of doubt, not the sale by the GUC Trust Administrator of New GM Warrants pursuant to Section 5.2(e) hereof) by either MLC or the GUC Trust, as a successor of MLC under the Plan, is exempt from registration under the Securities Act and any equivalent securities law provisions under state law. The exemption from Securities Act registration provided by section 1145(a) of the Bankruptcy Code (as well as any equivalent securities law provisions under state law) also is available for the offer and/or issuance by the GUC Trust of (i) beneficial interests in the GUC Trust and (ii) New GM Securities in exchange for such beneficial interests as outstanding Disputed General Unsecured Claims are resolved in accordance with the Plan. The offer and/or issuance of beneficial interests by any of the following successors of the Debtors – the Asbestos Trust, the Environmental Response Trust, and the Avoidance Action Trust – is exempt from Securities Act registration (along with equivalent securities law provisions under state law) in reliance upon section 1145(a) of the Bankruptcy Code.

**6.7** **Cancellation of Existing Securities and Agreements.** Except for purposes of evidencing a right to distributions under the Plan or otherwise provided hereunder or as set forth in Sections 2.4 and 10.1 hereof , on the Effective Date all the agreements and other documents evidencing the Claims or rights of any holder of a Claim against the Debtors, including all Indentures and Fiscal and Paying Agency Agreements and bonds, debentures, and notes issued thereunder evidencing such Claims, all Note Claims, all Eurobond Claims, all Nova Scotia Guarantee Claims, and any options or warrants to purchase Equity Interests, or obligating the Debtors to issue, transfer, or sell Equity Interests or any other capital stock of the Debtors, shall be cancelled and discharged; *provided, however*, that the Indentures and Fiscal and Paying Agency Agreements shall continue in effect solely for the purposes of (i) allowing the Indenture Trustees and the Fiscal and Paying Agents to make any distributions on account of Allowed General Unsecured Claims in Class 3 pursuant to the Plan and perform such other necessary administrative functions with respect thereto, (ii) permitting the Indenture Trustees and the Fiscal and Paying Agents to receive payment from the Indenture Trustee/Fiscal and Paying Agent Reserve Cash, (iii) permitting the Indenture Trustees and the Fiscal and Paying Agents to maintain any rights or liens they may have for fees, costs, expenses, and indemnities under the Indentures and the Fiscal and Paying Agency Agreements, against or recoverable from the Registered Holders and/or beneficial owners of debt securities with respect to the Note Claims, the Eurobond Claims, and the Nova

Scotia Guarantee Claims, and (iv) allowing holders of Nova Scotia Guarantee Claims to assert direct claims, if any, against GM Nova Scotia. Notwithstanding the foregoing, nothing contained herein shall affect any rights that a holder of a Note Claim or an Indenture Trustee may have against Delphi Corporation and/or any of its affiliates or successors with respect to that certain Assumption and Assignment Agreement – Industrial Revenue Bonds, dated as of January 1, 1999, between Delphi Automotive Systems LLC and General Motors Corporation and/or any related agreements or documents.

**6.8    Equity Interests in MLC Subsidiaries Held by the Debtors.**  On the Effective Date, at the option of the Debtors, each respective Equity Interest in a direct or indirect subsidiary of MLC shall be unaffected by the Plan, in which case the Debtor holding such Equity Interests shall continue to hold such Equity Interests and shall cause any such subsidiaries to be dissolved prior to December 15, 2011.  An amount equal to any net proceeds realized from such dissolutions shall be distributed to the DIP Lenders on account of amounts outstanding.

**6.9    Administration of Taxes.**  Subject to the MSPA and the GUC Trust Agreement, MLC shall be responsible for all tax matters of the Debtors until a certificate of cancellation or dissolution for MLC shall have been filed in accordance with Section 6.10 hereof.

**6.10    Dissolution of the Debtors.**  Within thirty (30) days after its completion of the acts required by the Plan, or as soon thereafter as is practicable, but no later than December 15, 2011, each Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of each Debtor; *provided, however,* that each Debtor shall file with the office of the Secretary of State or other appropriate office for the state of its organization a certificate of cancellation or dissolution; and *provided, further,* that upon the filing of such certificate of cancellation or dissolution, each such Debtor immediately shall cease to be, and not continue as, a body corporate for any purpose whatsoever.

**6.11    Determination of Tax Filings and Taxes.**

**(a)**    Following the filing of a certificate of cancellation or dissolution for MLC, subject to Section 6.16(a) of the MSPA and the GUC Trust Agreement, the GUC Trust Administrator shall prepare and file (or cause to be prepared and filed) on behalf of the Debtors, all tax returns, reports, certificates, forms, or similar statements or documents (collectively, "**Tax Returns**") required to be filed or that the GUC Trust Administrator otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds, for all taxable periods ending on, prior to, or after the Effective Date.

**(b)**    Each of the Debtors and the GUC Trust Administrator shall cooperate fully with each other regarding the implementation of this Section 6.11 (including the execution of appropriate powers of attorney) and shall make available to

the other as reasonably requested all information, records, and documents relating to taxes governed by this Section 6.11 until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals, or litigation with respect to such taxes. Without limiting the generality of the foregoing, the Debtors shall execute on or prior to the filing of a certificate of cancellation or dissolution for MLC a power of attorney authorizing the GUC Trust Administrator to correspond, sign, collect, negotiate, settle, and administer tax payments and Tax Returns for the taxable periods described in Section 6.11(a) hereof.

(c)     The Debtors and the GUC Trust Administrator shall have the right to request an expedited determination of the tax liability of the Debtors, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the filing of a certificate of cancellation or dissolution for MLC.

(d)     Following the filing of a certificate of cancellation or dissolution for MLC, subject to Section 6.16(a) and (d) of the MSPA, the GUC Trust Administrator shall have the sole right, at its expense, to control, conduct, compromise, and settle any tax contest, audit, or administrative or court proceeding relating to any liability for taxes of the Debtors and shall be authorized to respond to any tax inquiries relating to the Debtors (except with respect to any property and ad valorem taxes relating to the Environmental Response Trust Assets).

(e)     Following the filing of a certificate of cancellation or dissolution for MLC, subject to the MSPA, the GUC Trust Administrative Fund shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of any Debtors, including for any taxable period ending on, prior to, or after the Effective Date (except with respect to any property and ad valorem tax refunds and credits relating to the Environmental Response Trust Assets).

(f)     The Environmental Response Trust shall be responsible for the payment of any property and ad valorem taxes relating to the Environmental Response Trust Assets that become due after the Environmental Response Trust Transfer Date.

(g)     Following the Environmental Response Trust Transfer Date, subject to Section 6.16(a) and (d) of the MSPA, the Environmental Response Trust Administrative Trustee shall have the sole right, at its expense, to control, conduct, compromise, and settle any tax contest, audit, or administrative or court proceeding relating to any liability for property and ad valorem taxes attributable to the Environmental Response Trust Assets and shall be authorized to respond to any such tax inquiries relating to the Environmental Response Trust Assets.

(h)     Following the Environmental Response Trust Transfer Date, subject to the MSPA, the Environmental Response Trust Administrative Trustee shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any property and ad valorem taxes attributable to the

Environmental Response Trust Assets, including for any taxable period ending on, prior to, or after the Effective Date.

(i)     Each of the Debtors and the Environmental Response Trust Administrative Trustee shall cooperate fully with each other regarding the implementation of this Section 6.11 (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records, and documents relating to property and ad valorem taxes governed by this Section 6.11 until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals, or litigation with respect to such taxes. Without limiting the generality of the foregoing, the Debtors shall execute on or prior to the Environmental Response Trust Transfer Date a power of attorney authorizing the Environmental Response Trust Administrative Trustee to correspond, sign, collect, negotiate, settle, and administer tax payments and Tax Returns for the taxes described in Section 6.11(f) hereof.

**6.12   <u>Books and Records</u>.** MLC shall comply with its obligations under the Environmental Response Trust Consent Decree and Settlement Agreement to provide documents, other records, and/or information to the Environmental Response Trust Administrative Trustee. Upon the Effective Date, MLC shall transfer and assign to the GUC Trust full title to, and the GUC Trust shall be authorized to take possession of, all of the books and records of the Debtors, with the exception of those books and records that are necessary for the implementation of the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, as applicable, which books and records MLC shall transfer and assign to the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, respectively. Upon the Effective Date, the Creditors' Committee shall transfer and assign to the GUC Trust Monitor the books and records related to the administration of the GUC Trust and any relevant information prepared by the Creditors' Committee during the Chapter 11 Cases. Upon the Avoidance Action Trust Transfer Date, (i) MLC shall transfer and assign to the Avoidance Action Trust full title to, and the Avoidance Action Trust shall be authorized to take possession of, all of the books and records of the Debtors relating to the Avoidance Action Trust Assets and (ii) the Creditors' Committee shall transfer and assign to the Avoidance Action Trust Monitor the books and records related to the administration of the Avoidance Action Trust and any relevant information prepared by the Creditors' Committee during the Chapter 11 Cases. Any such books and records transferred by either the Debtors or the Creditors' Committee shall be protected by the attorney-client privilege. The GUC Trust, the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, as applicable, shall have the responsibility of storing and maintaining the books and records transferred hereunder until one year after the date MLC is dissolved in accordance with Section 6.10 hereof, after which time such books and records may be abandoned or destroyed without further Bankruptcy Court order; *provided, however*, that any tax-related books and records transferred hereunder shall be stored and maintained until the expiration of the applicable statute of limitations. The Debtors shall cooperate with the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental

Response Trust Administrative Trustee, or the Avoidance Action Trust Administrator, as applicable, to facilitate the delivery and storage of their books and records in accordance herewith.  The Debtors (as well as their current and former officers and directors) shall be entitled to reasonable access to any books and records transferred in accordance with this Section 6.12 for all necessary corporate purposes, including, without limitation, defending or prosecuting litigation, determining insurance coverage, filing tax returns, and addressing personnel matters.  For purposes of this Section, books and records include computer-generated or computer-maintained books and records and computer data, as well as electronically-generated or maintained books and records or data, along with books and records of the Debtors maintained by or in possession of third parties and all the claims and rights of the Debtors in and to their books and records, wherever located.

**6.13** **Corporate Action.**  Upon the Effective Date, the Debtors shall perform each of the actions and effect each of the transfers required by the terms of the Plan, in the time period allocated therefor, and all matters provided for under the Plan that would otherwise require approval of the stockholders, partners, members, directors, or comparable governing bodies of the Debtors shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law (or other applicable governing law) of the states in which the Debtors are incorporated or organized, without any requirement of further action by the stockholders, members, or directors (or other governing body) of the Debtors.  Each of the Debtors shall be authorized and directed, following the completion of all disbursements, other transfers, and other actions required of the Debtors by the Plan, to file its certificate of cancellation or dissolution as contemplated by Section 6.10 hereof.  The filing of such certificates of cancellation or dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including, without express or implied limitation, any action by the stockholders, members, or directors (or other governing body) of the Debtors.

**6.14** **Effectuating Documents and Further Transactions.**  Each of the officers of each of the Debtors is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**6.15** **Continued Applicability of Final Order Approving DIP Credit Agreement.**  The restrictions set forth in paragraph 20 of the Final Order approving the DIP Credit Agreement (ECF No. 2529) shall continue to apply to the DIP Lenders' Collateral however treated under the Plan.

## ARTICLE VII.

### PROCEDURES FOR DISPUTED CLAIMS

**7.1** **Objections to Claims and Resolution of Disputed Claims.**

(a) Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, on and after the Effective Date and through the dissolution of MLC, the Debtors shall have the right to the exclusion of all others (except as to applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code) to object to Administrative Expenses, Priority Tax Claims, DIP Credit Agreement Claims, Priority Non-Tax Claims, and Secured Claims.

(b) On and after the Effective Date, the GUC Trust Administrator shall have the exclusive right to object, and/or continue prosecution of objections, to General Unsecured Claims (other than the Asbestos Trust Claim). If the Residual Wind-Down Assets are transferred to the GUC Trust upon the dissolution of MLC, after such transfer, the GUC Trust Administrator shall have the exclusive right to object to any remaining Administrative Expenses, Priority Tax Claims, DIP Credit Agreement Claims, Priority Non-Tax Claims, and Secured Claims.

(c) The Debtors or the GUC Trust Administrator, as applicable, shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than one hundred eighty (180) days after (i) the Effective Date for all Claims (with the exception of Unliquidated Litigation Claims as set forth in this Section 7.1), and (ii) such date as may be fixed by the Bankruptcy Court, whether fixed before or after the dates specified in clause (i) above. The Bankruptcy Court shall have the authority on request of the Debtors or the GUC Trust Administrator, as applicable, to extend the foregoing dates ex parte. On and after the Effective Date, the Debtors shall continue to have the power and authority to prosecute and resolve objections to Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed DIP Credit Agreement Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims. All objections shall be litigated to a Final Order except to the extent the Debtors or the GUC Trust Administrator, as applicable, elects to withdraw any such objection or the Debtors or the GUC Trust Administrator, as applicable, and the holder of a Claim elect to compromise, settle, or otherwise resolve any such objection, in which event they may compromise, settle, or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.

(d) Notwithstanding the foregoing, holders of Unliquidated Litigation Claims (other than (i) the United States, including its agencies and instrumentalities, and (ii) state and tribal governments with respect to any Claims concerning alleged environmental liabilities) shall be subject to the ADR Procedures and Unliquidated Litigation Claims shall be channeled to the GUC Trust and resolved in accordance with

the ADR Procedures.  If the Debtors or the GUC Trust Administrator, as applicable, terminate the ADR Procedures with respect to an Unliquidated Litigation Claim, the Debtors or the GUC Trust Administrator, as applicable, shall have one hundred eighty (180) days from the date of termination of the ADR Procedures to file and serve an objection to such Unliquidated Litigation Claim.  If the Debtors or the GUC Trust Administrator terminate the ADR Procedures with respect to an Unliquidated Litigation Claim and such Unliquidated Litigation Claim is litigated in a court other than the Bankruptcy Court, the Debtors or the GUC Trust Administrator, as applicable, shall have ninety (90) days from the date of entry of a Final Order adjudicating such Claim to file and serve an objection to such Claim for purposes of determining the treatment of such Claim under the Plan.

(e)	The resolution of Asbestos Personal Injury Claims shall be dealt with by the Asbestos Trust in accordance with the Asbestos Trust Distribution Procedures.

**7.2	No Distribution Pending Allowance.**  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder to the holder thereof shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.  Until such time, with respect to General Unsecured Claims, the GUC Trust Administrator or the Avoidance Action Trust Administrator, as applicable, shall withhold from the property to be distributed to holders of beneficial interests in the GUC Trust or the Avoidance Action Trust, as applicable, the portion of such property allocable to Disputed General Unsecured Claims, the Asbestos Trust Claim based on the amount set forth in the Confirmation Order until such time as the amount of the Asbestos Trust Claim is finally determined as set forth in Section 1.15 hereof, and the "Maximum Amount" (as defined in the GUC Trust Agreement) of the potential General Unsecured Claims arising from any successful recovery of proceeds from the Term Loan Avoidance Action or other Avoidance Actions, and shall hold such property in the GUC Trust or the Avoidance Action Trust Claims Reserve, as applicable.  All Unliquidated Litigation Claims shall be deemed Disputed Claims unless and until they are Allowed after resolution by settlement or Final Order.  This Section 7.2 shall not apply to Property Environmental Claims.

**7.3	Estimation.**  The Debtors or the GUC Trust Administrator, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the GUC Trust Administrator previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the GUC Trust Administrator, as applicable, may pursue supplementary proceedings to

object to the allowance of such Claim.  All the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  On and after the Confirmation Date, Claims that have been estimated may be compromised, settled, withdrawn, or otherwise resolved subsequently, without further order of the Bankruptcy Court.  This Section 7.3 shall not apply to Property Environmental Claims.

**7.4** **Allowance of Disputed Claims.**  If, on or after the Effective Date, any Disputed Claim becomes, in whole or in part, an Allowed Claim, the Debtors, the GUC Trust Administrator, or the Avoidance Action Trust Administrator, as applicable, shall, on the next applicable distribution date following when the Disputed Claim becomes an Allowed Claim, distribute to the holder thereof the distributions, if any, that such holder would have received had its Claim been Allowed on the Effective Date, except as otherwise provided herein.

**7.5** **Dividends.**  In the event that dividend distributions have been made with respect to the New GM Securities that are in the GUC Trust, such dividends shall be distributed to holders of Allowed Claims in the same manner and at the same time as the New GM Securities to which such dividends relate are distributed.

## ARTICLE VIII.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.1** **Executory Contracts and Unexpired Leases.**  On the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected as of the Effective Date, except for an executory contract or unexpired lease that (i) has been assumed or rejected pursuant to the order of the Bankruptcy Court approving the 363 Transaction, (ii) has been assumed or rejected pursuant to Final Order of the Bankruptcy Court entered prior to the Effective Date, (iii) is the subject of a separate motion to assume or reject filed under section 365 of the Bankruptcy Code by the Debtors prior to the Effective Date, or (iv) constitute Environmental Trust Assets.

**8.2** **Approval of Rejection of Executory Contracts and Unexpired Leases.**  Entry of the Confirmation Order shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected as of the Effective Date pursuant to the Plan.

**8.3** **Rejection Claims.**  In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator, or any property to be distributed under the Plan, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the Avoidance Action Trust unless a proof of Claim is filed with the Bankruptcy Court and

served upon the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator on or before the date that is thirty (30) days after the Confirmation Date.

**ARTICLE IX.**

**EFFECTIVENESS OF THE PLAN**

**9.1**    **Condition Precedent to Confirmation of Plan.**  The following is a condition precedent to the confirmation of the Plan:

(a)    The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtors.

**9.2**    **Conditions Precedent to Effective Date.**  The following are conditions precedent to the Effective Date of the Plan:

(a)    The Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect;

(b)    The GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental Response Trust Agreement, and the Avoidance Action Trust Agreement shall have been executed;

(c)    The GUC Trust Assets shall have been transferred to the GUC Trust;

(d)    The Environmental Response Trust Consent Decree and Settlement Agreement shall have been approved by order of the Bankruptcy Court, such order shall be in full force and effect, and no stay thereof shall be in effect, and the Environmental Response Trust Assets shall have been transferred to the Environmental Response Trust; and

(e)    The Debtors shall have sufficient Cash to pay the sum of (i) Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and, if applicable, Allowed Secured Claims, and the professional fees of the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, and the fee examiner appointed in these Chapter 11 Cases that have not been paid, (ii) an amount that would be required to distribute to the holders of Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and, if applicable, Disputed Secured Claims if all such Claims are subsequently Allowed, as set forth more fully in Article VII hereof, and (iii) the amounts required to fund the GUC Trust Administrative Fund, the Asbestos Trust, the Environmental Response Trust Administrative Funding Account, the Avoidance Action Trust, and the Indenture Trustee/Fiscal and Paying Agent Reserve Cash.

**9.3** **Satisfaction and Waiver of Conditions.** Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. If the Debtors decide that any of the conditions precedent set forth in Section 9.2 hereof cannot be satisfied and the occurrence of such conditions is not waived or cannot be waived, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court. Notwithstanding the foregoing, the Debtors reserve, in their sole discretion, the right, with the written consent of the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative, to waive the occurrence of any of the conditions precedent set forth in Section 9.2(b) or (c) hereof or to modify any of such conditions precedent. Any such written waiver of such condition precedents may be effected at any time, without notice or leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.

**9.4** **Effect of Nonoccurrence of Conditions to Consummation.** If each of the conditions to the occurrence of the Effective Date has not been satisfied or duly waived on or before the first Business Day that is one hundred eighty (180) days after the Confirmation Date, or such later date as shall be agreed by the Debtors and the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, and the U.S. Treasury, the Confirmation Order may be vacated by the Bankruptcy Court. If the Confirmation Order is vacated pursuant to this Section, the Plan shall be null and void in all respects, and nothing contained in the Plan shall constitute a waiver or release of any Claims against any of the Debtors.

**ARTICLE X.**

**EFFECT OF CONFIRMATION**

**10.1** **Vesting of Assets.** As of the Effective Date, the property of the Debtors' estates shall vest in the Debtors and, in accordance with Article VI hereof and subject to the exceptions contained therein, (i) the GUC Trust Assets shall be transferred to the GUC Trust, (ii) the Asbestos Trust Assets shall be transferred to the Asbestos Trust, (iii) the Environmental Response Trust Assets shall be transferred to the Environmental Response Trust, and (iv) if the Term Loan Avoidance Action is still pending on the Avoidance Action Trust Transfer Date, the Avoidance Action Trust Assets shall be transferred to the Avoidance Action Trust. From and after the Effective Date, (i) the GUC Trust Administrator may dispose of the GUC Trust Assts free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan and the GUC Trust Agreement, (ii) the Asbestos Trust Administrator(s) may dispose of the Asbestos Trust Assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan and the Asbestos Trust Agreement, (iii) the Environmental Response Trust Administrative Trustee may dispose of the Environmental Response Trust Assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan, the Environmental Response Trust Agreement, and the Environmental Response Trust Consent Decree and Settlement Agreement, and (iv) if the

Term Loan Avoidance Action is still pending on the Asbestos Trust Transfer Date, the Avoidance Action Trust Administrator may dispose of the Avoidance Action Trust Assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan and the Avoidance Action Trust Agreement; *provided, however*, that the DIP Lenders' liens on the DIP Lenders' Collateral remain fully perfected, nonavoidable, and enforceable with respect to the Cash the DIP Lenders fund into the Trusts as of and following the Effective Date. As of the Effective Date, all assets of the Debtors, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the Avoidance Action Trust shall be free and clear of all Claims and Encumbrances, except as provided in the Plan or the Confirmation Order.

**10.2   Release of Assets.**  Until the Effective Date, the Bankruptcy Court shall retain jurisdiction of the Debtors and their assets and properties. Thereafter, jurisdiction of the Bankruptcy Court shall be limited to the subject matters set forth in Article XI hereof.

**10.3   Binding Effect.**  Because the Plan is a liquidating chapter 11 plan, confirmation of the Plan does not provide the Debtors with a discharge under section 1141 of the Bankruptcy Code. Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

**10.4   Term of Injunctions or Stays.**  Unless otherwise expressly provided herein, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases.

**10.5   Term Loan Avoidance Action; Offsets.**  If the Term Loan Avoidance Action is still pending on the Avoidance Action Trust Transfer Date, the Avoidance Action Trust Administrator may pursue, abandon, settle, or release the Term Loan Avoidance Action transferred to the Avoidance Action Trust as it deems appropriate, without the need to obtain approval or any other or further relief from the Bankruptcy Court. The Debtors, the GUC Trust Administrator, or the Avoidance Action Trust Administrator, as applicable, may, in their sole discretion, offset any claim held against a person against any payment due such person under the Plan; *provided, however*, that any claims of the Debtors arising before the Commencement Date shall first be offset against Claims against the Debtors arising before the Commencement Date.

**10.6   Injunction.**  On and after the Confirmation Date, all persons are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) on account of or respecting any claim, debt, right, or cause of action of the Debtors for which the Debtors,

the GUC Trust Administrator, or the Avoidance Action Trust Administrator retains sole and exclusive authority to pursue in accordance with the Plan.

**10.7** **Injunction Against Interference with Plan.** Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

**10.8** **Special Provisions for Governmental Units.** Except as provided in the Environmental Response Trust Consent Decree and Settlement Agreement and the Priority Order Sites Consent Decrees and Settlement Agreements, as to "governmental units" (as defined in the Bankruptcy Code), nothing in the Plan, including Sections 12.5 and 12.6 hereof, shall discharge, release, enjoin, or otherwise bar (i) any liability of the Debtors, their Estates, any successors thereto, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, or the Avoidance Action Trust, arising on or after the Confirmation Date, (ii) any liability that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code, (iii) any valid right of setoff or recoupment, (iv) any police or regulatory action, (v) any environmental liability that the Debtors, their Estates, any successors thereto, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, or any other Person or Entity may have as an owner or operator of real property after the Effective Date, and (vi) any liability to a "governmental unit" (as defined in the Bankruptcy Code), on the part of any Persons or Entities other than the Debtors, their Estates, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, or the Avoidance Action Trust Administrator, except with respect to the parties as specifically provide 0d for in Sections 12.5 and 12.6 hereof.

ARTICLE XI.

RETENTION OF JURISDICTION

**11.1** **Jurisdiction of Bankruptcy Court.** The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a) To hear and determine motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(b) To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced before or after the Confirmation Date, including, without limitation, any proceeding with respect to a

Cause of Action or Avoidance Action (including the Term Loan Avoidance Action);

(c) To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d) To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e) To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f) To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g) To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h) To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i) To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the GUC Trust, the Asbestos Trust, the Environmental Response Trust, the Avoidance Action Trust, the GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental Response Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Avoidance Action Trust Agreement, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing, including to formulate and enforce alternative dispute resolution procedures with respect to the Environmental Response Trust Agreement or the Environmental Response Trust Consent Decree and Settlement Agreement; *provided, however*, that the Bankruptcy Court's jurisdiction with respect to the Environmental Response Trust Agreement and the Environmental Response Trust Consent Decree and Settlement Agreement shall be concurrent with the jurisdiction of other courts of competent jurisdiction over such matters to the extent such agreements provide for concurrent jurisdiction;

(j)  To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

(k) To recover all assets of the Debtors, property of the Debtors' estates, the GUC Trust Assets, the Asbestos Trust Assets, and the Avoidance Action Trust Assets, wherever located;

(l)  To hear and determine all objections to the termination of the Asbestos Trust;

(m) To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n) To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, matters with respect to any taxes payable by a trust or reserve established in furtherance of the Plan);

(o) To resolve all matters related to the 363 Transaction;

(p) To enforce all orders previously entered by the Bankruptcy Court;

(q) To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and

(r)  To enter a final decree closing the Chapter 11 Cases.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the forgoing matters, the reference to the "Bankruptcy Court" in this Article XI shall be deemed to be replaced by the "District Court." Notwithstanding anything in this Article XI to the contrary, (i) the allowance of Asbestos Personal Injury Claims and the forum in which such allowance will be determined shall be governed by and in accordance with the Asbestos Trust Distribution Procedures and the Asbestos Trust Agreement and (ii) the Bankruptcy Court and/or the District Court shall have concurrent, rather than exclusive, jurisdiction with respect to disputes relating to (a) rights under insurance policies issued to the Debtors that are included in the Asbestos Insurance Assets, and (b) the Debtors' rights to insurance with respect to workers' compensation claims.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

**12.1**   **Dissolution of Committees.**  On the Effective Date, the Creditors' Committee shall dissolve; *provided, however*, that, following the Effective Date, the Creditors' Committee shall continue to have standing and a right to be heard with respect

to (i) Claims and/or applications for compensation by professionals and requests for allowance of Administrative Expenses for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code, (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date to which the Creditors' Committee is a party, (iii) responding to creditor inquiries for one hundred twenty (120) days following the Effective Date, (iv) the settlement or determination by Final Order of the Asbestos Trust Claim (including through any appeals), and (v) the settlement or determination by Final Order of the proper Term Loan Avoidance Action Beneficiaries (including through any appeals). On the Effective Date, the Asbestos Claimants' Committee shall dissolve. Upon the dissolution of the Creditors' Committee and the Asbestos Claimants' Committee, the current and former members of the Creditors' Committee, the members of the Asbestos Claimants' Committee, and the Future Claimants' Representative, and their respective officers, employees, counsel, advisors, and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's, the Asbestos Claimants' Committee's, and the Future Claimant's Representative's respective attorneys, accountants, and other agents shall terminate, except that the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, and their respective professionals shall have the right to pursue, review, and object to any applications for compensation and reimbursement of expenses filed in accordance with Section 2.2 hereof. The GUC Trust Administrator shall continue to serve through the Avoidance Action Trust Transfer Date to prosecute the Term Loan Avoidance Action. The Future Claimants' Representative shall continue to serve through the termination of the Asbestos Trust in order to perform the functions required under the Asbestos Trust Agreement. The fees and expenses of the Future Claimants' Representative from and after the Effective Date relating to the role of the Future Claimants' Representative in the Asbestos Trust, pursuant to the Asbestos Trust Agreement and the Asbestos Trust Distribution Procedures (including, without limitation, the fees and expenses of any professionals retained by the Future Claimants' Representative), shall be the sole responsibility of the Asbestos Trust.

**12.2    Substantial Consummation.** On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**12.3    Effectuating Documents and Further Transactions.** An officer of each of the Debtors is authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

**12.4    Exemption from Transfer Taxes.** Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with

any disposition of assets contemplated by the Plan (including transfers of assets to and by the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the Avoidance Action Trust) shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use, or other similar tax.

**12.5** **Release.** As of the Effective Date, the Debtors release (i) all present and former directors and officers of the Debtors who were directors and/or officers, respectively, on or after the Commencement Date, and any other Persons who serve or served as members of management of the Debtors on or after the Commencement Date, (ii) all post-Commencement Date advisors, consultants, agents, counsel, or other professionals of or to the Debtors, the DIP Lenders, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, the Indenture Trustees, and the Fiscal and Paying Agents, and (iii) all members (current and former) of the Creditors' Committee and of the Asbestos Claimants' Committee, in their capacity as members of such Committees, the Future Claimants' Representative, and the Indenture Trustees and the Fiscal and Paying Agents and their respective officers, directors, and employees from any and all Causes of Action held by, assertable on behalf of, or derivative from the Debtors, in any way relating to the Debtors, the Chapter 11 Cases, the Plan, negotiations regarding or concerning the Plan, and the ownership, management, and operation of the Debtors, except for actions found by Final Order to be willful misconduct (including, but not limited to, conduct that results in a personal profit at the expense of the Debtors' estates), gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), and *ultra vires* acts; *provided, however,* that the foregoing (a) shall not operate as a waiver of or release from any Causes of Action arising out of any express contractual obligation owing by any former director, officer, or employee of the Debtors or any reimbursement obligation of any former director, officer, or employee with respect to a loan or advance made by the Debtors to such former director, officer, or employee, and (b) shall not limit the liability of any counsel to their respective clients contrary to Rule 1.8(h)(1) of the New York Rules of Professional Conduct.

**12.6** **Exculpation.** Neither the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the DIP Lenders, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, the Indenture Trustees, and the Fiscal and Paying Agents, nor any of their respective members (current and former), officers, directors, employees, counsel, advisors, professionals, or agents, shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of the Chapter 11 Cases; negotiations regarding or concerning the Plan, the GUC Trust Agreement, the Environmental Response Trust Agreement, the Asbestos Trust Agreement, the Avoidance Action Trust Agreement, the Environmental Response Trust Consent Decree and Settlement Agreement, and the Priority Order Sites Consent Decrees and Settlement Agreements; the pursuit of confirmation of the Plan; the consummation of the Plan; or the administration of the Plan or the property to be distributed under the Plan,

except for actions found by Final Order to be willful misconduct, gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty (to the extent applicable), and *ultra vires* acts, and, in all respects, the Debtors, the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, the Avoidance Action Trust Administrator, the Creditors' Committee, the Asbestos Claimants' Committee, the Future Claimants' Representative, the Indenture Trustees, the Fiscal and Paying Agents, and each of their respective members (current or former), officers, directors, employees, counsel, advisors, professionals, and agents shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; *provided, however,* that the foregoing shall not limit the liability of any counsel to their respective clients contrary to Rule 1.8(h)(1) of the New York Rules of Professional Conduct. In the event a holder of a Claim fails to satisfy a Medical Lien, such holder shall be barred and prohibited from seeking recourse directly against the Debtors, the GUC Trust, and any of their respective officers, directors, representatives, employees, counsel, and advisors.

### 12.7 Post-Confirmation Date Fees and Expenses.

(a) **Fees and Expenses of Professionals.** The Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court (but subject to the review by and approval of the DIP Lenders), pay the reasonable fees and expenses, incurred after the Confirmation Date, of the professional persons employed by the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Committee in connection with the implementation and consummation of the Plan, the claims reconciliation process, and any other matters as to which such professionals may be engaged.

(b) **Fees and Expenses of GUC Trust Administrator, Asbestos Trust Administrator(s), Environmental Response Trust Administrative Trustee, and Avoidance Action Trust Administrator.** The fees and expenses of the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator shall be paid in accordance with the terms of the GUC Trust Agreement, the Asbestos Trust Agreement, the Environmental Response Trust Agreement, and the Avoidance Action Trust Agreement, respectively, and shall be subject to the provisions of the Budget.

### 12.8 Payment of Statutory Fees.

On the Effective Date, and thereafter as may be required, each of the Debtors, and after the Effective Date, the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, and the Avoidance Action Trust Administrator shall each (i) pay all the respective fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code and (ii) be responsible for the filing of consolidated postconfirmation quarterly status reports with the Bankruptcy Court in accordance with Rule 3021-1 of the Southern District of New York Local Bankruptcy Rules, which status reports shall include reports on the disbursements made (i) on the Effective Date by each of the

Debtors and (ii) after the Effective Date by the GUC Trust, the Asbestos Trust, the Environmental Response Trust, and the Avoidance Action Trust.

**12.9** **Modification of Plan.** Upon reasonable notice to the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests under the Plan, the Debtors (and as of the Effective Date, the GUC Trust Administrator) may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan. Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided, however,* that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

**12.10** **Revocation or Withdrawal of Plan.** The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Debtors take such action, the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any other person in any further proceedings involving the Debtors.

**12.11** **Courts of Competent Jurisdiction.** If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**12.12** **Severability.** If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**12.13** __Governing Law.__  Except to the extent the Bankruptcy Code or other U.S. federal law is applicable, or to the extent an Exhibit to the Plan or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

**12.14** __Exhibits.__  The Exhibits to the Plan and the Plan Supplement are incorporated into and as part of the Plan as if set forth herein.

**12.15** __Successors and Assigns.__  All the rights, benefits, and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such person.

**12.16** __Time.__  In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**12.17** __Notices.__  To be effective, all notices, requests, and demands to or upon the Debtors, the Creditors' Committee, the U.S. Treasury, the GUC Trust Administrator, the Asbestos Trust Administrator(s), the Environmental Response Trust Administrative Trustee, or the Avoidance Action Trust Administrator shall be in writing (including by facsimile or electronic transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors, to:

Motors Liquidation Company
401 South Old Woodward Avenue
Suite 370
Birmingham, Michigan 48009
Attn:  Thomas Morrow
Telephone:  (313) 486-4044
Telecopier:  (313) 486-4259
E-mail:  tmorrow@alixpartners.com

- and -

AlixPartners LLP
40 West 57th Street
New York, New York 10019
Attn:  Ted Stenger
Telephone:  (212) 490-2500
Telecopier:  (212) 490-1344
E-mail:  tstenger@alixpartners.com

      -and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:    Stephen Karotkin, Esq.
          Joseph H. Smolinsky, Esq.
Telephone:  (212) 310-8000
Telecopier:  (212) 310-8007
E-mail:  stephen.karotkin@weil.com
        joseph.smolinsky@weil.com

If to the Creditors' Committee, to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attn:    Thomas Moers Mayer, Esq.
          Robert Schmidt, Esq.
Telephone:  (212) 715-9100
Telecopier:  (212) 715-8000
E-mail:  tmayer@kramerlevin.com
        rschmidt@kramerlevin.com

If to the Asbestos Claimants' Committee, to:

Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, New York 10152-3500
Attn:    Elihu Inselbuch, Esq.
          Rita C. Tobin, Esq.
Telephone:  (212) 319-7125
Telecopier:  (212) 644-6755
E-mail:  ei@capdale.com
        rct@capdale.com

-and-

Caplin & Drysdale, Chartered
One Thomas Circle, N.W., Suite 1100
Washington, DC 20005
Attn:   Trevor W. Swett III, Esq.
          Kevin C. Maclay, Esq.
Telephone:  (202) 862-5000
Telecopier:  (202) 429-3301
E-mail:  tws@capdale.com
          kcm@capdale.com

If to the Future Claimants' Representative, to:

Stutzman, Bromberg, Esserman & Plifka,
A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Attn:   Sander L. Esserman, Esq.
          Robert T. Brousseau, Esq.
Telephone:  (214) 969-4900
Telecopier:  (214) 969-4999
E-mail:  esserman@sbep-law.com
          brousseau@sbep-law.com

If to the U.S. Treasury, to:

United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Attn:   Chief Counsel, Office of Financial Stability
Telecopier:  (202) 927-9225
E-mail:  OFSChiefCounselNotices@do.treas.gov

-and-

Cadwalader, Wickersham & Taft LLP
1 World Financial Center
New York, New York 10128
Attn:  John J. Rapisardi, Esq.
Telephone:  (212) 504-6000
Telecopier:  (212) 504-6666
E-mail:  john.rapisardi@cwt.com

-and-

Cadwalader, Wickersham & Taft LLP
700 Sixth St. NW
Washington, DC 20001
Attn:  Douglas S. Mintz, Esq.
Telephone:  (202) 862-2200
Telecopier:  (212) 504-6666
E-mail:  douglas.mintz@cwt.com

If to the GUC Trust Administrator,
the Asbestos Trust Administrator(s),
the Environmental Response Trust Administrative Trustee, or
the Avoidance Action Trust Administrator,
to the address(es)
designated in the Confirmation Order

Dated:      New York, New York
                December 7, 2010

                          Respectfully submitted,


                          MOTORS LIQUIDATION COMPANY

                          By:      /s/ Ted Stenger_____
                                        Name:  Ted Stenger
                                        Title:  Executive Vice President

MLC OF HARLEM, INC.
MLCS, LLC
MLCS DISTRIBUTION CORPORATION
REMEDIATION AND LIABILITY MANAGEMENT COMPANY,
INC.
ENVIRONMENTAL CORPORATE REMEDIATION COMPANY,
INC.

BY:  MOTORS LIQUIDATION COMPANY, as agent for each of
the foregoing entities

    By:    /s/ Ted Stenger
           Name:  Ted Stenger
           Title:  Executive Vice President

# EXHIBIT A

# ASBESTOS TRUST AGREEMENT

**MLC ASBESTOS PI TRUST AGREEMENT**

DOC# 362130

# MLC ASBESTOS PI TRUST AGREEMENT

## TABLE OF CONTENTS

SECTION 1 — Agreement of Trust .......................................................3

    1.1    Creation and Name .................................................3
    1.2    Purpose .................................................................3
    1.3    Transfer of Assets ................................................4
    1.4    Acceptance of Assets and Assumption of Liabilities ...........4
    1.5    Certain Tax Matters .............................................5

SECTION 2 — Powers and Trust Administration ....................................5

    2.1    Powers ...............................................................5
    2.2    General Administration ........................................8
    2.3    Claims Administration ..........................................13

SECTION 3 — Accounts, Investments, and Payments ..............................13

    3.1    Accounts ...........................................................13
    3.2    Investments ........................................................13
    3.3    Source of Payments .............................................15

SECTION 4 — Trustees; Delaware Trustee .............................................16

    4.1    Number ..............................................................16
    4.2    Term of Service ...................................................16
    4.3    Appointment of Successor Trustees ......................17
    4.4    Liability of Trustees, Members of the TAC and
            the Futures Representative ...................................18
    4.5    Compensation and Expenses of Trustees .............18
    4.6    Indemnification ...................................................19
    4.7    Lien .....................................................................20
    4.8    Trustees' Employment of Experts; Delaware Trustee's
            Employment of Counsel ......................................20
    4.9    Trustees' Independence ........................................21
    4.10   Bond .................................................................21
    4.11   Delaware Trustee ...............................................21

SECTION 5 — Trust Advisory Committee ...............................................................23

    5.1      Members ........................................................................................23
    5.2      Duties .............................................................................................23
    5.3      Term of Office ...............................................................................23
    5.4      Appointment of Successor ............................................................24
    5.5      TAC's Employment of Professionals ...........................................25
    5.6      Compensation and Expenses of the TAC .....................................26
    5.7      Procedures for Consultation With and Obtaining the
                Consent of the TAC .......................................................................27
                (a)     Consultation Process ..............................................27
                (b)     Consent Process .....................................................28


SECTION 6 — The Futures Representative ...........................................................29

    6.1      Duties .............................................................................................29
    6.2      Term of Office ...............................................................................29
    6.3      Appointment of Successor ............................................................30
    6.4      Futures Representative's Employment of Professionals ...............30
    6.5      Compensation and Expenses of the Futures Representative ..........31
    6.6      Procedures for Consultation with and Obtaining the
                Consent of the Futures Representative ..........................................32
                (a)     Consultation Process ..............................................32
                (b)     Consent Process .....................................................33

SECTION 7 — General Provisions .........................................................................34

    7.1      Irrevocability ................................................................................34
    7.2      Term; Termination ........................................................................34
    7.3      Amendments ..................................................................................36
    7.4      Meetings ........................................................................................37
    7.5      Severability ...................................................................................37
    7.6      Notices ..........................................................................................37
    7.7      Successors and Assigns .................................................................38
    7.8      Limitation on Claim Interests for Securities Laws Purposes ........39
    7.9      Entire Agreement; No Waiver ......................................................39
    7.10    Headings .......................................................................................39
    7.11    Governing Law .............................................................................39
    7.12    Settlors' Representative and Cooperation .....................................40
    7.13    Dispute Resolution ........................................................................40
    7.14    Enforcement and Administration ..................................................40
    7.15    Effectiveness .................................................................................41
    7.16    Counterpart Signatures .................................................................41

# MLC ASBESTOS PI TRUST AGREEMENT

This MLC Asbestos PI Trust Agreement (this "**PI Trust Agreement**"), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into, pursuant to the **[Debtors' Amended Joint Chapter 11 Plan]** dated as of **[DATE]** (as it may be amended or supplemented, the "**Plan**"),[1] by **[Motors Liquidation Company (f/k/a General Motors Corporation) and its affiliated debtors]** (collectively referred to as the "**Debtors**," "**MLC**," or the "**Settlors**"), the debtors and debtors-in-possession whose chapter 11 cases are jointly administered under Case No. 09-50026 (REG) in the United States Bankruptcy Court for the Southern District of New York; the Legal Representative for Future Claimants (the "**Futures Representative**"); the Official Committee of Unsecured Creditors Holding Asbestos-Related Claims (the "**ACC**"); the Asbestos PI Trustees (the "**Trustees**"); **[Wilmington Trust Company]** (the "**Delaware Trustee**") and the members of the Trust Advisory Committee (the "**TAC**") identified on the signature pages hereof; and

WHEREAS, the Debtors are liquidating under the provisions of chapter 11 of the Bankruptcy Code in cases filed in the United States Bankruptcy Court for the Southern District of New York, jointly administered and known as In re Motors Liquidation Company, et al. (f/k/a General Motors Corporation, et al.), Case No. 09-50026 (REG); and

WHEREAS, the Confirmation Order has been entered by the Bankruptcy Court; and

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference; *provided, however*, that "Asbestos Personal Injury Claims" as defined in the Plan shall be referred to herein as "**PI Trust Claims**." All capitalized terms not defined herein or defined in the Plan, but defined in the Bankruptcy Code or Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Rules, and such definitions are incorporated herein by reference.

**WHEREAS**, the Plan provides, *inter alia*, for the creation of the MLC Asbestos PI Trust (the "**PI Trust**"); and

**WHEREAS**, pursuant to the Plan, the PI Trust is to use its assets and income to satisfy all PI Trust Claims; and

**WHEREAS**, it is the intent of MLC, the Trustees, the ACC, the TAC, and the Futures Representative that the PI Trust be administered, maintained, and operated at all times through mechanisms that provide reasonable assurance that the PI Trust will satisfy all PI Trust Claims pursuant to the MLC Asbestos PI Trust Distribution Procedures (the "**TDP**") that are attached hereto as Exhibit 1 in substantially the same manner, and in strict compliance with the terms of this PI Trust Agreement; and

**WHEREAS**, all rights of the holders of PI Trust Claims arising under this PI Trust Agreement and the TDP shall vest upon the Effective Date; and

**WHEREAS**, pursuant to the Plan, the PI Trust is intended to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "**QSF Regulations**"); and

**WHEREAS**, the PI Trust and the Plan do not satisfy all the prerequisites that would be applicable for an injunction pursuant to section 524(g) of the Bankruptcy Code with respect to any and all PI Trust Claims, and no such injunction has been entered in connection with the Confirmation Order;

**NOW, THEREFORE**, it is hereby agreed as follows:

# SECTION I

## AGREEMENT OF TRUST

**1.1** **Creation and Name.** The Debtors as Settlors hereby create a trust known as the "MLC Asbestos PI Trust," which is the Asbestos PI Trust provided for and referred to in the Plan. The Trustees of the PI Trust may transact the business and affairs of the PI Trust in the name of the PI Trust, and references herein to the PI Trust shall include a Trustee or Trustees acting on behalf of the Trust. It is the intention of the parties hereto that the trust created hereby constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the "**Act**") and that this document, together with the by-laws described herein, constitute the governing instruments of the PI Trust. The Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto.

**1.2** **Purpose.** The purpose of the PI Trust is to assume all liabilities and responsibility for all PI Trust Claims, and, among other things to: (a) direct the processing, liquidation and payment of all PI Trust Claims in accordance with the Plan, the TDP, and the Confirmation Order; (b) preserve, hold, manage, and maximize the assets of the PI Trust for use in paying and satisfying PI Trust Claims; and (c) qualify at all times as a qualified settlement fund. The PI Trust is to use the PI Trust's assets and income to pay the holders of all PI Trust Claims in accordance with this PI Trust Agreement and the TDP in such a way that such holders of PI Trust Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such claims.

**1.3**     <u>Transfer of Assets</u>.  Pursuant to, and in accordance with, Sections **[7.2.2]** and **[7.2.4]**[2] of the Plan, the PI Trust has received the Asbestos PI Trust Assets (collectively, the "**PI Trust Assets**") to fund the PI Trust and settle, discharge or channel all PI Trust Claims.  In all events, the PI Trust Assets or any other assets to be transferred to the PI Trust under the Plan will be transferred to the PI Trust free and clear of any liens or other claims by the Debtors, New GM, any creditor, or other entity except as otherwise provided in the Plan.  The Debtors shall also execute and deliver such documents to the PI Trust as the Trustees reasonably request to transfer and assign any PI Trust Assets to the PI Trust.

**1.4**     <u>Acceptance of Assets and Assumption of Liabilities</u>.

    (a)     In furtherance of the purposes of the PI Trust, the PI Trust hereby expressly accepts the transfer to the PI Trust of the PI Trust Assets or any other transfers contemplated by the Plan in the time and manner as, and subject to the terms, contemplated in the Plan.

    (b)     In furtherance of the purposes of the PI Trust, the PI Trust expressly assumes all liabilities and responsibility for all PI Trust Claims.  Except as otherwise provided in this PI Trust Agreement and the TDP, the PI Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding such claims that MLC has or would have had under applicable law.

    (c)     No provision herein or in the TDP shall be construed or implemented in a manner that would cause the PI Trust to fail to qualify as a "qualified settlement fund" under the QSF Regulations.

**1.5**     <u>Certain Tax Matters</u>.

---

[2] **[ALL REFERENCES TO THE PLAN AND TDP NEED TO BE UPDATED WHEN FINAL DOCUMENTS ARE AVAILABLE.]**

(a)     For all U.S. federal and applicable state and local income tax purposes, all parties (including, without limitation, the Debtors, the Trustees, the Delaware Trustee, and the holders of PI Trust Claims) shall treat the PI Trust as a "qualified settlement fund" within the meaning of the QSF Regulations.

(b)     Following the funding of the PI Trust (and in no event later than February 15th of the calendar year following the funding of the PI Trust), MLC shall provide a "§ 1.468B-3 Statement" to the Trustees in accordance with Treasury Regulation section 1.468B-3(e).

(c)     The Trustees may request an expedited determination of taxes of the PI Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the PI Trust for all taxable periods through the dissolution of the PI Trust.

## SECTION II

## POWERS AND TRUST ADMINISTRATION

**2.1     Powers.**

(a)     The Trustees are and shall act as the fiduciaries to the PI Trust in accordance with the provisions of this PI Trust Agreement and the Plan.  The Trustees shall, at all times, administer the PI Trust and the PI Trust Assets in accordance with the purposes set forth in Section 1.2 above.  Subject to the limitations set forth in this PI Trust Agreement, the Trustees shall have the power to take any and all actions that, in the judgment of the Trustees, are necessary or proper to fulfill the purposes of the PI Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)     Except as required by applicable law or otherwise specified herein, the Trustees need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited below, the Trustees shall have the power to:

(i)     receive and hold the PI Trust Assets and exercise all rights with respect thereto, including the right to vote and sell any securities that are included in the PI Trust Assets;

(ii)     invest the monies held from time to time by the PI Trust;

(iii)     sell, transfer, or exchange any or all of the PI Trust Assets at such prices and upon such terms as the Trustees may consider proper, consistent with the other terms of this PI Trust Agreement;

(iv)     enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the PI Trust to operate;

(v)     pay liabilities and expenses of the PI Trust;

(vi)     establish such funds, reserves, and accounts within the PI Trust estate, as deemed by the Trustees to be useful in carrying out the purposes of the PI Trust;

(vii)     sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding;

(viii)     establish, supervise, and administer the PI Trust in accordance with this PI Trust Agreement and the TDP and the terms thereof;

(ix)     appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing, and forecasting, and other consultants and

agents as the business of the PI Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustees permit and as the Trustees, in their discretion, deem advisable or necessary in order to carry out the terms of this PI Trust;

(x)     pay employees, legal, financial, accounting, investment, auditing, and forecasting, and other consultants, advisors, and agents, including those engaged by the PI Trust in connection with its alternative dispute resolution activities, reasonable compensation;

(xi)     compensate the Trustees, the Delaware Trustee, the TAC members, and the Futures Representative as provided below, and their employees, legal, financial, accounting, investment, and other advisors, consultants, independent contractors, and agents, and reimburse the Trustees, the Delaware Trustee, the TAC members, and the Futures Representatives all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)     execute and deliver such instruments as the Trustees consider proper in administering the PI Trust;

(xiii)     enter into such other arrangements with third parties as are deemed by the Trustees to be useful in carrying out the purposes of the PI Trust, provided such arrangements do not conflict with any other provision of this PI Trust Agreement;

(xiv)     in accordance with Section 4.6 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) (A) the Trustees, the Delaware Trustee, the members of the TAC, and the Futures Representative, and (B) the officers and employees of the PI Trust, and any agents, advisors and consultants of the PI Trust, the TAC, or the Futures Representative (the "**Additional Indemnitees**"), to the fullest extent that a statutory trust

organized under the laws of the State of Delaware is from time to time entitled to indemnify and/or insure its directors, trustees, officers, employees, agents, advisors, and representatives;

(xv) delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the PI Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 below;

(xvi) consult with the TAC and the Futures Representative at such times and with respect to such issues relating to the conduct of the PI Trust as the Trustees consider desirable; and

(xvii) make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the PI Trust, any claim, right, action, or cause of action included in the PI Trust Assets, including, but not limited to, insurance recoveries (if applicable), before any court of competent jurisdiction.

(d) The Trustees shall not have the power to guarantee any debt of other persons.

(e) The Trustees agree to take the actions of the PI Trust required hereunder.

(f) The Trustees shall give the TAC and the Futures Representative prompt notice of any act performed or taken pursuant to Sections 2.1(c)(i), (iii), (vii), or (xv) above, and any act proposed to be performed or taken pursuant to Section 2.2(f) below.

## 2.2 **General Administration.**

(a) The Trustees shall act in accordance with the PI Trust Agreement. The Trustees shall adopt and act in accordance with the PI Trust Bylaws. To the extent not

inconsistent with the terms of this PI Trust Agreement, the PI Trust Bylaws shall govern the affairs of the PI Trust. In the event of an inconsistency between the PI Trust Bylaws and this PI Trust Agreement, this PI Trust Agreement shall govern.

(b) The Trustees shall (i) timely file such income tax and other returns and statements required to be filed and shall timely pay all taxes required to be paid by the PI Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the PI Trust as a qualified settlement fund within the meaning of the QSF Regulations, and (iv) take no action that could cause the PI Trust to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

(c) The Trustees shall timely account to the Bankruptcy Court as follows:

(i) The Trustees shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report (the "**Annual Report**") containing financial statements of the PI Trust (including, without limitation, a balance sheet of the PI Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustees and accompanied by an opinion of such firm as to the fairness of the financial statements' presentation of the cash and investments available for the payment of claims and as to the conformity of the financial statements with generally accepted accounting principles. The Trustees shall provide a copy of such Annual Report to the TAC and the Futures Representative when such reports are filed with the Bankruptcy Court.

(ii)     Simultaneously with the filing of the Annual Report, the Trustees shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of claims disposed of during the period covered by the financial statements.  The Trustees shall provide a copy of such report to the TAC and the Futures Representatives when such report is filed.

(iii)     All materials required to be filed with the Bankruptcy Court by this Section 2.2(c) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court and shall be filed with the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**").

(d)     The Trustees shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year and the succeeding four fiscal years.  The budget and cash flow projections shall include a determination of the Maximum Annual Payment pursuant to Section **[2.4]** of the TDP, and the Claims Payment Ratio pursuant to Section **[2.5]** of the TDP.  The Trustees shall provide a copy of the budget and cash flow projections to the TAC and the Futures Representative.

(e)     The Trustees shall consult with the TAC and the Futures Representative (i) on the general implementation and administration of the PI Trust; (ii) on the general implementation and administration of the TDP; and (iii) on such other matters as may be required under this PI Trust Agreement and the TDP.

(f)     The Trustees shall be required to obtain the consent of the TAC and the Futures Representative pursuant to the Consent Process set forth in Section 5.7(b) and 6.6(b) below, in addition to any other instances elsewhere enumerated, in order:

(i)  to redetermine the Payment Percentage described in Section **[2.3]** of the TDP as provided in Section **[4.2]** of the TDP;

(ii)  to change the Claims Payment Ratio described in Section **[2.5]** of the TDP in the event that the requirements for such a change as set forth in said provision have been met;

(iii)  to change the Disease Levels, Scheduled Values and/or Medical/Exposure Criteria set forth in Section **[5.3(a)(3)]** of the TDP, and/or the Average Values and/or Maximum Values set forth in Section **[5.3(b)(3)]** and Section **[5.4(a)]** of the TDP;

(iv)  to establish and/or to change the Claims Materials to be provided by holders of PI Trust Claims under Section **[6.1]** of the TDP;

(v)  to require that claimants provide additional kinds of medical evidence pursuant to Section **[7.1]** of the TDP;

(vi)  to change the form of release to be provided pursuant to Section **[7.8]** of the TDP;

(vii)  to terminate the PI Trust pursuant to Section 7.2 below;

(viii)  to settle the liability of any insurer under any insurance policy or legal action related thereto;

(ix)  to change the compensation and/or per diem of the members of the TAC, the Futures Representative, the Delaware Trustee or the Trustees, other than to reflect cost-of-living increases or changes approved by the Bankruptcy Court as otherwise provided herein;

(x)  to take actions to minimize any tax on the PI Trust Assets; provided that no such action prevents the PI Trust from qualifying as a qualified settlement fund

within the meaning of the QSF Regulations or requires an election for the PI Trust to be treated as a grantor trust for tax purposes;

(xi)     to adopt the PI Trust Bylaws in accordance with Section 2.2(a) above or thereafter to amend the PI Trust Bylaws in accordance with the terms thereof;

(xii)    to amend any provision of this PI Trust Agreement or the TDP in accordance with the terms thereof;

(xiii)   to acquire an interest in or to merge any claims resolution organization formed by the PI Trust with another claims resolution organization that is not specifically created by this PI Trust Agreement or the TDP, or to contract with another claims resolution organization or other entity that is not specifically created by this PI Trust Agreement or the TDP, or permit any other party to join in any claims resolution organization that is formed by the PI Trust pursuant to the PI Trust Agreement or the TDP; provided that such merger, acquisition, contract or joinder will require the surviving organization to make decisions about the allowability and value of claims in accordance with Section **[2.1]** of the TDP which requires that such decisions be based on the provisions of the TDP; or

(xiv)    if and to the extent required by Section **[6.5]** of the TDP, to disclose any information, documents, or other materials to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an insurance policy or settlement agreement pursuant to Section **[6.5]** of the TDP.

(g)     The Trustees shall meet with the TAC and the Futures Representative no less often than quarterly.  The Trustees shall meet in the interim with the TAC and the Futures Representative when so requested by either.

(h)     The Trustees, upon notice from either the TAC or the Futures Representative, if practicable in view of pending business, shall at their next meeting with the TAC or the Futures Representative consider issues submitted by the TAC or the Futures Representative.

**2.3     Claims Administration.**  The Trustees shall promptly proceed to implement the TDP.

## SECTION III

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

**3.1     Accounts.**

(a)     The Trustees may, from time to time, create such accounts and reserves within the PI Trust estate as they may deem necessary, prudent, or useful in order to provide for the payment of expenses and payment of PI Trust Claims and may, with respect to any such account or reserve, restrict the use of monies therein.

(b)     The Trustees shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account and the payments from each such account in the reports to be filed with the Bankruptcy Court and provided to the TAC and the Futures Representative pursuant to Section 2.2(c)(i) above.

**3.2     Investments.**  Investment of monies held in the PI Trust shall be administered in the manner consistent with the standards set forth in the Uniform Prudent Investor Act, subject to the following limitations and provisions:

(a)        The PI Trust may invest only in diversified equity portfolios whose benchmark is a broad equity market index such as, but not limited to, the S&P 500 Index, Russell 1000 Index, S&P ADR Index or MSCI EAFE Index.  The PI Trust shall not acquire, directly or indirectly, equity in any entity or business enterprise if, immediately following such acquisition, the PI Trust would hold more than 5% of the equity in such entity or business enterprise.  The PI Trust shall not hold, directly or indirectly, more than 5% of the equity in any entity or business enterprise.

(b)        The PI Trust shall not acquire or hold any long-term debt securities unless (i) such securities are PI Trust Assets under the Plan, (ii) such securities are rated "Baa" or higher by Moody's, "BBB" or higher by Standard & Poor's ("**S&P's**"), or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency, or (iii) have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.  This restriction does not apply to any pooled investment vehicles where pooled assets receive an investment grade rating (i.e., "BBB" rating or above) by a nationally recognized rating agency.

(c)        The PI Trust shall not acquire or hold for longer than ninety (90) days any commercial paper unless such commercial paper is rated "Prime-1" or higher by Moody's or "A-1" or higher by S&P's, or has been given an equivalent rating by another nationally recognized statistical rating agency.

(d)        The PI Trust shall not acquire any debt securities or other debt instruments issued by any entity if, following such acquisition, the aggregate market value of all such debt securities and/or other debt instruments issued by such entity held by the PI Trust would exceed 5% of the then current aggregate value of the PI Trust's assets.  There is no limitation on holding

debt securities or other debt instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(e)     The PI Trust shall not acquire or hold any certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 3.2(b) above.

(f)     The PI Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustees, they are adequately collateralized.

(g)     The PI Trust may allow its investment managers to acquire prudently or hold derivative instruments, including, without limitation, options, futures and swaps in the normal course of portfolio management.  Specifically, the PI Trust may acquire or hold derivatives to help manage or mitigate portfolio risk, including, without limitation, interest rate risk and equity market risk.  Using derivative instruments to leverage a portfolio to enhance returns (at a much greater risk to the portfolio) is prohibited.

(h)     The PI Trust may lend securities on a short-term basis, subject to adequate, normal and customary collateral arrangements.

(i)     Notwithstanding (a) above, the PI Trust may acquire and hold an equity interest in a claims resolution organization without limitation as to the size of the equity interest acquired and held if prior to such acquisition, the PI Trust complies with the provisions of Section 2.2(f)(xiv) hereof with respect to the acquisition.

**3.3     <u>Source of Payments</u>.**

(a)     All PI Trust expenses and payments and all liabilities with respect to claims shall be payable solely by the Trustees out of the PI Trust Assets.  Neither the Debtors,

their subsidiaries, the present or former directors, officers, employees or agents of the Debtors, nor the Trustees, the TAC or Futures Representative, or any of their officers, agents, advisors, or employees shall be liable for the payment of any PI Trust expense or any other liability of the PI Trust, except to the extent provided in the Plan or Plan Documents.

(b)     The Trustees shall include a reasonably detailed description of any payments made in accordance with this Section 3.3 in the Annual Report.

## SECTION IV

## TRUSTEES; DELAWARE TRUSTEE

**4.1     Number.**  In addition to the Delaware Trustee appointed pursuant to Section 4.11, there shall be **[three (3)]** Trustees who shall be those persons named on the signature page hereof.

**4.2     Term of Service.**

(a)     The initial Trustees named pursuant to Article 4.1 above shall serve staggered terms of three (3), four (4) and five (5) years shown on the signature pages hereof. Thereafter each term of service shall be five (5) years.  The initial Trustees shall serve from the Effective Date until the earlier of (i) the end of his or her term, (ii) his or her death, (iii) his or her resignation pursuant to Section 4.2(b) below, (iv) his or her removal pursuant to Section 4.2(c) below, or (v) the termination of the PI Trust pursuant to Section 7.2 below.

(b)     A Trustee may resign at any time by written notice to the remaining Trustees, the TAC, and the Futures Representative.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A Trustee may be removed (i) by unanimous vote of the remaining Trustees or (ii) at the recommendation of the TAC and the Futures Representative with the approval of the Bankruptcy Court, in the event that he or she becomes unable to discharge his or her duties hereunder due to accident or physical or mental deterioration, or for other good cause. Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 above, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustees hereunder, or repeated non-attendance at scheduled meetings.  Such removal shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

**4.3    Appointment of Successor Trustees.**

(a)    In the event of a vacancy in the position of a Trustee, whether by death, term expiration, resignation, or removal, the remaining Trustees shall consult with the TAC and the Futures Representative concerning appointment of a successor Trustee.  The vacancy shall be filled by the unanimous vote of the remaining Trustees unless a majority of the TAC or the Futures Representative vetoes the appointment.  In the event that the remaining Trustees cannot agree on a successor Trustee, or a majority of the TAC or the Futures Representative vetoes the appointment of a successor Trustee, the Bankruptcy Court shall make the appointment.  Nothing shall prevent the reappointment of a Trustee for an additional term or terms, and there shall be no limit on the number of terms that a Trustee may serve.

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act.  No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustees.

(c)    Each successor Trustee shall serve until the earlier of (i) the end of a full term of five (5) years if the predecessor Trustee completed his or her term, (ii) the end of the remainder of the term of the Trustee whom he or she is replacing if said predecessor Trustee did not complete said term, (iii) his or her death, (iv) his or her resignation pursuant to Section 4.2(b) above, (v) his or her removal pursuant to Section 4.2(c) above, or (vi) the termination of the PI Trust pursuant to Section 7.2 below.

**4.4    Liability of Trustees, Members of the TAC and the Futures Representative.** The Trustees, the Members of the TAC and the Futures Representative shall not be liable to the PI Trust, to any individual holding an asbestos claim, or to any other person, except for such individual's own breach of trust committed in bad faith or willful misappropriation.

**4.5    Compensation and Expenses of Trustees.**

(a)    Each Trustee shall receive a retainer from the PI Trust for his or her service as a Trustee in the amount of $60,000.00 per annum, which amount shall be payable in quarterly installments.  In addition, for all time expended attending Trustee meetings, preparing for such meetings, and working on authorized special projects, the Trustees shall receive the sum of $500 per hour, and the sum of $250 per hour for non-working travel time, in both cases computed on a quarter-hour basis.  The Trustees shall record all hourly time to be charged to the Trust on a daily basis.  The per annum retainer and hourly compensation payable to the Trustees hereunder shall be reviewed every year by the Trustees and, after consultation with the members of the TAC and the Futures Representative, appropriately adjusted by the Trustees for changes in the cost of living.  The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(b)     The PI Trust will promptly reimburse the Trustees and the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustees or the Delaware Trustee in connection with the performance of their duties hereunder.

(c)     The PI Trust shall include a description of the amounts paid under this Section 4.5 in the Annual Report.

**4.6     <u>Indemnification.</u>**

(a)     The PI Trust shall indemnify and defend the Trustees, the members of the TAC and the Futures Representative in the performance of their duties hereunder to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend such persons against any and all liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment, or funding of the PI Trust.  The PI Trust may indemnify any of the Additional Indemnitees in the performance of their duties hereunder to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and defend such persons against any and all liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment or funding of the PI Trust.  Notwithstanding the foregoing, no individual shall be indemnified or defended in any way for any liability, expense, claim, damage, or loss for which he or she is ultimately liable under Section 4.4 above.

(b)     Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of a Trustee, a member of the TAC, the Futures Representative or

Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the PI Trust pursuant to Section 4.6(a) above, shall be paid by the PI Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trustees, the members of the TAC, the Futures Representative or Additional Indemnitee, to repay such amount in the event that it shall be determined ultimately by final order that such Trustee, member of the TAC, the Futures Representative or Additional Indemnitee is not entitled to be indemnified by the PI Trust.

(c)     The Trustees may purchase and maintain reasonable amounts and types of insurance on behalf of an individual who is or was a Trustee, member of the TAC, the Futures Representative or Additional Indemnitee, including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, TAC member, Futures Representative, an officer or an employee of the PI Trust, or an advisor, consultant or agent of the PI Trust, the TAC or the Futures Representative.

**4.7**     **Lien.**  The Trustees, members of the TAC, the Futures Representative and the Additional Indemnitees shall have a first priority lien upon the PI Trust Assets to secure the payment of any amounts payable to them pursuant to Section 4.6 above.

**4.8**     **Trustees' Employment of Experts; Delaware Trustee's Employment of Counsel.**

(a)     The Trustees may, but shall not be required to, retain and/or consult with counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors and such other parties deemed by the Trustees to be qualified as experts on the matters submitted to them (the "**Trust Professionals**"), and in the absence of gross negligence, the written opinion of or information provided by any such party deemed by the Trustees to be an expert on the

particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustees hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

(b)     The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

**4.9     Trustees' Independence.**  The Trustees shall not, during the term of their service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for New GM.  No Trustee shall act as an attorney for any person who holds an asbestos claim.  For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.10     Bond.**  The Trustees and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.11     Delaware Trustee.**

(a)     There shall at all times be a Delaware Trustee.  The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity.  If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 4.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.11(c) below.  For the avoidance of doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)     The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustees set forth herein.  The Delaware Trustee shall be one of the trustees of the PI Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act.  The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the PI Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.

(c)     The Delaware Trustee shall serve until such time as the Trustees remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustees in accordance with the terms of Section 4.11(d) below.  The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustees; provided, that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustees in accordance with Section 4.11(d) below. If the Trustees do not act within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustees shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee.  Any successor Delaware Trustee must satisfy the requirements of Section

3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustees and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this PI Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this PI Trust Agreement.

## SECTION V

## TRUST ADVISORY COMMITTEE

**5.1    Members.**  The TAC shall consist of four (4) members, who shall initially be the persons named on the signature page hereof.

**5.2    Duties.**  The members of the TAC shall serve in a fiduciary capacity representing all holders of present PI Trust Claims. The Trustees must consult with the TAC on matters identified in Section 2.2(e) above and in other provisions herein, and must obtain the consent of the TAC on matters identified in Section 2.2(f) above. Where provided in the TDP, certain other actions by the Trustees are also subject to the consent of the TAC.

**5.3    Term of Office.**

(a)    The initial members of the TAC appointed in accordance with Section 5.1 above shall serve the staggered three-, four-, or five-year terms shown on the signature pages hereof. Thereafter, each term of office shall be five (5) years. Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b)

below, (iii) his or her removal pursuant to Section 5.3(c) below, (iv) the end of his or her term as provided above, or (v) the termination of the PI Trust pursuant to Section 7.2 below.

(b) A member of the TAC may resign at any time by written notice to the other members of the TAC, the Trustees and the Futures Representative. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c) A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause. Such removal shall be made at the recommendation of the remaining members of the TAC with the approval of the Bankruptcy Court.

**5.4** **Appointment of Successor.**

(a) If, prior to the termination of service of a member of the TAC other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a member of the TAC, such individual shall be his or her successor. If such member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service as contemplated above, such member's law firm may designate his or her successor. If (i) a member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service and such member's law firm does not designate his or her successor as contemplated above or (ii) he or she is removed pursuant to Section 5.3(c) above, his or her successor shall be appointed by a majority of the remaining members of the TAC or, if such members cannot agree on a successor, the Bankruptcy Court. Nothing in this Agreement

shall prevent the reappointment of an individual serving as a member of the TAC for an additional term or terms, and there shall be no limit on the number of terms that a TAC member may serve.

(b)        Each successor TAC member shall serve until the earlier of (i) the end of the full term of five (5) years for which he or she was appointed if his or her immediate predecessor member of the TAC completed his or her term, (ii) the end of the term of the member of the TAC whom he or she replaced if his or her predecessor member did not complete such term (iii) his or her death, (iv) his or her resignation pursuant to Section 5.3(b) above, (v) his or her removal pursuant to Section 5.3(c) above, or (vi) the termination of the PI Trust pursuant to Section 7.2 below.

**5.5        TAC's Employment of Professionals.**

(a)        The TAC may but is not required to retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on matters submitted to the TAC (the "**TAC Professionals**").  The TAC and the TAC Professionals shall at all times have complete access to the PI Trust's officers, employees and agents, as well as to the Trust Professionals, and shall also have complete access to all information generated by them or otherwise available to the PI Trust or the Trustees provided that any information provided by the Trust Professionals shall not constitute a waiver of any applicable privilege.  In the absence of gross negligence, the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be qualified as an expert on the particular matter submitted to the TAC shall be full and complete authorization and protection in support of any

action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b) The PI Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel pursuant to this provision in connection with the TAC's performance of its duties hereunder. The PI Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other TAC Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; *provided, however*, that (i) the TAC has first submitted to the PI Trust a written request for such reimbursement setting forth the reasons (A) why the TAC desires to employ such TAC Professional, and (B) why the TAC cannot rely on Trust Professionals to meet the need of the TAC for such expertise or advice, and (ii) the PI Trust has approved the TAC's request for reimbursement in writing. If the PI Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as a PI Trust expense. If the PI Trust declines to pay for the TAC Professional, it must set forth its reasons in writing. If the TAC still desires to employ the TAC Professional at the PI Trust's expense, the TAC and/or the Trustees shall resolve their dispute pursuant to Section 7.13 below.

**5.6** **Compensation and Expenses of the TAC.**

The members of the TAC shall receive compensation from the PI Trust for their services as TAC members in the form of a reasonable hourly rate set by the Trustees for attendance at meetings or other conduct of PI Trust business. The members of the TAC shall also be reimbursed promptly for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder. Such reimbursement or direct payment shall be

deemed a PI Trust expense. The PI Trust shall include a description of the amounts paid under this Section 5.6 in the Annual Report to be filed with the Bankruptcy Court and provided to the Futures Representative and the TAC pursuant to Section 2.2(c)(i).

**5.7** **Procedures for Consultation With and Obtaining the Consent of the TAC**.

(a) **Consultation Process**.

(i) In the event the Trustees are required to consult with the TAC pursuant to Section 2.2(e) above or on other matters as provided herein, the Trustees shall provide the TAC with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustees shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the PI Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustees are considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustees.

(ii) In determining when to take definitive action on any matter subject to the consultation procedures set forth in this Section 5.7(a), the Trustees shall take into consideration the time required for the TAC, if its members so wish, to engage and consult with its own independent financial or investment advisors as to such matter. In any event, the Trustees shall not take definitive action on any such matter until at least thirty (30) days after providing the TAC with the initial written notice that such matter is under consideration by the Trustees, unless such time period is waived by the TAC.

(b)    **Consent Process.**

(i)    In the event the Trustees are required to obtain the consent of the TAC pursuant to Section 2.2(f) above, the Trustees shall provide the TAC with a written notice stating that their consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustees propose to take, and explaining in detail the reasons why the Trustees desire to take such action. The Trustees shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustees shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the PI Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustees are considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustees.

(ii)    The TAC must consider in good faith and in a timely fashion any request for its consent by the Trustees, and must in any event advise the Trustees in writing of its consent or its objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustees. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustees in writing of its consent or its objections to the action within thirty (30) days of receiving notice regarding such request, the TAC's consent to the proposed actions shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 5.7(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustees and/or the TAC shall resolve their dispute pursuant to Section 7.13.

However, the burden of proof with respect to the validity of the TAC's objection and withholding of its consent shall be on the TAC.

## SECTION VI

## THE FUTURES REPRESENTATIVE

**6.1** **Duties.** The initial Futures Representative shall be the individual identified on the signature pages hereto. He shall serve in a fiduciary capacity, representing the interests of the holders of future PI Trust Claims for the purpose of protecting the rights of such persons. The Trustees must consult with the Futures Representative on matters identified in Section 2.2(e) above and on certain other matters provided herein, and must obtain the consent of the Futures Representative on matters identified in Section 2.2(f) above. Where provided in the TDP, certain other actions by the Trustees are also subject to the consent of the Futures Representative.

**6.2** **Term of Office.**

(a) The Futures Representative shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) below, (iii) his or her removal pursuant to Section 6.2(c) below, or (iv) the termination of the PI Trust pursuant to Section 7.2 below.

(b) The Futures Representative may resign at any time by written notice to the Trustees. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c) The Futures Representative may be removed by the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to

perform or to participate in performing the duties hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.

**6.3**    **Appointment of Successor.**  A vacancy caused by death or resignation shall be filled with an individual nominated prior to the effective date of the resignation or the death by the resigning or deceased Futures Representative, and a vacancy caused by removal of the Futures Representative shall be filled with an individual nominated by the Trustees in consultation with the TAC, subject, in each case, to the approval of the Bankruptcy Court.  In the event a majority of the Trustees cannot agree, or a nominee has not been pre-selected, the successor shall be chosen by the Bankruptcy Court.

**6.4**    **Futures Representative's Employment of Professionals.**

(a)    The Futures Representative may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the Futures Representative to be qualified as experts on matters submitted to the Futures Representative (the "**Futures Representative Professionals**").  The Futures Representative and the Futures Representative Professionals shall at all times have complete access to the PI Trust's officers, employees and agents, as well as to the Trust Professionals, and shall also have complete access to all information generated by them or otherwise available to the PI Trust or the Trustees provided that any information provided by the Trust Professionals shall not constitute a waiver of any applicable privilege.  In the absence of gross negligence, the written opinion of or information provided by any Futures Representative Professional or Trust Professional deemed by the Futures Representative to be qualified as an expert on the particular matter submitted to the Futures Representative shall be full and complete authorization and protection in support of any action taken, or not taken, by the Futures

Representative in good faith and in accordance with the written opinion of or information provided by the Futures Representative Professional or Trust Professional.

(b)     The PI Trust shall promptly reimburse, or pay directly if so instructed, the Futures Representative for all reasonable fees and costs associated with the Futures Representative's employment of legal counsel pursuant to this provision in connection with the Futures Representative's performance of his or her duties hereunder.  The PI Trust shall also promptly reimburse, or pay directly if so instructed, the Futures Representative for all reasonable fees and costs associated with the Futures Representative's employment of any other Futures Representative Professionals pursuant to this provision in connection with the Futures Representative's performance of his or her duties hereunder; *provided, however*, that (i) the Futures Representative has first submitted to the PI Trust a written request for such reimbursement setting forth the reasons (A) why the Futures Representative desires to employ the Futures Representative Professional, and (B) why the Futures Representative cannot rely on Trust Professionals to meet the need of the Futures Representative for such expertise or advice, and (ii) the PI Trust has approved the Futures Representative's request for reimbursement in writing.  If the PI Trust agrees to pay for the Futures Representative Professional, such reimbursement shall be treated as a PI Trust expense.  If the PI Trust declines to pay for the Futures Representative Professional, it must set forth its reasons in writing.  If the Futures Representative still desires to employ the Futures Representative Professional at the PI Trust's expense, the Futures Representative and/or the Trustees shall resolve their dispute pursuant to Section 7.13 below.

**6.5     Compensation and Expenses of the Futures Representative.**  The Futures Representative shall receive compensation from the PI Trust in the form of payment at the

Futures Representative's normal hourly rate for services performed.  The PI Trust will promptly reimburse the Futures Representative for all reasonable out-of-pocket costs and expenses incurred by the Futures Representative in connection with the performance of his or her duties hereunder.  Such reimbursement or direct payment shall be deemed a PI Trust expense.  The PI Trust shall include a description of the amounts paid under this Section 6.5 in the Annual Report to be filed with the Bankruptcy Court and provided to the Futures Representative and the TAC pursuant to Section 2.2(c)(i).

      **6.6**     **Procedures for Consultation with and Obtaining the Consent of the Futures Representative.**

      (a)     **Consultation Process.**

      (i)     In the event the Trustees are required to consult with the Futures Representative pursuant to Section 2.2(e) above or on any other matters specified herein, the Trustees shall provide the Futures Representative with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances.  The Trustees shall also provide the Futures Representative with such reasonable access to the Trust Professionals and other experts retained by the PI Trust and its staff (if any) as the Futures Representative may reasonably request during the time that the Trustees are considering such matter, and shall also provide the Futures Representative the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustees.

      (ii)     In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 6.6(a), the Trustees shall take into consideration the time required for the Futures Representative, if he or she so wishes, to engage and consult with his or her own independent financial or investment advisors as to such matter.

In any event, the Trustees shall not take definitive action on any such matter until at least thirty (30) days after providing the Futures Representative with the initial written notice that such matter is under consideration by the Trustees, unless such period is waived by the Futures Representative.

(b)     **Consent Process.**

(i)     In the event the Trustees are required to obtain the consent of the Futures Representative pursuant to Section 2.2(f) above, the Trustees shall provide the Futures Representative with a written notice stating that his or her consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustees propose to take, and explaining in detail the reasons why the Trustees desire to take such action. The Trustees shall provide the Futures Representative as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustees shall also provide the Futures Representative with such reasonable access to the Trust Professionals and other experts retained by the PI Trust and its staff (if any) as the Futures Representative may reasonably request during the time that the Trustees are considering such action, and shall also provide the Futures Representative the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustees.

(ii)     The Futures Representative must consider in good faith and in a timely fashion any request for his or her consent by the Trustees, and must in any event advise the Trustees in writing of his or her consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustees. The Futures Representative may not withhold his or her consent unreasonably. If the Futures Representative decides to withhold consent, he or she must explain in detail his or her objections to the proposed action. If

the Futures Representative does not advise the Trustees in writing of his or her consent or objections to the proposed action within thirty (30) days of receiving the notice from the Trustees regarding such consent, the Futures Representative's consent shall be deemed to have been affirmatively granted.

(iii)     If, after following the procedures specified in this Section 6.6(b), the Futures Representative continues to object to the proposed action and to withhold its consent to the proposed action, the Trustees and/or the Futures Representative shall resolve their dispute pursuant to Section 7.13.  However, the burden of proof with respect to the validity of the Futures Representative's objection and withholding of his or her consent shall be on the Futures Representative.

## SECTION VII

## GENERAL PROVISIONS

**7.1     Irrevocability.**  To the fullest extent permitted by applicable law, the PI Trust is irrevocable.

**7.2     Term; Termination.**

(a)     The term for which the PI Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 7.2 below.

(b)     The PI Trust shall automatically dissolve on the date (the "**Dissolution Date**") ninety (90) days after the first to occur of the following events:

(i)     the date on which the Trustees decide to dissolve the PI Trust because (A) they deem it unlikely that new asbestos claims will be filed against the PI Trust, (B) all PI Trust Claims duly filed with the PI Trust have been liquidated and paid to the extent

provided in this PI Trust Agreement and the TDP or have been disallowed by a final non-appealable order, to the extent possible based upon the funds available through the Plan, and (C) twelve (12) consecutive months have elapsed during which no new asbestos claim has been filed with the PI Trust; or

(ii)     if the Trustees have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the PI Trust in a manner consistent with this PI Trust Agreement and the TDP, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a final order; or

(iii)     to the extent that any rule against perpetuities shall be deemed applicable to the PI Trust, the date on which twenty-one (21) years less ninety-one (91) days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof.

(c)     On the Dissolution Date or as soon as reasonably practicable, after the wind-up of the PI Trust's affairs by the Trustees and payment of all the PI Trust's liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the PI Trust estate shall be given to such organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustees using their reasonable discretion; *provided, however*, that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos-related lung disease or disorders, and (ii) the tax-exempt organization(s) shall not bear

any relationship to any entity that is related to pre-petition General Motors, MLC, New GM or any of their successors, assigns, or affiliates within the meaning of section 468B(d)(3) of the Internal Revenue Code. Notwithstanding any contrary provision of the Plan and related documents, this Section 7.2(c) cannot be modified or amended.

(d)     Following the dissolution and distribution of the assets of the PI Trust, the PI Trust shall terminate and the Trustees, or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the PI Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this PI Trust Agreement, the existence of the PI Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

**7.3     Amendments.**  The Trustees, after consultation with the TAC and the Futures Representative, and subject to the unanimous consent of the TAC and the Futures Representative, may modify or amend this PI Trust Agreement and the PI Trust By-laws.  The Trustees, after consultation with the TAC and the Futures Representative, and subject to the consent of the TAC and the Futures Representative, may modify or amend the TDP; *provided, however*, that no amendment to the TDP shall be inconsistent with the provisions limiting amendments to that document provided therein, and in particular the provisions limiting amendment of the Claims Payment Ratio set forth in Section **[2.5]** of the TDP and of the Payment Percentage set forth in Section **[4.2]** of the TDP.  Any modification or amendment made pursuant to this Article must be done in writing.  Notwithstanding anything contained in this PI Trust Agreement or the TDP to the contrary, neither this PI Trust Agreement, the PI Trust Bylaws, the TDP, nor any document annexed to the foregoing shall be modified or amended in

any way that could jeopardize, impair, or modify the PI Trust's qualified settlement fund status under the QSF Regulations.

**7.4**    **Meetings.**  The Delaware Trustee shall not be required nor permitted to attend meetings relating to the PI Trust.

**7.5**    **Severability.**  Should any provision in this PI Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this PI Trust Agreement.

**7.6**    **Notices.**  Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the PI Trust with respect to his or her PI Trust Claim.

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by e-mail or facsimile pursuant to the instructions listed below, or mailed by registered or certified mail, return receipt requested, postage prepaid, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the PI Trust through the Trustees:

Attn:  _____

_____

_____

To the Delaware Trustee:

Attn:  _____

_____

_____
_____

To the TAC:

    Attn: _____
    _____
    _____
    _____

To the Futures Representative:

    Attn: _____
    _____
    _____
    _____

To the Debtors:

    Attn: _____
    _____
    _____
    _____

(b)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**7.7**    **<u>Successors and Assigns</u>.**  The provisions of this PI Trust Agreement shall be binding upon and inure to the benefit of the Debtors, the PI Trust, the Trustees, and their respective successors and assigns, except that neither the Debtors, the PI Trust, the Trustees, nor may assign or otherwise transfer any of its, or their, rights or obligations, if any, under this PI

Trust Agreement except, in the case of the PI Trust and the Trustees, as contemplated by Section 2.1 above.

**7.8** **Limitation on Claim Interests for Securities Laws Purposes.** PI Trust Claims, and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; provided, however, that clause (a) of this Section 7.8 shall not apply to the holder of a claim that is subrogated to a PI Trust Claim as a result of its satisfaction of such PI Trust Claim.

**7.9** **Entire Agreement; No Waiver.** The entire agreement of the parties relating to the subject matter of this PI Trust Agreement is contained herein and in the documents referred to herein, and this PI Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**7.10** **Headings.** The headings used in this PI Trust Agreement are inserted for convenience only and do not constitute a portion of this PI Trust Agreement, nor in any manner affect the construction of the provisions of this PI Trust Agreement.

**7.11** **Governing Law.** This PI Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to Delaware conflict of law principles.

7.12 **Settlors' Representative and Cooperation.**  The Debtors are hereby irrevocably designated as the Settlors, and they are hereby authorized to take any action required of the Settlors by the Trustees in connection with the PI Trust Agreement.

7.13 **Dispute Resolution.**  Any disputes that arise under this PI Trust Agreement or under the TDP among the parties hereto shall be resolved by submission of the matter to an alternative dispute resolution ("**ADR**") process mutually agreeable to the parties involved. Should any party to the ADR process be dissatisfied with the decision of the arbitrator(s), that party may apply to the Bankruptcy Court for a judicial determination of the matter.  Any review conducted by the Bankruptcy Court shall be *de novo*.  In any case, if the dispute arose pursuant to the consent provision set forth in Section 5.7(b) (in the case of the TAC) or Section 6.6(b) (in the case of the Futures Representative), the burden of proof shall be on the party or parties who withheld consent to show that the objection was valid.  Should the dispute not be resolved by the ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.  If the Trustees determine that the matter in dispute is exigent and cannot await the completion of the ADR process, the Trustees shall have the discretion to elect out of the ADR process altogether or at any stage of the process and seek resolution of the dispute in the Bankruptcy Court.

7.14 **Enforcement and Administration.**  The provisions of this PI Trust Agreement and the TDP attached hereto shall be enforced by the Bankruptcy Court pursuant to the Plan. The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustees and over any disputes hereunder not resolved by alternative dispute resolution in accordance with Section 7.13 above.

**7.15** __Effectiveness.__  This PI Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

**7.16** __Counterpart Signatures.__  This PI Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this PI Trust Agreement this

_____ day of _____, 2010.

**Motors Liquidation Company**


By:_____


Title: _____


**[ADD NAMES OF OTHER DEBTORS]**

**TRUSTEES**

                                  **ACC**

_____

Name:  [NAME]

Expiration Date of Initial Term:  _____

Anniversary of the date of this PI Trust Agreement

By:_____

**DELAWARE TRUSTEE**

_____

Name:  [NAME]

Expiration Date of Initial Term:  _____

Anniversary of the date of this PI Trust Agreement

By:_____

_____

Name:  [NAME]

Expiration Date of Initial Term:  _____

Anniversary of the date of this PI Trust Agreement

**TRUST ADVISORY COMMITTEE**

_____
Name:  [NAME]
Expiration Date of Initial Term:  _____ Anniversary of
the date of this PI Trust Agreement


_____
Name:  [NAME]
Expiration Date of Initial Term:  _____ Anniversary of
the date of this PI Trust Agreement


_____
Name:  [NAME]
Expiration Date of Initial Term:  _____ Anniversary of
the date of this PI Trust Agreement


_____
Name:  [NAME]
Expiration Date of Initial Term:  _____ Anniversary of
the date of this PI Trust Agreement


**FUTURES REPRESENTATIVE**

_____
[NAME]

**EXHIBIT B**

**ASBESTOS TRUST DISTRIBUTION PROCEDURES**

**MLC**

**ASBESTOS PI TRUST**
**DISTRIBUTION PROCEDURES**

**MLC**

**ASBESTOS PI TRUST DISTRIBUTION PROCEDURES**

**TABLE OF CONTENTS**

<u>Page</u>

SECTION I — Introduction ........................................................................ 1

    1.1    Purpose ........................................................................ 1
    1.2    Interpretation ........................................................... 1


SECTION II — Overview ......................................................... 2

    2.1    PI Trust Goals ................................................................. 2
    2.2    Claims Liquidation Procedures ............................................. 3
    2.3    Application of the Payment Percentage .................................. 5
    2.4    PI Trust's Determination of the Maximum Annual Payment
            and Maximum Available Payment .................................. 7
    2.5    Claims Payment Ratio ....................................................... 9
    2.6    Indirect PI Trust Claims ................................................. 12


SECTION III — TDP Administration ........................................... 12

    3.1    Trust Advisory Committee and Futures Representative ......................... 12
    3.2    Consent and Consultation Procedures .................................. 13


SECTION IV — Payment Percentage; Periodic Estimates ........................................... 13

    4.1    Uncertainty of Debtors' Personal Injury Asbestos Liabilities ............... 13
    4.2    Computation of Payment Percentage ...................................... 13
    4.3    Applicability of the Payment Percentage ................................. 15

SECTION V — Resolution of PI Trust Claims ...................................................................... 19

5.1    Ordering, Processing and Payment of Claims ....................................... 19
    (a)    Ordering of Claims ............................................................... 19
        (1)    Establishment of the FIFO Processing Queue ............... 19
        (2)    Effect of Statutes of Limitations and Repose ................ 20
    (b)    Processing of Claims ............................................................ 20
    (c)    Payment of Claims ............................................................... 20
    (d)    New GM ............................................................................... 21
5.2    Resolution of Pre-Petition Liquidated PI Trust Claims ........................ 22
    (a)    Processing and Payment ....................................................... 22
    (b)    Marshalling of Security ........................................................ 24
5.3    Resolution of Unliquidated PI Trust Claims ......................................... 24
    (a)    Expedited Review Process .................................................... 25
        (1)    In General ............................................................. 25
        (2)    Claims Processing Under Expedited Review ................. 26
        (3)    Disease Levels, Scheduled Value
                and Medical/Exposure Criteria .................................. 26
    (b)    Individual Review Process .................................................... 30
        (1)    In General ............................................................. 30
            (A)    Review of Medical/Exposure Criteria ............... 31
            (B)    Review of Liquidated Value ............................... 32
        (2)    Valuation Factors to Be Considered in
                Individual Review .................................................... 32
        (3)    Scheduled, Average and Maximum Values ................... 34
5.4    Categorizing Claims as Extraordinary and/or Exigent Hardship............ 35
    (a)    Extraordinary Claims ........................................................... 35
    (b)    Exigent Hardship Claims ..................................................... 36
5.5    Secondary Exposure Claims .................................................................. 36
5.6    Indirect PI Trust Claims ........................................................................ 37
5.7    Evidentiary Requirements ...................................................................... 39
    (a)    Medical Evidence ................................................................. 39
        (1)    In General ............................................................. 39
            (A)    Disease Levels I–IV ........................................... 39
            (B)    Disease Levels V–VIII ....................................... 40
            (C)    Exception to the Exception for Certain
                      Pre-Petition Claims............................................. 41
        (2)    Credibility of Medical Evidence ................................... 41
    (b)    Exposure Evidence................................................................ 42
        (1)    In General ............................................................. 42
        (2)    Significant Occupational Exposure................................ 43
        (3)    General Motors Exposure ............................................. 43
5.8    Claims Audit Program ........................................................................... 44
5.9    Second Disease (Malignancy) Claims ................................................... 45

5.10 Arbitration ................................................................... 45
    (a) Establishment of ADR Procedures .............................. 45
    (b) Claims Eligible for Arbitration ................................. 47
    (c) Limitations on and Payment of Arbitration Awards .................... 47
5.11 Litigation ................................................................... 47


SECTION VI — Claims Materials ................................................. 48

6.1 Claims Materials ................................................. 48
6.2 Content of Claims Materials ................................... 48
6.3 Withdrawal or Deferral of Claims ............................. 49
6.4 Filing Requirements and Fees ................................. 49
6.5 Confidentiality of Claimants' Submissions ................... 49


SECTION VII — General Guidelines for Liquidating and Paying Claims ................... 51

7.1 Showing Required ............................................. 51
7.2 Costs Considered ............................................. 51
7.3 Discretion to Vary the Order and Amounts of Payments in
    Event of Limited Liquidity ................................. 52
7.4 Punitive Damages ............................................. 53
7.5 Sequencing Adjustment ....................................... 53
    (a) In General ............................................. 53
    (b) Unliquidated PI Trust Claims ........................... 54
    (c) Liquidated Pre-Petition Claims ......................... 54
7.6 Suits in the Tort System ..................................... 55
7.7 Payment of Judgments for Money Damages ..................... 55
7.8 Releases ..................................................... 56
7.9 Third-Party Services ......................................... 57
7.10 PI Trust Disclosure of Information .......................... 57


SECTION VIII — Miscellaneous .................................................. 57

8.1 Amendments ................................................. 57
8.2 Severability ................................................. 58
8.3 Governing Law ............................................... 58

# MLC

## ASBESTOS PI TRUST DISTRIBUTION PROCEDURES

The MLC Asbestos PI Trust Distribution Procedures (the "**TDP**") contained herein provide for resolving all "Asbestos Personal Injury Claims" as defined in the Amended Joint Chapter 11 Plan of Motors Liquidation Company, *et al.*, f/k/a General Motors Corp., *et al.*, dated as of _____, 2010 (as it may be amended or modified, the "**Plan**"),[1] as provided in and required by the Plan and the MLC Asbestos PI Trust Agreement (the "**PI Trust Agreement**"). The Plan and PI Trust Agreement establish the MLC Asbestos PI Trust (the "**PI Trust**"). The Trustees of the PI Trust (the "**Trustees**") shall implement and administer this TDP in accordance with the PI Trust Agreement.

## SECTION I

### Introduction

**1.1    Purpose.**  This TDP has been adopted pursuant to the PI Trust Agreement.  It is designed to provide fair, equitable and substantially similar treatment for all PI Trust Claims that may presently exist or may arise in the future.

**1.2    Interpretation.**  Except as may otherwise be provided below, nothing in this TDP shall be deemed to create a substantive right for any claimant.  The rights and benefits provided herein to holders of PI Trust Claims shall vest in such holders as of the Effective Date.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan and the PI Trust Agreement; provided, however, that "Asbestos Personal Injury Claims" as defined in the Plan shall be referred to herein as "**PI Trust Claims.**"

**SECTION II**

**Overview**

2.1     **PI Trust Goals.**  The goal of the PI Trust is to treat all claimants equitably.  This

TDP furthers that goal by setting forth procedures for processing and paying the Debtors'[2]

several share of the unpaid portion of the liquidated value of PI Trust Claims generally on an

impartial, first-in-first-out ("**FIFO**") basis, with the intention of paying all claimants over time as

equivalent a share as possible of the value of their claims based on historical values for

substantially similar claims in the tort system.[3]  To this end, the TDP establishes a schedule of

eight asbestos-related diseases ("**Disease Levels**"), seven of which have presumptive medical

and exposure requirements ("**Medical/Exposure Criteria**") and specific liquidated values

("**Scheduled Values**"), and five of which have both anticipated average values ("**Average

Values**") and caps on their liquidated values ("**Maximum Values**").  The Disease Levels,

Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values, which are

set forth in Sections 5.3 and 5.4 below, have all been selected and derived with the intention of

achieving a fair allocation of the PI Trust funds as among claimants suffering from different

disease processes in light of the best available information considering the settlement histories of

the Debtors and the rights claimants would have in the tort system absent the bankruptcy.  A

claimant may not assert more than one PI Trust Claim hereunder.

---

[2] "**Debtors**" means Motors Liquidation Company (f/k/a General Motors Corporation; MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.); MLCS, LLC (f/k/a Saturn, LLC); MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation); Remediation and Liability Management Company, Inc.; and Environmental Corporate Remediation Company, Inc.

[3] As used in this TDP, the phrase "in the tort system" shall not include claims asserted against a trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) and/or section 105 of the Bankruptcy Code or any other applicable law.

**2.2    Claims Liquidation Procedures.**  PI Trust Claims shall be processed based on their place in the FIFO Processing Queue to be established pursuant to Section 5.1(a) below. The PI Trust shall take all reasonable steps to resolve PI Trust Claims as efficiently and expeditiously as possible at each stage of claims processing and arbitration, which steps may include, in the PI Trust's sole discretion, conducting settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the FIFO Processing Queue are maintained and each claim is individually evaluated pursuant to the valuation factors set forth in Section 5.3(b)(2) below.  The PI Trust shall also make every effort to resolve each year at least that number of PI Trust Claims required to exhaust the Maximum Annual Payment and the Maximum Available Payment for Category A and Category B claims, as those terms are defined below.

The PI Trust shall liquidate all PI Trust Claims except Foreign Claims (as defined below) that meet the presumptive Medical/Exposure Criteria of Disease Levels I–V, VII and VIII under the Expedited Review Process described in Section 5.3(a) below.  Claims involving Disease Levels I–V, VII and VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the PI Trust's Individual Review Process described in Section 5.3(b) below.  In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the PI Trust can offer the claimant an amount up to the Scheduled Value of that Disease Level if the PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

PI Trust Claims involving Disease Levels IV–VIII tend to raise more complex valuation issues than the PI Trust Claims in Disease Levels I–III.  Accordingly, in lieu of liquidating such claimant's claim under the Expedited Review Process, claimants holding claims involving these

Disease Levels may alternatively seek to establish a liquidated value for the claim that is greater than its Scheduled Value by electing the PI Trust's Individual Review Process. However, the liquidated value of a more serious Disease Level IV, V, VII or VIII claim that undergoes the Individual Review Process for valuation purposes may be determined to be less than its Scheduled Value, and in any event shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(3) below, unless the claim qualifies as an Extraordinary Claim as defined in Section 5.4(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value specified in that provision for such claims. Level VI (Lung Cancer 2) claims and all Foreign Claims may be liquidated[4] only pursuant to the PI Trust's Individual Review Process.

Based upon the Debtors' claims settlement histories in light of applicable tort law, and current projections of present and future unliquidated claims, the Scheduled Values and Maximum Values set forth in Section 5.3(b)(3) have been established for each of the five (5) more serious Disease Levels that are eligible for Individual Review of their liquidated values, with the expectation that the combination of settlements at the Scheduled Values and those resulting from the Individual Review Process should result in the Average Values also set forth in that provision.

All unresolved disputes over a claimant's medical condition, exposure history and/or the liquidated value of the claim shall be subject to binding or non-binding arbitration as set forth in Section 5.10 below, at the election of the claimant, under the ADR Procedures that are to be established by the PI Trust. PI Trust Claims that are the subject of a dispute with the PI Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in

---

[4] For purposes of this TDP, "liquidated" means approved and valued by the PI Trust.

Sections 5.11 and 7.6 below.  However, if and when a claimant obtains a judgment in the tort system, the judgment shall be payable (subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio provisions set forth below) as provided in Section 7.7 below.

      **2.3**     **Application of the Payment Percentage.**  After the liquidated value of a PI Trust Claim other than a claim involving Other Asbestos Disease (Disease Level I – Cash Discount Payment), as defined in Section 5.3(a)(3) below, is determined pursuant to the procedures set forth herein for Expedited Review, Individual Review, arbitration, or litigation in the tort system, the claimant shall ultimately receive a pro-rata share of that value based on a Payment Percentage described in Section 4.2 below.  The Payment Percentage shall also apply to all Pre-Petition Liquidated Claims as provided in Section 5.2 below and to all sequencing adjustments paid pursuant to Section 7.5 below.

      The Initial Payment Percentage has been set at ___% and shall apply to all PI Trust Voting Claims accepted as valid by the PI Trust, unless adjusted by the PI Trust pursuant to the consent of the PI Trust Advisory Committee (the "**TAC**") and the Legal Representative for Future Claimants (the "**Futures Representative**") (who are described in Section 3.1 below) pursuant to Section 4.2 below, and except as provided in Section 4.3 below with respect to supplemental payments in the event the Initial Payment Percentage is changed.  The term "**PI Trust Voting Claims**" includes (i) Pre-Petition Liquidated Claims as defined in Section 5.2(a) below; (ii) claims filed against the Debtors in the tort system or actually submitted to the Debtors pursuant to an administrative settlement agreement prior to the Commencement Date of June 1, 2009 (October 9, 2009 with respect to Remediation and Liability Management Company, Inc. and Environmental Corporate Remediation Company, Inc.) (the "**Commencement Date**"); and

(iii) all asbestos claims filed against another defendant in the tort system prior to August 31, 2010, the date the Plan was filed with the Bankruptcy Court (the "**Plan Filing Date**"); provided, however, that (1) the holder of a claim described in subsection (i), (ii) or (iii) above, or his or her authorized agent, actually voted to accept or reject the Plan pursuant to the voting procedures established by the Bankruptcy Court, unless such holder certifies to the satisfaction of the Trustees that he or she was prevented from voting in this proceeding as a result of circumstances resulting in a state of emergency affecting, as the case may be, the holder's residence, principal place of business or legal representative's place of business at which the holder or his or her legal representative receives notice and/or maintains material records relating to his or her PI Trust Voting Claim; and provided further that (2) the claim was subsequently filed with the PI Trust pursuant to Section 6.1 below by the Initial Claims Filing Date defined in Section 5.1(a) below. The Initial Payment Percentage has been calculated on the assumption that the Average Values set forth in Section 5.3(b)(3) below shall be achieved with respect to existing present claims and projected future claims involving Disease Levels IV–VIII.

The Payment Percentage may thereafter be adjusted upwards or downwards from time to time by the PI Trust with the consent of the TAC and the Futures Representative to reflect then-current estimates of the PI Trust's assets and its liabilities, as well as then-estimated value of then-pending and future claims. Any adjustment to the Initial Payment Percentage shall be made only pursuant to Section 4.2 below. If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under the TDP shall receive additional payments only as provided in Section 4.2 below. Because there is uncertainty in the prediction of both the number and severity of future PI Trust Claims, and the amount of the PI Trust's

assets, no guarantee can be made of any Payment Percentage of a PI Trust Claim's liquidated value.

**2.4    PI Trust's Determination of the Maximum Annual Payment and Maximum Available Payment.**  After calculating the Payment Percentage, the PI Trust shall model the cash flow, principal and income year-by-year to be paid over its entire life to ensure that all present and future holders of PI Trust Claims are compensated at the Payment Percentage.  In each year, based upon the model of cash flow, the PI Trust shall be empowered to pay out the portion of its funds payable for that year according to the model (the "**Maximum Annual Payment**").  The PI Trust's distributions to all claimants for that year shall not exceed the Maximum Annual Payment.  The Payment Percentage and the Maximum Annual Payment figures are based on projections over the lifetime of the PI Trust.  As noted in Section 2.3 above, if such long-term projections are revised, the Payment Percentage may be adjusted accordingly, which would result in a new model of the PI Trust's anticipated cash flow and a new calculation of the Maximum Annual Payment figures.

However, year-to-year variations in the PI Trust's flow of claims or the value of its assets, including earnings thereon, will not mean necessarily that the long-term projections are inaccurate; they may simply reflect normal variations, both up and down, from the smooth curve created by the PI Trust's long-term projections.  If, in a given year, however, asset values, including earnings thereon, are below projections, the PI Trust may need to distribute less in that year than would otherwise be permitted based on the original Maximum Annual Payment derived from long-term projections.  Accordingly, the original Maximum Annual Payment for a given year may be temporarily decreased if the present value of the assets of the PI Trust as measured on a specified date during the year is less than the present value of the assets of the PI

Trust projected for that date by the cash flow model described in the foregoing paragraph. The PI Trust shall make such a comparison whenever the Trustees become aware of any information that suggests that such a comparison should be made and, in any event, no less frequently than once every six months. If the PI Trust determines that as of the date in question, the present value of the PI Trust's assets is less than the projected present value of its assets for such date, then it will remodel the cash flow year-by-year to be paid over the life of the PI Trust based upon the reduced value of the total assets as so calculated and identify the reduced portion of its funds to be paid for that year, which will become the Temporary Maximum Annual Payment (additional reductions in the Maximum Annual Payment can occur during the course of that year based upon subsequent calculations). If in any year the Maximum Annual Payment was temporarily reduced as a result of an earlier calculation and, based upon a later calculation, the difference between the projected present value of the PI Trust's assets and the actual present value of its assets has decreased, the Temporary Maximum Annual Payment shall be increased to reflect the decrease in the differential. In no event, however, shall the Temporary Maximum Annual Payment exceed the original Maximum Annual Payment. As a further safeguard, the PI Trust's distribution to all claimants for the first nine months of a year shall not exceed 85% of the Maximum Annual Payment determined for that year. If on December 31 of a given year, the original Maximum Annual Payment for such year is not in effect, the original Maximum Annual Payment for the following year shall be reduced proportionately.

In distributing the Maximum Annual Payment, the PI Trust shall first allocate the amount in question to (a) outstanding Pre-Petition Liquidated Claims, (b) PI Trust Claims involving Disease Level I (Cash Discount Payment) which have been liquidated by the PI Trust and (c) Exigent Hardship Claims (as defined in Section 5.4(b) below). Should the Maximum Annual

Payment be insufficient to pay all such claims in full, they shall be paid in proportion to the aggregate value of each group of claims and the available funds allocated to each group of claims shall be paid to the maximum extent to claimants in the particular group based on their place in their respective FIFO Payment Queue. Claims in any group for which there are insufficient funds shall be carried over to the next year, and placed at the head of their FIFO Payment Queue. If there is a decrease in the Payment Percentage prior to the payment of such claims, any such claims shall nevertheless be entitled to be paid at the Payment Percentage that they would have been entitled to receive but for the application of the Maximum Annual Payment. The remaining portion of the Maximum Annual Payment (the "**Maximum Available Payment**"), if any, shall then be allocated and used to satisfy all other liquidated PI Trust Claims, subject to the Claims Payment Ratio set forth in Section 2.5 below; provided, however, that if the Maximum Annual Payment is reduced during a year pursuant to the provisions above, the Maximum Available Payment shall be adjusted accordingly. Claims in the groups described in (a), (b) and (c) above shall not be subject to the Claims Payment Ratio.

      **2.5    Claims Payment Ratio.** Based upon the Debtors' claims settlement histories and analysis of present and future claims, a Claims Payment Ratio has been determined which, as of the Effective Date, has been set at __% for Category A claims, which consist of PI Trust Claims involving severe asbestosis and malignancies (Disease Levels IV–VIII) and at ___% for Category B claims, which are PI Trust Claims involving non-malignant Asbestosis or Pleural Disease (Disease Levels II and III).

      In each year, after the determination of the Maximum Available Payment described in Section 2.4 above, __% of that amount shall be available to pay Category A claims and ___% shall be available to pay Category B claims that have been liquidated since the Commencement

Date except for claims liquidated which, pursuant to Section 2.4 above, are not subject to the Claims Payment Ratio; provided, however, that if the Maximum Annual Payment is reduced during the year pursuant to the provisions of Section 2.4 above, the amounts available to pay Category A and Category B claims shall be recalculated based on the adjusted Maximum Available Payment. In the event there are insufficient funds in any year to pay the liquidated claims within either or both of the Categories, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue described in Section 5.1(c) below, which shall be based upon the date of claim liquidation. Claims for which there are insufficient funds allocated to the relevant Category shall be carried over to the next year where they shall be placed at the head of the FIFO Payment Queue. If there is a decrease in the Payment Percentage prior to the payment of such claims, such claims shall nevertheless be entitled to be paid at the Payment Percentage that they would have been entitled to receive but for the application of the Claims Payment Ratio.

If, for any year, there are excess funds available to pay the Category B claims because there is an insufficient amount of liquidated claims to exhaust the Maximum Available Payment amount allocable for Category B in such year, then the excess funds for Category B shall be available for the payment of Category A claims liquidated in such year. There shall be no rollover of funds allocated to Category B claims from year to year. If, for any year, there are excess funds available to pay the Category A claims because there is an insufficient amount of liquidated claims to exhaust the Maximum Available Payment amount allocable for Category A in such year, then the excess funds for Category A shall be rolled over and remain dedicated to Category A claims. During the first nine months of a given year, the PI Trust's payments to claimants in a Category shall not exceed (a) 85% of the amount that would otherwise be

available for payment to claimants in such Category plus (b) in the case of Category A, the amount of any excess funds that were rolled over for Category A from the prior year.

The ___%/___% Claims Payment Ratio and its rollover provision shall be continued absent circumstances, such as a significant change in law or medicine, necessitating amendment to avoid a manifest injustice. However, the accumulation, rollover and subsequent delay of claims resulting from the application of the Claims Payment Ratio shall not, in and of itself, constitute such circumstances. In addition, an increase in the numbers of Category B claims beyond those predicted or expected shall not be considered as a factor in deciding whether to reduce the percentage allocated to Category A claims.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Trustees shall consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the settlement histories that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment. In that regard, the Trustees should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants.

The Claims Payment Ratio shall not be amended until the first anniversary of the date the PI Trust first accepts for processing proof of claim forms and the other materials required to file a claim with the PI Trust. In any event, no amendment to the Claims Payment Ratio to reduce the percentage allocated to Category A claims may be made without the unanimous consent of the TAC members and the consent of the Futures Representative, and the percentage allocated to Category A claims may not be increased without the consent of the TAC and the Futures Representative. The consent process set forth in Sections 5.7(b) and 6.6(b) of the PI Trust

Agreement shall apply in the event of any amendments to the Claims Payment Ratio. The Trustees, with the consent of the TAC and the Futures Representative, may offer the option of a reduced Payment Percentage to holders of claims in either Category A or Category B in return for prompter payment (the "**Reduced Payment Option**").

      **2.6**    **Indirect Asbestos Claims.**  As set forth in Section 5.6 below, any Indirect Asbestos Claim with respect to a PI Trust Claim (an "**Indirect PI Trust Claim**") shall be subject to the same categorization, evaluation, and payment provisions of this TDP as all other PI Trust Claims.

## SECTION III

## TDP Administration

      **3.1**    **Trust Advisory Committee and Futures Representative.**  Pursuant to the Plan and the PI Trust Agreement, the PI Trust and this TDP shall be administered by the Trustees in consultation with the TAC, which represents the interests of holders of present PI Trust Claims, and the Futures Representative, who represents the interests of holders of PI Trust Claims that shall be asserted in the future. The Trustees shall obtain the consent of the TAC and the Futures Representative on any amendments to this TDP pursuant to Section 8.1 below, and on such other matters as are otherwise required below and in Section 2.2(f) of the PI Trust Agreement. The Trustees shall also consult with the TAC and the Futures Representative on such matters as are provided below and in Section 2.2(e) of the PI Trust Agreement. The initial Trustees, the initial members of the TAC and the initial Futures Representative are identified in the PI Trust Agreement.

      **3.2**    **Consent and Consultation Procedures.**  In those circumstances in which consultation or consent is required, the Trustees shall provide written notice to the TAC and the

Futures Representative of the specific amendment or other action that is proposed. The Trustees shall not implement such amendment nor take such action unless and until the parties have engaged in the Consultation Process described in Sections 5.7(a) and 6.6(a), or the Consent Process described in Sections 5.7(b) and 6.6(b), of the PI Trust Agreement, respectively.

## SECTION IV

## Payment Percentage; Periodic Estimates

**4.1** **Uncertainty of Debtors' Personal Injury Asbestos Liabilities.** As discussed above, there is inherent uncertainty regarding Debtors' total asbestos-related tort liabilities, as well as the total value of the assets available to the PI Trust to pay PI Trust Claims. Consequently, there is inherent uncertainty regarding the amounts that holders of PI Trust Claims shall receive. To seek to ensure substantially equivalent treatment of all present and future PI Trust Claims, the Trustees must determine from time to time the percentage of full liquidated value that holders of present and future PI Trust Claims shall be likely to receive, *i.e.*, the "**Payment Percentage**" described in Section 2.3 above and Section 4.2 below.

**4.2** **Computation of Payment Percentage.** As provided in Section 2.3 above, the Initial Payment Percentage shall be ___% and shall apply to all PI Trust Voting Claims as defined in Section 2.3 above, unless the Trustees, with the consent of the TAC and the Futures Representative, determine that the Initial Payment Percentage should be changed to assure that the PI Trust shall be in a financial position to pay holders of unliquidated and/or unpaid PI Trust Voting Claims and present and future PI Trust Claims in substantially the same manner.

In making any such adjustment, the Trustees, the TAC and the Futures Representative shall take into account the fact that, based upon the analysis of experts, the Initial Payment

Percentage represents a reasonably reliable estimate of the PI Trust's total assets and liabilities over its life based on the best information available at the time.

Except with respect to PI Trust Voting Claims to which the Initial Payment Percentage applies, the Payment Percentage shall be subject to change pursuant to the terms of this TDP and the PI Trust Agreement if the Trustees with the consent of the TAC and Futures Representative determine that an adjustment is required. No less frequently than once every three (3) years, commencing with the first day of January occurring after the Effective Date, the Trustees shall reconsider the then applicable Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration, change the Payment Percentage if necessary with the consent of the TAC and the Futures Representative. The Trustees shall also reconsider the then applicable Payment Percentage at shorter intervals if they deem such reconsideration to be appropriate or if requested to do so by the TAC or the Futures Representative. In any event, no less frequently than once every twelve (12) months, commencing on the Initial Claims Filing Date, the Trustees shall compare the liability forecast on which the then applicable Payment Percentage is based with the actual claims filing and payment experience of the PI Trust to date. If the results of the comparison call into question the ability of the PI Trust to continue to rely upon the current liability forecast, the Trustees shall undertake a reconsideration of the Payment Percentage.

The Trustees must base their determination of the Payment Percentage on current estimates of the number, types, and values of present and future PI Trust Claims, the value of the assets then available to the PI Trust for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all holders of PI Trust Claims. When

making these determinations, the Trustees shall exercise common sense and flexibly evaluate all relevant factors.  The Payment Percentage applicable to Category A or Category B claims may not be reduced to alleviate delays in payments of claims in the other Category; both Categories of claims shall receive the same Payment Percentage, but the payment may be deferred as needed, and a Reduced Payment Option may be instituted as described in Section 2.5 above.

**4.3**     **Applicability of the Payment Percentage.**  Except as set forth below in this Section 4.3 with respect to supplemental payments, no holder of a PI Trust Voting Claim, other than a PI Trust Voting Claim for Other Asbestos Disease (Disease Level I – Cash Discount Payment) as defined in Section 5.3(a)(3) below, shall receive a payment that exceeds the Initial Payment Percentage times the liquidated value of the claim.  Except as otherwise provided (a) in Section 5.1(c) below for PI Trust Claims involving deceased or incompetent claimants for which approval of the PI Trust's offer by a court or through a probate process is required and (b) in the paragraph below with respect to Released Claims, no holder of any other PI Trust Claim, other than a PI Trust Claim for Other Asbestos Disease (Disease Level I – Cash Discount Payment), shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment; provided, however, that if there is a reduction in the Payment Percentage, the Trustees, in their sole discretion, may cause the PI Trust to pay a PI Trust Claim based on the Payment Percentage that was in effect prior to the reduction if such PI Trust Claim was filed and actionable with the PI Trust ninety (90) days or more prior to the date the Trustees proposed the new Payment Percentage in writing to the TAC and the Future Claimants' Representative (the "**Proposal Date**") and the processing of such claim was unreasonably delayed due to circumstances beyond the control of the claimant or the claimant's counsel, but only if such claim had no deficiencies for the ninety (90) days prior to the Proposal

15

Date.  PI Trust Claims involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) shall not be subject to the Payment Percentage, but shall instead be paid the full amount of their Scheduled Value as set forth in Section 5.3(a)(3) below.

If a redetermination of the Payment Percentage has been proposed in writing by the Trustees to the TAC and the Futures Representative but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage. However, if the proposed Payment Percentage was the lower amount but was not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount.  Conversely, if the proposed Payment Percentage was the higher amount and was subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

Notwithstanding anything contained herein, if the proposed Payment Percentage is lower than the current Payment Percentage, a claimant whose PI Trust Claim was liquidated prior to the Proposal Date and who either (a) transmitted[5] an executed release to the PI Trust prior to the Proposal Date or (b) with respect to those claimants who had received releases fewer than thirty (30) days prior to the Proposal Date, transmitted an executed release to the PI Trust within thirty (30) days of the claimant's receipt of the release (the claims described in (a) and (b) are collectively referred to here in as the "**Released Claims**") shall be paid based on the current Payment Percentage (the "**Released Claims Payment Percentage**").  For purposes hereof, (a) a claimant represented by counsel shall be deemed to have received a release on the date that the claimant's counsel receives the release, (b) if the PI Trust transmits a release electronically, the

---

[5] For purposes of this sentence, "transmitted" is defined as the date/time postmarked if submitted by mail or the date/time uploaded if submitted electronically.

release shall be deemed to have been received on the date the PI Trust transmits the offer notification, and (c) if the PI Trust places the release in the U.S. mail, postage prepaid, the release shall be deemed to have been received three (3) business days after such mailing date. A delay in the payment of the Released Claims for any reason, including delays resulting from limitations on payment amounts in a given year pursuant to Sections 2.4 and 2.5 hereof, shall not affect the rights of the holders of the Released Claims to be paid based on the Released Claims Payment Percentage.

At least thirty (30) days prior to proposing in writing to the TAC and the Future Claimants' Representative a change in the Payment Percentage, the Trustees shall issue a written notice to claimants or claimants' counsel indicating that the Trustees are reconsidering such Payment Percentage. During the period of time when the Trustees are contemplating a change in the Payment Percentage, the PI Trust shall continuing processing claims and making offers in a manner consistent with its normal course of business.

There is uncertainty surrounding the amount of the PI Trust's future assets. There is also uncertainty surrounding the totality of the PI Trust Claims to be paid over time, as well as the extent to which changes in existing federal and state law could affect the PI Trust's liabilities under this TDP. If the value of the PI Trust's future assets increases significantly and/or if the value or volume of PI Trust Claims actually filed with the PI Trust is significantly lower than originally estimated, the PI Trust shall use those proceeds and/or claims savings, as the case may be, first to maintain the Payment Percentage then in effect.

If the Trustees, with the consent of the TAC and the Futures Representative, make a determination to increase the Payment Percentage due to a material change in the estimates of the PI Trust's future assets and/or liabilities, the Trustees shall also make supplemental payments

to all claimants who previously liquidated their claims against the PI Trust and received payments based on a lower Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (excluding the portion of such previously paid amounts that was attributable to any sequencing adjustment paid pursuant to Section 7.5 below).

The Trustees' obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $100.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $100.00. However, the Trustees' obligation shall resume and the Trustees shall pay any such aggregate supplemental payments due the claimant at such time that the total exceeds $100.00.

**SECTION V**

**Resolution of PI Trust Claims.**

5.1     **Ordering, Processing and Payment of Claims.**

5.1(a)  **Ordering of Claims.**

5.1(a)(1)  **Establishment of the FIFO Processing Queue.**  The PI Trust shall order claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "**FIFO Processing Queue**").  For all claims filed on or before the date six (6) months after the date that the PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with the PI Trust (such six-month anniversary being referred to herein as the "**Initial Claims Filing Date**"), a claimant's position in the FIFO Processing Queue shall be determined as of the earliest of (i) the date prior to Commencement Date that the specific claim was either filed against a Debtor in the tort system or was actually submitted to a Debtor pursuant to an administrative settlement agreement; (ii) the date before the Commencement Date that the asbestos claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with a Debtor; (iii) the date after the Commencement Date but before the date that the PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with the PI Trust that the asbestos claim was filed against another defendant in the tort system; (iv) the date after the Commencement Date but before the Effective Date that a proof of claim was filed by the claimant against a Debtor in the Chapter 11 proceeding; or (v) the date a ballot was submitted on behalf of the claimant for purposes of voting to accept or reject the Plan pursuant to the voting procedures approved by the Bankruptcy Court.

Following the Initial Claims Filing Date, the claimant's position in the FIFO Processing Queue shall be determined by the date the claim is filed with the PI Trust. If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the asbestos-related disease. If any claims are filed and diagnosed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

**5.1(a)(2)  Effect of Statutes of Limitation and Repose.**  PI Trust Claims may be filed with the PI Trust at any time irrespective of the application of any relevant federal, state or foreign statute of limitation or repose.

**5.1(b)  Processing of Claims.**  As a general practice, the PI Trust shall review its claims files on a regular basis and notify all claimants whose claims are likely to come up in the FIFO Processing Queue in the near future.

**5.1(c)  Payment of Claims.**  PI Trust Claims that have been liquidated by the Expedited Review Process as provided in Section 5.3(a) below, by the Individual Review Process as provided in Section 5.3(b) below, by arbitration as provided in Section 5.10 below, or by litigation in the tort system provided in Section 5.11 below, shall be paid in FIFO order based on the date their liquidation became final (the "**FIFO Payment Queue**"), all such payments being subject to the applicable Payment Percentage, the Maximum Available Payment, the Claims Payment Ratio, and the sequencing adjustment provided for in Section 7.5 below, except as otherwise provided herein. Pre-Petition Liquidated Claims, as defined in Section 5.2 below, shall be subject to the Maximum Annual Payment and Payment Percentage limitations, but not to the Maximum Available Payment and Claims Payment Ratio provisions set forth above.

Where the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the PI Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the PI Trust has been furnished with evidence that the settlement offer has been submitted to such court or in the probate process for approval. If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the PI Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease. If any claims are liquidated on the same date and the respective holders' asbestos-related diseases were diagnosed on the same date, the position of those claims in the FIFO Payment Queue shall be determined by the PI Trust based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

**[5.1(d) New GM.** The claim values set forth herein are for liquidation and settlement purposes with respect to claims filed against the PI Trust. No provision of this TDP shall preclude a claimant from pursuing his or her claim against New GM and seeking full recovery of his or her damages.

If a claimant has received payment from New GM as a result of a judgment entered in the tort system with respect to the claimant's PI Trust Claim, such claimant shall not be entitled to then file a claim with the PI Trust. If a claimant has received payment from New GM as the result of a settlement in connection with the claimant's PI Trust Claim, the claimant

subsequently may file a claim with the PI Trust, and the amount of the claimant's settlement with New GM shall be irrelevant with respect to the valuation of the PI Trust Claim by the PI Trust. If a claimant has received payment from the PI Trust with respect to his or her PI Trust Claim and the claimant then files a lawsuit against New GM with respect to such claim, the PI Trust shall waive its subrogation rights and, at the time of verdict molding, shall provide any information necessary to allow New GM to receive a credit on the verdict for the amount the claimant received from the PI Trust.]

**5.2    Resolution of Pre-Petition Liquidated PI Trust Claims.**

**5.2(a)    Processing and Payment.**    As soon as practicable after the Effective Date, the PI Trust shall pay, upon submission by the claimant of the appropriate documentation, all PI Trust Claims that were liquidated by (i) a binding settlement agreement for the particular claim entered into prior to the Commencement Date that is judicially enforceable by the claimant, (ii) a jury verdict or non-final judgment in the tort system obtained prior to the Commencement Date, or (iii) a judgment that became final and non-appealable prior to the Commencement Date (collectively "**Pre-Petition Liquidated Claims**").    In order to receive payment from the Trust, the holder of a Pre-Petition Liquidated Claim must submit all documentation necessary to demonstrate to the PI Trust that the claim was liquidated in the manner described in the preceding sentence, which documentation shall include (A) a court authenticated copy of the jury verdict (if applicable), a non-final judgment (if applicable) or a final judgment (if applicable) and (B) the name, social security number and date of birth of the claimant and the name and address of the claimant's lawyer.

The liquidated value of a Pre-Petition Liquidated Claim shall be the unpaid portion of the amount agreed to in the binding settlement agreement, the unpaid portion of the amount awarded

by the jury verdict or non-final judgment or the unpaid portion of the amount of the final judgment, as the case may be, plus interest, if any, that has accrued on that amount in accordance with the terms of the agreement, if any, or under applicable state law for settlements or judgments as of the Commencement Date; however, except as otherwise provided in Section 7.4 below, the liquidated value of a Pre-Petition Liquidated Claim shall not include any punitive or exemplary damages.  In addition, the amounts payable with respect to such claims shall not be subject to or taken into account in consideration of the Claims Payment Ratio and the Maximum Available Payment limitations, but shall be subject to the Maximum Annual Payment and Payment Percentage provisions.  In the absence of a Final Order of the Bankruptcy Court determining whether a settlement agreement is binding and judicially enforceable, a dispute between the claimant and the PI Trust over this issue shall be resolved pursuant to the same procedures in this TDP that are provided for resolving the validity and/or liquidated value of a PI Trust Claim (*i.e.*, arbitration and litigation in the tort system as set forth in Sections 5.10 and 5.11 below).

Pre-Petition Liquidated Claims shall be processed and paid in accordance with their order in a separate FIFO queue to be established by the PI Trust based on the date the PI Trust received all required documentation for the particular claim.  If any Pre-Petition Liquidated Claims were filed on the same date, the claimants' position in the FIFO queue for such claims shall be determined by the date on which the claim was liquidated.  If any Pre-Petition Liquidated Claims were both filed and liquidated on the same dates, the position of the claimants in the FIFO queue shall be determined by the dates of the claimants' birth, with older claimants given priority over younger claimants.

**5.2(b)  Marshalling of Security.**  Holders of Pre-Petition Liquidated Claims that are secured by letters of credit, appeal bonds, or other security or sureties shall first exhaust their rights against any applicable security or surety before making a claim against the PI Trust.  Only in the event that such security or surety is insufficient to pay the Pre-Petition Liquidated Claim in full shall the deficiency be processed and paid as a Pre-Petition Liquidated Claim.

**5.3      Resolution of Unliquidated PI Trust Claims.**  Within six (6) months after the establishment of the PI Trust, the Trustees, with the consent of the TAC and the Futures Representative, shall adopt procedures for reviewing and liquidating all unliquidated PI Trust Claims, which shall include deadlines for processing such claims.  Such procedures shall also require that claimants seeking resolution of unliquidated PI Trust Claims must first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of Sections 6.1 and 6.2 below.  It is anticipated that the PI Trust shall provide an initial response to the claimant within six (6) months of receiving the proof of claim form.

The proof of claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing.  Irrespective of the Disease Level alleged on the proof of claim form, all claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as subsumed into the higher Disease Level for both processing and payment purposes.

Upon filing of a valid proof of claim form with the required supporting documentation, the claimant shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above.  When the claim reaches the top of the FIFO Processing Queue, the PI Trust shall process and liquidate the claim based upon the

medical/exposure evidence submitted by the claimant and under the Process elected by the

claimant.  If the claimant failed to elect a Process, the PI Trust shall process and liquidate the

claim under the Expedited Review Process although the claimant shall retain the right to request

Individual Review as described in Section 5.3(b) below.

      **5.3(a)  Expedited Review Process.**

      **5.3(a)(1)  In General.**  The PI Trust's Expedited Review Process is

designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all

PI Trust Claims (except those involving Lung Cancer 2 – Disease Level VI and all Foreign

Claims (as defined below), which shall only be liquidated pursuant to the PI Trust's Individual

Review Process), where the claim can easily be verified by the PI Trust as meeting the

presumptive Medical/Exposure Criteria for the relevant Disease Level.  Expedited Review thus

provides claimants with a substantially less burdensome process for pursuing PI Trust Claims

than does the Individual Review Process described in Section 5.3(b) below.  Expedited Review is

also intended to provide qualifying claimants a fixed and certain claims payment.

      Thus, claims that undergo Expedited Review and meet the presumptive

Medical/Exposure Criteria for the relevant Disease Level shall be paid the Scheduled Value for

such Disease Level set forth in Section 5.3(a)(3) below.  However, except for claims involving

Other Asbestos Disease (Disease Level I), all claims liquidated by Expedited Review shall be

subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims

Payment Ratio limitations set forth above; provided, however, that Exigent Hardship Claims

shall not be subject to the Maximum Available Payment and the Claims Payment Ratio.

Claimants holding claims that cannot be liquidated by Expedited Review because they do not

meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may elect the PI Trust's Individual Review Process set forth in Section 5.3(b) below.

Subject to the provisions of Section 5.8, the claimant's eligibility to receive the Scheduled Value for his or her PI Trust Claim pursuant to the Expedited Review Process shall be determined solely by reference to the Medical/Exposure Criteria set forth below for each of the Disease Levels eligible for Expedited Review.

**5.3(a)(2)  Claims Processing Under Expedited Review.**  All claimants seeking liquidation of their claims pursuant to Expedited Review shall file the PI Trust's proof of claim form.  As a proof of claim form is reached in the FIFO Processing Queue, the PI Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the seven Disease Levels eligible for Expedited Review, and shall advise the claimant of its determination.  If a Disease Level is determined, the PI Trust shall tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level multiplied by the applicable Payment Percentage, together with a form of release approved by the PI Trust.  If the claimant accepts the Scheduled Value and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the PI Trust shall disburse payment subject to the limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

**5.3(a)(3)  Disease Levels, Scheduled Values and Medical/Exposure Criteria.**  The eight Disease Levels covered by this TDP, together with the Medical/Exposure Criteria for each and the Scheduled Values for the seven Disease Levels eligible for Expedited Review, are set forth below.  These Disease Levels, Scheduled Values, and Medical/Exposure Criteria shall apply to all PI Trust Voting Claims filed with the PI Trust (except Pre-Petition Liquidated Claims) on or before the Initial Claims Filing Date provided in Section 5.1 above for

which the claimant elects the Expedited Review Process.  Thereafter, for purposes of

administering the Expedited Review Process and with the consent of the TAC and the Futures

Representative, the Trustees may add to, change, or eliminate Disease Levels, Scheduled Values,

or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values or

Medical/Exposure Criteria; or determine that a novel or exceptional asbestos personal injury

claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the

then current Disease Levels.

| **Disease Level** | **Scheduled Value** | **Medical/Exposure Criteria** |
|---|---|---|
| Mesothelioma (Level VIII) | $_____ | (1) Diagnosis[6] of mesothelioma; and (2) Debtor Exposure as defined in Section 5.7(b)(3). |
| Lung Cancer 1 (Level VII) | $_____ | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos- |

---

[6] The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this TDP are set forth in Section 5.7 below.

[7] Evidence of "Bilateral Asbestos-Related Nonmalignant Disease," for purposes of meeting the criteria for establishing Disease Levels I, II, III, V, and VII, means either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest X-ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification.  Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (*e.g.,* an ILO report, a written radiology report or a pathology report).  Solely for asbestos claims filed against a Debtor or another defendant in the tort system prior to the Commencement Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a Qualified Physician, or (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Disease Levels I, II, III, V and VII.  Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982).  For all purposes of this TDP, a "Qualified Physician" is a physician who is board-certified (or in the case of Canadian Claims or Foreign Claims, a physician who is certified or qualified under comparable medical standards or criteria of the jurisdiction in question) in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine; provided, however, subject to the provisions of Section 5.8, that the requirement for board

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|

<table>
<tr><td></td><td></td><td>Related Nonmalignant Disease[7], (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure[8] to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question.</td></tr>
<tr><td>Lung Cancer 2 (Level VI)</td><td>None</td><td>(1) Diagnosis of a primary lung cancer; (2) Debtor Exposure prior to December 31, 1982, and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question.</td></tr>
</table>

Lung Cancer 2 (Level VI) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer 1 (Level VII) claims. All claims in this Disease Level shall be individually evaluated. The estimated likely average of the individual evaluation awards for this category is $_____, with such awards capped at $_____ unless the claim qualifies for Extraordinary Claim treatment.

Level VI claims that show no evidence of either an underlying Bilateral Asbestos-Related Nonmalignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims shall be treated as having any significant value, especially if the claimant is also a Smoker.[9] In any event, no presumption of

---

certification in this provision shall not apply to otherwise qualified physicians whose X-ray and/or CT scan readings are submitted for deceased holders of PI Trust Claims.

[8] The term "Significant Occupational Exposure" is defined in Section 5.7(b)(2) below.

[9] There is no distinction between Non-Smokers and Smokers for either Lung Cancer 1 (Level VII) or Lung Cancer 2 (Level VI), although a claimant who meets the more stringent requirements of Lung Cancer 1 (Level VII) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the PI Trust. In such a case, absent circumstances that would otherwise reduce the value of the claim, it is anticipated that the liquidated value of the claim might well exceed the $_____ Scheduled Value for Lung Cancer 1 (Level VII) shown above. "Non-Smoker" means a claimant who either (a) never

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| | | validity shall be available for any claims in this category. |
| Other Cancer (Level V) | $_____ | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level IV) | $_____ | (1) Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestos, plus (a) TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level III) | $_____ | (1) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease, plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level II) | $_____ | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and (2) six months Debtor Exposure prior to December 31, 1982, and (3) five years cumulative occupational exposure to asbestos. |

---

smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| Other Asbestos Disease (Level I – Cash Discount Payment) | $___ | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma, and (2) Debtor Green Exposure prior to December 31, 1982. |

**5.3(b)  Individual Review Process.**

**5.3(b)(1)  In General.**  Subject to the provisions set forth below, a claimant may elect to have his or her PI Trust Claim reviewed for purposes of determining whether the claim would be compensable in the tort system even though it does not meet the presumptive Medical/Exposure Criteria for any of the Disease Levels set forth in Section 5.3(a)(3) above.  In addition or alternatively, a claimant may elect to have a claim undergo the Individual Review Process for purposes of determining whether the liquidated value of claim involving Disease Levels IV, V, VII or VIII exceeds the Scheduled Value for the relevant Disease Level also set forth in said provision.  However, until such time as the PI Trust has made an offer on a claim pursuant to Individual Review, the claimant may change his or her Individual Review election and have the claim liquidated pursuant to the PI Trust's Expedited Review Process.  In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the FIFO Processing Queue.

The liquidated value of all Foreign Claims payable under this TDP shall be established only under the PI Trust's Individual Review process.  PI Trust Claims of individuals exposed in Canada who were resident in Canada when such claims were filed ("Canadian Claims") shall not be considered Foreign Claims hereunder and shall be eligible for liquidation under the Expedited Review Process.  Accordingly, a "**Foreign Claim**" is a PI Trust Claim with respect to which the claimant's exposure to an asbestos-containing product or conduct for which a Debtor has legal

responsibility occurred outside of the United States and its Territories and Possessions, and outside of the Provinces and Territories of Canada.

In reviewing Foreign Claims, the PI Trust shall take into account all relevant procedural and substantive legal rules to which the claims would be subject in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) below. The PI Trust shall determine the liquidated value of Foreign Claims based on historical settlements and verdicts in the Claimant's Jurisdiction as well as the other valuation factors set forth in Section 5.3(b)(2) below.

For purposes of the Individual Review process for Foreign Claims, the Trustees, with the consent of the TAC and the Futures Representative, may develop separate Medical/Exposure Criteria and standards, as well as separate requirements for physician and other professional qualifications, which shall be applicable to all Foreign Claims channeled to the PI Trust; provided however, that such criteria, standards or requirements shall not effectuate substantive changes to the claims eligibility requirements under this TDP, but rather shall be made only for the purpose of adapting those requirements to the particular licensing provisions and/or medical customs or practices of the foreign country in question.

At such time as the PI Trust has sufficient historical settlement, verdict and other valuation data for claims from a particular foreign jurisdiction, the Asbestos Trustees, with the consent of the TAC and the Futures Representative, may also establish a separate valuation matrix for any such Foreign Claims based on that data.

**5.3(b)(1)(A)  Review of Medical/Exposure Criteria.**  The PI Trust's Individual Review Process provides a claimant with an opportunity for individual consideration and evaluation of a PI Trust Claim that fails to meet the presumptive Medical/Exposure Criteria for Disease Levels I–V, VII or VIII.  In such a case, the PI Trust shall

either deny the claim or, if the PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system, the PI Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level.

**5.3(b)(1)(B)  Review of Liquidated Value.**  Claimants holding claims in the five more serious Disease Levels IV–VIII shall also be eligible to seek Individual Review of the liquidated value of their claims, as well as of their medical/exposure evidence. The Individual Review Process is intended to result in payments equal to the full liquidated value for each claim multiplied by the Payment Percentage; however, the liquidated value of any PI Trust Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review.  Moreover, the liquidated value for a claim involving Disease Levels IV–VIII shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(3) below, unless the claim meets the requirements of an Extraordinary Claim described in Section 5.4(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value set forth in that provision for such claims.  Because the detailed examination and valuation process pursuant to Individual Review requires substantial time and effort, claimants electing to undergo the Individual Review Process may be paid the liquidated value of their PI Trust Claims later than would have been the case had the claimant elected the Expedited Review Process.  Subject to the provisions of Section 5.8, the PI Trust shall devote reasonable resources to the review of all claims to ensure that there is a reasonable balance maintained in reviewing all classes of claims.

**5.3(b)(2)  Valuation Factors to Be Considered in Individual Review.** The PI Trust shall liquidate the value of each PI Trust Claim that undergoes Individual Review based on the historic liquidated values of other similarly situated claims in the tort system for the

same Disease Level. The PI Trust shall thus take into consideration all of the factors that affect the severity of damages and values within the tort system including, but not limited to, credible evidence of (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) whether the claimant's damages were (or were not) caused by asbestos exposure, including exposure to an asbestos-containing product or to conduct for which a Debtor has legal responsibility prior to December 31, 1982 (for example, alternative causes, and the strength of documentation of injuries); (iv) the industry of exposure; (v) settlement and verdict histories and other law firms' experience in the Claimant's Jurisdiction for similarly situated claims; and (vi) settlement and verdict histories for the claimant's law firm for similarly situated claims.

For these purposes, the "Claimant's Jurisdiction" is the jurisdiction in which the claim was filed (if at all) against a Debtor in the tort system prior to the Commencement Date. If the claim was not filed against a Debtor in the tort system prior to the Commencement Date, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resides at the time of diagnosis or when the claim is filed with the PI Trust; or (ii) a jurisdiction in which the claimant experienced exposure to an asbestos-containing product or to conduct for which a Debtor has legal responsibility.

With respect to the "Claimant's Jurisdiction" in the event a personal representative or authorized agent makes a claim under this TDP for wrongful death with respect to which the governing law of the Claimant's Jurisdiction could only be the Alabama Wrongful Death Statute, the Claimant's Jurisdiction for such claim shall be the Commonwealth of Pennsylvania, and such

33

claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles. The choice of law provision in Section 7.4 below applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the PI Trust and the claimant, and, to the extent the PI Trust seeks recovery from any entity that provided insurance coverage to a Debtor, the Alabama Wrongful Death Statute shall govern.

**5.3(b)(3) Scheduled, Average and Maximum Values.** The Scheduled, Average and Maximum Values for claims involving Disease Levels I–VIII are the following:

| **Scheduled Disease** | **Scheduled Value** | **Average Value** | **Maximum Value** |
|---|---|---|---|
| Mesothelioma (Level VIII) | $_____ | $_____ | $_____ |
| Lung Cancer 1 (Level VII) | $_____ | $_____ | $_____ |
| Lung Cancer 2 (Level VI) | None | $_____ | $_____ |
| Other Cancer (Level V) | $_____ | $_____ | $_____ |
| Severe Asbestosis (Level IV) | $_____ | $_____ | $_____ |
| Asbestosis/Pleural Disease (Level III) | $_____ | None | None |
| Asbestosis/Pleural Disease (Level II) | $_____ | None | None |
| Other Asbestos Disease – Cash Discount Payment (Level I) | $_____ | None | None |

These Scheduled Values, Average Values and Maximum Values shall apply to all PI Trust Voting Claims other than Pre-Petition Liquidated Claims filed with the PI Trust on or before the Initial Claims Filing Date as provided in Section 5.1 above. Thereafter, the PI Trust,

with the consent of the TAC and the Futures Representative pursuant to Sections 5.7(b) and 6.6(b) of the PI Trust Agreement, may change these valuation amounts for good cause and consistent with other restrictions on the amendment power.

**5.4    Categorizing Claims as Extraordinary and/or Exigent Hardship.**

**5.4(a)  Extraordinary Claims.**  "Extraordinary Claim" means a PI Trust Claim that otherwise satisfies the Medical Criteria for Disease Levels II–VIII, and that is held by a claimant whose exposure to asbestos (i) occurred predominantly as a result of working in a manufacturing facility of a Debtor during a period in which such Debtor was manufacturing asbestos-containing products at that facility, or (ii) was at least 75% the result of exposure to an asbestos-containing product or to conduct for which a Debtor has legal responsibility, and in either case there is little likelihood of a substantial recovery elsewhere.  All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to an award of up to a maximum extraordinary value of five (5) times the Scheduled Value set forth in Section 5.3(b)(3) for claims qualifying for Disease Levels II–V, VII and VIII, and five (5) times the Average Value for claims in Disease Level VI, multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status shall be submitted to a special Extraordinary Claims Panel established by the PI Trust with the consent of the TAC and the Futures Representative.  All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review.  An Extraordinary Claim, following its liquidation, shall be placed in the FIFO Payment Queue ahead of all other PI Trust Claims, except Pre-Petition Liquidated Claims, Disease Level I Claims and Exigent Hardship Claims, based on its date of liquidation and shall be paid subject to the Maximum Available Payment and Claims Payment Ratio described above.

**5.4(b)  Exigent Hardship Claims.**  At any time the PI Trust may liquidate and pay PI Trust Claims that qualify as Exigent Hardship Claims as defined below.  Such claims may be considered separately no matter what the order of processing otherwise would have been under this TDP.  An Exigent Hardship Claim, following its liquidation, shall be placed first in the FIFO Payment Queue ahead of all other liquidated PI Trust Claims except Pre-Petition Liquidated Claims and Disease Level I Claims, which claims, together with the Exigent Hardship Claims, shall be paid in accordance with the provisions of Section 2.4 hereof.  A PI Trust Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the Medical/Exposure Criteria for Severe Asbestosis (Disease Level IV) or an asbestos-related malignancy (Disease Levels V–VIII), and the PI Trust, in its sole discretion, determines (i) that the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income, and (ii) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

**5.5      Secondary Exposure Claims.**  If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant must seek Individual Review of his or her claim pursuant to Section 5.3(b) above. In such a case, the claimant must establish that the occupationally exposed person would have met the exposure requirements under this TDP that would have been applicable had that person filed a direct claim against the PI Trust.  In addition, the claimant with secondary exposure must establish that he or she is suffering from one of the eight Disease Levels described in Section 5.3(a)(3) above or an asbestos-related disease otherwise compensable under this TDP, that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person was exposed to asbestos or asbestos-containing products

manufactured, produced or distributed by a Debtor or to conduct for which a Debtor has legal responsibility, and that such secondary exposure was a cause of the claimed disease. All other liquidation and payment rights and limitations under this TDP shall be applicable to such claims.

**5.6** **Indirect PI Trust Claims.** Indirect PI Trust Claims asserted against the PI Trust shall be treated as presumptively valid and paid by the PI Trust subject to the applicable Payment Percentage if (a) such claim satisfied the requirements of the Bar Date for such claims established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Code or subordinated under Section 509(c) of the Code, and, and (b) the holder of such claim (the "**Indirect Claimant**") establishes to the satisfaction of the Trustees that (i) the Indirect Claimant has paid in full the liability and obligation of the PI Trust to the individual claimant to whom the PI Trust would otherwise have had a liability or obligation under this TDP (the "**Direct Claimant**"), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the PI Trust from all liability to the Direct Claimant, and (iii) the claim is not otherwise barred by applicable law (excluding a statute of limitation or repose). In no event shall any Indirect Claimant have any rights against the PI Trust superior to the rights of the related Direct Claimant against the PI Trust, including any rights with respect to the timing, amount or manner of payment. In addition, no Indirect PI Trust Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant.

To establish a presumptively valid Indirect PI Trust Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the PI Trust) or a Final Order (as defined in the Plan) provided that such claim is valid under the applicable state law. In any case where the Indirect Claimant has satisfied the claim of a Direct

Claimant against the PI Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the PI Trust a release in form and substance satisfactory to the Trustees.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the PI Trust with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the PI Trust review the Indirect PI Trust Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the PI Trust had to the Direct Claimant. If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation, the PI Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the then applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled. Further, the liquidated value of any Indirect PI Trust Claim paid by the PI Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any PI Trust Claim that might be subsequently asserted by the Direct Claimant against the PI Trust.

Any dispute between the PI Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures provided in Section 5.10 below. If such dispute is not resolved by said ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.11 and 7.6 below.

The Trustees may develop and approve a separate proof of claim form for Indirect PI Trust Claims. Indirect PI Trust Claims that have not been disallowed, discharged, or otherwise

resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustees consistent with the provisions of this Section 5.6, which procedures (a) shall determine the validity, acceptability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the PI Trust would have afforded the holders of the underlying valid PI Trust Claims. Nothing in this TDP is intended to preclude a trust to which asbestos-related liabilities are channeled from asserting an Indirect PI Trust Claim against the PI Trust subject to the requirements set forth herein.

### 5.7    Evidentiary Requirements.

#### 5.7(a)    Medical Evidence.

##### 5.7(a)(1)    In General.    All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period. A finding by a physician after the Effective Date that a claimant's disease is "consistent with" or "compatible with" asbestosis shall not alone be treated by the PI Trust as a diagnosis.

###### 5.7(a)(1)(A)    Disease Levels I–IV.    Except for asbestos claims filed against a Debtor or any other defendant in the tort system prior to the Commencement Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I–IV) shall be based in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease. All living claimants must also provide (i) for Disease Levels I–III, evidence of Bilateral

Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 above); (ii) for Disease Level IV,[10] an ILO reading of 2/1 or greater or pathological evidence of asbestosis, and (iii) for Disease Levels III and IV, pulmonary function testing.[11]

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I–IV) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease; or (ii) pathological evidence of the non-malignant asbestos-related disease; or (iii) in the case of Disease Levels I–III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 above), and for Disease Level IV, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis; and (iv) for either Disease Level III or IV, pulmonary function testing.

**5.7(a)(1)(B)  Disease Levels V–VIII.**  All diagnoses of an asbestos-related malignancy (Disease Levels V–VIII) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related

---

[10] All diagnoses of Asbestos/Pleural Disease (Disease Levels II and III) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VIII) shall be presumed to be based on findings that the disease involves a malignancy.  However, the PI Trust may rebut such presumptions.

[11] "Pulmonary function testing" or "PFT" shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society ("**ATS**") and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration. PFT performed in a hospital accredited by the JCAHO, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician shall be presumed to comply with ATS standards, and the claimant may submit a summary report of the testing. If the PFT was not performed in an JCAHO-accredited hospital, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician, the claimant must submit the full report of the testing (as opposed to a summary report); provided, however, that if the PFT was conducted prior to the Effective Date of the Plan and the full PFT report is not available, the claimant must submit a declaration signed by a Qualified Physician or other qualified party, in the form provided by the PI Trust, certifying that the PFT was conducted in material compliance with ATS standards.

disease, or (ii) a diagnosis of such a malignant Disease Level by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").

**5.7(a)(1)(C)  Exception to the Exception for Certain Pre-Petition Claims.**  If the holder of a PI Trust Claim that was filed against a Debtor or any other defendant in the tort system prior to the Commencement Date has available a report of a diagnosing physician engaged by the holder or his or her law firm who conducted a physical examination of the holder as described in Sections 5.7(a)(1)(A), or if the holder has filed such medical evidence and/or a diagnosis of the asbestos-related disease by a physician not engaged by the holder or his or her law firm who conducted a physical examination of the holder with another asbestos-related personal injury settlement trust that requires such evidence, without regard to whether the claimant or the law firm engaged the diagnosing physician, the holder shall provide such medical evidence to the PI Trust notwithstanding the exception in Section 5.7(a)(1)(A).

**5.7(a)(2)  Credibility of Medical Evidence.**  Before making any payment to a claimant, the PI Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards.  The PI Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable.  Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to the Debtors to

41

settle for payment similar disease cases prior to the Debtors' bankruptcy, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, is presumptively reliable, although the PI Trust may seek to rebut the presumption. In addition, claimants who otherwise meet the requirements of this TDP for payment of a PI Trust Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the PI Trust in any Individual Review proceeding conducted pursuant to 5.3(b) or any Extraordinary Claim proceeding conducted pursuant to 5.4(a).

   **5.7(b) Exposure Evidence.**

    **5.7(b)(1) In General.** As set forth above in Section 5.3(a)(3), to qualify for any Disease Level, the claimant must demonstrate a minimum exposure to an asbestos-containing product manufactured, produced or distributed by a Debtor or to conduct for which a Debtor has legal responsibility. Claims based on conspiracy theories that involve no exposure to an asbestos-containing product manufactured, produced or distributed by a Debtor are not compensable under this TDP. To meet the presumptive exposure requirements of Expedited Review set forth in Section 5.3(a)(3) above, the claimant must show (i) for all Disease Levels, Debtor Exposure as defined in Section 5.7(b)(3) below prior to December 31, 1982; (ii) for Asbestos/Pleural Disease Level II, six (6) months Debtor Exposure prior to December 31, 1982, plus five (5) years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV), Other Cancer (Disease Level V) or Lung Cancer 1 (Disease Level VII), the claimant must show six (6) months Debtor

Exposure prior to December 31, 1982, plus Significant Occupational Exposure to asbestos. If the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review pursuant to Section 5.3(b) of his or her claim based on exposure to an asbestos-containing product or to conduct for which a Debtor has legal responsibility.

**5.7(b)(2)  Significant Occupational Exposure.**  "**Significant Occupational Exposure**" means employment for a cumulative period of at least five (5) years with a minimum of two (2) years prior to December 31, 1982, in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

**5.7(b)(3)  Debtor Exposure.**  The claimant must demonstrate (i) meaningful and credible exposure, which occurred prior to December 31, 1982, to asbestos or asbestos-containing products supplied, specified, manufactured, installed, maintained, or repaired by a Debtor and/or any entity, including a Debtor contracting unit, for which a Debtor has legal responsibility ("**Debtor Exposure**").  That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the claimant, by an affidavit or sworn statement of a co-worker or the affidavit or sworn statement of a family member in the case of a deceased claimant (providing the PI Trust finds such evidence reasonably reliable), by invoices, employment, construction or similar records, or by other credible evidence.  The specific

exposure information required by the PI Trust to process a claim under either Expedited or Individual Review shall be set forth on the proof of claim form to be used by the PI Trust. The PI Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.

Evidence submitted to establish proof of Debtor Exposure is for the sole benefit of the PI Trust, not third parties or defendants in the tort system. The PI Trust has no need for, and therefore claimants are not required to furnish the PI Trust with evidence of, exposure to specific asbestos products other than those for which a Debtor has legal responsibility, except to the extent such evidence is required elsewhere in this TDP. Similarly, failure to identify Debtor products in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the PI Trust, provided the claimant otherwise satisfies the medical and exposure requirements of this TDP.

**5.8    Claims Audit Program.**  The PI Trust, with the consent of the TAC and the Futures Representative, may develop methods for auditing the reliability of medical evidence, including additional reading of X-rays, CT scans and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos, including exposure to asbestos-containing products manufactured or distributed by a Debtor prior to December 31, 1982. In the event that the PI Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence to the PI Trust, it may decline to accept additional evidence from such provider in the future.

Further, in the event that an audit reveals that fraudulent information has been provided to the PI Trust, the PI Trust may penalize any claimant or claimant's attorney by rejecting the PI Trust Claim or by other means including, but not limited to, requiring the source of the

fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' PI Trust Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152, and seeking sanctions from the Bankruptcy Court.

  **5.9**  **Second Disease (Malignancy) Claims.** Notwithstanding the provisions of Section 2.1 that a claimant may not assert more than one (1) PI Trust Claim hereunder, the holder of a PI Trust Claim involving a non-malignant asbestos-related disease (Disease Levels I–IV) may assert a new PI Trust Claim against the PI Trust for a malignant disease (Disease Levels V–VIII) that is subsequently diagnosed.  Any additional payments to which such claimant may be entitled with respect to such malignant asbestos-related disease shall not be reduced by the amount paid for the non-malignant asbestos-related disease, provided that the malignant disease had not been diagnosed by the time the claimant was paid with respect to the original claim involving the non-malignant disease.

  **5.10**  **Arbitration.**

  **5.10(a)** **Establishment of ADR Procedures.** The PI Trust, with the consent of the TAC and the Futures Representative, shall institute binding and non-binding arbitration procedures in accordance with Alternative Dispute Resolution ("**ADR**") Procedures to be established by the Trustees, with the consent of the TAC and the Futures Representative, for resolving disputes concerning whether a pre-petition settlement agreement with a Debtor is binding and judicially enforceable in the absence of a Final Order of the Bankruptcy Court determining the issue, whether the PI Trust's outright rejection or denial of a claim was proper, or

whether the claimant's medical condition or exposure history meets the requirements of this TDP for purposes of categorizing a claim involving Disease Levels I–VIII. Binding and non-binding arbitration shall also be available for resolving disputes over the liquidated value of a claim involving Disease Levels IV–VIII, as well as disputes over the Debtors' share of the unpaid portion of a Pre-Petition Liquidated Claim described in Section 5.2 above and disputes over the validity of an Indirect PI Trust Claim.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.7 above. In the case of an arbitration involving the liquidated value of a claim involving Disease Levels IV–VIII, the arbitrator shall consider the same valuation factors that are set forth in Section 5.3(b)(2) above. In order to facilitate the Individual Review Process with respect to such claims, the PI Trust may from time to time develop a valuation model that enables the PI Trust to efficiently make initial liquidated value offers on those claims in the Individual Review setting. In an arbitration involving any such claim, the PI Trust shall neither offer into evidence or describe any such model nor assert that any information generated by the model has any evidentiary relevance or should be used by the arbitrator in determining the presumed correct liquidated value in the arbitration. The underlying data that was used to create the model may be relevant and may be made available to the arbitrator but only if provided to the claimant or his or her counsel ten (10) days prior to the arbitration proceeding. With respect to all claims eligible for arbitration, the claimant, but not the PI Trust, may elect either non-binding or binding arbitration. The ADR Procedures may be modified by the PI Trust with the consent of the TAC and the Futures Representative.

**5.10(b)  Claims Eligible for Arbitration.** In order to be eligible for arbitration, the claimant must first complete the Individual Review Process with respect to the disputed issue

as well as any processes required under the ADR Procedures.  Individual Review shall be treated as completed for these purposes when the claim has been individually reviewed by the PI Trust, the PI Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the Individual Review, and the claimant has notified the PI Trust of the rejection in writing. Individual Review shall also be treated as completed if the PI Trust has rejected the claim.

      **5.10(c)  Limitations on and Payment of Arbitration Awards.**  In the case of a non-Extraordinary claim involving Disease Levels I–III, the arbitrator shall not return an award in excess of the Scheduled Value for such claim.  In the case of a non-Extraordinary Claim involving Disease Levels IV–VIII, the arbitrator shall not return an award in excess of the Maximum Value for the appropriate Disease Level as set forth in Section 5.3(a)(3) above, and for an Extraordinary Claim involving any Disease Level, the arbitrator shall not return an award greater than the maximum extraordinary value for such a claim as set forth in Section 5.4(a) above.  A claimant who submits to arbitration and who accepts the arbitral award shall receive payments in the same manner as one who accepts the PI Trust's original valuation of the claim.

      **5.11    Litigation.**  Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the PI Trust pursuant to Section 7.6 below.  However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the PI Trust's available cash only as provided in Section 7.7 below.

## SECTION VI

## Claims Materials

**6.1     Claims Materials.**  The PI Trust shall prepare suitable and efficient claims materials ("**Claims Materials**") for all PI Trust Claims, and shall provide such Claims Materials upon a written request for such materials to the PI Trust.  The proof of claim form to be submitted to the PI Trust shall require the claimant to assert the highest Disease Level for which the claim qualifies at the time of filing.  The proof of claim form shall also include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure.  In developing its claim filing procedures, the PI Trust shall make every effort to provide claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation over the internet and electronically by disk or CD-rom.  The proof of claim form to be used by the PI Trust shall be developed by the PI Trust and submitted to the TAC and the Futures Representatives for approval; it may be changed by the PI Trust with the consent of the TAC and the Futures Representative.

**6.2     Content of Claims Materials.**  The Claims Materials shall include a copy of this TDP, such instructions as the Trustees shall approve, and a detailed proof of claim form.  If feasible, the forms used by the PI Trust to obtain claims information shall be the same or substantially similar to those used by other asbestos claims resolution organizations.  If requested by the claimant, the PI Trust shall accept information provided electronically.  The claimant may, but shall not be required to, provide the PI Trust with evidence of recovery from other defendants and claims resolution organizations.

**6.3** **Withdrawal or Deferral of Claims.** A claimant can withdraw a PI Trust Claim at any time upon written notice to the PI Trust and file another claim subsequently, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing. A claimant can also request that the processing of his or her PI Trust Claim by the PI Trust be deferred for a period not to exceed three (3) years, in which case the claimant shall also retain his or her original place in the FIFO Processing Queue. During the period of such deferral, a sequencing adjustment on such claimant's PI Trust Claim as provided in Section 7.5 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant. Except for PI Trust Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the PI Trust's offer is required, or a PI Trust Claim for which deferral status has been granted, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six (6) months of the PI Trust's written offer of payment or rejection of the claim. Upon written request and good cause, the PI Trust may extend the withdrawal or deferral period for an additional six (6) months.

**6.4** **Filing Requirements and Fees.** The Trustees shall have the discretion to determine, with the consent of the TAC and the Futures Representative, whether a filing fee should be required for any PI Trust Claims.

**6.5** **Confidentiality of Claimants' Submissions.** All submissions to the PI Trust by a holder of a PI Trust Claim or a proof of claim form and materials related thereto shall be treated as made in the course of settlement discussions between the holder and the PI Trust, and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including but not limited to those directly applicable to settlement discussions. The

PI Trust will preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only, with the permission of the holder, to another trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) of the Bankruptcy Code or other applicable law, to such other persons as authorized by the holder, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware State Court or the United States District Court for the District of Delaware.  Furthermore, the PI Trust shall provide counsel for the holder a copy of any such subpoena immediately upon being served.  The PI Trust shall on its own initiative or upon request of the claimant in question take all necessary and appropriate steps to preserve said privileges before the Bankruptcy Court, a Delaware State Court or the United States District Court for the District of Delaware and before those courts having appellate jurisdiction related thereto**.**  Notwithstanding anything in the foregoing to the contrary, with the consent of the TAC and the Futures Representative, the PI Trust may, in specific limited circumstances, disclose information, documents or other materials reasonably necessary in the PI Trust's judgment to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an insurance policy or settlement agreement within the Asbestos Insurance Assets, if applicable; provided, however, that the PI Trust shall take any and all steps reasonably feasible in its judgment to preserve the further confidentiality of such information, documents and materials, and prior to the disclosure of such information, documents or materials to a third party, the PI Trust shall receive from such third party a written agreement of confidentiality that (a) ensures that the information, documents and materials provided by the PI Trust shall be used solely by the receiving party for the purpose stated in the agreement and (b) prohibits any other use or further dissemination of the information, documents and materials by the third party except as set forth in the written agreement of confidentiality.

Nothing in this TDP, the Plan or the PI Trust Agreement expands, limits or impairs the obligation under applicable law of a claimant to respond fully to lawful discovery in any underlying civil action regarding his or her submission of factual information to the PI Trust for the purpose of obtaining compensation for asbestos-related injuries from the PI Trust.

## SECTION VII

## General Guidelines for Liquidating and Paying Claims

**7.1    Showing Required.**  To establish a valid PI Trust Claim, a claimant must meet the requirements set forth in this TDP.  The PI Trust may require the submission of X-rays, CT scans, laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence to support or verify the PI Trust Claim, and may further require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable.

**7.2    Costs Considered.**  Notwithstanding any provisions of this TDP to the contrary, the Trustees shall always give appropriate consideration to the cost of investigating and uncovering invalid PI Trust Claims so that the payment of valid PI Trust Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting a PI Trust Claim.  The Trustees shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the PI Trust so that valid PI Trust Claims are not unduly further impaired by the costs of additional investigation.  Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any claim against the PI Trust whatever the costs, or declining to accept medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program described in Section 5.8 above.

**7.3** **Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.** Consistent with the provisions hereof and subject to the FIFO Processing and Payment Queues, the Maximum Annual Payment, the Maximum Available Payment and the Claims Payment Ratio requirements set forth above, the Trustees shall proceed as quickly as possible to liquidate valid PI Trust Claims, and shall make payments to holders of such claims in accordance with this TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the PI Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants. However, the Trustees shall use their best efforts to treat similar claims in substantially the same manner, consistent with their duties as Trustees, the purposes of the PI Trust, the established allocation of funds to claims in Categories A and B, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the PI Trust faces temporary periods of limited liquidity, the Trustees may, with the consent of the TAC and the Futures Representative, (a) suspend the normal order of payment, (b) temporarily limit or suspend payments altogether, (c) offer a Reduced Payment Option as described in Section 2.5 above and/or (d) commence making payments on an installment basis.

**7.4** **Punitive Damages.** Except as provided below for claims asserted under the Alabama Wrongful Death Statute, in determining the value of any liquidated or unliquidated PI

Trust Claim, punitive or exemplary damages, *i.e.*, damages other than compensatory damages, shall not be considered or paid, notwithstanding their availability in the tort system.

Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the PI Trust in the tort system pursuant to Sections 5.11 above and 7.6 below. The only damages that may be awarded pursuant to this TDP to Alabama Claimants who are deceased and whose personal representatives pursue their claims only under the Alabama Wrongful Death Statute shall be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to its choice of law principles. The choice of law provision in Section 7.4 herein applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the PI Trust and the claimant including, but not limited to, suits in the tort system pursuant to Section 7.6, and to the extent the PI Trust seeks recovery from any entity that provided insurance to a Debtor, the Alabama Wrongful Death Statute shall govern.

**7.5     Sequencing Adjustment.**

**7.5(a)  In General.**  Except for any PI Trust Claim involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) and subject to the limitations set forth below, a sequencing adjustment shall be paid on all PI Trust Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years. The sequencing adjustment factor for each year shall be five percent (5%) per annum for each of the first five (5)

years after the Effective Date; thereafter, the PI Trust shall have the discretion to change the sequencing adjustment factor with the consent of the TAC and the Futures Representative.

7.5(b)  **Unliquidated PI Trust Claims.**  A sequencing adjustment shall be payable on the Scheduled Value of any unliquidated PI Trust Claim that meets the requirements of Disease Levels II–V, VII and VIII, whether the claim is liquidated under Expedited Review, Individual Review, or by arbitration.  No sequencing adjustment shall be paid on any claim involving Disease Level I or on any claim liquidated in the tort system pursuant to Section 5.11 above and Section 7.6 below.  The sequencing adjustment on an unliquidated PI Trust Claim that meets the requirements of Disease Level VI shall be based on the Average Value of such a claim. Sequencing adjustments on all such unliquidated claims shall be measured from the date of payment back to the earliest of the date that is one year after the date on which (a) the claim was filed against a Debtor prior to the Commencement Date; (b) the claim was filed against another defendant in the tort system on or after the Commencement Date but before the Effective Date; (c) the claim was filed with the Bankruptcy Court during the pendency of the Chapter 11 proceeding; or (d) the claim was filed with the PI Trust after the Effective Date.

7.5(c)  **Liquidated Pre-Petition Claims.**  A sequencing adjustment shall also be payable on the liquidated value of all Pre-Petition Liquidated Claims described in Section 5.2(a) above.  In the case of Pre-Petition Liquidated Claims liquidated by verdict or judgment, the sequencing adjustment shall be measured from the date of payment back to the date that is one (1) year after the date that the verdict or judgment was entered; provided, however, that in no event shall the sequencing adjustment be measured from a date prior to the Commencement Date if the liquidated value of the Pre-Petition Liquidated Claim includes pre-petition interest.  In the case of Pre-Petition Liquidated Claims liquidated by a binding, judicially enforceable settlement,

the sequencing adjustment shall be measured from the date of payment back to the date that is one (1) year after the Commencement Date.

**7.6    Suits in the Tort System.**  If the holder of a disputed claim disagrees with the PI Trust's determination regarding the Disease Level of the claim, the claimant's exposure history or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.10 above, the holder may file a lawsuit against the Trust in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) above.  Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  All defenses (including, with respect to the PI Trust, all defenses which could have been asserted by a Debtor) shall be available to both sides at trial; however, the PI Trust may waive any defense and/or concede any issue of fact or law.  If the claimant was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim form was filed with the PI Trust, the case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

**7.7    Payment of Judgments for Money Damages.**  If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final.  Thereafter, the claimant shall receive from the PI Trust an initial payment (subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio provisions set forth above) of an amount equal to the greater of (i) the PI Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system.  The claimant shall receive the balance of

the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio provisions above in effect on the date of the payment of the subject installment).

In the case of non-Extraordinary claims involving Disease Levels I, II and III, the total amounts paid with respect to such claims shall not exceed the relevant Scheduled Value for such Disease Levels as set forth in Section 5.3(b)(3) above. In the case of claims involving a non-malignant asbestos-related disease that does not attain classification under Disease Levels I, II or III, the amount payable shall not exceed the Scheduled Value for the Disease Level most comparable to the disease proven. In the case of non-Extraordinary claims involving severe asbestosis and malignancies (Disease Levels IV–VIII), the total amounts paid with respect to such claims shall not exceed the Maximum Values for such Disease Levels set forth in Section 5.3(b)(3). In the case of Extraordinary Claims, the total amounts paid with respect to such claims shall not exceed the maximum extraordinary values for such claims set forth in Section 5.4(a) above. Under no circumstances shall (a) a sequencing adjustment be paid pursuant to Section 7.5 or (b) interest be paid under any statute on any judgments obtained in the tort system.

**7.8     Releases.**  The Trustees shall have the discretion to determine the form and substance of the releases to be provided to the PI Trust. As a condition to making any payment to a claimant, the PI Trust shall obtain a general, partial, or limited release as appropriate in accordance with the applicable state or other law. If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a claimant may, in the discretion of the PI Trust, constitute such a release.

**7.9     Third-Party Services.**  Nothing in this TDP shall preclude the PI Trust from contracting with another asbestos claims resolution organization to provide services to the PI Trust so long as decisions about the categorization and liquidated value of PI Trust Claims are based on the relevant provisions of this TDP, including the Disease Levels, Scheduled Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

**7.10     PI Trust Disclosure of Information.**  Periodically, but not less often than once a year, the PI Trust shall make available to claimants and other interested parties, the number of claims by Disease Levels that have been resolved both by the Individual Review Process and by arbitration as well as by litigation in the tort system indicating the amounts of the awards and the averages of the awards by jurisdiction.

## SECTION VIII

## Miscellaneous

**8.1     Amendments.**  Except as otherwise provided herein, the Trustees may amend, modify, delete, or add to any provisions of this TDP (including, without limitation, amendments to conform this TDP to advances in scientific or medical knowledge or other changes in circumstances), provided they first obtain the consent of the TAC and the Futures Representative pursuant to the Consent Process set forth in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement, except that the right to amend the Claims Payment Ratio is governed by the restrictions in Section 2.5 above, and the right to adjust the Payment Percentage is governed by Section 4.2 above.  Nothing herein is intended to preclude the TAC or the Futures Representatives from proposing to the Trustees, in writing, amendments to this TDP.  Any amendment proposed by the TAC or the Futures Representatives shall remain subject to Section 7.3 of the PI Trust Agreement.

**8.2** **Severability.** Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this TDP. Should any provision contained in this TDP be determined to be inconsistent with or contrary to the Debtors' obligations to any insurance company providing insurance coverage to the Debtors in respect of claims for personal injury based on exposure to an asbestos-containing product or to conduct for which a Debtor has legal responsibility, the PI Trust with the consent of the TAC and the Futures Representative may amend this TDP and/or the PI Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of the Debtors to said insurance company.

**8.3** **Governing Law.** Except for purposes of determining the liquidated value of any PI Trust Claim, administration of this TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware. The law governing the liquidation of PI Trust Claims in the case of Individual Review, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.3(b)(2) above.

**EXHIBIT C**

**ENVIRONMENTAL RESPONSE TRUST CONSENT DECREE
AND SETTLEMENT AGREEMENT**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 09-50026 (REG) |
| MOTORS LIQUIDATION COMPANY, *et al.*, | ) | Chapter 11 |
|    f/k/a General Motors Corp., *et al.*, | ) | (Jointly Administered) |
| | ) | |
|    Debtors. | ) | |

## ENVIRONMENTAL RESPONSE TRUST
## CONSENT DECREE AND SETTLEMENT AGREEMENT
## AMONG DEBTORS,
## THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE TRUSTEE,
## THE UNITED STATES,
## THE STATES OF DELAWARE, ILLINOIS, INDIANA, KANSAS, MICHIGAN, MISSOURI, NEW JERSEY, NEW YORK, OHIO, WISCONSIN, COMMONWEALTH OF VIRGINIA, THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY, THE MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION, THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE COMMONWEALTH OF PENNSYLVANIA AND THE SAINT REGIS MOHAWK TRIBE

# TABLE OF CONTENTS

I.    DEFINITIONS..................................................................................................6

II.   JURISDICTION .............................................................................................11

III.  PARTIES BOUND; SUCCESSION AND ASSIGNMENT ......................................11

IV.   PURPOSES AND FORMATION OF THE ENVIRONMENTAL
      RESPONSE TRUST .....................................................................................11

             Funding Adjustments ...................................................................17
             Appointment and Duties of the Administrative Trustee ..................22
             Environmental Response Trust Administration and Accounts.........24
             a.    Cleanup and Redevelopment Managers............................24
             b.    Approval of Annual Cleanup Budgets and Emergency
                   Environmental Actions ........................................................26
             c.    Administrative Funding Account.......................................29
             d.    Cushion Funding Account ..................................................32
             e.    Minimum Estimated Property Funding Accounts and Reductions......35
             f.    Reserve Property Funding Accounts and Reductions..........36
             g.    Transfer of Excess Funds in Property Funding Accounts .....37
             .     GM-IFG Syracuse Site.........................................................37
             Sale or Transfer of Environmental Response Trust Property .........38
             Notice of the Sale.........................................................................38
             Criteria for the Sale......................................................................38
             Proceeds from the Sale..................................................................39
             Cleanup as Part of the Sale ...........................................................39
             GMNA Car – Wilmington Site ......................................................40
             Protections from Future Environmental Liability...........................41
             Coordination of Redevelopment and the Environmental Action....43
             Sales of Property After Execution of Settlement Agreement But Prior
             to the Effective Date .....................................................................44
             Audits of the Environmental Response Trust .................................45
             Completion of Environmental Actions ...........................................45
             Access to Property ........................................................................46
             Existing Financial Assurance in Massachusetts .............................46
             Existing Financial Assurance in Illinois ........................................47
             Existing Financial Assurance in Michigan .....................................47
             Disposition of Estate Assets Upon Termination of Trust ...............48
             Miscellaneous Provisions...............................................................49

V.    ALTERNATIVE DISPUTE RESOLUTION ............................................................53

VI.   OUTSTANDING OBLIGATIONS ........................................................................53

VII.     COVENANTS NOT TO SUE ...............................................................55
         Financial Assurance ...........................................................................56

VIII.    RESERVATION OF RIGHTS AND REGULATORY AUTHORITY ......................59

IX.      CONTRIBUTION PROTECTION.................................................................63

X.       PUBLIC COMMENT................................................................................64

XI.      JUDICIAL APPROVAL ............................................................................65

XII.     PLAN .................................................................................................65

XIII.    RETENTION OF JURISDICTION ..............................................................65

XIV.     EFFECTIVENESS OF SETTLEMENT AGREEMENT ..........................................66

XV.      SIGNATORIES/SERVICES ......................................................................66

ATTACHMENT A – Environment Response Trust Property Funding for Environmental
                Actions

ATTACHMENT B – Properties with Existing and Prospective Contracts for Demolition
                Activities

ATTACHMENT C – Environmental Response Trust Agreement

ATTACHMENT D – Motors Liquidation Company Bonds and Insurance Instruments for
                Owned Properties

# ENVIRONMENTAL RESPONSE TRUST
## CONSENT DECREE AND SETTLEMENT AGREEMENT

**WHEREAS**, this Environmental Response Trust Consent Decree and Settlement Agreement (the "Settlement Agreement") is made and entered as of the ___ day of ____, 2010, by and among MOTORS LIQUIDATION COMPANY ("MLC"), formerly known as General Motors Corporation ("General Motors Corp."), Remediation and Liability Management Company, Inc. ("REALM") and Environmental Corporate Remediation Company, Inc. ("ENCORE") (collectively the "Debtors"); the UNITED STATES OF AMERICA (the "United States"); the States of DELAWARE, ILLINOIS, INDIANA, KANSAS, MICHIGAN, MISSOURI, NEW JERSEY, NEW YORK, OHIO, VIRGINIA and WISCONSIN and the LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY, the MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION and DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE COMMONWEALTH OF PENNSYLVANIA, (collectively the "States"); the SAINT REGIS MOHAWK TRIBE (the "Tribe"); and EPLET, LLC, not individually but solely in its representative capacity as Administrative Trustee of the Environmental Response Trust established hereby (the "Administrative Trustee").

**WHEREAS**, on June 1, 2009, General Motors Corp. and three wholly-owned direct or indirect subsidiaries filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court (the "Bankruptcy Court"); then, on October 9, 2009, REALM and ENCORE each filed voluntary petitions for relief under chapter 11 in the Bankruptcy Court. The Debtors' cases are being jointly administered in the Bankruptcy Court. The Debtors' cases are collectively referred to as the "Bankruptcy Cases;"

**WHEREAS**, on June 1, 2009, General Motors Corp. also filed a motion to approve the sale of substantially all of its assets pursuant to 11 U.S.C. § 363;

**WHEREAS**, as part of the sale of assets, General Motors Corp. excluded from the sale certain real property and personalty it owned;

**WHEREAS**, on July 5, 2009, the Bankruptcy Court approved the sale of assets to NGMCO, Inc. (a/k/a Newco), now known as General Motors Company ("New GM");

**WHEREAS**, following the sale of assets, General Motors Corp. was renamed Motors Liquidation Company ("MLC"), and has continued to own and manage the real property assets excluded from the sale to Newco;

**WHEREAS,** the Debtors have environmental liabilities at certain of the properties set forth and defined in Attachment A (the "Properties") and many of those Properties have been and/or will be the subject of environmental response activities and other work;

**WHEREAS**, on June 25, 2009, the Bankruptcy Court, pursuant to Bankruptcy Code Section 363, entered a Final Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (a) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (b) Granting related Liens and Super-Priority Status, (c) Authorizing the Use of Cash Collateral and (d) Granting Adequate Protection to Certain Pre-Petition Secured Parties (the "DIP Order"), pursuant to which the United States Department of the Treasury ("U.S. Treasury") and Export Development Canada ("EDC") lent MLC $950 million in funding under a debtor-in-possession credit agreement ("DIP Loan") for purposes of, among other things, the orderly winding down of MLC's affairs;

**WHEREAS**, on July 5, 2009, the Bankruptcy Court amended the DIP Order and entered an Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (a) Approving Amendment to DIP Credit Facility to Provide for Debtors' Post-Petition Wind-Down Financing, pursuant to which the U.S. Treasury and EDC increased their loan to MLC from $950 million to $1.175 billion in DIP Loan funding for the orderly winding down of MLC's affairs;

**WHEREAS**, the United States on behalf of the Environmental Protection Agency ("U.S. EPA"), the States and the Tribe (U.S. EPA, the States and the Tribe are hereinafter referred to collectively as the "Governments") have alleged that MLC and/or affiliated Debtors are potentially responsible or liable parties with respect to the Properties and surrounding areas where Hazardous Substances have migrated, are continuing to migrate, or otherwise have or will come to be located, and are obliged as an owner of the Properties to comply with applicable law including state and federal environmental laws;

**WHEREAS**, the United States on behalf of U.S. EPA has alleged that it has incurred past response costs, and/or may incur future response costs, under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675, in connection with certain Properties for which Debtors allegedly are liable and that Debtors are liable for all post-petition response costs and the performance of Environmental Actions under CERCLA relating to the Properties as an owner thereof;

**WHEREAS**, the States and the Tribe have alleged that they have incurred past response costs, and/or may incur future response costs, under CERCLA or state environmental laws and, in connection with certain Properties for which Debtors are liable, that Debtors are liable for all post-petition environmental response costs and the performance

of Environmental Actions under CERCLA or state law relating to the Properties as an owner thereof;

**WHEREAS**, the Governments have alleged that the Debtors have liabilities in connection with several of the Properties to implement closure and post-closure work and corrective action work, and perform any necessary action with respect to any imminent and substantial endangerment to health or the environment as required by the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq*. and State environmental statutes, including any permits or orders issued thereunder;

**WHEREAS**, on November 28, 2009, the United States timely filed duplicate copies of a Proof of Claim against MLC both in the Bankruptcy Court and directly with Debtors' claims agent, and the two copies of the identical Proof of Claim were assigned Nos. 67362 and 64064, and on April 16, 2010, filed Proofs of Claim against REALM and ENCORE which were assigned Nos. 70254 and 70255, respectively, (collectively, the "U.S. Environmental Proofs of Claim").  The U.S. Environmental Proofs of Claim protectively set forth, inter alia, claims or causes of action for future work with respect to the Properties, and set forth claims for past costs for the Properties;

**WHEREAS**, various of the States timely filed Proofs of Claim in the Bankruptcy Cases as follows:  Nos. 48416 (Delaware); 44875 (against MLC) and 70228 (against REALM) (Illinois); 59181 (against MLC) (Indiana); 45638 (Kansas); 65349 (Massachusetts Department of Environmental Protection); 60528 (against MLC) and 70233 (against REALM) (Michigan Department of Natural Resources and Environment); 60897 (against MLC), 70235 (against REALM) (Missouri); 44869 and 48352 (New Jersey); 50587 (New York); 50676 (against MLC) and 70234 (against REALM) (Ohio); and 44759 (Wisconsin), which, inter alia,

set forth claims and causes of action under environmental laws in connection with the Properties. Such proofs of claim filed by the States are hereinafter referred to as the "State Environmental Proofs of Claim". Certain of the States' Environmental Proofs of Claim protectively set forth, _inter alia_, claims or causes of action for future work with respect to the Properties, and set forth claims for past costs for the Properties;

WHEREAS, the Tribe timely filed Proof of Claim No. 59086 (against MLC) in the Bankruptcy Cases setting forth claims or causes of action under environmental laws with respect to the Massena, New York Property. The proof of claim filed by the Tribe is hereinafter referred to as the "Tribe Proof of Claim";

WHEREAS, the Tribe Proof of Claim, State Environmental Proofs of Claim and the U.S. Environmental Proofs of Claim are hereinafter referred to collectively as the "Government Proofs of Claim";

WHEREAS, on August 31, 2010, the Debtors filed a chapter 11 Plan of Liquidation ("Plan"), which as amended will annex and incorporate the terms of this Settlement Agreement;

WHEREAS, Debtors and the Governments have agreed to enter into this Settlement Agreement in connection with the Properties as provided herein, which will place certain of the Properties and certain other assets of Debtors into an environmental response trust, to settle, compromise and resolve their disputes relating to the Properties, as provided herein;

WHEREAS, the Governments have agreed to the provisions and language of this Settlement Agreement based on the unique facts and circumstances present in this case, and nothing in this Settlement Agreement shall be treated as having any precedential value in any other bankruptcy;

**WHEREAS**, in consideration of, and in exchange for, the promises and covenants herein, the parties hereby agree to the terms and provisions of this Settlement Agreement;

**WHEREAS**, the obligations undertaken by Debtors pursuant to this Settlement Agreement are in the nature of compromises and it is the position of the Governments that these obligations are less than the Governments would seek in the absence of this settlement; and

**WHEREAS**, this Settlement Agreement is fair, reasonable, and in the public interest, and is an appropriate means of resolving the matters addressed in this Settlement Agreement.

**NOW, THEREFORE**, without the admission of liability or any adjudication on any issue of fact or law, and upon the consent and agreement of the parties by their authorized attorneys and authorized officials, it is hereby agreed as follows:

## I.  DEFINITIONS

1.    Unless otherwise expressly provided herein, terms used in this Settlement Agreement that are defined in CERCLA, RCRA, state environmental law or their respective regulations, or in the Bankruptcy Code shall have the meaning assigned to them in CERCLA, RCRA, state environmental law or their respective regulations, or in the Bankruptcy Code, as applicable.  Whenever terms listed below are used in this Settlement Agreement, the following definitions shall apply:

2.    "Administrative Funding Account" shall mean the funding held by the Environmental Response Trust for the costs necessary for the administration of the Environmental Response Trust and the orderly wind-down of the Properties, including, but not limited to, administrative and personnel costs, including professional and legal fees, security, utilities, maintenance, property taxes, property marketing costs, and demolition costs unrelated to Environmental Actions.  Such funding shall be set aside in separate dedicated subaccounts.

Funds in the Administrative Funding Account shall not be used by the Administrative Trustee to fund any Environmental Action.

3.    "Administrative Funding Reserve Account" shall mean the funding held by the Environmental Response Trust in a separate dedicated account for the express purpose of being used by the Administrative Trustee to fund actual or projected shortfalls in the Administrative Funding Account identified by the Administrative Trustee prior to the third anniversary of the Effective Date.  Such shortfalls are strictly limited to unexpectedly high demolition costs and Property holding costs and unexpectedly low proceeds derived from rental of Properties or proceeds derived from the sale of Properties or personalty.  The Administrative Funding Reserve Account shall not be used under any circumstances to fund any Environmental Action or any administrative or personnel matters, including legal or professional matters.

4.    "Administrative Trustee" shall mean (i) EPLET, LLC, not individually but solely in its representative capacity as Administrative Trustee, by and through Elliott Laws, not individually but solely in his representative capacity as president, manager or managing member of the Administrative Trustee, of the Environmental Response Trust that is created pursuant to this Settlement Agreement, the accompanying Environmental Response Trust Agreement (the "Trust Agreement") and the Debtors' Plan, as detailed in, *inter alia*, Paragraphs 42-44 of this Settlement Agreement, and (ii) any successor thereto.

5.    "Annual Cleanup Budget" shall mean the annual budget for Environmental Actions for each Property including any amendments thereto, as described in, *inter alia*, Paragraphs 43, 44, and 49 through 51 of this Settlement Agreement.

6.   "Cleanup Manager" shall mean an employee of the Environmental Response Trust or the Administrative Trustee with responsibilities for certain Environmental Actions and related activities at Properties located in a specified geographic area, as described in, *inter alia*, Paragraphs 45-47 of this Settlement Agreement.

7.   "Cushion Funding Account" shall mean the funding held by the Environmental Response Trust that is available for Environmental Actions at any of the Properties under the circumstances described in Paragraphs 57 and 58 of this Settlement Agreement.

8.   "Effective Date" shall mean the day on which the Plan becomes effective in accordance with its terms and the Bankruptcy Court's order confirming the Plan.

9.   "Environmental Action" shall mean any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and OMM activities authorized or required under law with respect to a Property.

10.   "Environmental Response Trust" shall mean the Environmental Response Trust created pursuant to this Settlement Agreement, the Trust Agreement, and the Plan.

11.   "Environmental Response Trust Protected Parties" shall mean the Administrative Trustee, individually and/or in its capacity as official representative of the Environmental Response Trust, and the Environmental Response Trust's and the Administrative Trustee's shareholders, members, officers, managers, directors, employees (including but not limited to the Cleanup Managers and the Redevelopment Manager), attorneys, and agents, if any, solely in their capacities as such.  For avoidance of doubt, the Environmental Response Trust is not an Environmental Response Trust Protected Party.

12. "Final Order" shall mean a court order that has not been reversed, stayed, modified, or amended, and as to which (i) the time to appeal, seek review, rehearing or remand, or petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; or (ii) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

13. "Governments" shall mean the United States, the States, and the Tribe.

14. "Hazardous Substances" shall mean all materials, substances, or wastes defined, designated, regulated or classified as hazardous, toxic or radioactive, under any federal or state environmental law, whether by type or by quantity, and shall include but not be limited to petroleum or any derivative or by-product thereof and asbestos-containing materials.

15. "Lead Agency" shall mean the agency designated as such for each Property, as reflected on Attachment A, Column 7 to this Settlement Agreement. For each Property, the Lead Agency shall either be the U.S. EPA, or an agency of the State in which the Property is located. The U.S. EPA and the State in which a Property is located may provide the Administrative Trustee with joint written notice that the Lead Agency for the Property has changed.

16. "Long Term OMM Property Funding Account" shall mean the funding (if any) to be held by the Environmental Response Trust and to be set aside in separate dedicated subaccounts for each Property and preserved for OMM with respect to each Property beginning ten years after the Effective Date.

17. "Minimum Estimated Property Funding Account" shall mean the funding to be held by the Environmental Response Trust, and to be set aside in separate dedicated subaccounts for

each Property, that has been estimated as the minimum amount of funding with respect to Environmental Actions with respect to each Property.

18. "OMM" shall mean operation, monitoring and maintenance activities required as Environmental Action.

19. "Plan" means the Chapter 11 Plan of Liquidation filed by Debtors on August 31, 2010, as amended, modified and supplemented from time to time and incorporating this Settlement Agreement.

20. "Properties" shall mean the 89 properties set forth on Attachment A.

21. "Redevelopment Manager" shall mean the employee of the Environmental Response Trust or the Administrative Trustee with responsibilities relating to the return of Properties to beneficial use, as described in, *inter alia*, Paragraph 48 of this Settlement Agreement.

22. "Reserve Property Funding Account" shall mean the funding to be held by the Environmental Response Trust, and to be set aside in separate dedicated subaccounts for each Property, that has been estimated as an appropriate amount of reserve funding with respect to Environmental Actions with respect to each Property for use in performing Environmental Actions with respect to each Property upon exhaustion of the Minimum Estimated Property Funding Account.

23. "States" shall mean the States (or Commonwealths) of Delaware, Illinois, Indiana, Kansas, Michigan, Missouri, New Jersey, New York, Ohio, Virginia, and Wisconsin, the Louisiana Department of Environmental Quality, the Massachusetts Department of Environmental Protection, and the Department of Environmental Protection of the Commonwealth of Pennsylvania.

24.  "Support Agency" shall mean the agency listed as such for each Property on Attachment A Column 8 to this Settlement Agreement.  Where a State agency is the Lead Agency, U.S. EPA will be the Support Agency; where U.S. EPA is the Lead Agency, a State Agency and/or St. Regis Mohawk Tribe will be the Support Agency or Agencies.

25.  "Tribe" shall mean the Saint Regis Mohawk Tribe.

26.  "United States" shall mean the United States of America, and all of its agencies, departments, and instrumentalities, including the U.S. EPA and the U.S. Treasury.

## II.    JURISDICTION

27.  The Bankruptcy Court has jurisdiction over the subject matter hereof pursuant to 28 U.S.C. §§ 157, 1331, and 1334.

## III.    PARTIES BOUND; SUCCESSION AND ASSIGNMENT

28.  This Settlement Agreement applies to, is binding upon, and shall inure to the benefit of the parties hereto, their legal successors and assigns, and any trustee, examiner or receiver appointed in the Bankruptcy Cases.

## IV.    PURPOSES AND FORMATION OF THE ENVIRONMENTAL RESPONSE TRUST

29.  The purpose of the Environmental Response Trust shall be to conduct, manage and/or fund Environmental Actions with respect to certain of the Properties, including the migration of Hazardous Substances emanating from certain of the Properties, in accordance with the provisions of this Settlement Agreement and the Trust Agreement; to reimburse the Lead Agency for Environmental Actions it conducts or has agreed to pay for with respect to the Properties; to own certain of the Properties, carry out administrative and property management functions related to the Properties and pay associated administrative costs; and to try to sell or transfer the Properties owned by the Environmental Response Trust with the

objective they be put to productive or beneficial use.  The Environmental Response Trust is separate and distinct from the Debtors, and is formed for the purposes expressly set forth herein.

30.  On the Effective Date and simultaneously with the payments to the Environmental Response Trust under Paragraph 32 hereof and pursuant to the Plan, Debtors shall transfer, assign and deliver to the Environmental Response Trust all of their rights, title, and interest in and to each of the Properties, including, without limitation, all of their fee ownership in the Properties and other Environmental Response Trust Assets as defined in the Environmental Response Trust Agreement, including all appurtenances, rights, easements, rights-of-way, mining rights, mineral rights, mineral claims, appurtenant groundwater rights, associated surface water rights, claims, and filings, permits, or other interests, including all personalty, related to the Properties (including without limitation all fixtures, improvements, and equipment located thereon as of the Effective Date).  After the establishment and funding of, and the conveyance of the Properties owned by Debtors to, the Trust as provided in this Settlement Agreement, the Debtors and their successors, assigns, officers, directors and employees in their respective capacities as such shall have no further role or residual interest with respect to the Trust or the Properties other than as expressly provided in Paragraphs 41, 93, 100 through 104 of this Settlement Agreement, nor shall they have any further liability, duty or obligation in connection with the matters resolved in this Settlement Agreement, including all environmental claims and other environmental liabilities asserted in any proof of claim filed by the Governments with respect to the Properties, other than as expressly reserved in Paragraphs 41, 93, 100 through 104 of this Settlement Agreement.  Pursuant to section 1146 of the Bankruptcy Code, the following shall not be subject to any stamp tax, transfer tax,

intangible tax, recording fee, or similar tax, charge, or expense to the fullest extent provided for under the Code: (i) the issuance, transfer, or exchange of any securities, instruments, or documents; (ii) the creation of any lien, mortgage, deed of trust, or other security interest; or (iii) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan or the sale or transfer of any assets of the Debtors into the Environmental Response Trust; any deeds, bills of sale, or assignments executed in connection with and in furtherance of the Plan; the Confirmation Order; this Settlement Agreement; the Trust Agreement; or the Environmental Response Trust, which are being entered into and created in connection with the Plan.

31.    The transfer of ownership of the Properties and personalty to the Environmental Response Trust shall be a transfer pursuant to the Plan of all of the Debtors' rights, title and interests therein, and such transfer of the Properties and personalty (i) shall be as is and where is, with no warranties of any nature whatsoever; (ii) shall, except for any statutory liens for property and ad valorem taxes not yet due and payable against the Properties, to the maximum extent permitted by law, be made free and clear of all claims, liens and interests, including but not limited to liens for the payment of monetary claims, such as property taxes, liens held for costs related to Environmental Actions undertaken prior to the Effective Date, or other monetary claims asserted or that could have been asserted in the Bankruptcy Cases, but shall remain subject to any existing *in rem* claims that do not secure payment of monetary claims (such as easements or deed restrictions), and all liens, claims or security interests of the lenders under the DIP Loan pursuant to the DIP Credit Agreement (as defined in the Plan) and any order of the Bankruptcy Court approving the DIP Credit Agreement, provided, however,

that the Required Lenders (as defined in the DIP Credit Agreement) hereby consent to the sale of all Properties or personalty securing those liens, claims and interests if such sale is made in accordance with the approved annual budget and the provisions of this Settlement Agreement, the Trust Agreement and the Plan; (iii) shall be subject to any rights of the Governments under this Settlement Agreement or the Trust Agreement; and (iv) shall be accomplished by quitclaim deed, in a form substantially similar to the quitclaim deed attached as Exhibit B to the Trust Agreement, and/or personal property bill of sale without warranty, all such conveyance documents to be agreed to in form by the Debtors and the Environmental Response Trust, provided that in no event shall the conveyance include any warranty whatsoever by the grantor by virtue of the grant document or statutory or common law or otherwise. The Debtors, or the entity administering the Plan for the benefit of the creditors, as applicable, shall cooperate with the Governments and the Administrative Trustee to record or cause to be recorded in the appropriate real property records the transfer documents with respect to the Properties within five business days of the Effective Date. Debtors shall pay all property and ad valorem taxes relating to the Properties and other assets owned by the Environmental Response Trust that are due on or prior to the Effective Date (and the Environmental Response Trust shall not be liable for such taxes), and the Environmental Response Trust shall pay all property and ad valorem taxes relating to the Properties and other assets owned by the Environmental Response Trust that are due after the Effective Date. On the Effective Date, the Debtors shall execute and record releases of any liens or security interests held by any of the Debtors or any creditors against any Property, provided, however that the liens or security interests against any Property or personalty held by the Required Lenders under the DIP Loan shall not be released prior to, and shall be released upon, the

Environmental Response Trust's completion of a sale of such Property or personalty. After Debtors execute this Settlement Agreement, Debtors shall not further encumber the Properties or Debtors' other interests therein and shall maintain the Properties, including the improvements thereon and the fixtures thereto that are related to Environmental Actions in the condition that they exist as of the date of such execution, except to the extent that ongoing Environmental Actions require otherwise or, with respect to demolition activities at Properties with existing and prospective contracts for demolition activities listed on Attachment B. Notwithstanding anything to the contrary herein or in the Plan, the lenders under the DIP Credit Agreement shall maintain any and all liens on any Collateral (as defined in the DIP Credit Agreement) and any transfer of that Collateral to the Environmental Response Trust shall not be made free and clear of the liens of the lenders under the DIP Credit Agreement, provided however that the Required Lenders hereby consent to the expenditure or sale of all Collateral securing those liens, claims and interests if such sale is made in accordance with the approved annual budget and the provisions of this Settlement Agreement, the Trust Agreement and the Plan.

32. On the Effective Date, and subject to adjustments as provided in Paragraph 36 of this Settlement Agreement as applicable, Debtors shall make a payment to fund the Environmental Response Trust in the amount of no less than $641,434,945; and the Debtor shall pay or cause to be paid to the Expendable Trust as defined in Paragraph 79 of this Agreement in the amount of $786,944, and the 807 Trust Fund as defined in Paragraph 80 of this Agreement in the amount of $102,390. The Environmental Response Trust funding amount consists of (i) a Minimum Estimated Property Funding Account containing funding with respect to each Property as set forth on Attachment A Column 2 attached hereto and totaling $295,036,131,

(ii) a Reserve Property Funding Account containing funding with respect to each Property as set forth on Attachment A Column 3 attached hereto and totaling $52,065,197, (iii) a Long Term OMM Property Funding Account containing funding (if any) for each Property as set forth in Attachment A Column 4 attached hereto and totaling $84,099,794; (iv) the Cushion Funding Account totaling $68,233,823; (v) the Administrative Funding Account in an amount of no less than $102 million; and (vi) the Administrative Funding Reserve Account totaling $40 million.

33. Environmental Response Trust funding of the Minimum Estimated Property Funding Accounts, Reserve Property Funding Accounts, and Long Term OMM Property Funding Accounts shall be held in trust in segregated trust subaccounts for each Property as provided in this Settlement Agreement and the Trust Agreement. Environmental Response Trust funding with respect to the Administrative Funding Account and the Cushion Funding Account each shall be held in trust in a segregated trust subaccount as provided in this Settlement Agreement. Funding from a subaccount for a Property may not be used for another Property except as otherwise expressly provided by and in accordance with this Settlement Agreement.

34. All interest earned in a subaccount shall be retained in such subaccount and used only for the same purposes as the principal in that subaccount as provided in this Settlement Agreement, subject to any reallocation provided for in accordance with the terms of this Settlement Agreement.

35. Notwithstanding any other provision of this Settlement Agreement or the Trust Agreement, "separately dedicated subaccounts" may be accomplished by accounting entries and nothing herein shall preclude the Administrative Trustee from commingling funds solely

for investment or administrative purposes, provided, however, that the Administrative Funding Account and Administrative Reserve Funding Account shall not be commingled with any other accounts under any circumstances.

Funding Adjustments.

36.  (a) The amount of funding provided with respect to any Property in the Minimum Estimated Property Funding Account and Reserve Property Funding Account shall be reduced on the Effective Date to reflect actual expenditures by the Debtors at the Property for third party contractor costs for Environmental Actions at the Property (1) that were paid by Debtors between July 1, 2010, and October 31, 2010, except to the extent already credited under Attachment A, provided that the costs for which the Debtors are seeking reduction were approved in writing by the Lead Agency (including approval of an estimate of such costs), and (2) any actual expenditures by the Debtors at the Property for third party contractor costs for Environmental Actions with respect to a Property between November 1, 2010 and the Effective Date will be a reduction provided that such costs were pre-approved in writing by the Lead Agency (including pre-approval of an estimate of such costs).  In no event shall any reductions be made for Environmental Actions performed by Debtors between July 1, 2010, and the Effective Date that exceed either the cost for them in the Property's Minimum Estimated Property Funding Account or Reserve Property Funding Account or any approval or pre-approval of such costs.  Following completion of any such Environmental Action and payment thereof, Debtors shall provide documentation to the Lead Agency of the exact amount of the expenditure.  In no event shall reductions be made for expenditures of Debtors that are not reimbursements of expenditures for and payments to third party contractors.  In no event shall reductions be made for expenditures of Debtors on any property that is not related

to a Property set forth on Attachment A hereto.  Any reductions or payments under this Paragraph are subject to the approval in writing of the Lead Agency that the reductions or payments are consistent with this Paragraph.  Any disputes under this Paragraph shall be resolved by the Bankruptcy Court.

(b) The amount of funding provided with respect to the Administrative Funding Account shall be adjusted on the Effective Date to reflect actual expenditures by the Debtors, as a result of any delay in the Effective Date beyond December 31, 2010, for administrative costs that were part of Debtors projected budget for the Administrative Funding Account. Such adjustment shall be subject to the approval of the U.S. Treasury.

37.   Debtors shall, on or before the Effective Date, directly reimburse a Lead Agency for costs expended by the Lead Agency for Environmental Actions with respect to a Property between June 1, 2009 and December 31, 2010 for Properties transferred to the Environmental Response Trust by MLC, or October 9, 2009 and December 31, 2010 for Properties transferred to the Environmental Response Trust by REALM or ENCORE, provided that (i) the applicable Debtor, the Lead Agency, and U.S. Treasury agree that the costs for which the Lead Agency is seeking reimbursement were included in the Property's Minimum Estimated Property Funding Account or Reserve Property Funding Account or were for Emergency Environmental Actions within the meaning of Paragraph 49; and (ii) the amount of funding provided with respect to any Property in the Minimum Estimated Property Funding Account and Reserve Property Funding Account is reduced on the Effective Date to reflect actual payments made by the Debtors to the Lead Agency.  In the event of a dispute between the relevant Debtor, the United States, and/or Lead Agency regarding the Debtor's reimbursement of costs incurred by the Lead Agency as provided for in this Paragraph, the Bankruptcy Court

shall resolve the dispute. Any costs expended by the Lead Agency for Environmental Actions with respect to a Property between January 1, 2011 and the Effective Date will be included in, and reimbursed by the Trust after the Effective Date pursuant to the Property's first approved Annual Cleanup Budget provided that those costs were included in the Property's Minimum Estimated Property Funding Account or Reserve Property Funding Account or were for Emergency Environmental Actions within the meaning of Paragraph 49. Under no circumstances will the Debtors or the Environmental Response Trust under this Paragraph pay any costs expended by the Governments in connection with any work relating to Debtors' bankruptcy proceedings.

38. The United States shall be the sole beneficiary of the Environmental Response Trust.

39. The United States, the States, and the Tribe shall have the rights and powers set forth in this Settlement Agreement and the Trust Agreement, and nothing shall limit their ability to enforce those rights and powers, including but not limited to (i) the right to file suit against Debtors or the Administrative Trustee for failure to fund on the Effective Date the Environmental Response Trust's Minimum Estimated Property Funding Accounts, Reserve Property Funding Accounts, Long Term OMM Property Funding Accounts and Cushion Funding Account as set forth in this Settlement Agreement; (ii) the right to file suit against the Environmental Response Trust or the Environmental Response Trust Protected Parties at any time for fraud or willful misconduct (with all funds recovered in any such action to be restored to the Environmental Response Trust subaccount from which they were taken); or (iii) the right to file suit against the Administrative Trustee as set forth in Paragraphs 50, 101, 102, and 103 of this Settlement Agreement, provided, however, that the Bankruptcy Court shall have exclusive jurisdiction over any issues relating to (a) approval of budgets and

expenditures of budgeted funds (provided further however, that if the Administrative Trustee enters into a consent decree or administrative order on consent, then the Governments may enforce the expenditure of budgeted funds to comply with such consent decree or administrative order on consent in other courts having jurisdiction), (b) changes to a Property's Minimum Estimated Property Funding, Reserve Property Funding and Long Term OMM Property Funding, if any, (c) access to Cushion Funding Account funds, (d) disputes involving the Administrative Funding Account, or (e) the removal of the Administrative Trustee.  Notwithstanding the foregoing, in no event shall the Environmental Response Trust Protected Parties be personally liable for any monetary damages other than for a finding of fraud or willful misconduct by Final Order, except as otherwise agreed in writing by the relevant Environmental Response Trust Protected Parties.

40.   The Environmental Response Trust shall have no objective or authority to engage in any trade or business.  The sale, lease or other disposition of some or all of a Property by the Environmental Response Trust shall not be deemed an engagement in any trade or business. The Environmental Response Trust, by and through its Administrative Trustee, the Debtors, and the Lead Agency for each of the Properties shall exchange information and reasonably cooperate to determine the appropriate disposition of any executory contracts or unexpired leases that relate to the relevant Property.

41.   With the exception of documents and information relating to the Properties and other assets of the Environmental Response Trust, including but not limited to personalty, stored at the facilities of Iron Mountain Inc. (the "Iron Mountain Documents"), no later than January 1, 2011, and at such earlier time as may be practicable, Debtors shall provide to the Administrative Trustee copies of or access to all documents and other materials in the care,

custody or control of Debtors, their professionals, consultants and/or contractors that: (i) contain or relate to environmental information regarding the Properties and other assets of the Environmental Response Trust, including but not limited to personalty, (e.g., field notes, data packages, historical documentation, cost estimations, summaries, other information, and databases including but not limited to all data included in the IDEA database, models, cost estimates, reports, correspondence, etc.); (ii) contain or relate to non-environmental information concerning the management of the Properties and other assets of the Environmental Response Trust, including but not limited to personalty, or prospective sale or other disposition of the Properties and other assets of the Environmental Response Trust, including but not limited to personalty; and (iii) contain or relate to any information concerning the implementation of and the spending of money associated with MLC's 10-Year Plan of Liquidation Financial Forecast as it relates to the Properties.  Prior to 30 days after the Effective Date, Debtors shall transmit all such documents and materials not already in the possession of the Administrative Trustee to the Administrative Trustee, and upon the Effective Date the Environmental Response Trust shall become the owner of the information in the IDEA database related to the Properties.  With respect to the Iron Mountain Documents, (i) prior to January 1, 2011, Debtors will undertake reasonable efforts to reach agreement with New GM on a process to transfer any Iron Mountain Documents requested by the Administrative Trustee to the Environmental Response Trust no later than July 31, 2011; and (ii) on the Effective Date, Debtors shall transfer all their rights to the Iron Mountain Documents, including their rights to copies of and access to such documents to the Administrative Trustee.  The United States shall provide to the Administrative Trustee, the States and the Tribe: (a) The Brattle Group, Inc.'s ("Brattle's") tables showing the estimated

timing and amount of future costs for Environmental Actions by Property; (b) Brattle's updated spreadsheet showing the estimated timing and amount of future costs for Environmental Actions by Property as of August 13, 2010; (c) cost backup documents in Brattle's possession not provided in the data included in the IDEA database; and (d) Brattle's Environmental Action summaries for the Properties.

Appointment and Duties of the Administrative Trustee.

42. EPLET, LLC, not individually but solely in its representative capacity as Administrative Trustee, by and through Elliott Laws, not individually but solely in his representative capacity as president, manager or managing member of the Administrative Trustee, is appointed as the Administrative Trustee to administer the Environmental Response Trust in accordance with this Settlement Agreement and the Trust Agreement substantially in the form attached hereto as Attachment C. The term of the Administrative Trustee shall be for five years at which time the Administrative Trustee may be re-appointed or terminated by the Bankruptcy Court upon recommendation by the United States after consultation with the States and the Tribe. The Bankruptcy Court may remove the Administrative Trustee prior to the end of its five-year term for "good cause" shown by the United States or any of the States, and appoint a new Administrative Trustee upon recommendation by the United States after consultation with the States and the Tribe. "Good cause" in this context shall mean a finding by the Bankruptcy Court that the Environmental Response Trust Administrative Trustee (i) committed fraud or willful misconduct after the Effective Date in relation to the Environmental Response Trust Administrative Trustee's duties under the Environmental Response Trust; (ii) has in any material respect, as a result of negligence, exacerbated conditions at any of the Properties; (iii) has been seriously or repeatedly deficient or seriously or repeatedly negligent or late in

the performance of its duties, or (iv) has violated the provisions of this Settlement Agreement or the Trust Agreement.

43. The Administrative Trustee shall be responsible for implementing the purposes of the Environmental Response Trust, including overseeing the development of budgets, retaining and overseeing professionals to conduct Environmental Actions, entering into and overseeing the implementation of all contracts binding the Environmental Response Trust, executing agreements, preparing and filing all required plans and reports with the Lead Agencies, handling accounting and legal matters for the Environmental Response Trust, establishing funding objectives, monitoring the performance of the Cleanup and Redevelopment Managers and other administrative tasks. The Administrative Trustee shall, consistent with the terms of this Settlement Agreement, the Trust Agreement and the approved cleanup budgets for Properties, conduct, manage and/or fund Environmental Actions with respect to the Properties; arrange for the implementation of certain Environmental Actions with respect to Properties; reimburse the Lead Agency for Environmental Actions with respect to a Property consistent with the approved Annual Cleanup Budget; manage the Properties and pay associated administrative costs; manage and allocate funds in the Minimum Estimated Property Funding Accounts, Reserve Property Funding Accounts, Long Term OMM Property Funding Accounts, the Administrative Funding Account and the Cushion Funding Account; and seek to sell or transfer the Properties so that they can be put to productive or beneficial use.

44. The Administrative Trustee is authorized to expend funds from the Minimum Estimated Property Funding Account, the Reserve Property Funding Account, and the Long Term OMM Property Funding Account so long as all such expenditures are consistent with the terms of

this Settlement Agreement, the Trust Agreement and the approved Annual Cleanup Budget described in Paragraphs 49 and 50 of this Settlement Agreement and the Trust Agreement.

Environmental Response Trust Administration and Accounts

a. Cleanup and Redevelopment Managers

45.  The Environmental Response Trust or Administrative Trustee shall employ a Cleanup Manager for (a) the Properties in the State of Michigan, (b) the Properties in the State of New York, (c) the Properties in the States of Delaware, Louisiana and Ohio and the Commonwealths of Massachusetts, Pennsylvania, and Virginia, collectively, and (d) the Properties in the States of Illinois, Indiana, Kansas, Missouri, New Jersey and Wisconsin, collectively.  The Cleanup Managers' compensation and expenses will be paid from the Administrative Funding Account.  Each Cleanup Manager shall be subject to the disapproval of the applicable Lead Agencies.  The Lead Agency may request that the Administrative Trustee replace the Cleanup Manager whose responsibilities include the Properties within the Lead Agency's jurisdiction.  Each Cleanup Manager will report to and be subject to the supervision of the Administrative Trustee and will be responsible for working with the Lead Agencies to arrange for the implementation of Environmental Actions at each Property consistent with the approved Annual Cleanup Budget.  The Administrative Trustee may replace the Cleanup Manager at any time, provided that the new Cleanup Manager is subject to the disapproval of the applicable Lead Agencies.

46.  The Administrative Trustee may delegate to the Cleanup Managers the authority to enter into contracts without the written authorization of the Administrative Trustee provided that (i) the total amount of the contract does not exceed $100,000 or, in the case of the Massena Property, $250,000; (ii) the terms of such contracts are consistent with approved Annual Cleanup Budgets for the Properties ; (iii) the terms of such contracts are consistent with this

Settlement Agreement and the Trust Agreement; (iv) the Cleanup Manager provides a copy of such contract to the Administrative Trustee upon execution of the contract; and (v) the Cleanup Manager keeps the Administrative Trustee apprised of all matters relating to such contracts. Where the above requirements are met, each Cleanup Manager has the discretion to enter into contracts for periods longer than one year where appropriate to maximize the efficiency or effectiveness of remediation. The Administrative Trustee and/or Cleanup Manager shall require appropriate liability insurance from each contractor or consultant hired to perform work.

47. The Lead Agency may require the use of competitive bidding for the selection of Environmental Action contractors and consultants. The Lead Agency shall have the right to disapprove the selection of an Environmental Action contractor or consultant for good cause. To the extent a Lead Agency maintains an approved list of Environmental Action contractors or consultants, it shall be good cause for a Lead Agency's disapproval of the selection of an Environmental Action contractor or consultant if that contractor or consultant is not on the Lead Agency's approved list. The Lead Agency may require that an Environmental Action contractor or consultant working at a Property on the Effective Date be utilized, provided that the continued use of the contractor or consultant would be cost effective. No earlier than four (4) years from the Effective Date, and at any time thereafter in connection with the Annual Cleanup Budget process, the Administrative Trustee may propose the reduction of the number of Cleanup Managers and/or the reallocation of the Properties for which each Cleanup Manager is responsible, if such reduction and/or reallocation would be cost effective. Such proposal shall be subject to the approval of the applicable Lead Agencies, which shall not be unreasonably withheld.

48.  The Environmental Response Trust or Administrative Trustee shall employ a Redevelopment Manager who will report to and be subject to the supervision of the Administrative Trustee and will assist the Administrative Trustee in dealing with the sale, lease or redevelopment of the Properties owned by the Environmental Response Trust.  The Redevelopment Manager's duties will include consulting with applicable federal and state officials working on redevelopment issues and affected communities where the Property is located.  The Redevelopment Manager's compensation and expenses will be paid from the Administrative Funding Account.

        b.      <u>Approval of Annual Cleanup Budgets and Emergency Environmental Action</u>.

49.  (i) Each Cleanup Manager shall, under the supervision of the Administrative Trustee, develop a proposed Annual Cleanup Budget with respect to each Property under its control detailing expenditures for Environmental Actions that are consistent with the funding available for such Property and the terms of this Settlement Agreement and the Trust Agreement.  The Annual Cleanup Budget for each Property shall include work to be undertaken in the upcoming year and shall include projections of work to occur during the following years to ensure continuity of work.  The work to be undertaken may be work to be performed by the Environmental Response Trust or work to be performed by the Lead Agency and reimbursed by the Environmental Response Trust provided that the work performed by the Lead Agency is consistent with the approved cleanup budget.  The Administrative Trustee shall review and, if necessary, revise the proposed Annual Cleanup Budget to ensure sufficient funding with respect to the budgeted Environmental Action.  The Administrative Trustee shall provide each proposed Annual Cleanup Budget to the appropriate Lead Agency for approval which shall not be unreasonably withheld.  During the

course of a budgeted year, the Lead Agency may request, or the Administrative Trustee may propose for the Lead Agency's approval, which shall not be unreasonably withheld, the amendment of the approved Annual Cleanup Budget for a Property to provide additional funding consistent with applicable requirements under environmental law and taking into account the funding available for Environmental Actions with respect to the Property. The Administrative Trustee shall provide a copy of any proposed budget or amendment and any approved budget or amendment to the Support Agency, which may provide comments to the Administrative Trustee and the Lead Agency. The Support Agency shall not have standing to challenge the budget.

(ii) In the event of an emergency at a Property requiring the performance of an Environmental Action within hours or days of the Administrative Trustee first receiving notice of the emergency, if the emergency does not permit sufficient time to amend the Annual Budget for that Property, the Administrative Trustee may utilize funding from the Property's Minimum Estimated Property Funding Account and/or Reserve Property Funding Account to undertake the Environmental Actions necessary to respond to the emergency (the "Emergency Environmental Actions"). If the Administrative Trustee does not undertake an Emergency Environmental Action, the Administrative Trustee may reimburse the Lead Agency (or the Support Agency, if the Lead Agency and Administrative Trustee concur in writing and the concurrence of the Trustee shall not be unreasonably withheld) for such Emergency Environmental Action from the Property's Minimum Property Funding Account or Reserve Property Funding Account provided that the Administrative Trustee and the Lead Agency (or Support Agency) agree in advance to a cap in the total amount of the funding, which must be sufficient to maintain flexibility to address conditions in the field, for such

Emergency Environmental Action, and further provided that sufficient funds to cover the Emergency Environmental Action remain in the Property's Minimum Property Funding Account and/or Reserve Property Funding Account. Nothing in this subparagraph shall preclude the payment or reimbursement of the Emergency Environmental Action through the annual budget or budget amendment process.

50. If the Lead Agency and the Administrative Trustee are unable to resolve any dispute relating to the approval of the Administrative Trustee's proposed Annual Cleanup Budget or any proposed amendment thereto, then the Lead Agency or Administrative Trustee may petition the Bankruptcy Court to resolve the dispute. Where the potential impact of the dispute is unlikely to cause the ultimate cost of the Environmental Action to exceed the funds in the Minimum Estimated Property Funding Account and the Reserve Property Funding Account, then the Bankruptcy Court shall decide the petition based on the totality of the evidence and the Administrative Trustee will bear the burden of proving by a preponderance of the evidence that (i) the Lead Agency's disapproval of the Annual Cleanup Budget, (ii) the Lead Agency's disapproval of a request by the Administrative Trustee to amend the approved Annual Cleanup Budget, or (iii) the Lead Agency's request for an amendment to the approved Annual Cleanup Budget was unreasonable. If the Lead Agency and the Administrative Trustee are unable to resolve the dispute where the potential impact of the dispute could reasonably be expected to cause the ultimate cost of the Environmental Action to exceed the funds in the Minimum Estimated Property Funding Account and the Reserve Property Funding Account, then the Bankruptcy Court shall decide the petition based on the totality of the evidence and the Lead Agency shall bear the burden of proving by clear and convincing evidence that (a) its disapproval of the proposed Annual Cleanup Budget, (b) its disapproval

of an amendment to the Annual Cleanup Budget, or (c) its request for an amendment to the approved Annual Cleanup Budget is based on material information, a material event, or a material condition at the Property that was not reasonably foreseeable at the time the Lead Agency and/or Support Agency participated in the development of the funding with respect to the Property. If the Administrative Trustee fails to fund the work provided for in the approved Annual Cleanup Budget or the approved amended Annual Cleanup Budget, or fails to reimburse the Lead Agency for performing such work, then the Lead Agency has the right to file suit against the Administrative Trustee in his official capacity in the Bankruptcy Court in accordance with the terms of this Settlement Agreement and the Trust Agreement. In no event shall the Environmental Response Trust Protected Parties be personally liable for any monetary damages other than for a finding of fraud or willful misconduct by Final Order.

51. Upon agreement of the Lead Agency and the Administrative Trustee, the Lead Agency and Administrative Trustee shall engage in non-binding informal dispute resolution prior to petitioning the Bankruptcy Court to resolve any dispute over the proposed Annual Cleanup Budget or a request that the approved Annual Cleanup Budget be amended.

        c. <u>Administrative Funding Account</u>.

52. The Administrative Trustee shall administer the Administrative Funding Account and the Administrative Funding Reserve Account. The purpose of the Administrative Funding Account is to provide funding with respect to costs necessary for the administration of the Environmental Response Trust and the orderly wind-down of the Properties, including, but not limited to, administrative and personnel costs, including professional and legal fees, and Property holding costs (security, utilities, maintenance, property taxes), Property marketing costs, and demolition costs unrelated to Environmental Actions. The Administrative Funding

Account shall be partially funded on the Effective Date in an amount no less than $102 million subject to adjustments as provided in Paragraph 36, and partially funded from income derived from the sale and/or lease of the Properties and the sale and/or lease of other assets, such as fixtures, improvements, and equipment located on the Properties as of the Effective Date that are not necessary to conduct or complete Environmental Actions. The Administrative Trustee shall develop an annual budget for all expenditures from the Administrative Funding Account based on the most cost-effective use of the funds. The Administrative Trustee shall provide a copy of the annual budget for the Administrative Funding Account to the U.S. Treasury for approval. Each approved administrative budget shall include line items for emergency and unanticipated expenditures. After approval, the Administrative Trustee shall provide a copy of the approved annual budget for the Administrative Funding Account to the United States, the States, and the Tribe. The Administrative Trustee is authorized to expend Administrative Funding Account funds consistent with the terms of this Settlement Agreement, the Trust Agreement, the Budget (as defined in the Plan) and the approved annual budget described in this Paragraph.

53. The purpose of the Administrative Funding Reserve Account is to fund actual or projected shortfalls in the Administrative Funding Account identified by the Administrative Trustee prior to the third anniversary of the Effective Date. Such shortfalls are strictly limited to unexpectedly high demolition costs and Property holding costs and unexpectedly low proceeds derived from rental of Properties or proceeds derived from the sale of Properties. The Administrative Funding Reserve Account shall be funded on the Effective Date in an amount totaling $40 million and shall not be used under any circumstances to fund any Environmental Action or any administrative or personnel matters, including legal and

professional fees, other than as provided for under this Paragraph.  In no event shall any disbursements be made from the Administrative Funding Reserve Account without prior approval by the U.S. Treasury.  In the event that the Administrative Trustee's application for funding from the Administrative Funding Reserve Account is approved by the U.S. Treasury, the approved amount in Administrative Reserve Funding shall be transferred to the Administrative Funding Account and shall be subject to all provisions otherwise applicable to Administrative Funding.  Any funds remaining in the Administrative Funding Reserve Account after the third anniversary of the Effective Date shall be returned to the U.S. Treasury.

54.  On or before the third anniversary of the Effective Date and semi-annually thereafter, the Administrative Trustee shall, in consultation with the U.S. Treasury, determine whether the amounts in the Administrative Funding Account exceed the amount of funds necessary to complete the tasks enumerated in Paragraph 52 of this Settlement Agreement.  If the Administrative Trustee makes such a determination, it shall reduce the amounts in the Administrative Funding Account and transfer such funds to the U.S. Treasury and Canada. The amount and basis for any such reductions will be provided in writing to the U.S. Treasury and Canada with copies to U.S. EPA, the States, and the Tribe no fewer than ten days prior to the proposed reduction and transfer.  The U.S. Treasury and Canada may petition the Bankruptcy Court for relief relating to the failure by the Administrative Trustee to follow the budget for the Administrative Funding Account or to make reductions and transfers in accordance with this section.  The Bankruptcy Court shall decide the petition based on the totality of all of the evidence submitted.  Notwithstanding anything to the contrary herein, in the Plan or in the Bankruptcy Court's order confirming the Plan, in the event any cash funding

remains in the Administrative Funding Account and Administrative Funding Reserve Account after all obligations imposed on the Environmental Response Trust and the Administrative Trustee pursuant to this Settlement Agreement, the Trust Agreement, and the Plan have been satisfied, the Administrative Trustee shall pay the remaining cash funding to the U.S. Treasury and EDC by wire transfer or immediately available funds to an account designated by the U.S. Treasury and EDC respectively, ratably in accordance with their respective interests in the DIP Credit Agreement Claims (as defined in the Plan).

        d.  <u>Cushion Funding Account</u>.

55.  The Administrative Trustee shall administer the Cushion Funding Account.  The purpose of the Cushion Funding Account is to provide portfolio-wide backup funding with respect to any of the Properties where the Minimum Estimated Property Funding and Reserve Property Funding have been exhausted, or the Long Term OMM Property Funding has been exhausted, and additional funding is necessary to undertake or complete the Environmental Action.  An additional purpose of the Cushion Funding Account is to provide funding with respect to Properties where no funding is allocated and unforeseeable conditions are discovered or arise which require funding to undertake Environmental Action.  The Governments have entered into this Settlement Agreement and the Trust Agreement in significant reliance on the availability of the Cushion Funding Account for any of the Properties.  In order to preserve funding in the account, there shall be a presumption against using Cushion Funding absent the showing set forth below.  This standard shall not apply to a shortfall in the Long Term OMM Property Funding with respect to a Property.

56.  For purposes of this Paragraph as well as Paragraphs 50, 55, 57, 58 and 60, in deciding whether information, an event, or condition was reasonably foreseeable at the time the Lead

Agency and/or Support Agency participated in the development of the Minimum Estimated Property Funding amounts and Reserve Property Funding amounts for a Property within the meaning of Paragraphs 50, 57, 58, and 60, the following shall not be considered to have been reasonably foreseeable: (i) remedy failure; or (ii) the discovery of significant unknown contamination requiring a material change in the scope of an Environmental Action, including, but not limited to, a material change in the amount or toxicity of known contamination. In deciding whether information, an event, or condition was reasonably foreseeable at the time the Lead Agency and/or Support Agency participated in the development of the Minimum Estimated Property Funding amounts and Reserve Property Funding amounts for a Property, the Administrative Trustee shall consider the Lead Agency's submissions to the Administrative Trustee, the data included in the IDEA database, all documents or other materials provided to the Environmental Response Trust by the United States as required by Paragraph 41 of this Settlement Agreement, and any information provided to the Environmental Response Trust by the Debtors as required by Paragraph 41 of this Settlement Agreement to the extent this information was provided to or exchanged with the relevant Governments at the time they participated in connection with the development of the Minimum Estimated Property Funding amounts and Reserve Property Funding amounts for the Property.

57. The Administrative Trustee shall determine if it is appropriate for funds from the Cushion Funding Account to be included in the proposed Annual Cleanup Budget. The Administrative Trustee's decision shall be based on the following criteria: (i) the Minimum Estimated Property Funding and Reserve Property Funding has been exhausted or will be exhausted during the year covered by the proposed Annual Cleanup Budget; (ii) the basis for additional

funds is directly related to material information, a material event or a material condition at the Property that was not reasonably foreseeable at the time the Lead Agency and/or Support Agency participated in the development of the Minimum Estimated Property Funding and Reserve Property Funding with respect to the Property; and (iii) the funds in the Cushion Funding Account are sufficient to address the Lead Agency's request and any other budget requests for other Properties made for that calendar year. It is acknowledged that unforeseeable conditions may be discovered or arise at a Property resulting in increased costs of Environmental Actions. Remedy failure or the discovery of significant unknown contamination requiring a material change in the scope of response action which did not form the basis of the Minimum Estimated Property and Reserve Property Funding shall not be considered reasonably foreseeable within the meaning of this Section. In the event that, within ten years after the Effective Date, the Minimum Estimated Funding and Reserve Funding with respect to a Property have been exhausted and no Cushion Funding is available, but Long Term OMM Property Funding with respect to the Property remains, the Long Term OMM Property Funding shall become available to fund Environmental Actions with respect to the Property.

58. A Lead Agency may request in writing that the Administrative Trustee include funds from the Cushion Funding Account in the Annual Cleanup Budget for a Property. If the Administrative Trustee denies such a request, it shall provide the requesting Lead Agency with written notice of its decision for such denial. If the Lead Agency and the Administrative Trustee are unable to resolve the dispute within a reasonable time, either party may petition the Bankruptcy Court to resolve the dispute. The Bankruptcy Court shall decide the petition on the totality of the evidence submitted and the Lead Agency bears the burden of proving by

clear and convincing evidence that the funding request is necessary because the basis for additional funds is directly related to material information, a material event or a material condition at the Property that was not reasonably foreseeable at the time Lead Agency and/or Support Agency participated in the development of the Minimum Estimated Property Funding and Reserve Property Funding with respect to the Property. The sole exception to this standard is if the Long Term OMM Property Funding has been exhausted. If the Long Term OMM Property Funding has been exhausted, then the Bankruptcy Court will decide the petition based on the totality of all of the evidence submitted.

59. Any decision by the Administrative Trustee to expend Cushion Funding Account funds pursuant to an Annual Cleanup Budget shall be provided to all of the Lead and Support Agencies thirty days in advance of the date on which the Administrative Trustee intends to use such funds, unless such funds are intended to be used on an emergency basis to respond to an imminent and substantial endangerment to human health or the environment, in which case written notice shall be provided as soon as practical. A Lead or Support Agency has standing to challenge the Administrative Trustee's decision to use Cushion Funding Account funds and may petition the Bankruptcy Court to resolve the dispute. The Bankruptcy Court shall decide the petition on the totality of the evidence submitted and the Lead or Support Agency challenging the decision shall bear the burden of proving by clear and convincing evidence that the Administrative Trustee's decision was arbitrary and capricious.

     e.  <u>Minimum Estimated Property Funding Accounts and Reductions</u>.

60. The Governments have entered into this Settlement Agreement and the Trust Agreement in significant reliance on the availability of the Minimum Estimated Property Funding Account provided for each Property. There shall be a presumption against any reductions in

amounts allocated for each Property absent the showing as set forth below.  Any time after three years from the Effective Date, the Administrative Trustee may reduce the amount of the Minimum Estimated Property Funding Account for a Property if it determines that the basis for reducing the funds is directly related to material information, a material event or a material condition at the Property that was not reasonably foreseeable at the time the Lead Agency and/or Support Agency participated in the development of the Minimum Estimated Property Funding with respect to the Property.  Prior to reducing the Minimum Estimated Property Funding Account for a particular Property, the Trustee must provide thirty days advance written notice to the Lead Agency and Support Agency for the Property, setting forth the basis for reducing the funding.  If the Lead Agency or Support Agency disputes the Administrative Trustee's proposed reduction, and the parties are unable to resolve the dispute, then the Administrative Trustee may petition the Bankruptcy Court to allow the reduction.  The Bankruptcy Court shall decide the petition based on the totality of the evidence submitted and the Administrative Trustee shall bear the burden of proving by clear and convincing evidence that the proposed reduction in the Minimum Estimated Property Funding Account for a particular Property is directly related to material information, a material event or a material condition at the Property that was not reasonably foreseeable at the time the Lead Agency and/or Support Agency participated in the development of the Minimum Estimated Property Funding with respect to the Property.

f.  Reserve Property Funding Accounts and Reductions.

61.  The Governments have entered into this Settlement Agreement and the Trust Agreement in significant reliance on the availability of the Reserve Property Funding Account provided for each Property.  Any time after three years from the Effective Date, the Administrative

Trustee may reduce the Reserve Property Funding Account for a Property based upon circumstances that changed from the time the funding was established for the Property. Prior to reducing the Reserve Property Funding Account for a particular Property, the Trustee must provide thirty days' advance written notice to the Lead Agency and the Support Agency for the Property, setting forth the basis for reducing the funding. If the Lead Agency or the Support Agency disputes the Administrative Trustee's proposed reduction, and the parties are unable to resolve the dispute, then the Administrative Trustee may petition the Bankruptcy Court to allow the reduction. The Bankruptcy Court shall decide the petition based on the totality of the evidence that the proposed reduction leaves sufficient funding to complete the Environmental Action with respect to such Property.

g.  Transfer of Excess Funds in Property Funding Accounts.

62.  The Administrative Trustee shall transfer any agreed-to or Bankruptcy Court-approved reduction in the Minimum or Reserve Property Funding Account for any Property to the Minimum or Reserve Property Funding Account for one or more other Properties in the same State where Cushion Funding is being used or will be used in the foreseeable future to fund Environmental Actions (any dispute about the amount of transfer of funds under this Paragraph to multiple properties in the same state shall be subject to the provisions of Paragraph 91). If there are no Properties in the same State where Cushion Funding is being used or will be used in the foreseeable future, the excess funds shall be transferred to the Cushion Funding Account.

63.  GM-IFG Syracuse Site.  The funding with respect to the IFG Syracuse Site from the Minimum Estimated Property Funding Account and the Reserve Property Funding Account shall be allocated in the following manner: $22,573,341 for remediation within the IFG

Syracuse facility property boundaries and $8,548,471 for the property extending from the facility property boundaries to the Route 11 Bridge. In the event that the existing building structure at the GM-IFG Syracuse Site in New York is demolished or partially demolished, thereby (i) eliminating the need for Long Term OMM Property Funding budgeted for vapor intrusion mitigation, soils management, and interim soils removals, and (ii) requiring additional Environmental Actions not included in the Property's funding estimates, the Administrative Trustee shall transfer the amount of any remaining Long Term OMM Property Funding budgeted for vapor intrusion mitigation, soils management, and interim soils removals no longer required due to the demolition or partial demolition from the Property's Long Term OMM Property Funding Account to the Property's Minimum Estimated Property Funding Account so that this funding becomes available to pay for the additional Environmental Actions required by the demolition. Upon transfer of the funding to the Property's Minimum Estimated Property Funding Account, all other provisions applicable to Minimum Estimated Property Funding, including the provisions set forth in Paragraph 61, shall apply.

Sale or Transfer of Environmental Response Trust Property.

64. Notice of the Sale. Any Property owned by the Environmental Response Trust may be sold or transferred by the Administrative Trustee after the Administrative Trustee provides thirty days' advance written notice of an intent to sell such Property to, and consults with, the United States, the relevant State, the Tribe, if applicable, and affected communities where the Property is located.

65. Criteria for the Sale. In contemplating the sale of all or part of a Property owned by the Environmental Response Trust, the Administrative Trustee shall consider (i) whether the

monetary value of the purchase price is sufficient in light of the projected budget for the sale of that Property, taking into account any surplus from past Properties sold or projected shortfall on the sale of the remaining Properties; (ii) the potential for the reuse to create jobs in the State, and the affected community; (iii) other benefits to the State, the Tribe, if applicable, and affected communities (such as increasing tax revenue, reducing blight, and providing a sense of renewal); (iv) avoiding a material increase in the cost of or interference with the Environmental Action; (v) the views of the State, the Tribe, if applicable, and affected communities; and (vi) the reputation and credibility of the prospective purchaser.

66.  <u>Proceeds from the Sale</u>. The proceeds from the sale of any Property owned by the Environmental Response Trust shall be transferred to the Administrative Funding Account. At no time shall any portion of the funding in any part of the Environmental Response Trust be transferred to any purchaser or transferee of a Property.  Upon the transfer or sale of any Property, the funding with respect to Environmental Action as provided in this Settlement Agreement and the Trust Agreement will continue to be available for the performance of Environmental Actions except as provided in Paragraph 67.

67.  <u>Cleanup as Part of the Sale</u>. The Administrative Trustee cannot require, as a condition of the sale or transfer of the Property, that a prospective purchaser perform all or some portion of the Environmental Action if there are available funds in the Minimum Estimated Property Funding Account, Reserve Property Funding Account or Cushion Funding Account to perform the Environmental Action with respect to such Property.  If the purchaser agrees to perform all or some portion of the Environmental Action, the funds representing the cost of the Environmental Action being performed by the purchaser shall be transferred from the applicable Minimum Estimated Property Funding Account, Reserve Property Funding

Account and/or Long Term OMM Property Funding Account by the Administrative Trustee to (i) the Administrative Funding Account to cover any shortfall in the projected budget for the sale of that Property, and then to (ii) the Cushion Funding Account. The funds can be transferred immediately provided the purchaser posts financial assurance on terms that are satisfactory to the applicable Lead Agency, or transferred after the completion of the Environmental Action provided the Lead Agency, in consultation with the Support Agency, agrees that the purchaser satisfactorily completed its portion of the Environmental Action. The transfer of funds representing the cost of such Environmental Action shall be consistent with (1) the funds budgeted or contemplated for the Environmental Action; (2) acceptable to the Administrative Trustee after consultation with the Lead Agency; and (3) the requirements for transferring excess funds out of such accounts as set forth in Paragraphs 60 through 62 of this Settlement Agreement. If the above criteria are met, the Lead Agency and the Support Agency shall not object to the Administrative Trustee transferring the funds associated with the purchaser's cleanup out of the Minimum Estimated Property Funding Account or Reserve Property Funding Account.

68. GMNA Car – Wilmington Site. Notwithstanding the provisions of Paragraph 67 regarding the transfer of funds from the Minimum Estimated Property Funding Account, Reserve Property Funding Account, and the Long Term OMM Property Funding Account, the amount of funding provided by the Delaware Department of Natural Resources and Environmental Control ("DNREC") to Fisker Automotive, Inc. ("Fisker") as a grant under the Delaware Brownfields Program to conduct sampling required under the Brownfield Development Agreement entered into between DNREC and Fisker, dated, May 28, 2010, to establish a baseline of pre-existing conditions ("Baseline Investigation") at the former GM

Assembly Plant in Wilmington, Delaware (the "GM Wilmington Plant"), up to the amount of $225,000, and expended by Fisker, to conduct the GM Wilmington Plant Baseline Investigation (i) shall be deemed to be part of the funding provided for a site-wide remedial investigation and feasibility study; and (ii) shall not be transferred out of the Minimum Estimated Property Funding Account pursuant to Paragraph 67. Consistent with the settlement agreement between DNREC and MLC, dated June 8, 2010 and approved by the Bankruptcy Court on June 29, 2010, DNREC shall be reimbursed from the Minimum Estimated Property Funding Account as provided for in this Settlement Agreement, for the amount of funding provided by DNREC to Fisker, and expended by Fisker, to conduct the GM Wilmington Plant Baseline Investigation, up to $225,000. Debtors have commenced some preliminary environmental investigation at the GMNA Car – Wilmington Site, which may, upon approval by DNREC, become part of a site-wide remedial investigation and feasibility study.

69. <u>Protections from Future Environmental Liability</u>. Given the unique circumstances of the Bankruptcy Cases, U.S. EPA, the States and, if applicable, the Tribe, shall work with the prospective purchaser(s) of the Properties with funding for Environmental Actions under the Environmental Response Trust to address the liability concerns for the Property. If the prospective purchaser determines that the self-executing statutory protection provided for bona fide prospective purchasers of contaminated sites under CERCLA or other statutory protections provided to purchasers of contaminated sites under applicable state law (including but not limited to Michigan's Natural Resources and Environmental Protection Act, MCL 324.20101 *et seq.*), are not sufficient to address the prospective purchaser's liability concerns, the U.S. EPA, relevant State and, where applicable, the Tribe, shall upon request use one or

more of the following enforcement or liability clarification tools for a Property to address the liability concerns of prospective purchasers for existing contamination (provided the purchasers comply with the requirements set forth in Paragraph 73(1)-(5):

- Prospective Purchaser Agreements or equivalent agreements under applicable State law (PPAs);
- Bona Fide Prospective Purchaser Work Agreements or equivalent agreements under applicable State law (BFPP Work Agreements); or
- Comfort/Status Letters or equivalent letter under applicable State practice.

U.S. EPA, the States, and the Tribe retain their enforcement discretion to select the appropriate enforcement or liability clarification tool from the options set forth in the three preceding bullet points.

70.  U.S. EPA and the applicable State may enter into PPAs with the prospective purchaser that will provide the prospective purchaser with a covenant not to sue for existing contamination at the time of purchase.  The purchaser would be responsible for any new contamination or the exacerbation of existing contamination.

71.  If the prospective purchaser is willing to conduct environmental work at the site, either by undertaking the on-going or planned Environmental Actions or enhancing the on-going or planned Environmental Actions, U.S. EPA and the State may enter into a BFPP Work Agreement (or an Administrative Order on Consent) to address the scope of the work to be performed and the obligations that the prospective purchaser has with regard to existing contamination.  The BFPP Work Agreement will provide the prospective purchaser with a covenant not to sue for existing contamination and for the work performed (subject to the prospective purchaser's performance of the agreed upon work), or liability concerns will be addressed by way of a PPA or Comfort/Status Letter.

72. U.S. EPA and the State may issue Comfort/Status Letters to the prospective purchaser regarding the on-going or planned Environmental Action at a Property.

73. In order to receive an enforcement or liability clarification tool as provided by Paragraph 69 of this Settlement Agreement, in all cases the prospective purchaser would be required to:

1. Undertake efforts to be informed about and knowledgeable of the environmental condition of the Property.

2. Comply with or institute land use restrictions and not impede the effectiveness or integrity of the ongoing or completed cleanup and institutional controls;

3. Take reasonable steps to stop any continuing release, prevent any threatened future release and prevent or limit any human, environmental, or natural exposure to any previously released Hazardous Substances. This will be a site-specific, fact-based inquiry;

4. Provide cooperation, assistance and access to governmental agencies and their representatives; and

5. Comply with information requests and administrative subpoenas and provide legally required notices.

Nothing in this Paragraph 73 shall require a prospective purchaser to perform all or some portion of the Environmental Action if there are sufficient funds in the Minimum Estimated Property Funding Account, Reserve Property Funding Account or Cushion Funding Account to perform the Environmental Action.

74. Coordination of Redevelopment and the Environmental Action. The Administrative Trustee and the applicable Lead Agency shall work together to attempt to integrate the redevelopment of the Property with the timing and the sequencing of the Environmental Action. The Lead Agency and the Administrative Trustee shall communicate with the prospective purchaser and/or the affected communities, including local economic

development officials, so that the purchaser and/or affected communities can integrate redevelopment with the timing and sequence of the Environmental Action. The Administrative Trustee and the Redevelopment Manager shall make a good faith effort to obtain input regarding the reuse and redevelopment of the Property from the affected communities during the sale process, including and without limitation, the consideration of community-preferred end uses when marketing any Property and prior to entering into a sales agreement with a prospective purchaser for any Property. Consistent with the terms of this Settlement Agreement and the Trust Agreement, the Administrative Trustee, the Redevelopment Manager and the relevant Cleanup Manager shall cooperate with any Lead Agency or Support Agency that has identified acceptable funding sources for any Property other than the funding provided by the Environmental Response Trust to maximize the use of such additional funds and coordinate the efficient implementation of Environmental Actions and redevelopment activities at the Property, including, where feasible, through coordinated contracting. Except as provided under Paragraph 68 hereof, the availability or use of any such funding sources at an Property shall not result in or be the basis for a reduction of the Property's Minimum Estimated Funding, Reserve Funding Account or Long Term OMM Property Funding, and shall not result in or be the basis for the denial of access to any Cushion Funding with respect to that Property.

75. <u>Sales of Property After Execution of Settlement Agreement But Prior to the Effective Date</u>. With respect to any Property sold by the Debtors prior to the Effective Date, the United States and the applicable State (and the Tribe in the case of the Massena, New York Property) must approve the terms of the sale in writing, in which event the funding obligations and other provisions of the Settlement Agreement and Trust Agreement shall continue to apply to that

property in the same manner as obligations at properties that continue to be owned by Debtors.

76.  Audits of the Environmental Response Trust.  An independent certified public accountant shall conduct a financial audit, an agreed upon procedures engagement, or similar engagement, of the assets and liabilities of the Environmental Response Trust once every year, the costs of which shall not exceed $250,000 per audit.  The accountant will be selected by the United States in consultation with the States and the Tribe, and the same accountant shall not conduct more than three consecutive audits.  Within fifteen days of completing the financial audit report, the accountant shall provide a copy of the financial audit report to the Governments.  The accountant's compensation and expenses will be paid from the Administrative Funding Account.  The accountant shall provide a written report of the financial audit to the United States, the States, the Tribe, and the Administrative Trustee.  No earlier than 10 years from the Effective Date, and at any time thereafter, the Administrative Trustee may propose the discontinuation or reduction of the frequency of the financial audits.  Such proposal shall be subject to the approval of the United States, the States, and the Tribe, which shall not be unreasonably withheld.

77.  Completion of Environmental Actions.  For each Property, subject to the provisions of Paragraphs 60 through 62, any funds remaining in the Minimum Estimated Property Funding Account and the Reserve Property Funding Account shall be used to fund any remaining long term OMM requirements and implement institutional controls or deed restrictions required by the Lead Agency for the protection of human health or welfare or the environment.  Upon completion of all required Environmental Actions for all Properties, including all long term OMM, any funds remaining in the Minimum Estimated Property Funding Accounts, Reserve

Property Funding Accounts ten years after the Effective Date, Long Term OMM Property Funding Accounts, and Cushion Funding Account shall be transferred to the Hazardous Substances Superfund upon completion of required Environmental Actions for all Properties.

78. <u>Access to Property.</u>  The Administrative Trustee shall at all reasonable times provide Lead Agencies and the Support Agencies, as designated representatives of the Lead Agencies, as well as their contractors or consultants access to all relevant portions of the Properties that the Environmental Response Trust owns for the purposes of conducting Environmental Actions.

79. <u>Existing Financial Assurance in Massachusetts.</u>  In the case of Massachusetts, no later than December 15, 2010, MLC and Massachusetts shall undertake steps necessary to arrange for transfer, on or before the Effective Date, of $786,944, the total current value of the existing penal surety bond for the Framingham Landfill Site, bearing Surety's bond number K07593867, and MLC shall cause to be transferred $786,944 into an expendable trust to be established pursuant to Mass. Gen. Laws ch. 6A, § 6, and 801 C.M.R. §§ 50.00, *et seq* (the "Expendable Trust").  The Expendable Trust will satisfy the Debtors' and the Environmental Response Trust's financial assurance obligation for the Framingham Landfill Site and be retained and used solely to conduct or finance long term OMM at or in connection with the Framingham Landfill Property after the Long Term OMM Property Funding Account for that Property has been exhausted.  Cushion Funding shall not be available to finance long term OMM costs at or in connection with the Framingham Landfill Property unless and until the Expendable Trust has been exhausted.  In all other respects the Framingham Landfill Property shall have access to Cushion Funding funds provided that all applicable requirements for access to Cushion Funding under this Settlement Agreement have been met.

80.  <u>Existing Financial Assurance in Illinois</u>.  In the case of Illinois, no later than December 15, 2010, MLC and Illinois shall undertake steps necessary to arrange for release of the existing surety bond for the Danville Site and transfer the collateral on that bond into a trust fund on or before the Effective Date in accordance with 35 Ill. Adm. Code 807.661, in the forms specified by Illustration A in 35 Ill. Adm. Code 807 Appendix A, as modified by Illinois, (the "807 Trust Fund") on or before the Effective Date.  The 807 Trust Fund will satisfy the Debtors' and the Environmental Response Trust's financial assurance obligations for the Danville Site and be retained and used solely to conduct or finance closure and post-closure Environmental Actions at or in connection with the Danville Site after the Long Term OMM Property Funding Account for that Property has been exhausted.  The Danville Site shall not have access to Cushion Funding fund to finance unforeseen closure and post-closure costs at or in connection with the Property unless and until the 807 Trust Fund has been exhausted, but shall in all other respects have access to Cushion Funding funds where (i) the Property's Minimum Estimated Property Funding and Reserve Property Funding have been exhausted, or the Long Term OMM Property Funding has been exhausted; and (ii) the otherwise applicable requirements for access to Cushion Funding funds under this Settlement Agreement have been met.

81.  <u>Existing Financial Assurance in Michigan</u>.  In the case of Michigan, on or before the Effective Date, MLC and Michigan shall take all necessary steps to cancel the performance bonds for closure and/or postclosure care for the Pontiac North Property (Bond No.K0748916A), Chevrolet-Pontiac-Canadian Pontiac Fiero Assembly Plant Property (Bond No. K07489158), GMNA Buick City Property (Bond No. K07489171), and Coldwater Road Landfill Property (Bond No. K07489225) issued to the Michigan Department of Natural

Resources and Environment (the "MDNRE") under Part 111 of the Natural Resources and Environmental Protection Act, MCL 324.11101 *et seq.*, and its implementing rules, MAC R 299.9705 with such cancellation to be effective only upon the full funding of the Environmental Response Trust as required under paragraph 32 of this Settlement Agreement. The Director of MDNRE, as beneficiary of the bonds, or his or her designee, will cancel the bonds subject to and in reliance upon (i) the entry of a Court order requiring that the financial assurance in place be cancelled at the same time as, and no sooner than, the Environmental Response Trust is funded in full as required under Paragraph 32 of this Settlement Agreement; (ii) the funding being provided to the Environmental Response Trust to cover the Environmental Actions for which the bonds were issued; and (iii) the Environmental Response Trust's agreement to perform the Environmental Actions for which the bonds were issued, in accordance with the provisions of this Settlement Agreement. On or before the Effective Date, Michigan will also take all necessary steps to cancel the Agreement and Acceptance of Certificate of Deposit for the Linden Road Landfill Property (General Motors Standby TR/EPA Account No. 131365 with the Bank of New York, CUS #S86677980) and direct the issuing financial institution to transfer such funds to the designated recipient with such cancellation and transfer of funds to be effective only upon the full funding of the Environmental Response Trust as required under Paragraph 32 of this Settlement Agreement.

82. <u>Disposition of Estate Assets Upon Termination of Trust</u>. Upon any termination of the Environmental Response Trust, the disposition of all Properties remaining in the Environmental Response Trust shall be governed by applicable State, tribal and federal law, or by future agreement of the Administrative Trustee, the United States and the applicable State and Tribe, or by order of the Bankruptcy Court. Neither the United States nor any State

or the Tribe shall be required to accept an ownership interest in any Properties remaining in the Environmental Response Trust upon its termination. In no event shall any of the Properties or other assets owned by the Environmental Response Trust be transferred to the Debtor.

83. <u>Miscellaneous Provisions</u>. The Administrative Trustee shall at all times seek to have the Environmental Response Trust treated as a "qualified settlement fund" as that term is defined in Treasury Regulation section 1.468B-1. Approval of the Bankruptcy Court shall be sought, and the Bankruptcy Court shall retain continuing jurisdiction over the Environmental Response Trust and each of that trust's accounts sufficient to satisfy the requirements of Treasury Regulation section 1.468B-1. The Administrative Trustee shall not elect to have the Environmental Response Trust treated as a grantor trust. The Environmental Response Trust shall be treated as a separate taxable entity. The Administrative Trustee shall cause any taxes imposed on the earnings, gains or other income of the Environmental Response Trust to be paid out of such earnings, gains or other income and shall comply with all tax reporting and withholding requirements imposed on the Environmental Response Trust under applicable tax laws. The Administrative Trustee shall be the "administrator" of the Environmental Response Trust pursuant to Treasury Regulation section 1.468B-2(k)(3).

84. a. In no event shall any of the Environmental Response Trust Protected Parties be held personally liable to any third parties for any liability, action, or inaction of any other party including Debtors or any other of the Environmental Response Trust Protected Parties.

b. The Administrative Trustee shall take such actions and execute such documents as are reasonably requested by Debtors with respect to effectuating the transactions contemplated

hereby. To the extent that Debtors request the Administrative Trustee to take such an action, the Administrative Trustee shall do so at the sole expense of Debtors.

c. The Environmental Response Trust is intended to be governed by the terms of the Settlement Agreement and the Trust Agreement and shall not be subject to any provision of the Uniform Custodial Trust Act as adopted by any state, now or in the future.

85. The Environmental Response Trust Protected Parties shall be exculpated and indemnified and held harmless by the Environmental Response Trust, consistent with the provisions of Paragraphs 86, 87 and 88, for any claims, causes of action, or other assertions of liability arising out of or in connection with: (i) the ownership of Environmental Response Trust Assets; (ii) the discharge of duties and powers conferred upon the Environmental Response Trust and/or the Administrative Trustee by this Settlement Agreement, the Trust Agreement and the Plan, any order of the Court, or applicable law or otherwise, including the performance of an Environmental Action on behalf of the Environmental Response Trust and the making of payments in accordance with this Settlement Agreement, the Trust Agreement and the Plan, or any order of court, and the implementing of the provisions of this Settlement Agreement, the Trust Agreement and the Plan or any order of court; or (iii) any claim by or against Debtors.

86. Unless a determination is made by a Final Order of the Bankruptcy Court finding that an Environmental Response Trust Protected Party committed fraud or willful misconduct in relation to the Environmental Response Trust Protected Party's duties, any judgment against that Environmental Response Trust Protected Party shall be paid solely from the Minimum Estimated Property Funding Account or Reserve Property Funding Account for the relevant Property if the judgment relates to an Environmental Action at the Property, and otherwise

shall be paid from the Administrative Funding Account, and without the Environmental Response Trust Protected Party having to first pay from its own funds for any liability. Unless a determination is made by a Final Order of the Bankruptcy Court finding that an Environmental Response Trust Protected Party committed fraud or willful misconduct in relation to the Environmental Response Trust Protected Party's duties, any costs of defense of that Environmental Response Trust Protected Party shall be paid from the Administrative Funding Account, and without the Environmental Response Trust Protected Party having to first pay from its own funds for any liability. In the event that the judgment is paid from the Minimum Estimated Property Funding Account or Reserve Property Funding Account, any payment shall be limited to funds in the Minimum Estimated Property Funding Account or the Reserve Property Funding Account for the relevant Property or the Administrative Account, as applicable. No Environmental Response Trust Protected Party shall be personally liable unless the Bankruptcy Court, by a Final Order, finds that it committed fraud or willful misconduct after the Effective Date in relation to the Administrative Trustee's duties.

87. The Environmental Response Trust Protected Parties and the Environmental Response Trust are exculpated by all persons or entities, including without limitation, holders of claims and other parties in interest, of and from any and all claims, causes of action and other assertions of liability arising out of or in connection with the matters contained in Paragraph 85(i), (ii) and (iii) of this Agreement. No person or entity, including without limitation, holders of claims and other parties in interest, shall be allowed to pursue any claims or cause of action against any Environmental Response Trust Protected Party or the Environmental Response Trust for any claim against Debtors, for making payments in accordance with this Settlement Agreement or any order of court, or for implementing the provisions of this

Settlement Agreement, the Trust Agreement, the Plan or any order of a court with competent jurisdiction. However, nothing in this Settlement Agreement or the Trust Agreement shall preclude the Governments from enforcing their rights under this Settlement Agreement or the Trust Agreement against an Environmental Response Trust Protected Party or the Environmental Response Trust, including but not limited to any rights relating to a finding by Final Order of fraud or willful misconduct. Notwithstanding the foregoing, in no event shall the Environmental Response Trust Protected Parties be personally liable for any monetary damages other than upon a finding of fraud or willful misconduct by Final Order, except as otherwise agreed in writing by the relevant Environmental Response Trust Protected Parties.

88. There shall be an irrebuttable presumption that any action taken, or not taken, with the approval of the Bankruptcy Court or other court with jurisdiction does not constitute willful misconduct.

89. Except as may otherwise be provided herein: (i) the Environmental Response Trust Protected Parties or the Environmental Response Trust may rely, and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties; (ii) the Environmental Response Trust Protected Parties may consult with legal counsel, financial or accounting advisors and other professionals and shall not personally be liable for any action taken or not taken in accordance with the advice thereof; and (iii) persons or entities dealing with the Environmental Response Trust and the Environmental Response Trust Protected Parties shall look only to the Environmental Response Trust assets that may be available to them consistent with this Settlement Agreement and the Trust Agreement to satisfy any liability incurred by the

Environmental Response Trust and the Environmental Response Trust Protected Parties to such person or entity in carrying out the terms of this Settlement Agreement, the Trust Agreement, the Plan or any order of the Bankruptcy Court, and the Environmental Response Trust Protected Parties shall have no personal liability absent a finding by Final Order of fraud or willful misconduct.

90. Neither the United States, the States, the Tribe, nor any of the Debtors shall be deemed to be an owner, operator, trustee, partner, agent, shareholder, officer, or director of the Environmental Response Trust or the Environmental Response Trust Protected Parties, or to be an owner or operator of any of the Properties on account of this Settlement Agreement, the Trust Agreement, or actions contemplated by the Settlement Agreement and/or Trust Agreement.

## V. ALTERNATIVE DISPUTE RESOLUTION

91. The Parties recognize that alternative dispute resolution may lead to the more efficient resolution of disputes in many circumstances and where appropriate and upon agreement of the relevant Parties, will engage in non-binding informal dispute resolution prior to petitioning the Court to resolve any dispute under this Settlement Agreement.

## VI. OUTSTANDING OBLIGATIONS

92. Subject to the provisions of Paragraph 34 of this Settlement Agreement, Debtors shall continue, at their own expense, the operations of any required Environmental Actions being performed by any Debtor at a Property until the payments required by Paragraph 32 of this Settlement Agreement are made, including, but not limited to, environmental monitoring activities.

93.   Notwithstanding any other provisions in this Paragraph 93 to the contrary, upon Debtors' completion of the payments and transfers to the Environmental Response Trust provided for herein, Debtors and their successors shall have no further obligations to perform work pursuant to any outstanding consent decree, agreed order, administrative order on consent, or administrative order issued unilaterally by EPA or any of the Governments regarding any of the Properties, provided, however, that Debtors shall produce, or make available for production, to the United States or any State with respect to a Property as to which such State is a party to any order or consent decree, any records relating to the Property, and such records should be provided in the state and condition in which such records are found.  Upon the Effective Date the Lead Agency may, as necessary, substitute the Environmental Response Trust for the applicable Debtor in any outstanding consent decree, administrative order or other settlement agreement with the relevant Lead Agency regarding any of the Properties so long as the amended or substituted decrees or orders are not inconsistent with the terms of, and funding provided under, this Settlement Agreement and the Trust Agreement. Specifically with respect to Administrative Order, Index No. CERLCA-02-2010-2027 (August 18, 2010), Administrative Order, Index No. II CERCLA-20215 (August 18, 1992), and Administrative Order, Index No. II-CERLCA-20207 (March 31, 1992) as modified by Amendment to Administrative Order, Index No. II-CERLCA-20207 (August 30, 1999) , which relate to the Massena Property, and NYS Department of Environmental Conservation Administrative Orders on Consent, Index Numbers D-7-001-97-06 (September 25,1997) and D7-0008-97-06 (July 15,1999) which relate to the IFG Property (the "Orders") upon the Effective Date, the Environmental Response Trust shall be substituted as respondent to such Orders and the Environmental Response Trust shall comply with such Orders, so long as the

amended or substituted decrees or orders are not inconsistent with the terms of, and funding provided under, this Settlement Agreement and the Trust Agreement, and Debtors shall be removed as respondent from such Orders. Within six months of the Effective Date, the Lead Agencies shall undertake reasonable efforts to either substitute the Environmental Response Trust for the Debtors in all other outstanding consent decrees, administrative orders or other settlement agreements with the relevant Lead Agency regarding any of the Properties that have ongoing obligations, so long as the amended or substituted decrees or orders are not inconsistent with the terms of, and funding provided under, this Settlement Agreement and the Trust Agreement, or remove the Debtors from such decrees, orders, or agreements. Specifically with respect to Consent Judgment 92-3740-CE for the General Motors Powertrain Bay City Facility, within six months of the Effective Date, the Lead Agency shall undertake reasonable efforts to modify the judgment to substitute the Environmental Response Trust for the Debtors and limit its obligations to only the portion of the General Motors Powertrain Bay City Facility currently owned by the Debtors and to be transferred to the Environmental Response Trust, the General Motors Powertrain (GMPT) Bay City Property (MLC Site ID 1100), so long as the amended or substituted decrees or orders are not inconsistent with the terms of, and funding provided under, this Settlement Agreement and the Trust Agreement and to substitute New GM for the Debtors for the remainder of the facility.

## VII.    COVENANTS NOT TO SUE

94.  With respect to the Properties (including releases of Hazardous Substances from any portion of the Properties and all areas affected by migration of such substances emanating from the Properties), and except as specifically provided in Section VIII (Reservation of Rights and Regulatory Authority), upon the Effective Date and Debtors' transfer of the

Properties and full funding of the Environmental Response Trust Accounts as set forth in Paragraphs 30, 31 and 32 of this Settlement Agreement, the United States on behalf of U.S. EPA and the States and Tribe covenant not to sue or assert any administrative or other civil claims or causes of action against Debtors, any successor entity thereto, or the Environmental Response Trust and the Environmental Response Trust Protected Parties under CERCLA, RCRA, and State environmental statutes, as well as any other environmental liabilities asserted in the Government Proofs of Claim.

95. With respect to the Properties, except as specifically provided in Section VIII (Reservation of Rights and Regulatory Authority), the Government Proofs of Claim shall be deemed satisfied in full in accordance with the terms of this Settlement Agreement, the U.S. EPA and the States and Tribe shall not be entitled to file any further claims under CERCLA, RCRA, or State environmental statutes, as well as any other environmental liabilities asserted in the Government Proofs of Claim, whether unsecured, secured, administrative priority or otherwise, and the U.S. EPA and the States and Tribe shall not receive any other distributions in the Bankruptcy Cases on account of such claims.

96. Financial Assurance. The relevant States and Debtors shall take all necessary steps to cancel or release the financial assurance instruments listed in Attachment D to this Settlement Agreement at the time the Environmental Response Trust is funded. Upon the Effective Date and Debtors' transfer of the Properties and full funding of the Environmental Response Trust Accounts as set forth in Paragraphs 30 through 32 of this Settlement Agreement, and the funding of the Expendable Trust for the Framingham Landfill Site in Massachusetts and the 807 Trust Fund for the Danville Landfill Property in Illinois as required by Paragraphs 79 and 80 of this Settlement Agreement, the Governments agree not to seek and covenant not to sue

or assert any administrative or other civil claims or causes of action against Debtors, the Environmental Response Trust or the Administrative Trustee, solely in his official capacity, with respect to any financial assurance required under environmental law relating to the Properties.

97. The covenants not to sue in paragraphs 94 through 99 (and the reservations thereto) shall also apply to Debtors' successors, assigns, officers, directors, employees, and trustees, but only to the extent that the alleged liability of the successor, assign, officer, director, employee, or trustee of Debtors is based solely on its status as and in its capacity as a successor, assign, officer, director, employee, or trustee of Debtors. For purposes of this Paragraph New GM shall not be considered a successor or assign of Debtors.

98. The covenants not to sue contained in this Settlement Agreement extend only to Debtors, the Environmental Response Trust, the Environmental Response Trust Protected Parties, and the persons or entities described in Paragraph 97 above and do not extend to any other person or entity. Nothing in this Agreement is intended as a covenant not to sue any person or entity other than Debtors, the Environmental Response Trust, the Environmental Response Trust Protected Parties, the United States, the States, the Tribe, and the persons or entities described in Paragraph 97. Except as provided in Paragraph 97, the United States, the States, the Tribe, Debtors, and the Environmental Response Trust and the Environmental Response Trust Protected Parties expressly reserve all claims, demands, and causes of action either judicial or administrative, past, present or future, in law or equity, which the United States, States, Tribe, or Debtors or the Environmental Response Trust Protected Parties and the Environmental Response Trust may have against all other persons or entities, firms, corporations, entities, or

predecessors of Debtors for any matter arising at or relating in any manner to the Properties and/or claims addressed herein.

99. Debtors, the Environmental Response Trust and the Administrative Trustee covenant not to sue and agree not to assert claims or causes of action against the United States, the Tribe or the States with respect to the Properties, including but not limited to any direct or indirect claim for reimbursement from (i) the Superfund (established pursuant to the Internal Revenue Code, 26 U.S.C. § 9507) through CERCLA Sections 106(b)(2), 107, 111, 112, 113, 42 U.S.C. §§ 9606(b), 9607, 9611, 9612, 9613, or (ii) any other provision of federal or state law; any claims against the United States, the Tribe or the States, including any of their departments, agencies or instrumentalities pursuant to Section 107 or 113 of CERCLA, 42 U.S.C. §§ 9607, 9613, or State environmental statutes; and any claims arising out of the response activities at the Properties. Nothing in this Settlement Agreement shall be construed to constitute preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611 or 40 C.F.R. § 300.700(d), or State environmental statutes. Nothing herein shall preclude the United States, the States, or the Tribe from consenting to the application or making of a claim. Debtors covenant not to sue and agree not to assert claims or causes of action against the Environmental Response Trust and the Environmental Response Trust Protected Parties with respect to the Properties. The Environmental Response Trust and the Administrative Trustee covenant not to sue or assert any claims or causes of action against Debtors and their successors, assigns, officers, directors and employees in their respective capacities as such, with respect to the matters addressed in this Settlement Agreement or acts or omissions in connection with, related to, or arising out of the negotiations or consummation of this Settlement Agreement or the holding, administration, investigation or remediation of the

Properties except for instances of fraud or willful misconduct on behalf of the Debtors or their successors, assigns, officers, directors or employees. In the event that an Environmental Response Trust Protected Party asserts a claim or cause of action against the United States, the States, the Tribe or the Debtors with respect to the Properties, then the covenant not to sue provided to that Environmental Response Trust Protected Party under Paragraphs 94 through 99 shall be null and void and have no effect.

## VIII.  RESERVATION OF RIGHTS AND REGULATORY AUTHORITY

100.  The covenants not to sue set forth in Section VII do not apply to any matters other than those expressly specified therein. The United States, the Tribe, and the States reserve, and this Settlement Agreement is without prejudice to, all rights against Debtors and the Environmental Response Trust and the Environmental Response Trust Protected Parties or other persons or entities with respect to all matters other than those set forth in Paragraphs 30 and 94 through 98. The United States, the States, and the Tribe also specifically reserve all rights against Debtors with respect to:

(i)     any action to enforce their rights under this Settlement Agreement;

(ii)    any general unsecured claim with respect to the release of Hazardous Substances into Lower Ley Creek, the Lake Bottom Subsite, or the Salina Landfill Subsite, which are part of the Onondaga Lake Superfund Site in Onondaga County, New York or the Old Ley Creek Channel in Onondaga County, New York. "Lower Ley Creek" for purposes of this Settlement Agreement shall mean the entire portion of Ley Creek which is downstream from the Route 11 Bridge;

(iii)   any general unsecured claim arising from costs incurred by a Lead Agency or Support Agency for Environmental Actions with respect to a Property prior to June 1, 2009, with respect to MLC and prior to October 9, 2009, with respect to REALM and ENCORE;

(iv)    any claim or cause of action for response costs and injunctive relief under CERCLA Sections 106 and 107, RCRA Sections 3008, 7002 and 7003 or State environmental statutes for future acts taken by the Debtors after the Effective

Date that create liability under CERCLA, RCRA, or state law;

(v)     criminal liability;

(vi)    any general unsecured claim arising from damages or injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

(vii)   all rights with respect to any site that is not a Property, other than claims or causes of action for migration of Hazardous Substances emanating from a Property; and

(viii)  all rights with respect to enforcement of state laws related to removal, collection or recovery of mercury-containing switches from end-of-life vehicles.

Debtors' future acts creating liability under CERCLA, RCRA or state law do not include continuing releases related to Debtors' conduct prior to the Effective Date. The United States, the States and the Tribe also reserve, and this Settlement Agreement is without prejudice to any liability of Debtors' successors, assigns, officers, directors, employees, and trustees for response costs and injunctive relief under CERCLA Section 106 and 107, RCRA Sections 7002 and 7003, and state laws for any future acts taken by any such respective entity after the Effective Date that create liability under CERCLA, RCRA or state law. Future acts creating liability under CERCLA, RCRA, or state law do not include continuing releases related to such party's conduct prior to the Effective Date. The United States, the States and the Tribe also specifically reserve all rights against the Environmental Response Trust and the Environmental Response Trust Protected Parties with respect to any action to enforce their rights under this Settlement Agreement, including but not limited to the right to file suit against the Environmental Response Trust and the Environmental Response Trust Protected Parties at any time for (i) fraud or willful misconduct (with all funds recovered in any such action to be restored to the Environmental Response Trust account or subaccount from which they were taken); (ii) criminal liability; and (iii) any rights reserved under Paragraphs 101 and

102 of this Settlement Agreement.  In no event shall the Environmental Response Trust Protected Parties be personally liable for any monetary damages other than for a finding of fraud or willful misconduct by Final Order.

101.    The United States, the States and the Tribe shall retain the right to issue, obtain, or enforce an order against the Environmental Response Trust to perform Environmental Action under applicable law, including an administrative order, provided that any such order or enforcement is not inconsistent with the provisions of the Settlement Agreement or the Trust Agreement.  The Administrative Trustee may enter into a consent decree or consent order with the United States, the States and the Tribe in which a Property is located, and may perform work pursuant to administrative orders issued unilaterally by U.S. EPA, a State or the Tribe under applicable law, to facilitate or conduct Environmental Actions at such Property, provided that any such consent decree, consent order or administrative order issued unilaterally by U.S. EPA, a State or the Tribe is not inconsistent with the provisions of the Settlement Agreement.  Nothing in the Settlement Agreement shall be deemed to limit the information-gathering authority of the United States or the States under Sections 104 and 122 of CERCLA, 42 U.S.C. §§ 9604 and 9622, or any other applicable federal or state law or regulation, or to excuse Debtors or the Environmental Response Trust from any disclosure or notification requirements imposed by CERCLA or any other applicable federal or state law or regulation.

102.    Nothing in the Settlement Agreement or the Trust Agreement shall impair any authority of the United States, the States or the Tribe to select or authorize Environmental Action for any Property under applicable law.  Nothing in this Settlement Agreement shall be deemed to (i) limit the authority of the United States or the States to take response action

under Section 104 of CERCLA, 42 U.S.C. § 9604, or any other applicable federal or state law or regulation; (ii) alter the applicable legal principles governing judicial review of any action taken by the United States or the States pursuant to that authority; or (iii) limit or alter any right of access of the United States or the States pursuant to applicable law. The Lead Agency may bring enforcement actions against the Environmental Response Trust that are not inconsistent with the provisions of the Settlement Agreement in other courts having jurisdiction, provided, however, that the Bankruptcy Court shall have exclusive jurisdiction over any issues relating to (a) approval of budgets and expenditures of budgeted funds (provided, however, that if the Administrative Trustee enters into a consent decree or administrative order on consent, then the Governments may enforce the expenditure of budgeted funds to comply with such consent decree or administrative order on consent in other courts having jurisdiction), (b) changes to a Property's Minimum Estimated Property Funding, Reserve Property Funding and Long Term OMM Property Funding, if any, (c) access to Cushion Funding Account funds, (d) disputes involving the Administrative Funding Account, or (e) the removal of the Administrative Trustee. In no event shall the Environmental Response Trust Protected Parties be personally liable for any monetary damages other than for a finding of fraud or willful misconduct by Final Order.

103. Debtors and the Administrative Trustee reserve, and this Settlement Agreement is without prejudice to, all rights, as applicable, against the United States, the States, the Tribe, the Debtors, and the Administrative Trustee with respect to (a) all matters other than those set forth in Paragraph 99, and (b) any action to enforce their rights under the terms of this Settlement Agreement. In addition, Debtors' covenant not to sue under Paragraph 99 shall not apply in the event that the United States, the Tribe, or a State brings a cause of action or issues

an order pursuant to the reservations set forth in Paragraph 100, but only to the extent that Debtors' claims arise from the same response action, response costs, damages, or other relief that the United States, the Tribe, or the State is seeking pursuant to the applicable reservations.

104.    Except as provided in Paragraph 100, nothing in this Settlement Agreement shall be construed to create any rights in, or grant any cause of action to, any person or entity not a party to this Settlement Agreement.  Except as provided in paragraph 100, nothing in this Settlement Agreement diminishes the rights of the Governments, pursuant Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), or State environmental statutes, to pursue any persons or entities not a party hereto to obtain additional response costs or response actions and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2), or State environmental statutes.  Except as provided in Paragraph 97, the Governments expressly reserve all existing rights against all persons or entities not a party to this Settlement Agreement, including New GM.

## IX.    CONTRIBUTION PROTECTION

105.    The parties hereto agree, and by entering this Settlement Agreement the Bankruptcy Court finds, that this Settlement Agreement constitutes a judicially-approved settlement for purposes of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and that the Debtors and the Environmental Response Trust and the Environmental Response Trust Protected Parties, as of the Effective Date, are entitled to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2) or as may be otherwise provided by law, for "matters addressed" in this Settlement Agreement.  The "matters addressed" in this Settlement Agreement are all costs of Environmental Actions incurred or to

be incurred by the U.S. EPA, the States, or the Tribe or any other person or entity relating to or in connection with the Properties, including releases of Hazardous Substances from any portion of the Properties, and all areas affected by migration of such substances emanating from the Properties; provided, however, that the "matters addressed" in this Settlement Agreement do not include (i) any matters reserved in Paragraph 100 of this Settlement Agreement; or (ii) any claims for past costs asserted by potentially responsible parties who are not parties to this Settlement Agreement.

106.     Debtors have informed Massachusetts, and hereby state, that they are not seeking contribution protection under Mass. Gen.Laws ch.21E, § 3A(j)(2), so that the comment period referenced in Mass. Gen.Laws ch.21E, § 3A(j)(2) shall be deemed to be closed.

## X.     PUBLIC COMMENT

107.     This Settlement Agreement will be subject to a public comment period following notice published in the Federal Register and notice under any applicable state law providing for public comment, which may take place concurrent with the judicial approval process under Paragraph 108 hereof.  The United States and any State or Tribe receiving public comment reserve the right to withdraw or withhold their consent if the public comments regarding the Settlement Agreement disclose facts or considerations that indicate that this Settlement Agreement is inappropriate, improper, or inadequate.  The Governments will promptly provide Debtors copies of any public comments received during the public comment period.  At the conclusion of the public comment period, the United States and any State or Tribe taking public comment will provide the Bankruptcy Court with copies of any public comments and their response thereto.  If the United States or any State or Tribe taking public comment withdraws or withholds its consent to the Settlement Agreement prior to the

Effective Date, this Settlement Agreement shall be void and have no further force and effect. Any changes, revisions or amendments to the Settlement Agreement in response to public comment are subject to the approval of all Parties.

## XI. JUDICIAL APPROVAL

108. The settlement reflected in this Settlement Agreement shall be subject to approval by the Bankruptcy Court pursuant to Bankruptcy Rule 9019. Debtors shall move promptly for court approval of this Settlement Agreement and shall exercise commercially reasonable efforts to obtain such approval.

## XII. PLAN

109. The Debtors shall incorporate this Settlement Agreement into the Plan by reference and approval of this Settlement Agreement shall be a condition precedent to confirmation of the Plan. The Debtors shall not file a Plan or amend the Plan in a manner inconsistent with the terms and provisions of this Settlement Agreement, take any other action in the Bankruptcy Cases that is inconsistent with the terms and provisions of this Settlement Agreement, or propose terms for any order confirming the Plan that are inconsistent with this Settlement Agreement. The Governments shall not oppose any term or provision of the Plan or an order confirming the Plan that is addressed by and is consistent with this Settlement Agreement. The Parties reserve all other rights or defenses that they may have with respect to the Plan. In the event of any inconsistency between the Plan, any order confirming the Plan, and this Settlement Agreement, the terms of this Settlement Agreement shall control.

## XIII. RETENTION OF JURISDICTION

110. The Bankruptcy Court shall retain jurisdiction over both the subject matter of this Settlement Agreement and the parties hereto, for the duration of the performance of the terms

and provisions of this Settlement Agreement for the purpose of enabling any of the parties to apply to the Bankruptcy Court at any time for such further order, direction and relief as may be necessary or appropriate for the construction or interpretation of this Settlement Agreement, or to effectuate or enforce compliance with its terms.

## XIV.   EFFECTIVENESS OF SETTLEMENT AGREEMENT

111.    This Settlement Agreement shall be effective after the close of the public comment period in accordance with Paragraph 107, and upon approval by the Bankruptcy Court pursuant to Paragraphs 107 and 108 of this Settlement Agreement and upon the Effective Date of the Debtor's Plan incorporating this Settlement Agreement.

## XV.   SIGNATORIES/SERVICES

112.    The signatories for the parties each certify that he or she is authorized to enter into the terms and conditions of this Settlement Agreement and to execute and bind legally such party to this document.

113.    The Administrative Trustee shall provide all notices to the Governments required by this Settlement Agreement and send copies of all reports, budgets, annual balance statements, and other documents that the Administrative Trustee is required to submit or provide to the Governments under the terms this Settlement Agreement, to the persons identified in Section 5.3 of the Trust Agreement.

[Remainder of this page is intentionally blank]

THE UNDERSIGNED PARTIES ENTER INTO THIS SETTLEMENT AGREEMENT

**FOR THE UNITED STATES**

_____
ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources
    Division
U.S. Department of Justice

Date: _____

_Natalie N. Kuehler_
PREET BHARARA
United States Attorney
Southern District of New York
By: David S. Jones
Natalie N. Kuehler
Assistant U.S. Attorneys

Date: **October 19, 2010**

_____
Alan S. Tenenbaum
National Bankruptcy Coordinator
Patrick Casey
Senior Counsel
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice

Date: _____

_____
CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

THE UNDERSIGNED PARTIES ENTER INTO THIS SETTLEMENT AGREEMENT

**FOR THE UNITED STATES**

_____
ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources
    Division
U.S. Department of Justice

Date:    10/15/10

_____
Alan S. Tenenbaum
National Bankruptcy Coordinator
Patrick Casey
Senior Counsel
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice

Date:    10/15/10

_____
CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

_____
PREET BHARARA
United States Attorney
Southern District of New York
By: David S. Jones
Natalie N. Kuehler
Assistant U.S. Attorneys

Date: _____

67

THE UNDERSIGNED PARTIES ENTER INTO THIS SETTLEMENT AGREEMENT

## FOR THE UNITED STATES

_____
ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources
   Division
U.S. Department of Justice

Date: _____

_____
PREET BHARARA
United States Attorney
Southern District of New York
By: David S. Jones
Natalie N. Kuehler
Assistant U.S. Attorneys

Date: _____


_____
Alan S. Tenenbaum
National Bankruptcy Coordinator
Patrick Casey
Senior Counsel
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice

Date: _____

_____  10/9/10
CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

**FOR MOTORS LIQUIDATION COMPANY, MLC OF HARLEM, INC., MLCS, LLC, MLCS DISTRIBUTION CORPORATION, REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC., AND ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.**

Date: _October 19, 2010_

Ted Stenger
Executive Vice President
Motors Liquidation Company, as agent for each
  of the foregoing entities
500 Renaissance Center, Suite 1400
Detroit, MI 48243
Tel.: (313) 486-4044
Fax: (313) 486-4259
Email: tstenger@alixpartners.com

Date: _October 19, 2010_

James M. Redwine
Vice President of Environmental Affairs
Motors Liquidation Company, as agent for each
  of the foregoing entities

Date: _____

David R. Berz
Weil, Gotshal & Manges LLP
Attorneys for Debtors and Debtors in Possession
1300 Eye Street, NW, Suite 900
Washington, D.C. 20005
Tel.: (202) 682-7000
Fax: (202) 857-0939
Email: david.berz@weil.coms

**FOR MOTORS LIQUIDATION COMPANY, MLC OF HARLEM, INC., MLCS, LLC, MLCS DISTRIBUTION CORPORATION, REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC., AND ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.**


Date: _____          _____

Ted Stenger
Executive Vice President
Motors Liquidation Company, as agent for each
   of the foregoing entities
500 Renaissance Center, Suite 1400
Detroit, MI 48243
Tel.: (313) 486-4044
Fax: (313) 486-4259
Email: tstenger@alixpartners.com


Date: _____          _____

James M. Redwine
Vice President of Environmental Affairs
Motors Liquidation Company, as agent for each
   of the foregoing entities


Date: October 19, 2010          _____

David R. Berz
Weil, Gotshal & Manges LLP
Attorneys for Debtors and Debtors in Possession
1300 Eye Street, NW, Suite 900
Washington, D.C. 20005
Tel.: (202) 682-7000
Fax: (202) 857-0939
Email: david.berz@weil.coms

**FOR THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE TRUSTEE**

EPLET, LLC in its Representative Capacity as the Proposed Environmental Response Administrative Trustee of The Environmental Response Trust

Date: ___October 19, 2010_____

By: _____
Elliott P. Laws
Managing Member

Date: _____

By: _____
Michael O. Hill
Proposed Chief Operating Officer and
General Counsel of
The Environmental Response Trust

**FOR THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE TRUSTEE**

EPLET, LLC in its Representative Capacity as the Proposed Environmental Response Administrative Trustee of The Environmental Response Trust

Date: _____     By: _____
                                Elliott P. Laws
                                Managing Member


Date: _10/12/10_     By: _____
                         Michael O. Hill
                         Proposed Chief Operating Officer and
                         General Counsel of
                         The Environmental Response Trust

**FOR THE STATE OF DELAWARE**

Date: _12 Octob 2010_

Collin P. O'Mara, Secretary
Delaware Department of Natural Resources
and Environmental Control

Date: _10/12/10_

Robert S. Kuehl
Deputy Attorney General
Delaware Department of Justice

# FOR THE STATE OF ILLINOIS AND THE ILLINOIS ENVIRONMENTAL PROTECTION AGENCY

FOR THE STATE OF ILLINOIS
LISA MADIGAN, Attorney General of the State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement/Asbestos Litigation Division

Date: _10-08-10_

THOMAS E. DAVIS, Chief
Environmental Bureau
Assistant Attorney General
500 South Second Street
Springfield, IL 62706

FOR THE ILLINOIS ENVIRONMENTAL PROTECTION AGENCY

Date: _16/12/10_

JOHN J. KIM
Chief Legal Counsel

71

**State of Indiana's Signature Page for**
**"ENVIRONMENTAL RESPONSE TRUST CONSENT DECREE AND SETTLEMENT**
**AGREEMENT" among DEBTOR MOTORS LIQUIDATION CORPORATION, THE**
**UNITED STATES, and Several States, including INDIANA**

Indiana Department of
Environmental Management

By: _____

Thomas W. Easterly
Commissioner

By: _____
Bruce H Palin,
Assistant Commissioner
Office of Land Quality

Ind. Dept. of Environmental Mgmt
100 North Senate Avenue
MC 50-01, ICGN 1301
Indianapolis, IN 46204

Date: _Oct 13, 2010_

Gregory F. Zoeller,
Attorney General of Indiana
Atty. No. 1958-98

By: _____
Patricia Orloff Erdmann
Chief Counsel for Litigation
Atty. No. 17664-49A

By: _____
Timothy J. Junk
Deputy Attorney General
Atty. No. 5587-02

Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204

Date: _Oct. 13, 2010_

## FOR THE STATE OF KANSAS

Date: 10/8/2010

_Roderick Bremby_

RODERICK L. BREMBY
Secretary
Kansas Department of
Health and Environment

In re:                                    )
                                          )        Case No. 09-50026 (REG)
MOTORS LIQUIDATION COMPANY, *et al.*,     )        Chapter 11
        f/k/a General Motors Corp., *et al.*,   )        (Jointly Administered)
                                          )
        Debtors.                          )

**ENVIRONMENTAL RESPONSE TRUST**
**CONSENT DECREE AND SETTLEMENT AGREEMENT**
**AMONG DEBTORS,**
**THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE TRUSTEE,**
**THE UNITED STATES,** *et al.*

**FOR THE STATE OF MICHIGAN**

Date: _Oct. 14, 2010_

_[signature]_

Michael A. Cox
Attorney General

Celeste R. Gill (P52484)
Assistant Attorney General
Environment, Natural Resources and
Agriculture Division
6th Floor, G. Mennen Williams Building
525 West Ottawa Street
P.O. Box 30755
Lansing, MI 48909
Tel.: (517) 373-7540
Fax: (517) 373-1610
gillc1@michigan.gov
Attorneys for the Michigan Department
of Natural Resources and Environment

**FOR THE STATE OF MISSOURI**

Date: _10/2/10_

_[signature]_
CHRIS KOSTER
Attorney General for the State of Missouri

JOHN K. McMANUS
Chief Counsel
Agriculture and Environment Division
P.O. Box 899
Jefferson City, Missouri 65102
Tel.: (573) 751-8370
Fax: (573) 751-8796
Email: jack.mcmanus@ago.mo.gov

Date: _10/13/10_

_[signature]_
Leanne Tippett Mosby
Director
Division of Environmental Quality
Missouri Department of Natural Resources
P.O. Box 176
Jefferson City, Missouri 65102

**FOR THE STATE OF NEW JERSEY**

Date: _October 13, 2010_

_[signature]_

PAULA T. DOW
Attorney General for the State of New Jersey

By: Richard F. Engel
Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey 08625-0093
Tel.: (609) 984-4863
Fax: (609) 341-5030

**FOR THE STATE OF NEW YORK**

ANDREW M. CUOMO
Attorney General

Date: *October 19, 2010*

By: Maureen Leary
Assistant Attorney General
Chief, Toxics Section
NYS Department of Law
Environmental Protection Bureau
The Capitol
Albany, New York 12224-0341
Tel.: (518) 474-7154
Fax: (518) 473-2534
maureen.leary@ag.ny.gov

**FOR THE STATE OF OHIO**

Date: _10/12/10_

RICHARD CORDRAY
Attorney General for the State of Ohio

By:    Michelle T. Sutter
Principal Assistant Attorney General
30 E. Broad Street, 26th Floor
Columbus, Ohio 43215
Tel.: (614) 752-4316
Fax: (866) 483-1104
Email: michelle.sutter@ohioattorneygeneral.gov

**FOR THE COMMONWEALTH OF VIRGINIA**

KENNETH T. CUCCINELLI, II
ATTORNEY GENERAL

Date: 10|18|10

By: _Kerri L. Nicholas_

Kerri L. Nicholas, VSB # 47230
Assistant Attorney General
Environmental Section
Virginia Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
(804) 371-8721
knicholas@oag.state.va.us

**FOR THE STATE OF WISCONSIN**

MATTHEW J. FRANK
Secretary

Date: _10/12/10_

_[signature]_

ALLEN K. SHEA
Deputy Secretary
Wisconsin Department of Natural Resources

Approved as to form:

J.B. VAN HOLLEN
Attorney General

Date: _10/12/10_

_[signature]_

ANNE C. MURPHY
Assistant Attorney General
State Bar # 1031600
Attorneys for the State of Wisconsin

**FOR THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY**

Date: _____10/12/10_____

_____

Beau James Brock
Assistant Secretary
Office of Environmental Compliance
Louisiana Department of Environmental Quality

# FOR THE MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION

MASSACHUSETTS DEPARTMENT OF
ENVIRONMENTAL PROTECTION
By its attorney,

MARTHA COAKLEY,
ATTORNEY GENERAL

Date: _10/14/10_     By:_____

Carol Iancu, MA BBO # 635626
Assistant Attorney General
Environmental Protection Division
Massachusetts Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 963-2428
carol.iancu@state.ma.us

**FOR THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE COMMONWEALTH OF PENNSYLVANIA**

Date: _10/14/10_

_[signature]_

Susan Shinkman
Chief Counsel
Office of Chief Counsel
Rachel Carson State Office Building
400 Market Street
Harrisburg, Pennsylvania  17101-2301

**FOR THE SAINT REGIS MOHAWK TRIBE**

Date: _____

_____
McNAMEE, LOCHNER, TITUS
     & WILLIAMS, P.C.
John J. Privitera, Esq.
Jacob F. Lamme, Esq.
677 Broadway
Albany, New York  12207
Tel.:  (518) 447-3200
Fax:  (518) 426-4260

| MLC Site ID | Site | 1. Total Property Funding [a] | 2. Minimum Estimated Property Funding | 3. Reserve Property Funding | 4. OMM Property Funding [b] | 5. State | 6. Region | 7. Lead Agency | 8. Support Agency |
|---|---|---|---|---|---|---|---|---|---|
| | **Total** | **$431,201,122** | **$295,036,131** | **$52,065,197** | **$84,099,794** | | | | |
| 1190 | GMNA Car - Wilmington | $11,728,473 | $9,084,380 | $1,603,126 | $1,040,967 | DE | 3 | State | EPA | |
| 1233 | GMPT - Danville Landfill | $5,258,489 | $3,090,664 | $545,411 | $1,622,414 | IL | 5 | State | EPA | * |
| 1288 | Former GM Delco Plant 5 | $7,268,319 | $5,508,605 | $972,107 | $787,607 | IN | 5 | EPA | State | |
| Various | Bedford Town Sites (60 Properties) | $4,017,597 | $3,352,197 | $591,564 | $73,836 | IN | 5 | EPA | State | |
| 1316 | Manual Transmission of Muncie | $5,695,448 | $3,715,037 | $655,595 | $1,324,816 | IN | 5 | State | EPA | |
| 1191 | Metal Fab - Indianapolis | $3,713,446 | $1,890,167 | $333,559 | $1,489,720 | IN | 5 | State | EPA | |
| 1320 | Delphi I - Anderson/Monroe | $2,811,565 | $2,280,338 | $402,413 | $128,814 | IN | 5 | State | EPA | |
| 1325 | Allison Gas Turbines | $1,668,107 | $416,235 | $73,453 | $1,178,419 | IN | 5 | State | EPA | |
| 1234 | Venture 2000 Property | $0 | $0 | $0 | $0 | IN | 5 | EPA | State | |
| 1329 | 1-Acre Fire Suppression Lot | $0 | $0 | $0 | $0 | IN | 5 | EPA | State | |
| 1289-1 | Fairfax I Plant | $4,786,321 | $3,727,624 | $657,816 | $400,881 | KS | 7 | State | EPA | |
| 1289-2 | Fairfax Parking Lot | $0 | $0 | $0 | $0 | KS | 7 | State | EPA | |
| 1192 | GMVM - Shreveport Assembly (exclude Stamping) | $0 | $0 | $0 | $0 | LA | 6 | State | EPA | |
| 1290 | MCD - Framingham Landfill | $2,325,836 | $623,123 | $109,963 | $1,592,750 | MA | 1 | State | EPA | ** |
| 1199-1 | GMPT - Willow Run | $35,779,454 | $22,761,031 | $4,016,652 | $9,001,771 | MI | 5 | State | EPA | |
| 1295 | GMNA - Buick City | $32,959,117 | $21,258,669 | $3,751,530 | $7,948,918 | MI | 5 | EPA | State | |
| 1197 | Pontiac North | $11,015,247 | $9,025,526 | $1,592,740 | $396,981 | MI | 5 | EPA | State | |
| 1003 | GMPT Saginaw Malleable | $10,725,985 | $7,310,082 | $1,290,014 | $2,125,889 | MI | 5 | State | EPA | |
| 1004 | Saginaw Nodular Iron (PIMS297) | $4,668,779 | $3,510,346 | $619,473 | $538,960 | MI | 5 | State | EPA | |
| 1300-3 | GMNA Car (Fisher Body) - Lansing | $7,736,956 | $5,013,345 | $884,708 | $1,838,903 | MI | 5 | State | EPA | |
| 3064 | Midsize & Luxury Car - Willow Run | $7,573,707 | $5,737,276 | $1,012,460 | $823,971 | MI | 5 | State | EPA | |
| 1302 | Delphi C - Livonia Groundwater | $6,669,037 | $2,734,383 | $482,538 | $3,452,116 | MI | 5 | EPA | State | |
| 1300-1 | GMNA Car - Lansing  2 | $5,509,240 | $3,800,527 | $670,681 | $1,038,032 | MI | 5 | State | EPA | |
| 1300-2 | GMNA Car - Lansing 3 | $5,385,566 | $3,695,404 | $652,130 | $1,038,032 | MI | 5 | State | EPA | |
| 1103 | Delphi I - Coldwater Rd. (Landfill) | $4,250,661 | $1,829,223 | $322,804 | $2,098,634 | MI | 5 | State | EPA | |
| 1198 | Stamping - Grand Rapids | $3,785,208 | $2,212,186 | $390,386 | $1,182,636 | MI | 5 | State | EPA | |
| 1100 | GMPT Bay City | $3,526,770 | $1,018,689 | $179,769 | $2,328,312 | MI | 5 | State | EPA | |
| 1299 | Flint West - Flint River (Bluff Street) | $3,186,069 | $2,708,159 | $477,910 | $0 | MI | 5 | EPA | State | |
| 1107 | Vacant Land South of Van Born (68 acres) | $3,210,644 | $2,609,105 | $460,430 | $141,109 | MI | 5 | EPA | State | |
| 1195 | GMPT - Livonia | $1,861,394 | $1,582,185 | $279,209 | $0 | MI | 5 | EPA | State | |
| 1106 | Greenpoint Landfill | $1,774,460 | $790,276 | $139,460 | $844,724 | MI | 5 | State | EPA | |
| 1291 | Hemphill lot | $1,779,650 | $1,476,984 | $260,644 | $42,022 | MI | 5 | State | EPA | |
| 1327 | Peregrine - Coldwater Rd. (plant) | $1,471,173 | $1,005,992 | $177,528 | $287,653 | MI | 5 | State | EPA | |
| 1001 | Employee Development Center | $1,213,426 | $1,031,412 | $182,014 | $0 | MI | 5 | State | EPA | |
| 1121 | Chevrolet-Pontiac-Canada Pontiac Fiero Assembly Plant | $839,741 | $713,780 | $125,961 | $0 | MI | 5 | EPA | State | |
| 1292 | Davison Road Land | $612,280 | $460,386 | $81,245 | $70,649 | MI | 5 | State | EPA | |
| 1296 | Dort Highway Land | $528,634 | $449,339 | $79,295 | $0 | MI | 5 | EPA | State | |
| 1306-1 | PCC-Validation | $470,639 | $400,043 | $70,596 | $0 | MI | 5 | EPA | State | |
| 1328 | Saginaw PLt 2 Landfill | $374,204 | $318,073 | $56,131 | $0 | MI | 5 | State | EPA | |

| MLC Site ID | Site | 1. Total Property Funding [a] | 2. Minimum Estimated Property Funding | 3. Reserve Property Funding | 4. OMM Property Funding [b] | 5. State | 6. Region | 7. Lead Agency | 8. Support Agency |
|---|---|---|---|---|---|---|---|---|---|
| 1308 | Pontiac Centerpoint Campus - West | $215,981 | $183,584 | $32,397 | $0 | MI | 5 | EPA | State |
| 1002 | Powertrain - Romulus Engineering Center | $276,029 | $234,625 | $41,404 | $0 | MI | 5 | State | EPA |
| 1005 | Former Howard W/H - Vacant Land | $248,252 | $211,014 | $37,238 | $0 | MI | 5 | State | EPA |
| 1108 | Textile Road Land | $160,789 | $136,671 | $24,118 | $0 | MI | 5 | EPA | State |
| 1310 | ACC - Penske site | $150,495 | $127,921 | $22,574 | $0 | MI | 5 | State | EPA |
| 1102 | Linden Road Landfill | $167,523 | $72,626 | $12,816 | $82,081 | MI | 5 | State | EPA |
| 1297 | Windiate Park Lots | $143,971 | $80,673 | $14,236 | $49,062 | MI | 5 | State | EPA |
| 1294 | Lot 8 - 6241 Cass Avenue at Amsterdam Ave. | $124,382 | $105,725 | $18,657 | $0 | MI | 5 | State | EPA |
| 1101 | 6560 Cass Ave/GMNA New Center Complex | $59,107 | $50,241 | $8,866 | $0 | MI | 5 | State | EPA |
| 1298-1 | GLTC land (Atherton Landfill/Die Lot Parking) | $223,394 | $189,885 | $33,509 | $0 | MI | 5 | State | EPA |
| 1006 | Vacant Land (76 acres) | $20,924 | $17,785 | $3,139 | $0 | MI | 5 | EPA | State |
| 1104 | Delphia C Livonia Coil & Bumper | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1105 | Land along Stanley Road | $0 | $0 | $0 | $0 | MI | 5 | State | EPA |
| 1116 | Fiero Site (Powerhouse) | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1120 | Flint Flow-through Warehouse | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1194 | GMPT - Flint North #5/#10/#81 | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1196 | GMVM - Pontiac Assembly | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1293 | Midsize & Luxury Car Clark Street | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1301 | Delta Engine Plant | $0 | $0 | $0 | $0 | MI | 5 | State | EPA |
| 1303 | 1831 Grondinwood (residence) | $0 | $0 | $0 | $0 | MI | 5 | State | EPA |
| 1304 | 1394 Oak Hollow (residence) | $0 | $0 | $0 | $0 | MI | 5 | State | EPA |
| 1305 | Pontiac Centerpoint Campus - Central | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1307 | Pontiac Centerpoint Campus - East | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1309 | Centerpoint Land (no Etkin ground lease) | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1311 | Centerpoint Land (Etkin ground lease) | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1312 | 652 Meadow Drive | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1313 | 642 Meadow Drive | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1314 | 631 Meadow Drive | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1315 | 607 Meadow Drive | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1199-2 | Willow Run Engineering Center | $0 | $0 | $0 | $0 | MI | 5 | State | EPA |
| 1306-2 | PCC Validation Southern Parking Lot | $0 | $0 | $0 | $0 | MI | 5 | EPA | State |
| 1007 | Former Leed's Assembly Plant - Northern Parcel | $1,724,806 | $1,166,210 | $205,802 | $352,794 | MO | 7 | State | EPA |
| 1109 | Former Leed's Assembly Plant - Southern Parcel | $0 | $0 | $0 | $0 | MO | 7 | State | EPA |
| 1008 | Hyatt Clark Industries | $14,176,022 | $6,900,785 | $1,217,786 | $6,057,451 | NJ | 2 | State | EPA |
| 1009 | Delphi Interior & Lighting Systems - Trenton | $10,532,047 | $8,422,742 | $1,486,366 | $622,939 | NJ | 2 | State | EPA |
| 1200 | Massena | $120,860,604 | $92,352,887 | $16,297,568 | $12,210,149 | NY | 2 | EPA | State |
| 1010 | GM-IFG Syracuse | $31,121,812 | $17,720,946 | $3,127,226 | $10,273,640 | NY | 2 | State | EPA |
| 1110 | Ley Creek PCB Dredging Site | $1,882,342 | $415,634 | $73,347 | $1,393,361 | NY | 2 | State | EPA |
| 1098 | Tonawanda Engine Landfill | $0 | $0 | $0 | $0 | NY | 2 | State | EPA |
| 1317 | Delphi Harrison - Moraine | $25,759,964 | $19,306,452 | $3,407,021 | $3,046,491 | OH | 5 | EPA | State |
| 1111 | Delphi Interior - Elyria | $7,263,306 | $3,421,417 | $603,780 | $3,238,109 | OH | 5 | State | EPA |

# ATTACHMENT A
## Environmental Response Trust Property Funding for Environmental Activities

| MLC Site ID | Site | 1. Total Property Funding [a] | 2. Minimum Estimated Property Funding | 3. Reserve Property Funding | 4. OMM Property Funding [b] | 5. State | 6. Region | 7. Lead Agency | 8. Support Agency |
|---|---|---|---|---|---|---|---|---|---|
| 1201 | Stamping - Mansfield | $2,990,952 | $2,110,204 | $372,389 | $508,359 | OH | 5 | State | EPA |
| 1099 | GMPT - Toledo 103C Landfill | $2,634,063 | $1,087,244 | $191,867 | $1,354,952 | OH | 5 | EPA | State |
| 1203 | GMPT - Parma Complex | $746,705 | $634,699 | $112,006 | $0 | OH | 5 | State | EPA |
| 1011 | Lordstown Excess Land | $0 | $0 | $0 | $0 | OH | 5 | State | EPA |
| 1012 | Moraine Lagoon | $0 | $0 | $0 | $0 | OH | 5 | EPA | State |
| 1202 | Moraine Assembly | $0 | $0 | $0 | $0 | OH | 5 | EPA | State |
| 1204 | Metal Fab - Pittsburgh | $3,299,231 | $2,757,748 | $486,661 | $54,822 | PA | 3 | State | EPA |
| 1205 | GMPT - Fredericksburg | $25,922 | $22,034 | $3,888 | $0 | VA | 3 | State | EPA |
| 1013 | Janesville Training Center | $210,857 | $165,588 | $29,221 | $16,048 | WI | 5 | State | EPA |

**Notes:**

[a] Funding as of August 13, 2010 and subject to the adjustments provided for under paragraph 36 and 37 of the Settlement Agreement.

Present value calculated as of January 2011, using Laddered Treasuries for discount rate (2/10/10) and CBO CPI projection for inflation rate (1/28/10).

[b] Long-term OMM costs after 10 years of remediation.

\* In addition, $102,390 in funding for closure and post-closure activities will be placed in an Illinois trust fund created pursuant to 35 Ill. Adm. Code 807.661.

\*\* In addition, $786,944 in funding for long-term OMM will be placed in a Massachusetts expendable trust account.

# ATTACHMENT B

## Properties with Existing and Prospective Contracts for Demolition Activities

| PO Number | Effective Date | Expiration Date | Vendor # | Vendor Name | Description |
|---|---|---|---|---|---|
| FLN0003 STD | 7/12/2010 | 12/31/2010 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | FEA Flint North |
| FLN0005 STD | 7/1/2010 | 7/31/2010 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | O&C Flint North |
| FLN0006 STD | 7/19/2010 | 1/15/2012 | 00-BIER | Bierlein | Demo Flint North |
| FLN00xx STD | 11/29/2010 | 11/29/2012 | TBD | TBD | Demo Flint North |
| LAN0005 STD | 4/5/2010 | 12/31/2010 | 00-HANDI | Handijon, Inc. | Service Lansing |
| LAN0006 STD | 4/5/2010 | 12131/2010 | 00-BESCO | Besco Water Treatment | Service Lansing |
| LAN0007 STD | 7/12/2010 | 12/31/2010 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | O&C Lansing |
| LAN00xx STD | 9/21/2010 | 1/31/2011 | TBD | TBD | Demo Lansing |
| MAN0001 STD | 2/9/2010 | 2/9/2011 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | FEA Mansfield |
| MAS00xx STD | 9/7/2010 | 12/31/2011 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | OSR Massena |
| MAS00xy STD | 9/17/2010 | 12/31/2011 | 00-BRAND | Brandenburg | Demo Massena |
| PPM0004 STD | 6/22/2010 | 12/19/2010 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | FEA Pontiac N |
| REC0001 STD | 8/9/2010 | 11/7/2010 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | O&C Romulus |
| REC0002 STD | | | 00-ADAMO | Adamo Group Inc. | Demo Romulus |
| SMI0001 STD | 10/12/2009 | 12/12/2011 | 00-NOAMDIS | North American Dismantling | Demo SMI |
| SMI0002 STD | 2/1/2010 | 11/30/2010 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | O&C SMI |
| WLR0002 STD | 6/22/2010 | 6/22/2011 | 00-OBRIEN | O'Brien & Gere Engineers, Inc | FEA |

**ENVIRONMENTAL RESPONSE TRUST AGREEMENT**


**BY AND AMONG**


**MOTORS LIQUIDATION COMPANY f/k/a GENERAL MOTORS CORP.,
REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC.,**
and
**ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.**
as Settlors,


**EPLET, LLC,**
not individually but solely in its representative capacity
as Environmental Response Trust Administrative Trustee,


**AND**


**THE UNITED STATES OF AMERICA,**
as Environmental Response Trust Beneficiary and Powers and Rights Holder


**AND**


**THE STATES OF DELAWARE, ILLINOIS, INDIANA, KANSAS, MICHIGAN,
MISSOURI, NEW JERSEY, NEW YORK, OHIO, WISCONSIN, COMMONWEALTH
OF VIRGINIA, THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY,
THE MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION,
THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE
COMMONWEALTH OF PENNSYLVANIA AND THE SAINT REGIS MOHAWK
TRIBE**
as Environmental Response Trust Powers and Rights Holders


As of [INSERT], 2010

# TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS AND PRINCIPLES OF CONSTRUCTION...................................... 2
1.1    Definitions.........................................................................................................2
1.2    Principles of Construction..............................................................................9

ARTICLE 2 ESTABLISHMENT OF THE ENVIRONMENTAL RESPONSE TRUST............. 9
2.1    Name .................................................................................................................9
2.2    Establishment of Environmental Response Trust ..........................................9
2.3    Purpose of the Environmental Response Trust .............................................10
2.4    Transfer of Ownership ..................................................................................10
2.5    Transfer of Funds and Creation of Environmental Response Trust Accounts ...............11
2.6    Holder of Environmental Response Trust Assets .........................................12
2.7    Management of Environmental Response Trust Assets .................................12
2.8    Investment and Safekeeping of Environmental Response Trust Assets........................13
2.9    Insurance Policy to Cover Cost Overruns with Respect to  Future
       Response Actions..........................................................................................14
2.10   Access and Institutional Controls ................................................................14
2.11   Internal Accounting .......................................................................................15
2.12   Inspection of Books ......................................................................................15
2.13   Independent Audits .......................................................................................15
2.14   Termination....................................................................................................16
2.15   Property Disposition .....................................................................................17

ARTICLE 3 WORK AND DISTRIBUTIONS.......................................................... 17
3.1    Budgets for and Payments by the Environmental Response Trust ...............17
3.2    Manner of Payment........................................................................................19
3.3    Unclaimed Distributions ...............................................................................20

ARTICLE 4 THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE
TRUSTEE      ...................................................................................................... 20
4.1    Appointment ..................................................................................................20
4.2    General Authority ..........................................................................................21
4.3    Powers............................................................................................................21
4.4    Cleanup Managers .........................................................................................23
4.5    Redevelopment Manager ...............................................................................24
4.6    Retention of Professionals ............................................................................24
4.7    Executive Compensation ...............................................................................25
4.8    Limitation of the Environmental Response Trust Administrative
       Trustee's Authority.......................................................................................25
4.9    Reliance by the Environmental Response Trust Protected Parties ...............25
4.10   Cost Reimbursement of the Environment Response Trust Administrative Trustee .......26
4.11   Liability of Environmental Response Trust Protected Parties.......................26
4.12   Exculpation and Indemnification ..................................................................27
4.13   Termination of the Environmental Response Trust, Replacement or Removal
       of the Environmental Response Trust Administrative Trustee......................28
4.14   Appointment of Successor Environmental Response Trust Administrative Trustee......30
4.15   No Bond.........................................................................................................30

ARTICLE 5 ENVIRONMENTAL RESPONSE TRUST BENEFICIARY AND POWERS
AND RIGHTS HOLDERS .................................................................................. 30
   5.1     Environmental Response Trust Beneficiary .................................................30
   5.2     Identification of Environmental Response Trust Beneficiary ......................30
   5.3     Settlors and Powers and Rights Holders.....................................................32
   5.4     Transfer of Beneficial Interests, Rights and Powers....................................40

ARTICLE 6 REPORTING AND TAXES........................................................................ 40
   6.1     Reports ........................................................................................................40
   6.2     Other ...........................................................................................................41
   6.3     Reports in Support of Insurance Claims .....................................................41
   6.4     Tax Treatment of the Environmental Response Trust ..................................41
   6.5     Taxable Entity .............................................................................................41
   6.6     Trustee as Administrator..............................................................................42
   6.7     Fiscal Year ..................................................................................................42
   6.8     Property Taxes .............................................................................................42
   6.9     Expedited Determination .............................................................................43

ARTICLE 7 MISCELLANEOUS PROVISIONS ........................................................... 43
   7.1     Amendments and Waivers ...........................................................................43
   7.2     Cooperation.................................................................................................43
   7.3     Situs of the Environmental Response Trust..................................................44
   7.4     Headings .....................................................................................................44
   7.5     Severability .................................................................................................44
   7.6     Sufficient Notice .........................................................................................45
   7.7     Counterparts................................................................................................45
   7.8     Actions Taken on Other Than Business Day................................................45
   7.9     Compliance with Laws ................................................................................45
   7.10   Preservation of Privilege.............................................................................45
   7.11   No Partnership ............................................................................................46
   7.12   Uniform Trust Act.......................................................................................46
   7.13   Dispute Resolution......................................................................................46

EXHIBIT "A" – Legal Description of Properties Transferred to the Environmental
               Response Trust

EXHIBIT "B" – Form of Quitclaim Deed

EXHIBIT "C" – List of Transferred Contracts

# ENVIRONMENTAL RESPONSE TRUST AGREEMENT

This Environmental Response Trust Agreement ("Agreement") is made and entered as of the **[INSERT]** day of **[INSERT]**, by and among Motors Liquidation Company f/k/a General Motors Corp. ("MLC"), a Delaware corporation, Remediation and Liability Management Company ("REALM"), a Michigan corporation, and Environmental Corporate Remediation Company, Inc. ("ENCORE"), a Delaware corporation, as debtors and debtors in possession in the Bankruptcy Case (defined below) (collectively "Settlors" or "Debtors"); EPLET, LLC, not individually but solely in its representative capacity as Environmental Response Trust Administrative Trustee (defined herein) of the Environmental Response Trust established hereby (the "Environmental Response Trust"); the United States of America (the "Environmental Response Trust Beneficiary" or "United States"); the States of Delaware, Illinois, Indiana, Kansas, Michigan, Missouri, New Jersey, New York, Ohio, Virginia and Wisconsin and the Louisiana Department of Environmental Quality, the Massachusetts Department of Environmental Protection and the Department of Environmental Protection of the Commonwealth of Pennsylvania (collectively, the "States") and the St. Regis Mohawk Tribe (the "Tribe").

## R E C I T A L S :

WHEREAS, on June 1, 2009, MLC and certain of its affiliates and subsidiaries commenced liquidation cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as amended ( "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York, ("Bankruptcy Court"), and on October 9, 2009, REALM and ENCORE commenced liquidation cases by filing voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code in the Bankruptcy Court, (collectively, "Chapter 11 Cases");

WHEREAS, on August 31, 2010, the Debtors filed a Chapter 11 Plan of Liquidation ("Plan of Liquidation") (as amended, modified and supplemented from time to time) with the Bankruptcy Court;

WHEREAS, Settlors are potentially responsible or liable parties with respect to the Properties (identified in Attachment A to the Environmental Response Trust Consent Decree and Settlement Agreement Among Debtors, the Administrative Trustee, the United States and certain States ("Settlement Agreement")) and surrounding areas where Hazardous Substances have migrated, are continuing to migrate, or otherwise have or will come to be located, and are obliged as owner of the Properties to comply with applicable law, including Environmental Law;

WHEREAS, the Settlors, the United States and the States have entered into the Settlement Agreement with respect to the Properties;

WHEREAS, the Plan of Liquidation provides for the creation of the Environmental Response Trust and transfer of certain of the Properties and Funding (defined below) to the Environmental Response Trust to be administered by the Environmental Response Trust Administrative Trustee pursuant to this Agreement and the Settlement Agreement;

WHEREAS, in accordance with the Plan, this Agreement and the Settlement Agreement, the Environmental Response Trust is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability under environmental laws; and, in connection therewith, to conduct, manage and/or fund Environmental Actions with respect to certain of the Properties, including the migration of Hazardous Substances emanating from certain of the Properties, in accordance with the provisions of this Settlement Agreement and the Trust Agreement; to reimburse the Lead Agency for Environmental Actions it conducts or has agreed to pay for with respect to the Properties; own certain of the Properties; carry out administrative and property management functions related to certain of the Properties and pay associated administrative costs; and try to sell or transfer the Properties owned by the Environmental Response Trust so that they can be put to productive or beneficial use;

WHEREAS, pursuant to the Plan of Liquidation and the Settlement Agreement, on the Effective Date (defined below), Debtors shall transfer certain of the Properties, along with the Funds (defined below), to the Environmental Response Trust;

WHEREAS, this Agreement and the Settlement Agreement govern the Environmental Response Trust, which is created pursuant to section 1.468B-1 of the Treasury Regulations promulgated under the Internal Revenue Code;

WHEREAS, the Environmental Response Trust shall be the exclusive holder of the assets described herein and in the Settlement Agreement for purposes of 31 U.S.C. § 3713(b); and

WHEREAS, the Environmental Response Trust is intended to qualify as a qualified settlement fund pursuant to section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder ("Treasury Regulations").

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein and in the Settlement Agreement, the Parties hereby agree as follows:

ARTICLE 1
DEFINITIONS AND PRINCIPLES OF CONSTRUCTION

1.1     Definitions

The following terms as used in this Agreement shall have the definitions given below:

 1.1.1   "Administrative Expenses" means the expenses incurred in administering the Environmental Response Trust, including but not limited to property taxes, liability insurance, security, personnel costs, utilities, maintenance, professional fees, Property marketing costs, and demolition costs unrelated to Environmental Actions.

 1.1.2   "Administrative Funding Account" means the funding held by the Environmental Response Trust for the costs necessary for the

administration of the Environmental Response Trust and the orderly wind-down of the Properties, including, but not limited to, Administrative Expenses. Such funding shall be set aside in separate dedicated subaccounts. Funds in the Administrative Funding Account shall not be used by the Administrative Trustee to fund any Environmental Action.

1.1.3 "<u>Administrative Funding Reserve Account</u>" means the funding held by the Environmental Response Trust in a separate dedicated account for the express purpose of being used by the Administrative Trustee to fund actual or projected shortfalls in the Administrative Funding Account identified by the Administrative Trustee prior to the third anniversary of the Effective Date. Such shortfalls are strictly limited to unexpectedly high demolition costs and Property holding costs and unexpectedly low proceeds derived from rental of Properties or proceeds derived from the sale of Properties or personalty. The Administrative Funding Reserve Account shall not be used under any circumstances to fund any Environmental Action or any administrative or personnel matters, including legal or professional matters.

1.1.4 "<u>Administrative Trustee</u>" or "<u>Environmental Response Trust Administrative Trustee</u>" means (i) EPLET, LLC, not individually but solely in its representative capacity as Administrative Trustee, by and through Elliott Laws, not individually but solely in his representative capacity as president, manager or managing member of the Administrative Trustee, of the Environmental Response Trust that is created pursuant to this Environmental Response Trust Agreement, the <u>Settlement Agreement</u>, and the Debtors' <u>Plan of Liquidation</u>, as detailed in, *inter alia*, paragraphs 29 through 32 of the Settlement Agreement, and (ii) any successor thereto.

1.1.5 "<u>Agreement</u>" means this Environmental Response Trust Agreement.

1.1.6 "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of New York.

1.1.7 "<u>Bankruptcy Code</u>" means chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as amended.

1.1.8 "<u>Beneficiary</u>" or "<u>Environmental Response Trust Beneficiary</u>" means the United States.

1.1.9 "<u>CERCLA</u>" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq*., as amended.

1.1.10 "<u>Chapter 11 Cases</u>" means the voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code in the Bankruptcy Court filed by MLC and certain of its affiliates and subsidiaries on June 1, 2009, and by REALM and ENCORE on October 9, 2009.

1.1.11 "Cleanup Manager" or "Environmental Response Trust Cleanup Manager" means an employee of the Environmental Response Trust or the Environmental Response Trust Administrative Trustee with responsibilities for certain Environmental Actions and related activities at Properties located in a specified geographic area, as described and designated pursuant to, *inter alia*, Paragraphs 45-47 of the Settlement Agreement.

1.1.12 "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan of Liquidation pursuant to section 1129 of the Bankruptcy Code.

1.1.13 "Court" means the Bankruptcy Court or, if the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of this Agreement, a United States District Court having competent jurisdiction with respect to such matters.

1.1.14 "Cushion Funding Account" means the funding held by the Environmental Response Trust that is available for Environmental Actions at any of the Properties under the circumstances described in Paragraphs 57 and 58 of the Settlement Agreement.

1.1.15 "Debtors" means MLC, REALM and ENCORE.

1.1.16 "EDC" means the Government of Canada and the Government of Ontario, through the Export Development Canada, Canada's export trading agency.

1.1.17 "Effective Date" means the day on which the Plan of Liquidation becomes effective in accordance with its terms and the Confirmation Order.

1.1.18 "Environmental Action" means any response, removal, investigation, sampling, remediation, reclamation, closure, post-closure, corrective action, engineering controls, institutional controls, deed restrictions, oversight costs and OMM activities authorized or required under law with respect to a Property.

1.1.19 "Environmental Costs" means the costs and expenses of implementing Environmental Actions with respect to any Property that are part of an approved budget.

1.1.20 "Environmental Cost Account" shall mean each of the Minimum Estimated Property Funding Account, Reserve Property Funding Account and Long Term OMM Property Funding Account.

1.1.21 "Environmental Response Trust" means the Environmental Response Trust as such term is defined in the Plan of Liquidation and the Settlement Agreement. Actions of the Environmental Response Trust shall be performed by or at the direction of the Administrative Trustee.

1.1.22 "<u>Environmental Response Trust Account</u>" shall have the meaning given in Section 2.5.2. hereof.

1.1.23 "<u>Environmental Response Trust Assets</u>" means the funding placed in the Environmental Response Trust Accounts and the assets transferred to the Environmental Response Trust in accordance with this Agreement, the Settlement Agreement and the Plan, but shall not include any General Motors, LLC ("New GM") securities. The Environmental Response Trust Assets are comprised of (i) Cash in the amount of no less than $641,414,653 million, as adjusted pursuant to Paragraphs 36 and 37 of the Settlement Agreement; (ii) the Properties listed in Exhibit "A" to this Trust Agreement; (iii) personal property, including equipment, related to certain of the Properties; (iv) all leases of Environmental Response Trust Assets with New GM; (v) all Transferred Contracts; and (vi) such other assets acquired or held by the Environmental Response Trust from time to time pursuant to this Agreement, the Settlement Agreement and the Plan of Liquidation, or an order of the Court.

1.1.24 "<u>Environmental Response Trust Protected Parties</u>" means the Administrative Trustee, individually and/or in its capacity as official representative of the Environmental Response Trust, and the Environmental Response Trust's and the Administrative Trustee's shareholders, members, officers, managers, directors, employees (including but not limited to the Cleanup Managers and the Redevelopment Manager), attorneys and agents, if any, solely in their capacities as such. Each of the Environmental Response Trust Protected Parties is, individually, an Environmental Response Trust Protected Party. For avoidance of doubt, the Environmental Response Trust is not an Environmental Response Trust Protected Party.

1.1.25 "<u>Environmental Response Trust Proceeds</u>" means income, interest earned and proceeds of any liquidation, sale, lease, recovery or other disposition of or other proceeds with respect to the Environmental Response Trust Assets.

1.1.26 "<u>Environmental Response Trust Beneficiary</u>" or "<u>Beneficiary</u>" means the United States of America ("United States").

1.1.27 "<u>Environmental Law</u>" means any applicable federal, tribal, state or local law, statute, ordinance, rule, regulation or code, any license, permit, authorization, administrative or court order, judgment, decree or injunction, including all common law, related to pollution, protection or restoration of health, safety or the environment, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of pollutants or Hazardous Substances, including, without limitation, CERCLA; RCRA; the Clean Air Act, 42 U.S.C. Section 7401, et seq.; the Federal Water Pollution

Control Act, 33 U.S.C. Section 1251, et seq.; the Toxic Substances Control Act, 15 U.S.C. Section 2601, et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. Section 11001, et seq.; the Safe Drinking Water Act, 42 U.S.C. Section 300f, et seq.; the Oil Pollution Act of 1990, 33 U.S.C. Section 2701 et seq.; and the Occupational Safety and Health Act, 29 U.S.C. 651, et seq. as it relates to the exposure of Hazardous Substances, and any applicable tribal, state, or local law counterparts, as the same may be reauthorized or amended from time to time.

1.1.28 "Final Order" means a court order that has not been reversed, stayed, modified, or amended, and as to which (i) the time to appeal, seek review, rehearing or remand, or petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; or (ii) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

1.1.29 "Funds" or "Funding" means those funds contributed by the Debtors to the Environmental Response Trust in an amount no less than $641,414,653 in order to pay Environmental Costs and Administrative Expenses of the Properties and the Environmental Response Trust, and to fulfill the purposes of the Environmental Response Trust consistent with this Agreement and the Settlement Agreement.

1.1.30 "Governments" means the United States, the States, and the Tribe.

1.1.31 "Hazardous Substances" means all materials, substances, or wastes defined, designated, regulated or classified as hazardous, toxic or radioactive, under any Environmental Laws, whether by type or by quantity, and includes but is not limited to petroleum or any derivative or by-product thereof and asbestos containing materials.

1.1.32 "Indemnifiable Expenses" has the meaning set forth in Section 4.12.2.

1.1.33 "Internal Revenue Code" or "IRC" means title 26 of the Internal Revenue Code of 1986, as amended, 26 U.S.C. §§ 1 *et seq.*

1.1.34 "Lead Agency" means the agency designated as such for each Property, as reflected on Attachment A Column 7 to the Settlement Agreement. For each Property, the Lead Agency shall either be the U.S. EPA, or an agency of the State in which the Property is located. The U.S. EPA and the State in which a Property is located may provide the Administrative Trustee with joint written notice that the Lead Agency for the Property has changed.

1.1.35 "Long Term OMM Property Funding Account" means the funding (if any) to be held by the Environmental Response Trust and to be set aside in

separate dedicated subaccounts for each Property and preserved for OMM with respect to each Property beginning ten years after the Effective Date.

1.1.36 "<u>Minimum Estimated Property Funding Account</u>" means the funding to be held by the Environmental Response Trust and to be set aside in separate dedicated subaccounts for each Property that has been estimated as the minimum amount of funding with respect to Environmental Actions with respect to each Property.

1.1.37 "<u>MSPA</u>" means the Amended and Restated Master Sale and Purchase Agreement by and among General Motors Corporation and its debtor subsidiaries, as Sellers, and NGMCO, Inc., as successor in interest to Vehicle Acquisition Holdings LLC, a purchaser sponsored by the U.S. treasury, as purchaser, dated as of June 26, 2009, together with all related documents and agreements as well as all exhibits, schedules, and addenda thereto, as amended, restated, modified, or supplemented from time to time.

1.1.38 "<u>OMM</u>" means operation, monitoring and maintenance activities required as Environmental Actions.

1.1.39 "<u>Parties</u>" means the Settlors, the Environmental Response Trust Administrative Trustee and the Governments.

1.1.40 "<u>Person</u>" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, charitable foundation, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

1.1.41 "<u>Plan of Liquidation</u>" means the Chapter 11 Plan of Liquidation filed by Debtors on August 31, 2010, as amended, modified and supplemented from time to time and incorporating the Settlement Agreement.

1.1.42 "<u>Properties</u>" means each of the 89 properties that are set forth and more particularly described in Attachment A to the Settlement Agreement including, without limitation, all Settlor-owned fixtures, improvements, and equipment located thereon as of the Effective Date and all appurtenances, rights, easements, rights-of-way, mining rights, mineral rights, mineral claims, appurtenant groundwater rights, associated surface water rights, claims and causes of actions, and filings or other interests relating to or benefitting such properties.

1.1.43 "<u>RCRA</u>" means the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., as amended.

1.1.44 "<u>Redevelopment Manager</u>" means the employee of the Environmental Response Trust Administrative Trustee with responsibilities relating to the

return of Properties to beneficial use, as described in and designated pursuant to, *inter alia*, Paragraph 48 of the Settlement Agreement.

1.1.45 "Reserve Property Funding Account" means the funding to be held by the Environmental Response Trust and to be set aside in separate dedicated subaccounts for each Property that has been estimated as an appropriate minimum amount of reserve funding with respect to Environmental Actions with respect to each Property for use in performing Environmental Actions upon exhaustion of the Minimum Estimated Property Funding Account.

1.1.46 "Settlement Agreement" means the Environmental Response Trust Consent Decree and Settlement Agreement Among Debtors, the Administrative Trustee, the United States and Certain States dated October 20, 2010.

1.1.47 "Settlors" means MLC, REALM and ENCORE.

1.1.48 "States" means the States (or Commonwealths) of Delaware, Illinois, Indiana, Kansas, Michigan, Missouri, New Jersey, New York, Ohio, Pennsylvania, Virginia, and Wisconsin, and the Louisiana Department of Environmental Quality, the Massachusetts Department of Environmental Protection, and the Department of Environmental Protection of the Commonwealth of Pennsylvania.

1.1.49 "Superfund" means the "Hazardous Substance Superfund" established by 26 U.S.C. § 9507 or, in the event such Hazardous Substance Superfund no longer exists, any successor fund or comparable account of the Treasury of the United States to be used for removal or remedial actions to address releases or threats of releases of Hazardous Substances.

1.1.50 "Support Agency" means the agency listed as such for each Property on Attachment A Column 8 to the Settlement Agreement. Where a State environmental agency is the Lead Agency, U.S. EPA will be the Support Agency; where U.S. EPA is the Lead Agency, the State and, where applicable, Tribal environmental agency will be the Support Agency.

1.1.51 "Transferred Contracts" means those contracts and agreements relating to the Properties listed in Exhibit "C" to this Agreement.

1.1.52 "Treasury Regulations" means the Treasury Regulations promulgated under the Internal Revenue Code.

1.1.53 "Tribe" means the Saint Regis Mohawk Tribe.

1.1.54 "United States" means the United States of America, and all of its agencies, departments, and instrumentalities, including the U.S. EPA and the United States Department of the Treasury.

1.1.55 "U.S. EPA" means the United States Environmental Protection Agency and any successor departments or agencies of the United States.

1.1.56 "U.S. Treasury" means the United States Department of the Treasury and any successor departments or agencies of the United States.

1.2 Principles of Construction

1.2.1 The meanings set forth for defined terms in Section 1.1 or elsewhere in this Agreement shall be equally applicable to both the singular and plural forms of the terms defined.

1.2.2 All references to "this Agreement" or "hereof" and other like terms mean, unless the context requires otherwise, this Agreement, including the Exhibits hereto, as it may be amended, modified or supplemented from time to time in accordance with the terms of this Agreement.

1.2.3 The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

1.2.4 References in this Agreement to Sections and Exhibits, unless otherwise specified, are to Sections of and Exhibits to this Agreement.

1.2.5 To the extent reasonably possible, the provisions of this Agreement shall be interpreted in a manner consistent with the Plan of Liquidation and the Settlement Agreement. Where the provisions of this Agreement are irreconcilable with the provisions of the Plan of Liquidation, the terms of this Agreement shall govern. Where the provisions of this Agreement are irreconcilable with the provisions of the Settlement Agreement, the terms of the Settlement Agreement shall govern.


ARTICLE 2
ESTABLISHMENT OF THE ENVIRONMENTAL RESPONSE TRUST

2.1 Name

The name of the Environmental Response Trust shall be the "[___] Environmental Response Trust."

2.2 Establishment of Environmental Response Trust

The Parties establish the Environmental Response Trust pursuant to this Agreement and the Settlement Agreement and as approved by the Bankruptcy Court to be effective as of the Effective Date to accomplish the purposes of the Environmental Response Trust described in Section 2.3 below and to benefit the Environmental Response Trust Beneficiary. It is the intention of the Parties that this Agreement and the Settlement Agreement constitute the

governing instruments of the Environmental Response Trust.  As of the Effective Date, the Environmental Response Trust Administrative Trustee shall have all the rights, powers and duties set forth herein and in the Settlement Agreement with respect to accomplishing the purpose of the Environmental Response Trust as set forth below, and the Governments shall have the rights and powers set forth in this Agreement and the Settlement Agreement.  Except as set forth in this Agreement or the Settlement Agreement, the Court shall retain continuing jurisdiction over the Environmental Response Trust, the Environmental Response Trust Assets and the Parties.

### 2.3    Purpose of the Environmental Response Trust

The exclusive purposes and functions of the Environmental Response Trust are to conduct, manage and/or fund Environmental Actions with respect to the Properties or migration of Hazardous Substances emanating from certain of the Properties in accordance with the provisions of this Agreement; to reimburse the Lead Agency for Environmental Actions it conducts with respect to the Properties; to own certain of the Properties, carry out administrative and property management functions related to the Properties and pay associated administrative costs; and to try to sell or transfer certain of the Properties with the objective that they be put to productive or beneficial use.  The Environmental Response Trust shall have no objective or authority to engage in any trade or business.  The performance by the Environmental Response Trust Administrative Trustee of its duties under this Agreement and the Settlement Agreement shall not be considered to be the Environmental Response Trust Administrative Trustee's engaging in a trade or business.  This Environmental Response Trust is intended to satisfy all of the requirements of, and is intended by the Parties to be properly classified as, a qualified settlement fund pursuant to section 468B of the IRC and related Treasury Regulations.

### 2.4    Transfer of Ownership

Pursuant to the Plan of Liquidation and Paragraph 30 of the Settlement Agreement, the Parties hereby establish, on behalf of the Environmental Response Trust Beneficiary, and Settlors hereby agree to transfer, assign, and deliver to the Environmental Response Trust, or to an entity formed by the Environmental Response Trust or the Environmental Response Trust Administrative Trustee and owned by the Environmental Response Trust, if the law of the state in which the property to be transferred is situated prohibits a trust entity from holding title, on behalf of the Environmental Response Trust Beneficiary, all of Settlors' rights, title and interests in and to the Environmental Response Trust Assets.  Settlors shall retain no ownership or other interest whatsoever in the Properties, the Funds or the Transferred Contracts.  The transfer of ownership shall be of all of the Settlors' rights, titles and interests, and the transfer of the Properties shall be consistent with Paragraphs 30 through 32, 36 and 37 of the Settlement Agreement.  The Environmental Response Trust Administrative Trustee, on behalf of the Environmental Response Trust, hereby accepts and agrees to hold the Environmental Response Trust Assets in the Environmental Response Trust for the benefit of the Environmental Response Trust Beneficiary for the purposes described in Section 2.3, subject to the terms of the Plan of Liquidation, the Settlement Agreement, this Agreement, and any applicable orders of the Court.

2.5     Transfer of Funds and Creation of Environmental Response Trust Accounts

      2.5.1     Funding.  On the Effective Date, the Settlors shall (i) transfer or cause to be transferred to the Environmental Response Trust or at the direction of the Environmental Response Trust Administrative Trustee cash in the amount of no less than $641,414,653, which constitutes the Environmental Response Trust Funds; (ii) pay or cause to be paid to the Expendable Trust as defined in Paragraph 79 of the Settlement Agreement the amount of $786,944; and (iii) pay or cause to be paid to the 807 Trust Fund as defined in Paragraph 80 of the Settlement Agreement the amount of $102,390.  Upon the Settlors' transfer of the Properties listed in Exhibit "A" and Funds pursuant to this Agreement and the Settlement Agreement, Debtors shall have no further obligation to transfer any additional properties or funds under this Agreement, the Settlement Agreement or otherwise for the purpose of paying Environmental Costs, the costs of administering the Environmental Response Trust or for any other purpose relating to the Properties.

      2.5.2     Environmental Response Trust Accounts.  Upon receipt of the Properties and the Funds, the Environmental Response Trust Administrative Trustee shall set aside in separate segregated trust subaccounts (each an "Environmental Cost Account"), the Funding for Environmental Costs with respect to each Property as follows: (i) minimum estimated property funding shall be placed in a Minimum Estimated Property Funding Account containing funding amounts for each Property as set forth on Table A Column 2 attached to the Settlement Agreement and totaling $294,977,592, (ii) reserve property funding shall be placed in a Reserve Property Funding Account containing funding amounts for each Property as set forth on Table A Column 3 attached to the Settlement Agreement and totaling $52,054,867, and (iii) a Long Term OMM Property Funding Account containing funding amounts (if any) for each Property as set forth in Table A Column 4 attached to the Settlement Agreement and totaling $84,099,794.  The Environmental Response Trust Administrative Trustee shall also set aside into a separate segregated trust subaccount the Cushion Funding totaling $68,282,400 (the "Cushion Funding Account").  The Environmental Response Trust Administrative Trustee shall further set aside into a separate segregated trust subaccount the Administrative Funding in an amount no less than $102 million (the "Administrative Funding Account"), and into a further separate segregated trust subaccount the Administrative Reserve Funding totaling $40 million (the "Administrative Funding Reserve Account").  The separate subaccounts are referred to in this Agreement individually as an "Environmental Response Trust Account" and collectively as the "Environmental Response Trust Accounts."  The initial Funds for each of the Environmental Response Trust Accounts shall be as set forth in Paragraph 32 of the Settlement Agreement, subject to adjustment as provided by Paragraphs 36 and 37 of the Settlement Agreement.  Subject to Section 2.7

of this Agreement, the income and gains from any investment of the Environmental Response Trust Assets in an Environmental Response Trust Account shall be allocated, paid and credited to that same Environmental Response Trust Account and shall be used for the same purposes as the principal in that Environmental Response Trust Account as provided for in, and subject to the qualifications of, Paragraph 34 of the Settlement Agreement.

2.6     Holder of Environmental Response Trust Assets

Upon transfer of the Environmental Response Trust Assets to the Environmental Response Trust, the Environmental Response Trust shall be the exclusive holder of the Environmental Response Trust Assets described herein, including the Environmental Response Trust Accounts, for purposes of 31 U.S.C. § 3713(b).

2.7     Management of Environmental Response Trust Assets

2.7.1   Consistent with this Agreement and the Settlement Agreement, including but not limited to Paragraphs 60 through 62 of the Settlement Agreement, the Environmental Response Trust shall use (i) the Minimum Estimated Property Funding Account for each of the Properties to perform or fund Environmental Actions and to reimburse the Lead Agency for Environmental Actions it conducts with respect to that Property; (ii) the Reserve Property Funding Account to perform or fund Environmental Actions applicable to that Property, and to reimburse the Lead Agency for Environmental Actions it conducts with respect to that Property, after the Property's Minimum Estimated Property Funding Account has been exhausted; and (iii) the Long Term OMM Account to fund or perform OMM at the Property, if any, beginning ten years after the Effective Date and to reimburse the Lead Agency for OMM it conducts with respect to that Property. The Environmental Response Trust Administrative Trustee shall also use the Cushion Funding Account to fund Environmental Actions at Properties under certain circumstances as provided for under the terms of this Agreement and the Settlement Agreement, including but not limited to Paragraphs 55 through 59 of the Settlement Agreement. The Environmental Response Trust Administrative Trustee shall further fund administrative expenses from the Administrative Funding Account as provided for under the terms of this Agreement and the Settlement Agreement, including but not limited to Paragraphs 52 and 54 of the Settlement Agreement.

2.7.2   Consistent with Paragraph 101 of the Settlement Agreement, the Environmental Response Trust Administrative Trustee may enter into a consent decree or consent order or agreement with the United States and/or a State or Tribe with regulatory authority, and may perform or cause to be performed work pursuant to administrative orders issued unilaterally by U.S. EPA or a State or Tribe under applicable law to

facilitate implementation of Environmental Actions with respect to such Property.

2.7.3   The Environmental Response Trust Administrative Trustee shall transfer Funds from or among the Environmental Cost Accounts as provided for under the Settlement Agreement, including but not limited to Paragraphs 60 through 62 of the Settlement Agreement. The Environmental Response Trust Administrative Trustee shall also transfer Funding from the Administrative Funding Account and the Administrative Funding Reserve Account as provided for under the Settlement Agreement, including but not limited to Paragraphs 52 through 54 of the Settlement Agreement.

2.8   Investment and Safekeeping of Environmental Response Trust Assets

2.8.1   The Environmental Response Trust Assets, until sold or otherwise disposed of as provided under the terms of this Agreement, the Settlement Agreement and the Plan of Liquidation, shall be held in trust. The Environmental Response Trust Administrative Trustee shall be under no liability for interest or producing income on any moneys received by the Environmental Response Trust hereunder and held for distribution or payment as provided in this Agreement, except as such interest is actually received by the Environmental Response Trust. Investments of any moneys held by the Environmental Response Trust shall be administered in a manner consistent with the standards and requirements of Section 704(a)(1) and (a)(2) of the Bankruptcy Code; provided, however, that the right and power of the Environmental Response Trust to invest the Environmental Response Trust Assets, the Environmental Response Trust Proceeds, or any income earned by the Environmental Response Trust, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Article 3 hereof) in demand and time deposits, such as certificates of deposit, in banks or other savings institutions whose deposits are federally insured, or other liquid investments, such as U.S. Treasury bills, or such other investment as approved by the Governments; and provided further, that the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of the Treasury Regulations section 301.7701-4(d), may be permitted to hold, pursuant to Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise (although the Parties acknowledge and agree that the Environmental Response Trust is intended to be properly characterized for U.S. federal and applicable state and local tax purposes as a qualified settlement fund within the meaning of Section 1.468B-1 of the Treasury

Regulations, and not as a liquidating trust under Section 301.7701-4(d) of the Treasury Regulations).

2.8.2   Consistent with Paragraph 35 of the Settlement Agreement, "separately dedicated subaccounts" may be accomplished by accounting entries and nothing herein shall preclude the Administrative Trustee from commingling funds solely for investment or administrative purposes, provided, however, that the Administrative Funding Account and Administrative Funding Reserve Account shall not be commingled with any other accounts under any circumstances and that the Environmental Response Trust Administrative Trustee is expressly prohibited from holding any or all of the Funds in a common, commingled or collective trust fund with the assets of any other entity.

2.8.3   Nothing in this Section 2.8 shall be construed as authorizing the Environmental Response Trust Administrative Trustee to cause the Environmental Response Trust to carry on any business or to derive any gains therefrom, including without limitation, the business of an investment company, or a company "controlled" by an "investment company," required to register as such under the Investment Company Act of 1940, as amended. The sole purpose of this Section 2.8 is to authorize the investment of the funds in the Environmental Response Trust Accounts or any portions thereof as may be reasonably prudent pending use of the proceeds for the purposes of the Environmental Response Trust.

2.9   Insurance Policy to Cover Cost Overruns with Respect to Future Response Actions

Only with the written consent of the United States on behalf of U.S. Treasury and U.S. EPA, shall the Environmental Response Trust Administrative Trustee spend any resources investigating the purchase of an insurance policy to cover cost overrun risks or re-opener risk with respect to future Environmental Actions at one or more of the Properties, with all associated costs to be funded from the Administrative Funding Account. If, and only if, the United States and the State in which, or Tribe in whose territory, the Property is located unanimously consent in writing to the purchase of such insurance, shall the Environmental Response Trust Administrative Trustee purchase such insurance, with all associated costs and premiums to be funded exclusively from the relevant Properties' Minimum Estimated Funding Account.

2.10   Access and Institutional Controls

As set forth in Paragraph 78 of the Settlement Agreement, the Environmental Response Trust shall at all reasonable times provide Lead Agencies and Support Agencies, as designated representatives of the Lead Agencies, as well as their contractors and consultants access to all relevant portions of the Properties for the purposes of conducting Environmental Actions. Nothing in the Plan of Liquidation, the Settlement Agreement or this Agreement is intended to or shall be construed to terminate or otherwise amend any easements or deed restrictions of record as to any Property existing prior to the Effective Date. The Environmental Response Trust

Administrative Trustee shall abide by the terms of any institutional controls or deed restrictions in place as of the Effective Date.

2.11    Internal Accounting

The Environmental Response Trust Administrative Trustee shall maintain proper books, records, and accounts relating to all transactions pertaining to the Environmental Response Trust, and the assets and liabilities of, and claims against or assumed by, the Environmental Response Trust in such detail and for such period of time as may be necessary to enable the Environmental Response Trust Administrative Trustee to make full and proper accounting in respect thereof in accordance with Article 6 below and to comply with applicable provisions of law and Generally Accepted Accounting Principles ("GAAP"). Except as otherwise provided herein or by the Plan of Liquidation or the Settlement Agreement, the Environmental Response Trust Administrative Trustee shall not be required to file any accounting or seek approval of the Court with respect to the administration of the Environmental Response Trust, or as a condition for making any payment or distribution out of the Environmental Response Trust Assets. The United States shall have the right upon fourteen (14) days' prior written notice delivered to the Environmental Response Trust Administrative Trustee to inspect such books and records during normal business hours.

2.12    Inspection of Books

Subject to the Wind-Down, the Orders, the Related Section 363 Transactions and the Cases, as defined in the DIP Credit Facility, as amended and entered by the Court on July 5, 2009, the Environmental Response Trust shall (a) keep proper books of records and account in which full, true and correct entries in conformity with Generally Accepted Accounting Principles ("GAAP") and all requirements of law shall be made of all dealings and transactions in relation to its business and activities, and (b) permit representatives of the U.S. Treasury, the EDC, the Special Inspector General of the Troubled Asset Relief Program or the Comptroller General of the United States to visit and inspect any of its properties and examine and make abstracts from any of its books and records and other data delivered to them pursuant to the Loan Documents, as defined in the DIP Credit Facility, at any reasonable time upon reasonable notice and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Environmental Response Trust with advisors and employees of the Environmental Response Trust and with its independent certified public accountants.

2.13    Independent Audits

Consistent with Paragraph 76 of the Settlement Agreement, once every year, or in such other intervals as determined in accordance with Paragraph 76 of the Settlement Agreement, an independent certified public accountant selected by the United States in consultation with the States and Tribe shall conduct a financial audit of the assets, liabilities and accounting procedures of the Environmental Response Trust. The accountant will provide a written report of the financial audit to the Governments and the Environmental Response Trust Administrative Trustee within fifteen days of completing the financial audit. The Administrative Trustee shall make all books and records available to the accountant for inspection and pay the accountant's fees and expenses for conducting such audit, which shall not exceed $250,000 per audit from the

Administrative Funding Account. The same accountant shall not conduct more than three consecutive audits.

2.14 <u>Termination</u>

2.14.1 Consistent with the terms of this Agreement, the Settlement Agreement and the Plan of Liquidation, the Environmental Response Trust Administrative Trustee shall not unduly prolong the duration of the Environmental Response Trust and shall at all times endeavor to resolve, settle or otherwise dispose of all claims against Environmental Response Trust Assets and to effect the distribution of Environmental Response Trust Assets and other receipts relating thereto in accordance with the terms of this Agreement and the Settlement Agreement, and to terminate the Environmental Response Trust as soon as practicable consistent with this Agreement, the Settlement Agreement and the Plan of Liquidation.

2.14.2 The Parties agree that the rule against perpetuities does not apply to the Environmental Response Trust, but to the extent that any rule against perpetuities or a rule governing or limiting vesting, accumulations, the suspension of alienation or the like shall be deemed applicable, the Environmental Response Trust shall automatically terminate on the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, and provided further that if the Environmental Response Trust owns real property located in any jurisdiction that sets a maximum duration for interests in real property located in such jurisdiction held in trust under a rule against perpetuities or a rule governing or limiting vesting, accumulations, the suspension of alienation, or the like, that for the Environmental Response Trust is shorter than the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof, the Environmental Response Trust shall automatically terminate as to such Property upon the expiration of the maximum period authorized pursuant to the laws of such jurisdiction. If the Environmental Response Trust is terminated in whole or in part pursuant to this Section 2.14.2, title to the relevant Property or Properties as to which the Environmental Response Trust is terminated shall be transferred outright and free of trust to or at the direction of the United States in consultation with any of the States in which the relevant Property or Properties are located (or the Tribe in the case of the Massena Property), provided, however, in accordance with Paragraph 83 of the Settlement Agreement, that the disposition of all relevant Property or Properties shall be governed by applicable state and federal law, or by agreement of the Environmental Response Trust Administrative Trustee, the United States and the applicable State or Tribe, or by order of the Court, and further provided that neither the

United States nor any State or Tribe will be required to accept an ownership interest in the relevant Property or Properties as to which the Environmental Response Trust is terminated. Any Environmental Response Trust Assets remaining upon termination of the Environmental Response Trust shall be disposed of as provided for under Paragraph 82 of the Settlement Agreement.

2.15   Property Disposition

2.15.1  The United States, the State in which a Property is located (or the Tribe in the case of the Massena Property), or a governmental unit that is a designee thereof, may at any time propose in writing to take ownership of any of the Properties or any part thereof. Any such proposed transfer and the terms thereof are subject to the notice to and consultation with the United States, the State or Tribe in whose jurisdiction the Property is located, and the affected communities. Any Property owned by the Environmental Response Trust may be sold or transferred by the Administrative Trustee after the Administrative Trustee provides notice to and consults with the United States and the applicable State or Tribe, and affected communities where the Property is located. Any sale or other disposition of a Property owned by the Environmental Response Trust shall be consistent with the provisions of Paragraphs 64 through 67 and 69 through 75 of the Settlement Agreement.


ARTICLE 3
WORK AND DISTRIBUTIONS

3.1   Budgets for and Payments by the Environmental Response Trust

3.1.1  Administrative Expenses of the Environmental Response Trust. Within ninety (90) days after the Effective Date, and on or before January 1 of each year thereafter, the Environmental Response Trust Administrative Trustee shall provide the United States with a proposed annual budget for all expenditures from the Administrative Funding Account based on the most cost-effective use of the Funds. The Administrative Trustee shall provide a copy of the proposed annual budget for the Administrative Funding Account to the U.S. Treasury for approval. The Administrative Trustee shall provide a copy of the approved annual budget for the Administrative Funding Account to the Governments. Along with each annual budget, the Administrative Trustee shall provide a separate forecast of administrative expenditures with annual details for at least the next three years (or such longer period as the United States shall reasonably request). The Administrative Trustee is authorized to expend Administrative Funding Account funds consistent with the terms of this Agreement, the Settlement Agreement and the approved annual budget described in this paragraph. The Environmental Response Trust shall

regularly, but not less often than annually, and otherwise upon the reasonable request of the United States, provide documentation to the United States, the States and the Tribe to substantiate compliance with the approved administrative budget. Each approved administrative budget shall include line items for emergency and unanticipated expenditures.

3.1.2 <u>Remuneration for Environmental Response Trust Administrative Trustee's Start-Up Fees and Expenses.</u> The Environmental Response Trust Administrative Trustee shall, in connection with the first annual budget, be entitled to remuneration from the Environmental Response Trust Administrative Funding Account of up to $165,000 per month for its fees and expenses, including attorneys' fees, incurred from August 22, 2010, through the Effective Date in connection with the formation of the Environmental Response Trust, up to a maximum amount of $500,000. The Environmental Response Trust Administrative Trustee shall submit documentation of its expenses as part of the approval process of the first annual budget. The Environmental Response Trust Administrative Trustee shall coordinate with the Settlors to avoid duplication of efforts.

3.1.3 <u>Environmental Expenses of the Environmental Response Trust</u>. Consistent with Paragraph 49 of the Settlement Agreement, the Environmental Response Trust Administrative Trustee shall oversee the preparation of balance sheets, financial statements and proposed annual budgets of projected expenditures for Environmental Costs from each of the Environmental Cost Accounts and the Cushion Funding Account. The first proposed budgets for the remainder of the current calendar year and the next calendar year shall be prepared within ninety (90) days following the Effective Date and annual budgets shall be prepared thereafter on or before each January 1 during the term of the Environmental Response Trust. The applicable Lead Agencies shall have the authority to approve or disapprove the proposed budgets consistent with Paragraph 49 of the Settlement Agreement. If disapproved, a budget shall be revised and resubmitted as expeditiously as possible. No expenses to be paid from an Environmental Cost Account may be incurred or paid by the Environmental Response Trust Administrative Trustee that are inconsistent with an approved budget, unless the Lead Agency approves an amended budget consistent with Paragraph 49 of the Settlement Agreement or any dispute relating to the budget is resolved by the Court or informal dispute resolution as set forth in Paragraphs 50 and 51 of the Settlement Agreement; provided, however, that the Environmental Response Trust Administrative Trustee may incur or pay ongoing or recurring expenses approved in the prior year's budget that occur between the time a proposed annual budget or proposed amended annual budget is submitted and the time it is approved. The Environmental Response Trust Administrative Trustee shall pay expenses and fees due to contractors, professionals or consultants hired consistent with the applicable approved annual budget or approved amended annual budget from the relevant

Environmental Response Trust Account.  In addition, the Environmental Response Trust Administrative Trustee shall pay Funds from the relevant Environmental Cost Account or, if applicable and previously approved, Cushion Funding Account, to the Lead Agency within 10 business days of a written request by the Lead Agency for such funds if the Environmental Actions completed by the Lead Agency are consistent with the approved or approved amended annual budget for a Property.  Such written request shall specify what expenditures by the Lead Agency the funds would reimburse and shall certify that such expenditures by the Lead Agency were only for Environmental Actions and/or oversight costs included in the approved or approved amended annual budget with respect to the Property.  Disputes between the Environmental Response Trust Administrative Trustee and Lead Agency will be resolved in accordance with Paragraphs 50 and 51 of the Settlement Agreement.

3.1.4 <u>Emergency Environmental Action.</u>  Consistent with the provisions of Paragraph 49(ii) of the Settlement Agreement, in the event of an emergency at a Property requiring performance of an Environmental Action within hours or days of the Environmental Response Trust Administrative Trustee first receiving notice of the emergency, the Environmental Response Trust Administrative Trustee shall be authorized to utilize funding from a Property's Minimum Estimated Property Funding Account and/or Reserve Property Funding Account to conduct the emergency Environmental Actions or reimburse the Lead Agency or Support Agency for conducting the emergency Environmental Actions.

3.1.5 <u>Annual Reports.</u>  By March 1 of each year during the term of the Environmental Response Trust and within nine (9) months after termination of the Environmental Response Trust, the Environmental Response Trust Administrative Trustee shall prepare and submit to the Governments an annual report with respect to each of the Environmental Response Trust Accounts.  The annual report shall pertain to the prior calendar year, or if the report is a final report, such period from the most recent annual report to the termination of the Environmental Response Trust Accounts.  After receipt of an annual report, the States and Tribe shall have the right upon fourteen (14) days written notice delivered to the Environmental Response Trust Administrative Trustee to inspect the Environmental Response Trust's books and records as related to the annual report.

3.2 <u>Manner of Payment</u>

Payments made by the Environmental Response Trust pursuant to this Agreement and the Settlement Agreement shall be in United States dollars by checks drawn on a domestic bank whose deposits are federally insured selected by the Environmental Response Trust Administrative Trustee, or where possible by wire transfer from such a domestic bank, at the option of the Environmental Response Trust Administrative Trustee.

3.3     Unclaimed Distributions

Upon the termination of the Environmental Response Trust, and after payment of all obligations of the Environmental Response Trust in accordance with applicable law, the Environmental Response Trust Administrative Trustee shall, as expeditiously as is consistent with the conservation and preservation of the Environmental Trust Assets, distribute any remaining assets in the Environmental Response Trust in accordance with this Agreement and the terms of Paragraphs 53, 54, 77, and 82 of the Settlement Agreement.

ARTICLE 4
THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE TRUSTEE

4.1     Appointment

4.1.1   Debtors, after approval by the United States, hereby appoint, not individually but solely in its representative capacity as Environmental Response Trust Administrative Trustee, to serve as the Environmental Response Trust Administrative Trustee, and the Environmental Response Trust Administrative Trustee hereby accepts such appointment and agrees to serve in such representative capacity, beginning on the Effective Date of this Agreement.  Subject to the provisions of Section 4.11 herein, the term of the Environmental Response Trust Administrative Trustee shall be for five years at which time the Environmental Response Trust Administrative Trustee may be re-appointed or terminated as provided for under Paragraph 42 of the Settlement Agreement.  Any successor Environmental Response Trust Administrative Trustee shall be appointed in accordance with Paragraph 42 of the Settlement Agreement.  If the Environmental Response Trust Administrative Trustee is not reappointed and no successor Environmental Response Trust Administrative Trustee is appointed by the expiration of the Environmental Response Trust Administrative Trustee's term, the Court may, on an interim basis, reappoint the Environmental Response Trust Administrative Trustee or appoint a successor Environmental Response Trust Administrative Trustee until a successor is appointed in accordance with Paragraph 42 of the Settlement Agreement.

4.1.2   The Environmental Response Trust Administrative Trustee is authorized, consistent with the requirements of Paragraphs 46, 47, 49 and 50 of the Settlement Agreement to obtain the services of outside environmental contractors ("Contractors") and consultants ("Consultants") to implement the Environmental Actions.  The Contractors and Consultants shall obtain environmental, general and professional liability insurance in the sum of no less than $25,000,000 or such lesser amount as agreed to by the Environmental Response Trust Administrative Trustee after consultation with the Governments.  Additional insureds or other beneficiaries of the insurance policies shall be the Environmental Response Trust and the insurance policies shall cover negligence committed by the Contractors

and Consultants in implementing the future Environmental Actions or any other negligence committed by the Contractors and Consultants. The legal relationship of Contractors and Consultants to the Environmental Response Trust and Environmental Response Trust Administrative Trustee is that of an independent contractor professional, not that of an employee of the Environmental Response Trust or the Environmental Response Trust Administrative Trustee. The Contractors and Consultants shall not be deemed an Environmental Response Trust Protected Party.

4.2     <u>General Authority</u>

The Environmental Response Trust Administrative Trustee's powers are exercisable solely consistent with and in furtherance of the purposes of the Environmental Response Trust, and in accordance with the terms of this Agreement and the Settlement Agreement and not otherwise. The Environmental Response Trust Administrative Trustee shall have the authority to bind the Environmental Response Trust, and any successor Environmental Response Trust Administrative Trustee, or successor or assign of the Environmental Response Trust, but shall for all purposes hereunder be acting in its representative capacity as Environmental Response Trust Administrative Trustee and not individually.

4.3     Powers

In connection with the administration of the Environmental Response Trust, except as otherwise set forth in this Agreement and the Settlement Agreement, the Environmental Response Trust Administrative Trustee is authorized to perform any and all acts necessary to accomplish the purposes of the Environmental Response Trust. However the Environmental Response Trust Administrative Trustee shall take all best efforts to take no action that causes the Environmental Response Trust to fail to qualify as a qualified settlement fund (for which no grantor trust election has been made) under section 468B of the Internal Revenue Code and the Treasury Regulations thereunder. Expenditure of funds by the Environmental Response Trust Administrative Trustee to conduct, manage and/or fund Environmental Actions with respect to the Properties or migration of Hazardous Substances emanating from certain of the Properties in accordance with the provisions of this Agreement; to reimburse the Lead Agency for Environmental Actions it conducts with respect to the Properties; to own certain of the Properties, carry out administrative and property management functions related to the Properties and pay associated administrative costs; and to try to sell or transfer certain of the Properties with the objective that they be put to productive or beneficial use shall not be deemed to result in a breach of the preceding sentence. The powers of the Environmental Response Trust Administrative Trustee shall, without any further Court approval or order, include, without limitation, each of the following:

4.3.1     to receive, manage, invest, supervise and protect the Environmental Response Trust Assets, withdraw, make distributions and pay taxes and other obligations owed by the Environmental Response Trust or the Environmental Response Trust Accounts from funds held by the Environmental Response Trust Administrative Trustee and/or the Environmental Response Trust (or the Environmental Response Trust

21

Accounts) in accordance with this Agreement and the Settlement Agreement, and withhold and pay to the appropriate taxing authority any withholding taxes on distributions from the Environmental Response Trust;

4.3.2    to invest in, and only in, demand and time deposits such as certificates of deposit, in banks or other savings institutions or other liquid investments, such as a U.S. Treasury bills as permitted by Section 345 of the Bankruptcy Code or as otherwise permitted by the Bankruptcy Court or agreed to by the Governments, but including only those investments, and expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise;

4.3.3    to incur or assume liabilities in furtherance of or in connection with the Environmental Response Trust Administrative Trustee's or the Environmental Response Trust's duties, powers, authority, and obligations under this Agreement and the Settlement Agreement and determine and satisfy any and all liabilities created, incurred or assumed by the Environmental Response Trust;

4.3.4    to make distributions of the Environmental Response Trust Assets from the Environmental Response Trust Accounts for the purposes contemplated in this Agreement, the Settlement Agreement and the Plan of Liquidation;

4.3.5    to engage and retain employees, counsel and other professionals in a manner not inconsistent with the terms of this Agreement and the Settlement Agreement to assist the Environmental Response Trust Administrative Trustee with respect to the responsibilities described herein, on such terms as the Environmental Response Trust Administrative Trustee deems appropriate, without Bankruptcy Court approval;

4.3.6    to perform duties, exercise the powers, and assert the rights of a trustee under Sections 704(a)(1) and 704(a)(2) of the Bankruptcy Code;

4.3.7    to obtain general liability insurance, pollution legal liability insurance for third-party bodily injury and property damage risks and other reasonable insurance coverage, including errors and omissions and directors and officers liability insurance, with respect to the Environmental Response Trust Administrative Trustee's liabilities and obligations as Environmental Response Trust Administrative Trustee under this Agreement and the Settlement Agreement (in the form of an errors and omissions policy or otherwise) and indemnification for the Environmental Response Trust

Administrative Trustee and others to the extent provided for in the Plan of Liquidation, this Agreement, and the Settlement Agreement;

4.3.8    to request any appropriate tax determination with respect to the Environmental Response Trust, protest, contest or otherwise object to any such tax determination, and make any tax election, settle or compromise any tax liability, or consent to any claim or assessment relating to taxes;

4.3.9    to effect all actions and execute all agreements, instruments and other documents necessary to implement this Agreement and the Settlement Agreement, including to exercise such other powers as may be vested in or assumed by the Environmental Response Trust and/or the Environmental Response Trust Administrative Trustee pursuant to this Agreement and any order of the Court or as may be necessary and proper to carry out the provisions of this Agreement. No Person dealing with the Environmental Response Trust shall be obligated to inquire into the authority of the Environmental Response Trust Administrative Trustee in connection with the protection, conservation or disposition of Environmental Response Trust Assets. The Environmental Response Trust Administrative Trustee is authorized to execute and deliver all documents on behalf of the Environmental Response Trust to accomplish the purposes of this Agreement and the Settlement Agreement;

4.3.10   to prosecute and defend lawsuits or administrative actions or proceedings on behalf of the Environmental Response Trust;

4.3.11   to take all other appropriate action with respect to the Environmental Trust Assets to the extent consistent with the purpose of the Environmental Response Trust; and

4.3.12   to file, if necessary, any and all tax and information returns with respect to the Environmental Response Trust, and pay taxes, if any, payable by the Environmental Response Trust.

4.4      Cleanup Managers

4.4.1    In connection with the administration of the Environmental Response Trust, the Environmental Response Trust Administrative Trustee is authorized to, consistent with the requirements of Paragraph 45 of the Settlement Agreement, employ on behalf of the Environmental Response Trust Cleanup Managers who will report to, and be subject to the supervision of, the Environmental Response Trust Administrative Trustee.

4.4.2    As provided for by Paragraph 45 of the Settlement Agreement, the Cleanup Managers shall be acceptable to the Lead Agencies with jurisdiction over Properties within the respective Cleanup Manager's responsibilities, and each Cleanup Manager is subject to the disapproval of the applicable Lead Agencies. Any Lead Agency may request that the

Environmental Response Trust Administrative Trustee replace the Cleanup Manager whose responsibilities include the Properties within the Lead Agency's jurisdiction, and the Environmental Response Trust Administrative Trustee may replace a Cleanup Manager at any time, provided that the new Cleanup Manager is acceptable to the applicable Lead Agencies. Costs associated with the Cleanup Managers will be paid from the Administrative Funding Account.

4.5     Redevelopment Manager

4.5.1   In connection with the administration of the Environmental Response Trust, the Environmental Response Trust Administrative Trustee is authorized to, consistent with the requirements of Paragraph 48 of the Settlement Agreement, employ on behalf of the Environmental Response Trust a Redevelopment Manager who will report to, and be subject to the supervision of, the Environmental Response Trust Administrative Trustee, to assist the Environmental Response Trust Administrative Trustee in dealing with the sale, lease or redevelopment of Properties.

4.5.2   As provided for under Paragraph 48 of the Settlement Agreement, the Redevelopment Manager's duties will include consulting with applicable federal and state officials working on redevelopment issues and affected communities where the Property is located, and the Redevelopment Manager's expenses will be paid from the Administrative Funding Account.

4.6     Retention of Professionals

The Environmental Response Trust Administrative Trustee is authorized to retain on behalf of the Environmental Response Trust and pay such third parties as the Environmental Response Trust Administrative Trustee (in accordance with a budget approved pursuant to Section 3.1 above) may deem necessary or appropriate to assist the Environmental Response Trust Administrative Trustee in carrying out its powers and duties under this Agreement, the Settlement Agreement and the Plan of Liquidation, including, without limitation, (i) counsel to the Environmental Response Trust and/or Environmental Response Trust Administrative Trustee, (ii) a public accounting firm to perform such accounting functions as may be required to (a) maintain the books and records of the Environmental Response Trust as required by this Agreement or the Settlement Agreement; (b) review and/or audit the financial books and records of the Environmental Response Trust as may be appropriate in the Environmental Response Trust Administrative Trustee's reasonable discretion; and (c) prepare and file any tax returns or informational returns for the Environmental Response Trust or the Environmental Response Trust Accounts as may be required, and (iii) environmental consultants, custodians, appraisers, security personnel, engineers, surveyors, brokers, contractors, and clerks. The Environmental Response Trust Administrative Trustee may pay all such Persons compensation for services rendered and expenses incurred in accordance with a budget approved as provided in Section 3.1.

4.7     Executive Compensation

The Environmental Response Trust shall take all necessary action to ensure that it complies in all respects with, and shall take all other actions necessary to comply with, (i)) Section 111 of the Emergency Economic Stabilization Act of 2008 ("EESA"), as implemented by any guidance or regulation thereunder, including the rules set forth in 31 C.F.R. Part 30, or any other guidance or regulations under the EESA, as the same shall be in effect from time to time (collectively, the "Compensation Regulations"), and (ii) any rulings, limitations or restrictions implemented or issued by the Office of the Special Master for Troubled Asset Relief Program Executive Compensation with respect to the Environmental Response Trust. The Environmental Response Trust shall also take all necessary action to ensure that it complies in all respects with, and shall take all other actions necessary to comply with, the Employ American Workers Act.

4.8     Limitation of the Environmental Response Trust Administrative Trustee's Authority

The Environmental Response Trust and the Environmental Response Trust Administrative Trustee shall have no authority to do any of the following:

4.8.1   engage in any trade or business with respect to the Environmental Response Trust Assets or collect any proceeds therefrom except as, and to the extent the same is deemed in good faith by the Environmental Response Trust Administrative Trustee, to be reasonably necessary or proper for the conservation or protection of the Environmental Response Trust Assets, or the fulfillment of the purposes of the Environmental Response Trust;

4.8.2   take any action in contravention of this Agreement, the Settlement Agreement, the Plan of Liquidation, the Confirmation Order or applicable law, or any action that would make it impossible to carry on the activities of the Environmental Response Trust; or

4.8.3   except as otherwise set forth in this Agreement or the Settlement Agreement, possess property of the Environmental Response Trust or assign the Environmental Response Trust's rights in specific property for other than purposes of the Environmental Response Trust.

4.9     Reliance by the Environmental Response Trust Protected Parties

Except as may otherwise be provided herein: (a) the Environmental Response Trust Protected Parties, the Environmental Response Trust and the Administrative Trustee may rely, and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties; (b) the Environmental Response Trust Protected Parties may consult with legal counsel, financial or accounting advisors and other professionals and shall not be personally liable for any action taken or not taken in accordance with the advice thereof; and (c) persons or entities dealing with

the Environmental Response Trust Protected Parties, the Environmental Response Trust and the Administrative Trustee shall look only to the Environmental Response Trust assets that may be available to them consistent with this Agreement and the Settlement Agreement to satisfy any liability incurred by the Environmental Response Trust Protected Parties to such person or entity in carrying out the terms of this Agreement, the Settlement Agreement, the Plan or any order of the Bankruptcy Court, and the Environmental Response Trust Protected Parties shall have no liability absent a finding by Final Order of fraud or willful misconduct.

    4.10    <u>Cost Reimbursement of the Environmental Response Trust Administrative Trustee</u>

The Environmental Response Trust shall pay its own reasonable and necessary costs and expenses, and shall reimburse the Environmental Response Trust Administrative Trustee for the actual reasonable out-of-pocket fees and expenses to the extent incurred by the Environmental Response Trust Administrative Trustee in connection with the Environmental Response Trust Administrative Trustee's duties hereunder, including, without limitation, necessary travel, lodging, office rent, postage, photocopying, telephone and facsimile charges upon receipt of periodic billings, all in accordance with the applicable approved annual budget or approved amended annual budget and in accordance with the U.S. Department of Justice Fee Guidelines for Reviewing Applications for Compensation & Reimbursement of Expenses filed under 11 U.S.C. § 330, reprinted at 28 C.F.R. Part 58, without the necessity of court approval. In no event shall any of the Environmental Response Trust Protected Parties be compensated (i) at a rate above $500 per hour for the first 1,500 hours billed by an individual in a calendar year; (ii) at a rate above $400 per hour for any hours billed in excess of 1,500 hours by any individual during a calendar year; (iii) on the basis of a fee structure that includes blended hourly rates; or (iv) on the basis of a fee structure that includes incentive compensation.

    4.11    <u>Liability of Environmental Response Trust Protected Parties</u>

In no event shall the Environmental Response Trust Protected Parties be held liable to any third parties for any liability, action, or inaction of any other Party including each other and the Settlors. The Environmental Response Trust Protected Parties shall, further, be indemnified and exculpated in accordance with Section 4.12 of this Agreement.

To the extent provided in the Settlement Agreement, the Environmental Response Trust Protected Parties are deemed to have resolved their civil liability to the Governments arising from or relating to the Properties under CERCLA, RCRA, and State environmental statutes, as well as any other environmental liabilities asserted in the Governments' proofs of claim, and have protection from contribution actions or claims as provided by Sections 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2) or similar state law for matters addressed in the Settlement Agreement. The Environmental Response Trust Protected Parties shall have the benefits of the covenants not to sue, contribution protections, and the other protection provisions as set forth in the Settlement Agreement.

4.12    Exculpation and Indemnification

The Environmental Response Trust Protected Parties shall be exculpated and indemnified and held harmless, consistent with the provisions of this Section 4.12 for any claims, causes of action, or other assertions of liability arising out of or in connection with:

(a) the ownership of Environmental Response Trust Assets;

(b) the discharge of duties and powers conferred upon the Environmental Response Trust and/or Environmental Response Trust Administrative Trustee by this Agreement, the Settlement Agreement and the Plan of Liquidation, any order of the Court, or applicable law or otherwise, including the performance of an Environmental Action on behalf of the Environmental Response Trust and the making of payments in accordance with this Agreement, the Settlement Agreement and the Plan of Liquidation, or any order of court, and the implementing of the provisions of this Agreement, the Settlement Agreement and the Plan of Liquidation or any order of court; or

(c) any claim by or against Settlors.

4.12.1  Exculpation.  The Environmental Response Trust Protected Parties and the Environmental Response Trust are exculpated by all persons, including without limitation, holders of claims and other parties in interest, of and from any and all claims, causes of action and other assertions of liability arising out of or in connection with the matters contained in Section 4.12 (a), (b), and (c).  No person, including without limitation, holders of claims and other parties in interest, shall be allowed to pursue any claims or cause of action against any Environmental Response Trust Protected Party or the Environmental Response Trust for any claim against the Debtors, for making payments in accordance with the Settlement Agreement or any order of court, or for implementing the provisions of this Agreement, the Settlement Agreement, the Plan or any order of court. However, nothing in this Section 4.12.1 or this Agreement or the Settlement Agreement shall preclude the Governments from enforcing their rights under this Agreement or the Settlement Agreement, including but not limited to any rights relating to a finding by Final Order of fraud or willful misconduct.

4.12.2  Indemnification.  The Environmental Response Trust shall indemnify, defend and hold harmless (without the Environmental Response Trust Protected Parties having to first pay from their personal funds) the Environmental Response Trust Protected Parties from and against any and all claims, causes of action, liabilities, obligations, losses, costs, taxes, judgments, damages or expenses (including attorneys' fees and expenses) and any other assertion of liability arising out of or in connection with the matters contained in the provisions of Section 4.12 (a), (b) and (c) (collectively, the "Indemnifiable Expenses"), to the fullest extent

permitted by applicable law. Unless a determination is made by a Final Order of the Bankruptcy Court finding that an Environmental Response Trust Protected Party committed fraud or willful misconduct in relation to the Environmental Response Trust Protected Party's duties (i) the Indemnifiable Expenses shall be paid from the Minimum Estimated Property Funding Account or Reserve Property Funding Account for the relevant Property if the Indemnifiable Expenses relate to an Environmental Action at the Property, and otherwise shall be paid from the Administrative Funding Account; and (ii) any judgment against Environmental Response Trust Parties shall be paid from the Minimum Estimated Property Funding Account or Reserve Property Funding Account for the relevant Property if the judgment relates to an Environmental Action at the Property, and otherwise shall be paid from the Administrative Funding Account. In the event that the Indemnifiable Expenses are paid from the Minimum Estimated Property Funding Account or Reserve Property Funding Account, any payment shall be limited to funds in the Minimum Estimated Property Funding Account or the Reserve Property Funding Account for the relevant Property, as applicable. Notwithstanding the foregoing, to the extent fraud or willful misconduct of any Environmental Response Trust Protected Party is alleged and the Court finds, by a Final Order, that such Environmental Response Trust Protected Party committed fraud or willful misconduct after the Effective Date in relation to the Environmental Response Trust Administrative Trustee's duties that are alleged to be the basis for liability, there shall be no indemnification and no reimbursement for costs of defense of that Environmental Response Trust Protected Party for any judgments arising from such allegations of fraud or willful misconduct (the "Carved Out Expenses"). The Environmental Response Trust shall advance to any Environmental Response Trust Protected Party incurring any Indemnifiable Expenses such amounts, on a monthly basis, if the Environmental Response Trust Protected Party provides the Environmental Response Trust with an undertaking reasonably satisfactory to the Environmental Response Trust Administrative Trustee that such Environmental Response Trust Protected Party will repay any amounts finally determined to be Carved Out Expenses.

4.12.3 It shall be an irrebuttable presumption that any action taken, or inaction, consistent with Court approval or approval of another court of competent jurisdiction shall not constitute willful misconduct or fraud.

4.13 Termination of the Environmental Response Trust, Replacement or Removal of the Environmental Response Trust Administrative Trustee.

4.13.1 Termination. The duties, responsibilities and powers of the Environmental Response Trust Administrative Trustee will terminate on the date the Environmental Response Trust is terminated under applicable law in accordance with this Agreement and the Settlement Agreement, or

by an order of the Court; provided that this Section and Sections 4.9, 4.11 and 4.12 above shall survive such termination. The Environmental Response Trust's duties to conduct Environmental Actions at a Property shall terminate when (i) the Lead Agency and Support Agency for the Property agrees in writing; or (ii) the purchaser of the Property agrees to assume responsibility for all Environmental Actions with respect to the Property in conformity with all applicable provisions of this Agreement and the Settlement Agreement. Prior to such termination errors and omissions insurance shall be established.

4.13.2. <u>Resignation.</u> The Environmental Response Trust Administrative Trustee may resign by giving not less than ninety (90) days prior written notice thereof to the Court.

4.13.3 <u>Replacement.</u> Consistent with the provisions of the Settlement Agreement, the Environmental Response Trust Administrative Trustee may be replaced upon completion of any five (5) year term, however, this Section and Sections 4.9, 4.11 and 4.12 above shall survive such replacement.

4.13.4 <u>Removal.</u> The Environmental Response Trust Administrative Trustee may be removed, if such removal is consistent with the terms of the Settlement Agreement, by:

(1) The entry of a Final Order by the Court, finding that the Administrative Trustee: (i) committed fraud or willful misconduct after the Effective Date in relation to the Environmental Response Trust Administrative Trustee's duties under the Environmental Response Trust; (ii) has in any material respect, as a result of negligence, exacerbated conditions at any of the Properties; (iii) has been seriously or repeatedly deficient or seriously or repeatedly negligent or late in the performance of its duties, or (iv) has violated the provisions of the Settlement Agreement or this Agreement. In the event of a finding by the Bankruptcy Court of the occurrence of the events set forth in the foregoing clauses (i), (ii), (iii), or (iv), the United States and the State in which, or Tribe in whose territory, the relevant Property is located may jointly direct that the Environmental Response Trust Administrative Trustee be replaced in accordance with this Agreement. The removal of the Environmental Response Trust Administrative Trustee under this Section 4.13.4(1) and 4.13.4.(2) shall become effective immediately upon notice of appointment of a temporary or permanent successor. The provisions of this Section and Section 4.9, 4.11 and 4.12 above shall survive the removal of the Environmental Response Trust Administrative Trustee.

(2) Other than with respect to removal for fraud or willful misconduct, the Environmental Response Trust Administrative Trustee shall continue to be compensated and his expenses reimbursed until a successor Environmental Response Trust Administrative Trustee is in place.

4.14    Appointment of Successor Environmental Response Trust Administrative Trustees

Any successor Environmental Response Trust Administrative Trustee shall be selected in accordance with the provisions of Paragraph 42 of the Settlement Agreement and appointed by the Court.  Any successor Environmental Response Trust Administrative Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the Environmental Response Trust records.  Thereupon, such successor Environmental Response Trust Administrative Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the Environmental Response Trust with like effect as if originally named herein; provided, however, that a removed, incapacitated or resigning Environmental Response Trust Administrative Trustee shall, nevertheless, when requested in writing by the successor Environmental Response Trust Administrative Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Environmental Response Trust Administrative Trustee under the Environmental Response Trust all the estates, properties, rights, powers, and trusts of such predecessor Environmental Response Trust Administrative Trustee.

4.15    No Bond

Notwithstanding any state law to the contrary, the Environmental Response Trust Administrative Trustee, including any successor Environmental Response Trust Administrative Trustee, shall be exempt from providing any bond or other security in any jurisdiction, except as specifically set forth in Settlement Agreement Paragraphs 79 through 81.


ARTICLE 5
ENVIRONMENTAL RESPONSE TRUST BENEFICIARY
AND POWERS AND RIGHTS HOLDERS

5.1    Environmental Response Trust Beneficiary

Beneficial interests in the Environmental Response Trust shall be held by the United States.

5.2    Identification of Environmental Response Trust Beneficiary

5.2.1    In order to determine the actual names and addresses of the authorized representatives of the United States, the Environmental Response Trust and the Environmental Response Trust Administrative Trustee shall be entitled to rely conclusively on the name and address of the authorized representative for the United States listed below in Section 5.2.3, who may

from time to time provide additional or replacement names and addresses of authorized representatives, or listed in any written notice provided to the Environmental Response Trust Administrative Trustee in the future by an authorized representative of the United States.

5.2.2    The Environmental Response Trust Administrative Trustee shall send copies of all reports, budgets, annual balance statements, and other documents that the Environmental Response Trust Administrative Trustee is required to submit to the United States under this Agreement and the Settlement Agreement, and related implementation documents including any unilateral administrative orders, consent decrees, or administrative orders on consent to the following person(s), as applicable:

Authorized representative and party to receive all notices under Section 5.2.2:

The United States:

Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, DC  20044
Ref. DOJ File No. 90-11-3-1-09754

David S. Jones
Natalie N. Kuehler
Assistant United States Attorneys
Office of the United States Attorney
for the Southern District of New York
86 Chambers Street, Third Floor
New York, NY  10007
Tel.:  (212) 637-2739/2741
Fax:  (212) 637-2750
Email:  David.Jones6@usdoj.gov
          Natalie.Kuehler@usdoj.gov

U.S. EPA:

Bob Roberts
Attorney-Advisor
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, DC  20460
Mail Code: 2272A
Tel.: (202) 564-4267

Fax: (202) 501-0269
Email: roberts.robert@epa.gov

U.S. EPA Region 2:
Marla E. Wieder
Joel E. Singerman
U.S. EPA, Region 2
290 Broadway
New York, NY 10007-1866
Tel.: (212) 637-3184
Fax: (212) 678-2424
Email: Wieder.Marla@epa.gov
　　　　Singerman.Joel@ epa.gov

U.S. EPA Region 5:
Peter Felitti
Jose Cisneros
U.S. EPA, Region 5
77 West Jackson Boulevard
Chicago, IL 60604
Tel.: (312) 886-5114
Fax: (312) 692-2495
Email: Felitti.Peter@epamail.epa.gov
　　　　Cisneros.Jose@epamail.epa.gov

U.S. Treasury:
United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Attention: Chief Counsel, Office of Financial Stability
Fax: (202) 927-9225
Email: OFSChiefCounselNotices@do.treas.gov

5.3    Settlors and Powers and Rights Holders

Upon the Effective Date of this Agreement, the Settlors shall have no interests including, without limitation, any reversionary interest, in the Environmental Response Trust or any Environmental Response Trust Assets. Upon the Effective Date of this Agreement, the States and Tribe shall have the rights and powers provided to them under this Agreement and the Settlement Agreement, including the right to receive certain notices, reports and other materials.

5.3.1    In order to determine the actual names and addresses of the authorized representatives of a State or Tribe, the Environmental Response Trust and the Environmental Response Trust Administrative Trustee shall be entitled to rely conclusively on the name and address of the authorized

representative for such State or the Tribe listed below in Section 5.3.2, who may from time to time provide additional or replacement names and addresses of authorized representatives, or listed in any written notice provided to the Environmental Response Trust Administrative Trustee in the future by an authorized representative of such State or the Tribe.

5.3.2   The Environmental Response Trust Administrative Trustee shall send copies of all reports, budgets, annual balance statements, and other documents that the Environmental Response Trust Administrative Trustee is required to submit to a State or the Tribe under this Agreement and the Settlement Agreement, and related implementation documents including any unilateral administrative orders, consent decrees, or administrative orders on consent to the following person(s), as applicable:

<u>The State of Delaware</u>

Kathleen M. Stiller
Program Manager II
DNREC-SIRB
391 Lukens Drive
New Castle, DE 19720
Phone: 302-395-2600
Fax: 302-395-2601
Email: Kathleen.Stiller@state.de.us

and

Robert S. Kuehl
Deputy Attorney General
DNREC-SIRB
391 Lukens Drive
New Castle, DE 19720
Phone: 302-395-2600
Fax: 302-395-2601
Email: Robert.Kuehl@state.de.us

<u>The State of Illinois</u>

James Morgan, AAG
Environmental Bureau South
Office of the Attorney General
500 South Second Street
Springfield, IL 62706
Tel.: 217-524-7506
Email: jmorgan@atg.state.il.us

and

James Kropid
Illinois Environmental Protection Agency
Division of Legal Counsel
P.O. Box 19276
1021 North Grand Avenue East
Springfield, IL 62794-9276
Tel.: 217-782-5544
Email: james.kropid@illinois.gov

The State of Indiana

Timothy J. Junk, Dep. Atty. Gen.
Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204
Tel.: (317) 232-6247
Email: tim.junk@atg.in.gov

and

Michael E. Sickels, Sen. Tech. Adv.
Indiana Department of Environmental Management
Office of Land Quality
100 North Senate Avenue
MC 66-30 IGCN 1101
Indianapolis, IN 46204-2251
Tel.: (317) 232-3406
Email: msickels@idem.in.gov

The State of Kansas

Rick Bean
Section Chief,
Remediation Section
Bureau of Environmental Remediation
Division of the Environment
Kansas Department of Health and Environment
1000 SW Jackson
Topeka, KS 66612-1368

and

Paul Gerard Marx
Attorney
Kansas Department of Health and Environment
1000 SW Jackson, Suite 560
Tel.: (785) 296-6917
Fax: (785) 296-7119
Email: pmarx@kdheks.gov

<u>The State of Michigan</u>

Delores Montgomery, Chief
Hazardous Waste Section
Environmental Resource Management Division
Michigan Department of Natural Resources and Environment
Constitution Hall, Atrium North
525 West Allegan Street
Lansing, MI   48933
Tel.: (517) 373-7973
Fax: (517) 373-4797
Email: montgomeryd1@michigan.gov

and

Chief; Redevelopment and Enforcement Support Unit
Compliance and Enforcement Section, Remediation Division
Michigan Department of Natural Resources and Environment
Constitution Hall
525 West Allegan Street
Lansing, MI   48933
Tel.: (517) 373-7508
Fax: (517) 241-9581
Email: monroeb@michigan.gov

and

Celeste R. Gill (P52484)
Assistant Attorney General
Environment, Natural Resources and Agriculture Division
6th Floor, G. Mennen Williams Building
525 West Ottawa Street
P.O. Box 30755
Lansing, MI  48909
Tel.: (517) 373-7540
Fax: (517) 373-1610
Email: gillc1@michigan.gov

The State of Missouri

Harry D. Bozoian
Department General Counsel
Missouri Department of Natural Resources
P.O. Box 176
1101 Riverside Drive
Jefferson City, MO 65102
Tel: (573) 751-0323
Email: harry.bozoian@dnr.mo.gov

and

David J. Lamb
Director, Hazardous Waste Program
PO Box 176
Jefferson City, MO 65102
Tel: (573) 751-2747
Email: david.lamb@dnr.mo.gov

and

John K. McManus, or his successor
Chief Counsel
Agriculture and Environment Division
P.O. Box 899
Jefferson City, MO 65102
Tel: (573) 751-8370
Fax: (573) 751-8796
Email: jack.mcmanus@ago.mo.gov


The State of New Jersey

Section Chief,
Cost Recovery/Natural Resource Damages Section
Office of the Attorney General
Department of Law and Public Safety Division of Law
25 Market Street
P.O.Box 093
Trenton, New Jersey 08625-0093

The State of New York

Maureen Leary
Assistant Attorney General
Chief, Toxics Section
NYS Department of Law
Environmental Protection Bureau
The Capitol
Albany, New York 12224-0341
Tel.:  (518) 474-7154
Fax:  (518) 473-2534
maureen.leary@ag.ny.gov


The State of Ohio

Laurie Stevenson
Deputy Director, Business Relations
Ohio Environmental Protection Agency
50 W. Town Street
Columbus, Ohio 43215
Tel.:  (614) 644-2782
Fax:  (614) 614-3184
Email: laurie.stevenson@epa.state.oh.us

and

Michelle T. Sutter
Principal Assistant Attorney General
30 E. Broad Street, 25th Floor
Columbus, Ohio  43215
Tel.:  (614) 466-2766
Fax:  (614) 483-1104
Email:  michelle.sutter@ohioattorneygeneral.gov


The Commonwealth of Virginia

Melanie D. Davenport, Director
Division of Enforcement
Virginia Department of Environmental Quality
629 East Main Street
Richmond, Virginia  23219
Tel.:  (804) 698-4038

<u>The State of Wisconsin</u>

Darsi Foss, Chief, Brownfields and Outreach Section
Bureau of Remediation and Redevelopment
Wisconsin Department of Natural Resources
101 South Webster Street, PO Box 7921
Madison, WI 53707-7921
Tel: (608) 267-6713
Fax: (608) 267-7646
E-mail: Darsi.Foss@wisconsin.gov

and

Janet DiMaggio, Project Manager
Wisconsin Department of Natural Resources – South Central Region
3911 Fish Hatchery Road
Fitchburg WI  53711
Tel:  608-275-3295
Fax:  608-275-3338
Email:  janet.dimaggio@wisconsin.gov

and

Kathleen Strasbaugh, Staff Attorney
Bureau of Legal Services
Wisconsin Department of Natural Resources
101 South Webster Street, PO Box 7921
Madison, WI 53707-7921
Tel: (608) 266-0911
Fax: (608) 266-6983
Email: Kathleen.Strasbaugh@wisconsin.gov

and

Anne C. Murphy, Assistant Attorney General
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707-7857
Tel: (608) 266-9224
Fax:  608-267-2779
Email:  MurphyAC@doj.state.wi.us

<u>The Louisiana Department of Environmental Quality</u>

Christopher A. Ratcliff
Attorney Supervisor
Louisiana Department of Environmental Quality
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Tel.: 225-219-3985
Email: chris.ratcliff@la.gov


<u>The Massachusetts Department of Environmental Protection</u>

Stephen Johnson
Deputy Regional Director, Bureau of Waste Site Cleanup
Northeast Regional Office
Massachusetts Department of Environmental Protection
205B Lowell Street
Wilmington, MA 01887.

and

Jennifer Davis
Senior Counsel
Office of General Counsel
Massachusetts Department of Environmental Protection
One Winter Street
Boston, MA 02108


<u>The Department of Environmental Protection of the Commonwealth of Pennsylvania</u>

David Eberle
Environmental Cleanup Program Manager
Department of Environmental Protection of the Commonwealth of PA
400 Waterfront Drive
Pittsburgh, PA 15222-4745
Tel.:  (412) 442-4156
Fax:  (412) 442-4194
Email:  deberle@state.pa.us

<u>The Saint Regis Mohawk Tribe</u>

John J. Privitera, Esq.
McNamee, Lochner, Titus & Williams, P.C.
677 Broadway
Albany, NY  12207
Tel.:  (518) 447-3200
Fax:  (518) 426-4260
Email:  privitera@mltw.com

and

St. Regis Mohawk Tribe
Director, Environment Division
Community Building
412 Route 37
Akwesasne, NY  13655
Tel.:  (518) 358-5937
Fax:  (518) 358-6252

ATTN:	Kenneth Jock
Email:  ken.jock@srmt-nsn.gov


5.4	<u>Transfer of Beneficial Interests, Rights and Powers</u>

The beneficial interest of the United States in the Environmental Response Trust, and the rights and powers provided to the Governments in this Agreement and the Settlement Agreement, are not negotiable and may not be transferred other than by order of the Court.


ARTICLE 6
<u>REPORTING AND TAXES</u>

6.1	<u>Reports</u>

As soon as practicable after the end of the second and fourth quarters of each calendar year, beginning with the first such quarter ended after assets are first received by the Environmental Response Trust and ending as soon as practicable upon termination of the Environmental Response Trust, the Environmental Response Trust shall submit to the Governments a written report, including: (a) financial statements of the Environmental Response Trust through the end of such calendar quarter; and (b) a description of any action taken by the Environmental Response Trust in the performance of its duties which, as determined by outside counsel, accountants or other professional advisors, materially and adversely affects the Environmental Response Trust and of which notice has not previously been given to the Governments.  The Environmental Response Trust shall promptly submit additional reports to the Governments whenever, as determined by outside counsel, accountants or other professional

advisors, an adverse material event or change occurs which affects either the Environmental Response Trust or the rights of the Persons receiving distributions (including, without limitation, the Governments) hereunder. The Environmental Response Trust shall also provide the reports or information required by Section 3.1 of this Agreement.

6.2     Other

The Environmental Response Trust shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Environmental Response Trust, that are required by any applicable governmental unit.

6.3     Reports in Support of Insurance Claims

The Environmental Response Trust shall also file (or cause to be filed) reports and cost analyses in support of claims against insurance carriers at the request of the Governments and shall provide the Governments a copy of any such reports and cost analyses.

6.4     Tax Treatment of the Environmental Response Trust

Except as provided in the following sentence, for U.S. federal and applicable state and local income tax purposes, all Parties shall treat the Environmental Response Trust as a qualified settlement fund within the meaning of Treasury Regulation section 468B-1 (for which no grantor trust election has been made) and, to the extent provided by law, this Agreement shall be governed and construed in all respects consistently with such treatment. The preceding sentence shall not be binding on the Internal Revenue Service as to the application of Treasury Regulation section 1.468B-1 or any other tax issue with respect to the Environmental Response Trust. Following the funding of the Environmental Response Trust (and in no event later than February 15th of the calendar year following the funding of the Environmental Response Trust), the Settlors shall provide a "§ 1.468B-3 Statement" to the Environmental Response Trust Administrative Trustee in accordance with Treasury regulation section 1.468B-3(e). Prior to the delivery of the § 1.468B-3 Statement, the Environmental Response Trust Administrative Trustee may reasonably consult with the Settlors,

6.5     Taxable Entity

In connection with the foregoing, the Environmental Response Trust will be treated as a separate taxable entity. The Environmental Response Trust Administrative Trustee shall cause any property taxes imposed on property owned by the Environmental Response Trust, and all other taxes imposed on the Environmental Response Trust or its earnings, to be timely paid out of the Administrative Funding Account, and shall timely comply with all tax reporting and withholding requirements imposed on the Environmental Response Trust under applicable law. Subject to definitive guidance from the Internal Revenue Service or a judicial decision to the contrary, the Environmental Response Trust Administrative Trustee shall file tax returns and pay applicable taxes with respect to the Environmental Response Trust in a manner consistent with the provisions of Treasury Regulation Section 1.468B-2. All such taxes shall be paid from the Administrative Funding Account.

6.6    Trustee as Administrator

The Environmental Response Trust Administrative Trustee shall be the "administrator," within the meaning of Treasury Regulation Section 1.468B-2(k)(3), of the Environmental Response Trust.

6.7    Fiscal Year

The Environmental Response Trust's fiscal year shall be the calendar year.

6.8    Property Taxes

6.8.1.  Settlors shall pay all property and ad valorem taxes relating to the Properties and other assets owned by the Environmental Response Trust that are due on or prior to the Effective Date (and the Environmental Response Trust shall not be liable for such taxes), and the Environmental Response Trust shall pay all property and ad valorem taxes relating to the Properties and other assets owned by the Environmental Response Trust that are due after the Effective Date.

6.8.2.  Following the Effective Date, subject to Sections 6.16(a) and (d) of the MSPA, the Environmental Response Trust Administrative Trustee shall have the sole right, at its expense, to control, conduct, compromise, and settle any tax contest, audit, or administrative or court proceeding relating to any liability for property and ad valorem taxes attributable to the Properties and shall be authorized to respond to any such tax inquiries relating to the Properties.

6.8.3.  Following the Effective Date, subject to the MSPA, the Environmental Response Trust shall be entitled to the entire amount of any refunds or credits (including interest thereon) with respect to or otherwise relating to any property and ad valorem taxes attributable to the Properties, including for any taxable period ending on, prior to, or after the Effective Date.

6.8.4.  Each of the Debtors and the Environmental Response Trust Administrative Trustee shall cooperate fully with each other regarding the implementation of this Section 6.8 (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records, and documents relating to property and ad valorem taxes governed by this Section 6.8 until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals, or litigation with respect to such taxes. Without limiting the generality of the foregoing, the Debtors shall execute on or prior to the Effective Date a power of attorney authorizing the Environmental Response Trust Administrative Trustee to correspond, sign, collect, negotiate, settle, and administer tax payments and tax returns

for the taxes payable by the Environmental Response Trust and described in Section 6.8.1. hereof.

6.9    Expedited Determination

The Environmental Response Trust Administrative Trustee may request an expedited determination of taxes of the Environmental Response Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Environmental Response Trust for all taxable periods through the termination of the Environmental Response Trust.

ARTICLE 7
MISCELLANEOUS PROVISIONS

7.1    Amendments and Waivers

Any provision of this Agreement may be amended or waived by mutual written consent of the Environmental Response Trust Administrative Trustee, the United States, the States and the Tribe; provided, however, that no change shall be made to this Agreement that would alter the provisions of Section 6.4 hereof or adversely affect the U.S. federal income tax status of the Environmental Response Trust as a "qualified settlement fund" (for which no grantor trust election has been made), in accordance with Section 6.4 hereof, or, unless agreed to in writing by the affected Environmental Response Trust Administrative Trustee, the rights of the Environmental Response Trust Administrative Trustee. Technical amendments to this Agreement may be made as necessary, to clarify this Agreement or enable the Environmental Response Trust Administrative Trustee to effectuate the terms of this Agreement in a manner consistent with the Settlement Agreement with the mutual consent of the Environmental Response Trust, the United States, the States and the Tribe.

7.2    Cooperation

Debtors agree to cooperate with the Environmental Response Trust Administrative Trustee prior to the Effective Date by providing reasonable access to and/or copies of their non-privileged books and records relating to the Properties for the purpose of performing the Environmental Response Trust Administrative Trustee's duties and exercising its powers hereunder, including all environmental information and/or data in the state and condition in which such records are found regarding the Properties in possession of Debtors or any environmental consultants or contractors previously retained by Debtors. As provided for under Paragraph 41 of the Settlement Agreement, no later than January 1, 2011, Debtors shall provide to the Administrative Trustee copies of or access to all documents and other materials in the care, custody or control of Debtors, their professionals, consultants and/or contractors that: (i) contain or relate to environmental information regarding the Properties, (e.g., field notes, data packages, historical documentation, databases, models, cost estimates, reports, correspondence, etc.); (ii) contain or relate to non-environmental information concerning the management of the Properties; and (iii) contain or relate to any information concerning the implementation of and the spending of money associated with MLC's wind-down budget as it relates to the Properties. Prior to 30 days after the Effective Date, Debtors shall transmit all such documents and materials

not already in the possession of the Administrative trustee to the Administrative Trustee, and upon the Effective Date the Environmental response Trust shall become the owner of the information in the IDEA database related to the Properties. With respect to documents stored at the facilities of Iron Mountain Inc., (i) prior to January 1, 2011, Debtors will undertake reasonable efforts to reach agreement with New GM on a process to transfer any Iron Mountain Documents requested by the Administrative Trustee to the Environmental Response Trust no later than July 31, 2011; and (ii) on the Effective Date, Debtors shall transfer all their rights to the Iron Mountain Documents, including their rights to copies of and access to such documents, to the Administrative Trustee. Prior to the Effective Date and for a period of sixty (60) days after the Effective Date, Debtors and/or any successor entity shall provide reasonable access by the Environmental Response Trust Administrative Trustee to such employees of Debtors, their agents, advisors, attorneys, accountants or any other professionals hired by the Debtors with knowledge of matters relevant to the Environmental Trust Assets. The Environmental Response Trust and Environmental Response Trust Administrative Trustee shall take such actions and execute such documents as are reasonably requested by Debtors with respect to effectuating this Agreement, the Settlement Agreement and the transactions contemplated thereby, provided that such actions are not inconsistent with this Agreement, the Settlement Agreement or the Plan of Liquidation, and provided that such actions shall be at the sole expense of the Debtors. The Environmental Response Trust Administrative Trustee, Debtor, and the Lead Agency for each of the Properties will exchange information and reasonably cooperate to determine the appropriate disposition of executor contracts or unexpired leases, if any, that relate to the relevant Property.

7.3     Situs of the Environmental Response Trust

The situs of the Environmental Response Trust herein established is New York, and except to the extent the Bankruptcy Code or other U.S. federal law is applicable the rights, duties, and obligations arising under the Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of law thereof.

7.4     Headings

The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

7.5     Severability

If any provision of this Agreement or application thereof to any Person or circumstance shall be finally determined by the Court to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

7.6     Sufficient Notice

Any notice or other communication hereunder shall be in writing (including, but not limited to, facsimile transmission or by e-mail) and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the Person for whom such notice is intended (or in the case of notice by facsimile or e-mail, when received and telephonically or electronically confirmed), to the name and address set forth in Sections 5.2 and 5.3 of this Agreement or such other address provided in writing to the Environmental Response Trust Administrative Trustee by an authorized representative of the United States or the respective State or Tribe.

Any notice to the Environmental Response Trust Administrative Trustee shall be provided to:

Elliott P. Laws
1001 Pennsylvania Avenue, N.W., 13th Floor
Washington, DC  20004
Tel: 202/624-2500
Fax: 202.628.5116

7.7     Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all together shall constitute one agreement.

7.8     Actions Taken on Other Than Business Day

If any payment or act under the Plan of Liquidation, this Agreement or the Settlement Agreement is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date. For the purposes of this Agreement, a business day shall be any of the days Monday through Friday, excluding federal holidays.

7.9     Compliance with Laws

Any and all transfers or sales of Environmental Response Trust Assets by the Environmental Response Trust shall be in compliance with applicable federal and state laws.

7.10    Preservation of Privilege

In connection with the rights, claims, and causes of action that constitute the Environmental Response Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Environmental Response Trust shall vest in the Environmental Response Trust and its representatives, and the Parties are authorized to take all necessary actions to effectuate the transfer of such privileges.

7.11    No Partnership

This Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust. The Environmental Response Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Environmental Response Trust Administrative Trustee, the United States, or any of them, for any purpose be, or be deemed to be or be treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers. The relationship of the United States to the Environmental Response Trust shall be solely that of beneficiary of a trust and shall not be deemed to be a principal or agency relationship, and the rights of the United States shall be limited to those conferred upon it by this Agreement and the Settlement Agreement.

7.12    Uniform Trust Act

The Environmental Response Trust Agreement shall not be subject to any provision of the Uniform Trust Act as adopted by any State, now or in the future.

7.13    Dispute Resolution

The Parties recognize that alternative dispute resolution may lead to the more efficient resolution of disputes in many circumstances and where appropriate and upon agreement of the relevant Parties, will engage in non-binding informal dispute resolution prior to petitioning the Court to resolve any dispute under this Agreement. Where disputes are not resolved consensually or by alternative dispute resolution, the provisions of the Settlement Agreement regarding the judicial resolution of disputes shall apply.

[Remainder of this page is intentionally blank]

IN WITNESS WHEREOF, THE UNDERSIGNED PARTIES ENTER INTO THIS
AGREEMENT

## FOR THE UNITED STATES

_____          _____
ROBERT G. DREHER                          PREET BHARARA
Acting Assistant Attorney General         United States Attorney
Environment and Natural Resources         Southern District of New York
    Division                              By:  David S. Jones
U.S. Department of Justice                Natalie N. Kuehler
                                          Assistant U.S. Attorneys

Date:  _____                  Date:  _____


_____
Alan S. Tenenbaum
National Bankruptcy Coordinator
Patrick Casey
Senior Counsel
Environment and Natural Resources Division
Environmental Enforcement Section
U.S. Department of Justice

Date:  _____


_____
CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance
Assurance
U.S. Environmental Protection Agency

**FOR MOTORS LIQUIDATION COMPANY, MLC OF HARLEM, INC., MLCS, LLC, MLCS DISTRIBUTION CORPORATION, REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC., AND ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.**

Date: _____     _____
                                 Ted Stenger
                                 Executive Vice President
                                 Motors Liquidation Company, as agent for each
of the foregoing entities
                                 500 Renaissance Center, Suite 1400
                                 Detroit, MI 48243
                                 Tel.: (313) 486-4044
                                 Fax: (313) 486-4259
                                 Email: tstenger@alixpartners.com

Date: _____     _____
                                 Jim M. Redwine
                                 Vice President of Environmental Affairs
                                 Motors Liquidation Company, as agent for each
                                 of the foregoing entities

Date: _____     _____
                                 David R. Berz
                                 Weil, Gotshal & Manges LLP
                                 Attorneys for Debtors and Debtors in Possession
                                 1300 Eye Street, NW, Suite 900
                                 Washington, D.C. 20005
                                 Tel.: (202) 682-7000
                                 Fax: (202) 857-0939
                                 Email: david.berz@weil.coms

## FOR THE ENVIRONMENTAL RESPONSE TRUST ADMINISTRATIVE TRUSTEE

EPLET, LLC in its Representative Capacity as the Environmental Response Administrative Trustee of The Environmental Response Trust

Date: _____  By: _____

Name: Elliott P. Laws
Title: Managing Member

Date: _____  By: _____

Michael O. Hill
Chief Operating Officer and General Counsel
The Environmental Response Trust

**FOR THE STATE OF DELAWARE**


Date: _____          _____
                                 Collin P. O'Mara, Secretary
                                 Delaware Department of Natural Resources
                                 and Environmental Control


Date: _____          _____
                                 Robert S. Kuehl
                                 Deputy Attorney General
                                 Delaware Department of Justice

**FOR THE STATE OF ILLINOIS AND THE ILLINOIS ENVIRONMENTAL PROTECTION AGENCY**

FOR THE STATE OF ILLINOIS
LISA MADIGAN, Attorney General of the State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement/Asbestos Litigation Division


Date:_____          _____
                                    THOMAS E. DAVIS, Chief
                                    Environmental Bureau
                                    Assistant Attorney General
                                    500 South Second Street
                                    Springfield, IL   62706



                                    FOR THE ILLINOIS ENVIRONMENTAL PROTECTION
                                    AGENCY


Date:_____          _____
                                    JOHN J. KIM
                                    Chief Legal Counsel

# FOR THE STATE OF INDIANA

Indiana Department of
Environmental Management

Gregory F. Zoeller,
Attorney General of Indiana
Atty. No. 1958-98

By: _____

    Thomas W. Easterly
    Commissioner

By:_____

    Patricia Orloff Erdmann
    Chief Counsel for Litigation
    Atty. No. 17664-49A

By: _____

    Bruce H Palin,
    Assistant Commissioner
    Office of Land Quality
    Ind. Dept. of Environmental Mgmt
    100 North Senate Avenue
    MC 50-01, ICGN 1301
    Indianapolis, IN 46204

By: _____

    Timothy J. Junk
    Deputy Attorney General
    Atty. No. 5587-02
    Office of the Attorney General
    Indiana Government Center South, Fifth  Floor
    302 West Washington Street
    Indianapolis, IN 46204

    Date: _____

    Date: _____

**FOR THE STATE OF KANSAS**

Date: _____

_____
RODERICK L. BREMBY
Secretary
Kansas Department of
Health and Environment

**FOR THE STATE OF MICHIGAN**


Date: _____        _____
                                      Michael A. Cox
                                      Attorney General

                                      Celeste R. Gill (P52484)
                                      Assistant Attorney General
                                      Environment, Natural Resources and
                                      Agriculture Division
                                      6th Floor, G. Mennen Williams Building
                                      525 West Ottawa Street
                                      P.O. Box 30755
                                      Lansing, MI 48909
                                      Tel.: (517) 373-7540
                                      Fax: (517) 373-1610
                                      gillc1@michigan.gov
                                      Attorneys for the Michigan Department
                                      of Natural Resources and Environment

**FOR THE STATE OF MISSOURI**


Date: _____          _____
                                     CHRIS KOSTER
                                     Attorney General for the State of Missouri

                                     JOHN K. McMANUS
                                     Chief Counsel
                                     Agriculture and Environment Division
                                     P.O. Box 899
                                     Jefferson City, Missouri  65102
                                     Tel.:  (573) 751-8370
                                     Fax:  (573) 751-8796
                                     Email:  jack.mcmanus@ago.mo.gov


Date: _____          _____
                                     Leanne Tippett Mosby
                                      Director
                                     Division of Environmental Quality
                                     Missouri Department of Natural Resources
                                     P.O. Box 176
                                     Jefferson City, Missouri  65102

**FOR THE STATE OF NEW JERSEY**


Date: _____          _____
                                    PAULA T. DOW
                                    Attorney General for the State of New Jersey

                              By:   Richard F. Engel
                                    Deputy Attorney General
                                    Richard J. Hughes Justice Complex
                                    25 Market Street
                                    P.O. Box 093
                                    Trenton, New Jersey  08625-0093
                                    Tel.:  (609) 984-4863
                                    Fax:  (609) 341-5030

**FOR THE STATE OF NEW YORK**

ANDREW M. CUOMO
Attorney General

Date:                                    _____

By:     Maureen Leary
        Assistant Attorney General
        Chief, Toxics Section
        NYS Department of Law
        Environmental Protection Bureau
        The Capitol
        Albany, New York 12224-0341
        Tel.:  (518) 474-7154
        Fax:  (518) 473-2534
        maureen.leary@ag.ny.gov

**FOR THE STATE OF OHIO**


Date: _____          _____
                                 RICHARD CORDRAY
                                 Attorney General for the State of Ohio

                          By:    Michelle T. Sutter
                                 Principal Assistant Attorney General
                                 30 E. Broad Street, 26th Floor
                                 Columbus, Ohio  43215
                                 Tel.:  (614) 752-4316
                                 Fax:  (866) 483-1104
                                 Email:  michelle.sutter@ohioattorneygeneral.gov

**FOR THE COMMONWEALTH OF VIRGINIA**


KENNETH T. CUCCINELLI, II
ATTORNEY GENERAL


Date: _____     By:_____
Kerri L. Nicholas, VSB # 47230
Assistant Attorney General
Environmental Section
Virginia Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
(804) 371-8721
knicholas@oag.state.va.us

**FOR THE STATE OF WISCONSIN**

MATTHEW J. FRANK
Secretary

Date: _____          _____

ALLEN K. SHEA
Deputy Secretary
Wisconsin Department of Natural Resources

Approved as to form:

J.B. VAN HOLLEN
Attorney General

Date: _____          _____

ANNE C. MURPHY
Assistant Attorney General
State Bar # 1031600
Attorneys for the State of Wisconsin

**FOR THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY**


Date: _____    _____
                            Cheryl Sonnier Nolan
                            Assistant Secretary
                            Office of Environmental Services
                            Louisiana Department of Environmental Quality

**FOR THE MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION**

MASSACHUSETTS DEPARTMENT OF
ENVIRONMENTAL PROTECTION
By its attorney,

MARTHA COAKLEY,
ATTORNEY GENERAL

Date: _____     By:_____
                                                      Carol Iancu, MA BBO # 635626
                                                      Assistant Attorney General
                                                      Environmental Protection Division
                                                      Massachusetts Office of the Attorney General
                                                      One Ashburton Place, 18th Floor
                                                      Boston, MA 02108
                                                      (617) 963-2428
                                                      carol.iancu@state.ma.us

**FOR THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE COMMONWEALTH OF PENNSYLVANIA**


Date: _____        _____
                               Susan Shinkman
                               Chief Counsel
                               Office of Chief Counsel
                               Rachel Carson State Office Building
                               400 Market Street
                               Harrisburg, Pennsylvania  17101-2301

**FOR THE SAINT REGIS MOHAWK TRIBE**


Date: _____          _____
                                   McNAMEE, LOCHNER, TITUS
                                        & WILLIAMS, P.C.
                                   John J. Privitera, Esq.
                                   Jacob F. Lamme, Esq.
                                   677 Broadway
                                   Albany, New York  12207
                                   Tel.:  (518) 447-3200
                                   Fax:  (518) 426-4260

# EXHIBIT "A"

## Legal Description of Properties Transferred to the Environmental Response Trust

## EXHIBIT "B"

## FORM OF QUITCLAIM DEED

## QUITCLAIM DEED

STATE OF _____        §
                         §   KNOW ALL BY THESE PRESENTS
COUNTY OF _____       §

THAT _____, a _____ ("Grantor"), for and in consideration of the sum of TEN DOLLARS and No/100 ($10.00) and other good and valuable consideration paid by _____, a _____ ("Grantee"), the receipt of which is hereby acknowledged, and pursuant to the Order of the United States Bankruptcy Court for the Southern District of New York entered on _____ __, 20__ in Case No. 09-50026 (REG) styled *In re: Motors Liquidation Company, f/k/a General Motors Corporation, et al.*, has QUITCLAIMED and by these presents does QUITCLAIM unto Grantee, all of Grantor's rights, title and interests in and to (a) those certain tract(s) of land, as more particularly described in Exhibit B attached hereto and incorporated herein by this reference for all purposes (b) strips and gores between such tract(s) of land and any abutting properties whether owned or claimed by deed, limitations or otherwise, and whether or not held under fence by Grantor, (c) any land lying in or under the bed of any creek, stream or waterway or any highway, avenue, street, road, alley, easement or right-of-way, open or proposed, in, on, across, abutting or adjacent to such tract(s) of land, (d) improvements, buildings or fixtures located on such tract(s) of land, (e) mineral, water, oil, gas, solar and wind rights relating to all or any part of such tract(s) of land, together with all of Grantor's rights, claims, titles and interests in and to any and all appurtenances, rights, easements, ands rights-of-way, filings or other interests, including without limitation rents and profits accruing after the effective date hereof, related to or benefiting such tract(s) of land (collectively, the "Properties").

TO HAVE AND TO HOLD all of Grantor's rights, titles and interests in and to the Properties unto Grantee, its successors and assigns forever, so that neither Grantor nor its successors and assigns shall have, claim or demand any right or title to the Properties or any part thereof.

WHEN RECORDED RETURN TO:

_____
_____
_____
_____

[Signature on following page]

1

EXECUTED effective as of the _____ day of _____, 20__.

GRANTOR: _____

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

STATE OF _____     §
                         §
COUNTY OF _____    §

       This instrument was acknowledged before me on ___, 20__, by _____, the _____ of _____, a _____, the _____ of _____, a _____, on behalf of said _____.

_____
NOTARY PUBLIC

STATE OF _____     §
                         §
COUNTY OF _____    §

       This instrument was acknowledged before me on ___, 20__, by _____, the _____ of _____, a _____, the _____ of _____, a _____, on behalf of said _____.

_____
NOTARY PUBLIC

2

## <u>EXHIBIT C</u>

List of Transferred Contracts

| NO. | SITE | CONTRACT WITH | CONTRACT/LEASE DESCRIPTION |
|-----|------|---------------|----------------------------|
| 1.  |      |               |                            |

# ATTACHMENT D

MOTORS LIQUIDATION COMPANY BONDS AND
INSURANCE INSTRUMENTS FOR OWNED PROPERTIES

| | BOND NO. | OBLIGEE | SITE DESCRIPTION | BOND AMOUNT | COLATTERAL AMOUNT |
|---|---|---|---|---|---|
| | K07489195 | ILLINOIS ENVIRONMENTAL PROTECTION AGENCY | GM Foundry Landfill - I-74 AT "G" STREET, Danville, IL | $ 102,390.00 | $ 102,390.00 |
| | K07593119 | UNITED STATES ENVIRONMENTAL PROTECTION AGENCY | General Motors - Central Foundry Division Superfund Site, Rooseveltown Hwy, St. Lawrence County, Massena, NY | $ 22,071,714.00 | $ 22,071,714.00 |
| | K07736757 | UNITED STATES ENVIRONMENTAL PROTECTION AGENCY | Pontiac Centerpoint Campus Site (sections 3 & 4 of Township T2N, Range R10E, Pontiac, Michigan) | $ 206,980.00 | $ 206,980.00 |
| | K08181974 | DEPARTMENT OF ENVIRONMENTAL MANAGEMENT OF THE STATE OF INDIANA | Former Allison Gas Turbine, 2701 West Raymond Street, Indianapolis, IN 46013 | $ 868,158.00 | $ 868,158.00 |
| | K0818205A | DEPARTMENT OF ENVIRONMENTAL MANAGEMENT OF THE STATE OF INDIANA | WFG Anderson, 2915 Dr. Martin Luther King Blvd., Anderson, IN 46016 | $ 377,752.00 | $ 377,752.00 |
| ENVIRONMENTAL BONDS | | | **ACE-USA/WESTCHESTER FIRE INSURANCE COMPANY** | $ 23,626,994.00 | $ 23,626,994.00 |
| | | | | | |
| | CORRECTIVE ACTION 0907329 | UNITED STATES ENVIRONMENTAL PROTECTION AGENCY | GM CORP. FORMER DELPHI CHASSIS DIVISION (RCRA), LIVONIA - 13000 Eckles Road, Livonia, MI 48150 | $ 3,839,721.29 | $ 3,794,191.00 |
| | CLOSURE 0907330 | NJ DEPT. OF ENVIRONMENTAL PROTECTION | WORLDWIDE FACILITIES GROUP - TRENTON (RCRA) CLOSURE - 1445 Parkway Avenue, Trenton, NJ 08628 | $ 297,022.00 | $ 293,500.00 |
| | CLOSURE/POST CLOSURE 0907327 | OHIO ENVIRONMENTAL PROTECTION AGENCY | WFG ELYRIA (RCRA) - POST CLOSURE - 1400 Lowell St., Elyria, OH 44035 | $ 3,079,006.96 | $ 3,042,497.00 |
| | CLOSURE/POST CLOSURE 0907327 | OHIO ENVIRONMENTAL PROTECTION AGENCY | WFG MORAINE FORMER HARRISON DAYTON (RCRA) - POST CLOSURE - 3600 Dryden Rd, Moraine, OH 45439 | $ 2,743,532.00 | $ 2,711,000.00 |
| ENVIRONMENTAL INSURANCE | | | **AIG - AISLIC INSURANCE COMPANY** | $ 9,959,282.25 | $ 9,841,188.00 |
| | | | | | |
| | CASH COLLATERAL FOR LETTER OF CREDIT FOR | NJ DEPT. OF ENVIRONMENTAL PROTECTION | Hyatt Clark - 1300 Raritan Road, Clark, NJ 07066 | $ 12,875,000.00 | $ 12,875,000.00 |
| ENVIRONMENTAL LOCs | | | **JPMORGAN CHASE BANK** | $ 12,875,000.00 | $ 12,875,000.00 |
| | | | | | |
| TOTAL | | | | $ 46,461,276.25 | $ 46,343,182.00 |

**EXHIBIT D**

**GUC TRUST AGREEMENT**

# MOTORS LIQUIDATION COMPANY
# GUC TRUST AGREEMENT

MOTORS LIQUIDATION COMPANY GUC TRUST AGREEMENT, dated as of [DATE] (this "Trust Agreement"), by and among Motors Liquidation Company ("MLC"), MLC of Harlem, Inc., MLCS, LLC, MLCS Distribution Corporation, Remediation and Liability Management Company, Inc., and Environmental Corporate Remediation Company, Inc. (collectively, the "Debtors"), as debtors and debtors-in-possession, Wilmington Trust Company, as trust administrator (together with any successor appointed under the terms hereof, the "GUC Trust Administrator") of the Motors Liquidation Company GUC Trust (the "GUC Trust") for the benefit of the general unsecured creditors of the Debtors and FTI Consulting, Inc., as trust monitor (together with any successor appointed under the terms hereof, the "GUC Trust Monitor") of the GUC Trust. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Debtors' [TITLE OF PLAN] under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code"), dated [DATE], as confirmed (including all exhibits thereto, as the same may be further amended, modified, or supplemented from time to time, the "Plan").

## Background

A.      On June 1, 2009, the Debtors filed in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

B.      On or about [DATE], the Debtors filed their Plan and Disclosure Statement in the Bankruptcy Court.

C.      The Disclosure Statement was approved by the Bankruptcy Court on [DATE].

D.      On or about [DATE], the Bankruptcy Court entered an order (the "Confirmation Order") confirming the Plan.

E.      The Plan provides for the creation of the GUC Trust as a post-confirmation successor to MLC within the meaning of Section 1145(a) of the Bankruptcy Code, to hold and administer:

(i)      the common stock of General Motors Company (F\K\A NGMCO, Inc.) ("New GM Common Stock") to be contributed to the GUC Trust under the Plan, including (x) any dividends declared thereon in the form of New GM Common Stock, whether prior to or on or after the Effective Date, (y) any additional shares of New GM Common Stock (the "Additional Shares") to be issued in respect of General Unsecured Claims (as hereinafter defined) pursuant to the MSPA (as defined in the Plan), together with any dividends declared thereon in the form of New GM Common Stock, whether prior to or on or after the Effective Date, and (z) any capital stock or other property or assets into which such New GM Common Stock may be converted or for which it may be exchanged (including by way of recapitalization, merger, consolidation, reorganization or otherwise) (the "GUC Trust Common Stock Assets");

(ii)  the two series of warrants , each entitling the holder to acquire one share of New GM Common Stock, one series with an exercise price of $10 per share and an expiration date of July 10, 2016 and the other with an exercise price of $18.33 per share and an expiration date of July 10, 2019, the "New GM Warrants" and, together with the New GM Common Stock, the "New GM Securities") to be contributed to the GUC Trust under the Plan, as such warrants may from time to time be modified or adjusted in accordance with their terms (the "GUC Trust Warrant Assets" and, together with the GUC Trust Common Stock Assets, the "GUC Trust Securities Assets");

(iii)  any dividends on the GUC Trust Common Stock Assets, whether in the form of cash, securities or other property other than New GM Common Stock, declared prior to the Effective Date (the "Initial GUC Trust Dividend Assets") and any such dividends, including New GM Common Stock, declared on or after the Effective Date (the "Subsequent GUC Trust Dividend Assets," and, together with the Initial GUC Trust Dividend Assets, "GUC Trust Dividend Assets");

(iv) Cash proceeds from the sale of fractional New GM Securities sold pursuant to Section 5.6 (the "Fractional Share Proceeds");

(v)  any Cash proceeds from the sale of New GM Securities, from the sale of expiring New GM Warrants or otherwise, but excluding Fractional Share Proceeds and excluding Cash proceeds constituting Other GUC Trust Administrative Cash (the "GUC Trust Distributable Cash" and, collectively with the GUC Trust Dividend Assets and the GUC Trust Securities Assets, the "GUC Trust Distributable Assets");

(vi)  Cash for purposes of funding the administrative expenses of the GUC Trust, contributed to the GUC Trust from the DIP Lenders on the Effective Date in accordance with the terms of the Plan (the "Wind-Down Budget Cash");

(vii) other sources of Cash for the purposes of funding the administrative expenses of the GUC Trust, including Cash obtained upon the sale of New GM Securities pursuant to Section 6.1(b) or otherwise obtained by the GUC Trust following the Effective Date (the "Other GUC Trust Administrative Cash" and together with the Wind-Down Budget Cash, the "GUC Trust Administrative Cash"),

(collectively, the "GUC Trust Assets") and distribute the GUC Trust Distributable Assets to the GUC Trust Beneficiaries (as hereafter defined), in accordance with the terms of the Plan, the Confirmation Order and this Trust Agreement.

F.      The GUC Trust is being created on behalf of, and for the benefit of, (i) the holders of general unsecured claims against the Debtors that are allowed as of the Effective Date (the "Initial Allowed General Unsecured Claims") and (ii) (a) the holders of general unsecured claims against the Debtors that are Disputed (as defined in the Plan) ("Disputed General Unsecured Claims") as of the Effective Date and that are allowed after the Effective Date in accordance with the claims resolution procedures administered under the Plan (to the extent so resolved); (b) the Asbestos Trust Claim to the extent and in the amount agreed upon by the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee and the Future Claimants'

Committee or ordered by the Bankruptcy Court; (c) the Term Loan Avoidance Action Claims, to the extent and in the amount of the determination in favor of the plaintiffs in the underlying litigation; and (d) the Other Avoidance Action Claims, to the extent and in the amount of the determination in favor of the plaintiffs in the underlying litigations (collectively, the "Resolved Allowed General Unsecured Claims" and, together with the Initial Allowed General Unsecured Claims, the "Allowed General Unsecured Claims"). The holders of Allowed General Unsecured Claims, and any holders of Units acquired, directly or indirectly, by transfer from holders of Allowed General Unsecured Claims, in their capacities as beneficiaries of the GUC Trust, are sometimes referred to as the "GUC Trust Beneficiaries."

G.    The GUC Trust Administrator shall have all powers necessary to implement the provisions of this Trust Agreement and administer the GUC Trust, including the power to: (i) prosecute for the benefit of the GUC Trust Beneficiaries, through counsel and other professionals selected by the GUC Trust Administrator, any causes of action that may from time to time be held by the GUC Trust, (ii) resolve Disputed General Unsecured Claims against the Debtors; (iii) preserve and maintain the GUC Trust Assets; (iv) distribute the GUC Trust Distributable Assets to the GUC Trust Beneficiaries in accordance with the Plan, the Confirmation Order and this Trust Agreement; (v) expend the GUC Trust Administrative Cash to cover fees and expenses of the GUC Trust; and (vi) otherwise perform the functions and take the actions provided for in this Trust Agreement or permitted in the Plan and/or the Confirmation Order, or in any other agreement executed pursuant to the Plan, in each case subject to the provisions of Articles VI, VIII and XI hereof regarding the rights and powers of the GUC Trust Monitor.

H.    The GUC Trust is subject to the continuing jurisdiction of the Bankruptcy Court, whose approval is required to pay or distribute money or property to, or on behalf of, a GUC Trust Beneficiary, except as expressly provided in this Trust Agreement.

I.    The GUC Trust is intended to qualify as a "disputed ownership fund" under Treasury Regulations section 1.468B-9.

J.    If the Residual Wind-Down Assets (as defined in the Plan) are transferred to the GUC Trust, the GUC Trust Administrator shall be responsible for liquidating and winding down the Debtors and administering and distributing any Residual Wind-Down Assets transferred to the GUC Trust pursuant to the Plan.

## Agreement

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants contained herein, the Debtors and the GUC Trust Administrator agree as follows:

## ARTICLE I
## DEFINED TERMS

1.1.    Definitions.  Whenever used in this Trust Agreement, unless the context otherwise requires, the following words and phrases shall have the respective meanings ascribed to them as follows:

(a)  "Affiliates" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person. For purposes of this definition "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(b)  "Allowed Excess GUC Trust Distributable Assets," as of any date, means the Excess GUC Trust Distributable Assets multiplied by the Allowed Percentage, each determined as of such date.

(c)  "Allowed General Unsecured Claims" has the meaning set forth in Background paragraph (F).

(d)  "Allowed Percentage" means the percentage equal to a fraction of which the numerator is the Total Allowed Amount and the denominator is the Current Maximum Amount.

(e)  "Budget" shall have the meaning set forth in section 6.3 of this Trust Agreement.

(f)  "Calendar quarter" means the relevant three-month period ending on the last day of March, June, September or December, as applicable, of each calendar year; *provided, however*, that the calendar quarter that contains the Effective Date shall be the period commencing on the Effective Date and concluding on the date on which the relevant calendar quarter would naturally end in accordance with the foregoing.

(g)  "Claim Conflict Resolution" has the meaning set forth in Section 3.6.

(h)  "Confidential Party" has the meaning set forth in Section 13.13.

(i)  "Current Maximum Amount" means as of a given date, the sum of (A) the Total Allowed Amount, (B) the Maximum Disputed Amount, (C) the Maximum Amount of the Asbestos Trust Claim, (D) the Maximum Amount of the Term Loan Avoidance Action Claims, (E) the Maximum Amount of the Other Avoidance Action Claims and (F) the Maximum Amount of the Protective Holdback.

(j)  "DIP Lenders" means the lenders under the DIP Credit Agreement.

(k)  "Distribution Date" means the date of any distribution made by the GUC Trust Administrator to the GUC Trust Beneficiaries pursuant to this Trust Agreement, whether on account of either or both of Allowed GUC Claims or Units.

(l)  "Distribution Threshold" means an amount of Excess GUC Trust Distributable Assets equal to:  (i) with respect to New GM Common Stock, [__] shares of New GM Common Stock, (ii) with respect to New GM Warrants of each series  (A) warrants to acquire [____] shares of New GM Common Stock, and (B) warrants to acquire [ ] shares of New GM Common Stock or (iii) with respect to Cash, $[_____].

(m)  "<u>DTC</u>" means The Depository Trust Company.

(n)  "<u>Excess Distribution Record Date</u>" means, with respect to any given calendar quarter other than the calendar quarter that includes the Effective Date, the first date of such calendar quarter, which date shall constitute the record date for distributions pursuant to <u>Section 5.4</u> hereof.

(o)  "<u>Excess GUC Trust Distributable Assets</u>" means (i) the amount of the GUC Trust Distributable Assets held by the GUC Trust (after providing for all distributions then required to be made in respect of Resolved Allowed General Unsecured Claims), minus (ii) (A) the amount of the GUC Trust Distributable Assets necessary for the satisfaction of Disputed General Unsecured Claims, the Asbestos Trust Claim, the Term Loan Avoidance Action Claims and the Other Avoidance Action Claims, in each case if such claims were to become Allowed General Unsecured Claims at the Maximum Amount, and (B) to satisfy the Protective Holdback in the Maximum Amount; calculated in the manner provided in <u>Article V</u> hereof.

(p)  "<u>Fair Market Value</u>" means, with respect to the New GM Securities on any given date, the closing price of the New GM Securities on the national securities exchange on which such New GM Securities trade on that date or, in the event that the New GM Securities are not traded on that date, the closing price on the immediately preceding trading date.  If any of the New GM Securities are not traded on a national securities exchange, then "<u>Fair Market Value</u>" means, with respect to the New GM Securities on any given date, the fair market value of the New GM Securities as determined by the GUC Trust Administrator in good faith.

(q)  "<u>General Unsecured Claim</u>" has the meaning set forth in the Plan.  Upon settlement or determination by Final Order of the Asbestos Trust Claim, the Asbestos Trust Claim shall be treated as a Resolved Allowed General Unsecured Claim for purposes of distribution from the GUC Trust.  For the avoidance of doubt, until the Asbestos Trust Claim has been settled or determined by Final Order, the GUC Trust Administrator shall have no authority over the Asbestos Trust Claim.  In addition, in the event that the Term Loan Avoidance Action or any other Avoidance Actions shall be resolved in favor of the plaintiffs in such action, the Term Loan Avoidance Action Claims and the Other Avoidance Action Claims shall be treated as Resolved Allowed General Unsecured Claims, to the extent and in the amount of the determination in favor of plaintiffs therein.  For the avoidance of doubt, unless and until the Asbestos Trust Claim, the Term Loan Avoidance Action Claims or Other Avoidance Action Claims become Resolved Allowed General Unsecured Claims, such claims shall not receive any distribution from the GUC Trust.

(r)  "<u>GUC Trust Administrative Cash</u>" has the meaning set forth in Background paragraph (E)(vii).

(s)  "<u>GUC Trust Administrator Parties</u>" means the GUC Trust Administrator and its principals, directors, officers, employees, agents, representatives, attorneys, accountants, advisors and other professionals (including the Trust Professionals).

(t)    "<u>GUC Trust Assets</u>" has the meaning set forth in Background paragraph (E).

(u)    "<u>GUC Trust Beneficiaries</u>" has the meaning set forth in Background paragraph (F).

(v)    "<u>GUC Trust Cash</u>" means cash or cash equivalents included in the GUC Trust Assets, including any GUC Trust Administrative Cash, Fractional Share Proceeds, and GUC Trust Distributable Cash, plus any cash or cash equivalents included in the Residual Wind-Down Assets.

(w)    "<u>GUC Trust Common Stock Assets</u>" has the meaning set forth in Background paragraph (E)(i).

(x)    "<u>GUC Trust Distributable Assets</u>" has the meaning set forth in Background paragraph (E)(v)

(y)    "<u>GUC Trust Distributable Cash</u>" has the meaning set forth in Background paragraph (E)(v).

(z)    "<u>GUC Trust Dividend Assets</u>" has the meaning set forth in Background paragraph (E)(iii).

(aa)    "<u>GUC Trust Monitor Parties</u>" means the GUC Trust Monitor and its principals, directors, officers, employees, agents, representatives, attorneys, accountants, advisors and other professionals.

(bb)    "<u>GUC Trust Securities Assets</u>" has the meaning set forth in Background paragraph (E)(ii).

(cc)    "<u>GUC Trust Warrant Assets</u>" has the meaning set forth in Background paragraph (E)(ii).

(dd)    "<u>GUC Trust Reports</u>" means reports prepared by the GUC Trust Administrator each calendar quarter, as provided in <u>Section 6.2</u>.

(ee)    "<u>Holdback</u>" has the meaning set forth in Section 2.6(c) of this Trust Agreement.

(ff)    "<u>Initial Allowed General Unsecured Claims</u>" has the meaning set forth in Background paragraph (F).

(gg)    "<u>Initial GUC Trust Dividend Assets</u>" has the meaning set forth in Background paragraph (E)(iii).

(hh)    "<u>IRS</u>" means the Internal Revenue Service.

(ii)  "Maximum Disputed Amount" means the aggregate Maximum Amount of all Disputed General Unsecured Claims.

(jj)  "Maximum Amount" means,

(A)    with respect to any Disputed General Unsecured Claim, (x) the amount agreed to by the Debtors and/or the GUC Trust Administrator and the holder of such claim (which shall include any agreed capped amount pursuant to the ADR Procedures approved by the Bankruptcy Court; (y) the amount, if any, estimated or determined by the Bankruptcy Court in accordance with Bankruptcy Code Section 502(c); or (z) absent any such agreement, estimation or determination, the liquidated amount set forth in the proof of claim filed by the holder of such claim, or in the case of unliquidated claims, the amount estimated by the Debtors and/or the GUC Trust Administrator;

(B)    with respect to the Asbestos Trust Claim, until the amount of the Asbestos Trust Claim has either been agreed upon by the Debtors, the Creditors' Committee, the Asbestos Claimants' Committee, and the Future Claimants' Representative or ordered by the Bankruptcy Court pursuant to a Final Order, an amount equal to $[_____] and, after such agreement or order, zero;

(C)    with respect to the Term Loan Avoidance Action Claims, until resolution or dismissal of the Term Loan Avoidance Action (or any related potential unsecured claims) an amount equal to $[1.5 billion] and, after final resolution of the Term Loan Avoidance Action (including the recovery of assets related thereto) or dismissal of the Term Loan Avoidance Action by Final Order, zero;

(D)    with respect to the Other Avoidance Action Claims, (x) an amount equal to zero, in the event that no Avoidance Actions (other than the Term Loan Avoidance Action) have been commenced on or before June 1, 2011, or (y) in the event that one or more Avoidance Actions (other than the Term Loan Avoidance Action) have been commenced and/or identified as potentially forthcoming by the proposed plaintiffs to such Avoidance Actions prior to June 1, 2011, an amount equal to the aggregate of an amount estimated by the GUC Trust Administrator, with the approval of the GUC Trust Monitor, equal to the maximum amount reasonably recoverable by the plaintiffs with respect to such Other Avoidance Action Claims, and after final resolution of such Avoidance Actions, (including recovery of assets related thereto) or dismissal of such Avoidance Actions by Final Order, zero; and

(E)    with respect to the Protective Holdback, an amount equal to the value determined by the GUC Trust Administrator, in consultation with the GUC Trust Monitor and in accordance with section 6.1(d) of this Trust Agreement, or if no such value is set, an amount equal to zero.

(kk)  "New GM Common Stock" has the meaning set forth in Background paragraph (E)(i).

(ll)  "New GM Warrants" has the meaning set forth in Background paragraph (E)(ii).

(mm) "<u>Other Avoidance Action Claims</u>" means the additional general unsecured claims that may arise as a result of recovery of proceeds of the Avoidance Actions other than the Term Loan Avoidance Action (and any related unsecured claims).

(nn) "<u>Other GUC Trust Administrative Cash</u>" has the meaning set forth in Background paragraph (E)(vii).

(oo) "<u>Permissible Investments</u>" means investments in any of the following:

(i)     Marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury, either by statute or an opinion of the Attorney General of the United States;

(ii)     Marketable debt securities, rated Aaa by Moody's and/ or AAA by S&P, issued by U. S. Government-sponsored enterprises, U. S. Federal agencies, U. S. Federal financing banks, and international institutions whose capital stock has been subscribed for by the United States;

(iii)     Certificates of Deposit, Time Deposits, and Bankers Acceptances of any bank or trust company incorporated under the laws of the United States or any state, provided that, at the date of acquisition, such investment, and/or the commercial paper or other short term debt obligation of such bank or trust company has a short-term credit rating or ratings from Moody's and/or S&P, each at least P-1 or A-1;

(iv)     Commercial paper of any corporation incorporated under the laws of the United States or any state thereof which on the date of acquisition is rated by Moody's and/or S&P, provided each such credit rating is least  P-1 and/or A-1;

(v)     Money market mutual funds that are registered with the Securities and Exchange Commission under the Investment Company Act of 1940, as amended, and operated in accordance with Rule 2a-7 and that at the time of such investment are rated Aaa by Moody's and/or AAAm by S&P, including such funds for which the Trustee or an affiliate provides investment advice or other services;

(vi)     Tax-exempt variable rate commercial paper, tax-exempt adjustable rate option tender bonds, and other tax-exempt bonds or notes issued by municipalities in the United States, having a short-term rating of "MIG-1" or "VMIG-1" or a long term rating of "AA" (Moody's), or a short-term rating of "A-1" or a long term rating of "AA" (S&P);  and

(vii)     Repurchase obligations with a term of not more than thirty days, 102 percent collateralized, for underlying securities of the types described in clauses (i) and (ii) above, entered into with any bank or trust company or its respective affiliate meeting the requirements specified in clause (iii) above;

*provided that* maturities on the above securities shall not exceed 365 days and all rating requirements and/or percentage restrictions shall be evaluated as of the time of purchase.

KL2 2677419.4

(pp)    "Protective Holdback" has the meaning set forth in Section 6.1(d).

(qq)    "Purchaser" means NGMCO, Inc., as Purchaser under the MSPA.

(rr)    "Residual Wind-Down Claims" has the meaning set forth in Section 2.7.

(ss)    "Resolved Allowed General Unsecured Claims" has the meaning set forth in Background paragraph (F).

(tt)    "Seller Group" has the meaning set forth in the MSPA.

(uu)    "Subsequent GUC Trust Dividend Assets" has the meaning set forth in Background paragraph (E)(iii).

(vv)    "Tax Returns" means all tax returns, reports, certificates, forms or similar statements or documents.

(ww)    "Term Loan Avoidance Action Claims" means the additional general unsecured claims that may arise as a result of recovery of proceeds of the Term Loan Avoidance Action (or any related unsecured claims).

(xx)    "Total Allowed Amount" means the sum of the amount of all Initial Allowed General Unsecured Claims plus the amount of all Resolved Allowed General Unsecured Claims.

(yy)    "Treasury Regulations" means the income tax regulations promulgated under the Tax Code, including any amended or successor income tax regulations thereto.

(zz)    "Trust Professionals" means, collectively, independent contractors, including attorneys, accountants, appraisers, disbursing agents or other parties deemed by the GUC Trust Administrator to have the qualifications necessary or desirable to assist in the proper administration of the GUC Trust and that are employed or retained by the GUC Trust in such capacities.

(aaa)   "Unit Issuance Ratio" means the ratio of one Unit for each [$ AMOUNT] in amount of Allowed General Unsecured Claims.

(bbb)   "Units" means the units of beneficial interest issued by the GUC Trust to holders of Allowed General Unsecured Claims.

(ccc)   "Wind-Down Budget Cash" has the meaning set forth in Background paragraph (E)(vi).

1.2.    Terms Not Defined Herein.  Capitalized terms used but not defined in this Trust Agreement shall have the meaning ascribed to such terms in the Plan.

1.3.    Meanings of Other Terms.  Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words

importing the singular number shall include the plural number and vice versa and words importing persons shall include firms, associations, corporations and other entities. All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Trust Agreement, and the words herein and words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or subdivision of this Trust Agreement. The term "including" shall mean "including, without limitation."

## ARTICLE II
## DECLARATION OF TRUST

2.1.  Creation of Trust. The Debtors and the GUC Trust Administrator, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of chapter 11 of the Bankruptcy Code, hereby constitute and create the GUC Trust, [in the form of a statutory trust under the laws of the State of Delaware,] which shall bear the name "Motors Liquidation Company GUC Trust." In connection with the exercise of the GUC Trust Administrator's power hereunder, the GUC Trust Administrator may use this name or such variation thereof as the GUC Trust Administrator sees fit.

2.2.  Purpose of GUC Trust. The sole purpose of the GUC Trust is to implement the Plan on behalf, and for the benefit, of the GUC Trust Beneficiaries, to serve as a mechanism for distributing the GUC Trust Distributable Assets under the Plan and in accordance with Treasury Regulations section 1.468B-9, paying all expenses incident thereto (including with respect to the fees and expenses of the Trust Professionals and other professionals retained by the GUC Trust) and, following the dissolution of the Debtors, to liquidate and wind-down the Debtors, with no objective to engage in the conduct of a trade or business.

2.3.  Transfer of GUC Trust Assets to the GUC Trust.

(a)  Effective as of the Effective Date, the Debtors hereby transfer, pursuant to Bankruptcy Code Sections 1123(a)(5)(B) and 1123(b)(3)(B), and in accordance with the Plan and the Confirmation Order, the GUC Trust Assets, as they exist on the Effective Date, to the GUC Trust, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other entities to the maximum extent contemplated by and permissible under Bankruptcy Code Section 1141(c); *provided*, *however* that notwithstanding anything to the contrary in the Plan, Disclosure Statement, Confirmation Order, this Trust Agreement or any other agreement, the DIP Lenders shall maintain their liens on the Wind-Down Budget Cash, provided that for the avoidance of doubt, the DIP Lenders shall not demand acceleration of their liens on the Wind-Down Budget Cash except in accordance with the provisions of section 7.2 of the Wind-Down DIP Loan Agreement. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax. The Debtors and their successors and assigns shall be released from any and all liability with respect to transfer of the GUC Trust Assets to the GUC Trust as aforesaid. Nothing in this Trust Agreement is intended to, or shall be construed to, effect a release, extinguishment or compromise of any claim or cause of action transferred to the GUC Trust pursuant to this Trust Agreement. The GUC Trust Assets and all other property held from time to time by the

GUC Trust under this Trust Agreement and any earnings (including interest) thereon are to be managed, applied and disposed of by the GUC Trust Administrator in accordance with the terms hereof, the Plan and the Confirmation Order for the benefit of the GUC Trust Beneficiaries, and for no other party, subject to the further covenants, conditions and terms hereinafter set forth, including the provisions of section 2.6.

(b)    To the extent any GUC Trust Assets cannot be transferred to the GUC Trust, because of a restriction on transferability under applicable non-bankruptcy law that is not superseded by Bankruptcy Code Section 1123 or any other provision of the Bankruptcy Code, such assets shall be retained by the Debtors.  The proceeds of sale of any such assets retained by the Debtors shall be allocated to the GUC Trust pursuant to the Plan as if such transfer had not been restricted under applicable non-bankruptcy law.  The GUC Trust Administrator may commence an action in the Bankruptcy Court to resolve any dispute regarding the allocation of the proceeds of any assets retained by the Debtors pursuant to the Plan and Confirmation Order.

(c)    On the Effective Date, the Debtors shall also deliver to the GUC Trust a complete list of all General Unsecured Claims, both Allowed and Disputed, reflected on the claims registry as of the Effective Date, including the names and addresses of all holders of such General Unsecured Claims, whether such claims have been Allowed or are Disputed, and the details of all objections in respect of Disputed General Unsecured Claims.

2.4.    <u>Appointment and Acceptance of GUC Trust Administrator</u>.  The GUC Trust Administrator shall be deemed to be appointed pursuant to Bankruptcy Code Section 1123(b)(3)(B).  The GUC Trust Administrator hereby accepts the trusteeship of the GUC Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery by the Debtors to the GUC Trust Administrator, on behalf, and for the benefit, of the GUC Trust Beneficiaries, of all of their respective right, title and interest in the GUC Trust Distributable Assets, upon and subject to the terms and conditions set forth in the Plan, the Confirmation Order and this Trust Agreement.  The GUC Trust Administrator's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the GUC Trust and not otherwise, and in accordance with applicable law.  The GUC Trust Administrator shall have the authority to bind the GUC Trust within the limitations set forth herein, but shall for all purposes hereunder be acting in the capacity as GUC Trust Administrator, and not individually.

2.5.    <u>Distribution of GUC Trust Distributable Assets</u>.  The GUC Trust Administrator shall, in an expeditious but orderly manner and subject to the provisions of the Plan, the Confirmation Order and this Trust Agreement, make timely distributions of the GUC Trust Distributable Assets in accordance with the terms hereof and not unduly prolong the existence of the GUC Trust. The GUC Trust Administrator may incur and pay any reasonable and necessary expenses in connection with the administration of the GUC Trust, including the fees and expenses of the Trust Professionals provided however that all such expenditures shall be made in accordance with the Budget.

2.6.    <u>No Reversion to Debtors</u>.

(a)    In no event shall any part of the GUC Trust Assets revert to or be distributed to or for the benefit of any Debtor.  All GUC Trust Distributable Assets shall be applied to the satisfaction of Allowed GUC Claims, including through distributions made in respect of the Units.

(b)    To the extent that after satisfaction in full of all of the costs and expenses of the administration of the GUC Trust, after all Allowed General Unsecured Claims have been paid pursuant to the Plan, after satisfaction of all other obligations or liabilities of the GUC Trust (including without limitation distributing the Residual Wind-Down Assets to holders of Allowed Secured, Administrative and Priority Claims, but not including the claims of the DIP Lenders) incurred or assumed in accordance with the Plan, Confirmation Order or this Trust Agreement, (or to which the GUC Trust Assets are otherwise subject), and after the affairs of the GUC Trust have been finally concluded in accordance with the provisions of Section 4.3 hereof, there shall remain any Wind-Down Budget Cash or Residual Wind-Down Assets, the GUC Trust Administrator is authorized to and shall distribute any such remaining Wind-Down Budget Cash and Residual Wind-Down Assets to the DIP Lenders in accordance with the terms of the DIP Credit Facility.  To the extent any portion of such residue is not accepted by the respective DIP Lenders, the GUC Trust Administrator shall request an order from the Bankruptcy Court authorizing the GUC Trust Administrator to distribute any such remaining Wind-Down Budget Cash or Residual Wind-Down Assets to an organization described in section 501(c)(3) of the Tax Code and exempt from U.S. federal income tax under section 501(a) of the Tax Code that is unrelated to the Debtors, the GUC Trust, the GUC Trust Administrator, the GUC Trust Monitor and any insider of the GUC Trust or GUC Trust Monitor, or authorizing such other disposition as recommended by the GUC Trust Administrator and approved by the Bankruptcy Court.

(c)    The GUC Trust agrees that all payments of Wind-Down Budget Cash to Trust Professionals shall be subject to a 10 percent holdback for each calendar year (the "Holdback").  If the Trust Professional does not exceed the Budget for such calendar year, such Trust Professional shall receive any amounts actually owed but not yet paid for the calendar year from the Wind-Down Budget Cash in the amount of its Holdback, no less than 30 days after the end of the calendar year.   If the Trust Professional exceeds the amount allocated to it in the Budget, such Trust Professional shall not receive the Holdback until 30 days after the earlier of (x) the termination of such Trust Professional's engagement by the GUC Trust or (y) the dissolution of the GUC Trust pursuant to section 4.1 of this GUC Trust Agreement (which amount shall be payable from the Wind-Down Budget Cash to the extent such funds are available at that time, and otherwise from Other Administrative Cash).  If the Trust Professional has exceeded the amount allocated to it in the Budget (measured on an annual basis), the Trust Professional shall not be paid from the Wind-Down Budget Cash any amount greater than the amount allocated in the Budget for such period except with the written consent of the DIP Lenders, *provided that* if the DIP Lenders do not consent, the GUC Trust Administrator, in consultation with the GUC Trust Monitor may seek Bankruptcy Court approval to pay the Trust Professional from the Wind-Down Budget Cash an amount greater than the amount allocated in the Budget for such period.  The GUC Trust Administrator may only request such Bankruptcy Court approval on the grounds that the DIP Lenders acted in bad faith in not consenting to authorize payment to the Trust Professional in excess of the Budget.  "Bad faith" shall not include, *inter alia*, a failure to permit payments outside the

Budget for any rational business purpose. Any Wind-Down Budget Cash remaining upon the dissolution of the GUC Trust, other than the Holdback amount, shall be returned to the DIP Lenders in accordance with Section 5.2(b) of the Plan. Notwithstanding the foregoing, a Trust Professional may receive payment for amounts in excess of the Budget from sources other than the Wind-Down Budget Cash in accordance with section 6.1(d) of this Trust Agreement.

(d)    Notwithstanding the foregoing, any remaining Other GUC Trust Administrative Cash up to the amount of the proceeds from the sale of (or borrowing against) any GUC Trust Securities pursuant to Section 6.1(b) shall not be distributed to the DIP Lenders, but rather shall be distributed to holders of Allowed General Unsecured Claims or holders of Units, as the case may be, pursuant to Article V.

2.7.    Dissolution of the Debtors.  If any Residual Wind-Down Assets shall remain upon dissolution of the Debtors, which according to the Plan shall occur  no later than December 15, 2011, then, immediately prior to such dissolution, the Debtors shall transfer to the GUC Trust all such remaining Residual Wind-Down Assets.  In such case,  after such transfer, the GUC Trust Administrator shall have the exclusive right to object to any remaining Administrative Expenses, Priority Tax Claims, DIP Credit Agreement Claims, Priority Non-Tax Claims, and Secured Claims, and shall administer the resolution of all Disputed Administrative Expenses, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Secured Claims (collectively, the "Residual Wind-Down Claims"), all in accordance with the terms of the Plan, the Confirmation Order and Section 8.1(c) of this Trust Agreement.

## ARTICLE III
## GUC TRUST BENEFICIARIES; UNITS

3.1.    Rights of Beneficiaries.

(a)    Except as provided in Section 2.6 hereof, the GUC Trust Beneficiaries shall be the sole beneficiaries of the GUC Trust and the GUC Trust Distributable Assets, and the GUC Trust Administrator shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized in the Plan, the Confirmation Order and this Trust Agreement, including those powers set forth in Articles VI and VIII hereof.

(b)    The beneficial interest of a GUC Trust Beneficiary in the GUC Trust is hereby declared and shall be in all respects and for all purposes intangible personal property.

(c)    Except as expressly provided herein, a GUC Trust Beneficiary shall have no title or right to, or possession, management or control of, the GUC Trust, or the GUC Trust Assets, or to any right to demand a partition or division of such assets or to require an accounting of the GUC Trust Administrator or the GUC Trust Monitor.  The whole legal title to the GUC Trust Assets shall be vested in the GUC Trust Administrator and the sole beneficial interest of the GUC Trust Beneficiaries shall be as set forth in this Trust Agreement.

3.2.    Limited Liability.  No provision of the Plan, the Confirmation Order or this Trust Agreement, and no mere enumeration herein of the rights or privileges of any GUC Trust Beneficiary, shall give rise to any liability of such GUC Trust Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, by creditors or employees of any

Debtor, or by any other Person.  GUC Trust Beneficiaries are deemed to receive the GUC Trust Distributable Assets in accordance with the provisions of the Plan, the Confirmation Order and this Trust Agreement in exchange for their Allowed General Unsecured Claims or on account of their Units, as applicable, without further obligation or liability of any kind, but subject to the provisions of this Trust Agreement.

3.3.    Issuance of Units.

(a)    The GUC Trust shall issue Units to holders of Allowed General Unsecured Claims as provided in this Trust Agreement.  As of the Effective Date, Holders of Initial Allowed General Unsecured Claims shall receive the number of Units equal to the amount of such Initial Allowed General Unsecured Claims multiplied by the Unit Issuance Ratio, rounded up or down to the nearest whole Unit.  Following the Effective Date, holders of Resolved Allowed General Unsecured Claims shall receive Units in such amounts and at such times as provided in Section 5.3 hereof.  Units will represent the contingent right to receive, on a pro rata basis as provided in the Plan, the Confirmation Order and this Trust Agreement, GUC Trust Distributable Assets that are not required for satisfaction of Resolved Allowed General Unsecured Claims.   The Units shall be issued subject to all the terms and conditions of the Plan, the Confirmation Order and this Trust Agreement.  References in this Trust Agreement to holders of Units shall be to the record holders of such Units or to the beneficial holders of the Units, as the context requires.

(b)    With respect to the claims of beneficial holders of debt securities arising out of or relating to the Note Claims [and Eurobond Claims], the GUC Trust shall issue additional Units to the Indenture Trustees [and agents under the agreements governing the Eurobond Claims], to the extent necessary to provide each such beneficial holder with a number of Units equal to the number of Units such holder would receive had its claim been treated as an Initial Allowed General Unsecured Claim hereunder.

(c)    As provided in Section 7.5 hereof, the GUC Trust Administrator may also hold back and retain Units otherwise issuable pursuant to this subsection with respect to Allowed General Unsecured Claims that are subject to withholding, and the GUC Trust Administrator shall apply amounts distributed in respect of such retained Units to satisfy such withholding obligations.

3.4.    Evidence of Units.

(a)    Except as otherwise provided in this Trust Agreement, Units will be issued in book-entry form only, and held through participants (including securities brokers and dealers, banks, trust companies, clearing corporations and other financial organizations) of DTC, as depositary.  Unit holders will not receive physical certificates for their Units, and the Units will not be registered in a direct registration system on the books and records of the GUC Trust.  To receive Units, holders of Allowed General Unsecured Claims shall be required to designate a direct or indirect participant in DTC with whom such holder has an account into which the Units may be deposited, which in the case of Note Claims [and Eurobond Claims] shall be designated by the applicable Indenture Trustee [or agent under the agreements governing the Eurobond Claims, as applicable].  For so long as DTC serves as

14

depository for the Units, the GUC Trust Administrator may rely on the information and records of DTC to make distributions and send communications to the holders of Units and, in so doing, the GUC Trust Administrator shall be fully protected and incur no liability to any holder of Units, any transferee (or purported transferee) of Units, or any other person or entity.

(b)   If and for so long as a holder of an Allowed General Unsecured Claim does not designate a direct or indirect participant in DTC, the GUC Trust Administrator shall hold the Units such holder is otherwise entitled to receive, together with any GUC Trust Distributable Assets distributed in respect of such Units, until such time as such holder designates a direct or indirect participant in DTC, with whom such holder has an account and at such time the GUC Trust Administrator shall distribute to such holder the Units and any distributions thereon to which it is so entitled; *provided*, *however*, that if a holder has not designated a direct or indirect participant in DTC prior to the final Distribution Date, then the GUC Trust Distributable Assets distributed in respect of the Units reserved for such holder shall be distributed pro rata to all holders of Units then outstanding.

(c)   If DTC is unwilling or unable to continue as a depositary for the Units, or if the numbers of participants in whose account Units are held exceed 500 as of the end of any fiscal year of the GUC Trust, or if the GUC Trust Administrator with the approval of the GUC Trust Monitor otherwise determines to do so, the GUC Trust Administrator shall either exchange the Units represented in book-entry form for physical certificates or record ownership of the Units through a direct registration system.

3.5.   Transfers of Units.[1]   Units shall be freely negotiable and transferable, subject to applicable law and, for so long as DTC continues to serve as depositary for the Units, the requirements of DTC's electronic book-entry system; *provided*, *however*, that if DTC shall cease to serve as depositary for the Units, the Units shall not be transferable to the extent that as a result of such transferability, the GUC Trust would be required to register the Units under Section 12(g) of the Securities Exchange Act of 1934, as amended.  In no event, however, shall the GUC Trust Administrator or anyone acting on its behalf, directly or indirectly, engage in any activity designed to facilitate or promote trading in the Units including by engaging in activities prohibited pursuant to Section 8.2; provided that no activity undertaken by the GUC Trust Administrator in compliance with the terms of the Plan, the Confirmation Order or this Trust Agreement shall be deemed to facilitate or promote trading in the Units for these purposes.

3.6.   Conflicting Claims to Units.   If the GUC Trust Administrator has actual knowledge of any conflicting claims or demands that have been made or asserted with respect to a Unit, or a beneficial interest therein, the GUC Trust Administrator shall be entitled, at its sole election, to refuse to comply with any such conflicting claims or demands.  In so refusing, the GUC Trust Administrator may elect to make no payment or distribution with respect to the Unit subject to the claims or demands involved, or any part thereof, and the GUC Trust Administrator

---

[1]   It is currently contemplated that a request for no action will be made to the Division of Corporation Finance of the Securities and Exchange Commission for assurance that the GUC Trust will not have to register the Units under the Securities Exchange Act of 1934 if the Units are held through DTC and the number of participants in whose accounts the Units are held, together with any holders of record of the Units, is less than 500.

shall be entitled to refer such conflicting claims or demands to the Bankruptcy Court, which shall have exclusive and continuing jurisdiction over resolution of such conflicting claims or demands. The GUC Trust Administrator shall not be or become liable to any party for either (i) its election to continue making distributions pursuant to its books and records and/or the books and records of DTC, as applicable, without regard to the conflicting claims or demands; or (ii) its election to cease payments or distributions with respect to the subject Unit.  In the event that the GUC Trust Administrator elects to cease payments, it shall be entitled to refuse to act until either (x) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court (or such other court of proper jurisdiction) or (y) all differences have been resolved by a written agreement among all of such parties and the GUC Trust Administrator, which agreement shall include a complete release of the GUC Trust and the GUC Trust Administrator (the occurrence of either (x) or (y), a "Claim Conflict Resolution").  Until a Claim Conflict Resolution is reached with respect to such conflicting claims or demands, the GUC Trust Administrator shall hold in a segregated account any payments or distributions from the GUC Trust to be made with respect to the Unit at issue.  Promptly after a Claim Conflict Resolution is reached, the GUC Trust Administrator shall transfer the payments and distributions, if any, held in the segregated account, together with any interest and income earned thereon, if any, in accordance with the terms of such Claim Conflict Resolution.

## ARTICLE IV
## DURATION AND TERMINATION OF THE GUC TRUST

4.1.    Duration.  The GUC Trust shall become effective upon the Effective Date and the execution of this Trust Agreement and shall remain and continue in full force and effect until (x) the earlier of (i) the date on which (A) all of the GUC Trust Distributable Assets have been distributed by the GUC Trust Administrator in accordance with this Trust Agreement, the Plan, and the Confirmation Order, and (B) if the Residual Wind-Down Assets are transferred to the GUC Trust upon the dissolution of the Debtors, the GUC Trust Administrator has completed the resolution of the Residual Wind-Down Claims and distribution of the Residual Wind-Down Assets, and (ii) the fifth anniversary of the Effective Date, or (y) such shorter or longer period authorized by the Bankruptcy Court (I) in order to resolve all Disputed General Unsecured Claims, the Asbestos Trust Claim, the Term Loan Avoidance Action and other Avoidance Actions, and (II) to complete the resolution of the Residual Wind-Down Claims and distribution of the Residual Wind-Down Assets.

4.2.    Dissolution of the GUC Trust.  Notwithstanding anything to the contrary in this Trust Agreement, in no event shall the GUC Trust Administrator unduly prolong the duration of the GUC Trust, and the GUC Trust Administrator shall, in the exercise of its reasonable business judgment and in the interests of all GUC Trust Beneficiaries, at all times endeavor to terminate the GUC Trust as soon as practicable in accordance with the purposes and provisions of this Trust Agreement and the Plan.

4.3.    Continuance of GUC Trust for Purposes of Winding Up.  After the dissolution of the GUC Trust and solely for the purpose of liquidating and winding up its affairs, the GUC Trust Administrator shall continue to act in such capacity until its duties hereunder have been fully performed.  The GUC Trust Administrator shall retain the books, records and files that shall have been delivered to or created by the GUC Trust Administrator until distribution of all the

GUC Trust Assets and the resolution of the Residual Wind-Down Claims and distribution of the Residual Wind-Down Assets. At the GUC Trust Administrator's discretion, all of such records and documents may be destroyed at any time following the later of (x) final distribution of the GUC Trust Assets and completion of the resolution of the Residual Wind-Down Claims and distribution of the Residual Wind-Down Assets, if applicable, unless such records and documents are necessary to fulfill the GUC Trust Administrator's obligations pursuant to Articles VI and VIII hereof and subject to any joint prosecution and common interests agreement(s) to which the GUC Trust Administrator may be party, and (y) the date until which the GUC Trust Administrator is required by applicable law to retain such records and documents.

## ARTICLE V
## CLAIMS RESOLUTION; DISTRIBUTIONS

5.1.    Resolution of Claims.

(a)    Except as otherwise provided in this Trust Agreement, as of the Effective Date, objections to, and requests for estimation of Disputed General Unsecured Claims against the Debtors may be interposed and prosecuted only by the GUC Trust Administrator [or, to the extent applicable, the Creditors' Committee]. Such objections and requests for estimation, to the extent not already pending, shall be served on the respective claimant and filed with the Bankruptcy Court on or before the 180th day following the Effective Date (with the exception of Unliquidated Litigation Claims); provided, that the GUC Trust Administrator may seek extension of such date by *ex parte* application to the Bankruptcy Court, *provided further* that the GUC Trust Administrator shall provide U.S. Treasury with five business days notice prior to its application to the Bankruptcy Court.

(b)    Except as otherwise set forth herein, no distributions shall be made with respect to any portion of a Disputed General Unsecured Claim unless and until such Disputed General Unsecured Claim has become an Allowed General Unsecured Claim.

(c)    To the extent that a Disputed General Unsecured Claim becomes an Allowed General Unsecured Claim, distributions (if any) shall be made to the holder of such Allowed General Unsecured Claim in accordance with the provisions of the Plan, the Confirmation Order and this Trust Agreement.

(d)    From and after the Effective Date, the GUC Trust Administrator shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Disputed General Unsecured Claims against the Debtors, subject to the consent of the GUC Trust Monitor, as may be required pursuant to the terms of Section 11.3 hereof.

(e)    The GUC Trust Administrator may at any time request that the Bankruptcy Court estimate any contingent claim, unliquidated claim or Disputed General Unsecured Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or any other Person previously objected to such General Unsecured Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any General Unsecured Claim at any time during litigation concerning any objection to any General Unsecured Claim, including during the pendency of any appeal

relating to any such objection. In the event that the Bankruptcy Court estimates any contingent claim, unliquidated claim or Disputed General Unsecured Claim, the amount so estimated shall constitute either the Allowed amount of such General Unsecured Claim or a maximum limitation on such General Unsecured Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such General Unsecured Claim, the GUC Trust Administrator may pursue supplementary proceedings to object to the allowance of such General Unsecured Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. General Unsecured Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

(f)     Notwithstanding anything to the contrary contained in this Section 5.1 or elsewhere in this Trust Agreement, holders of Unliquidated Litigation Claims (other than (i) the United States, including its agencies and instrumentalities, and (ii) state and tribal governments with respect to any Claims concerning alleged environmental liabilities) shall be subject to the ADR Procedures. The GUC Trust Administrator shall, at all times and in all cases, comply with and implement the ADR Procedures with respect to holders of Unliquidated Litigation Claims. As set forth in the Plan, if the GUC Trust Administrator terminates the ADR Procedures with respect to an Unliquidated Litigation Claim, the GUC Trust Administrator shall have one hundred eighty (180) days from the date of termination of the ADR Procedures to file and serve an objection to such Unliquidated Litigation Claim. If the GUC Trust Administrator terminates the ADR Procedures with respect to an Unliquidated Litigation Claim and such Unliquidated Litigation Claim is litigated in a court other than the Bankruptcy Court, the GUC Trust Administrator, as applicable, shall have ninety (90) days from the date of entry of a Final Order adjudicating such Claim to file and serve an objection to such Claim for purposes of determining the treatment of such Claim under the Plan.

5.2.    Distributions to Holders of Initial Allowed General Unsecured Claims. As promptly as practicable following the Effective Date (but no earlier than the first Business Day following the Distribution Record Date), the GUC Trust Administrator shall deliver to each holder of an Initial Allowed General Unsecured Claim:

(a)    a distribution consisting of

(i)     the amount of GUC Trust Distributable Assets in proportion to the amount of such Initial Allowed General Unsecured Claim as prescribed by the Plan; provided that, for the avoidance of doubt, the pro rata amount of GUC Trust Distributable Assets distributable in respect of an Allowed General Unsecured Claim, shall be a pro rata share of each type of asset comprising the Allowed Excess GUC Trust Distributable Assets (whether such assets consist of Cash, New GM Common Stock and/or each series of New GM Warrants); and

(ii)    if such holder of an Initial Allowed General Unsecured Claim has designated a direct or indirect participant in DTC in accordance with Section 3.4 hereof, a number of Units as provided in Section 3.3.

(b)     With respect to the claims of beneficial holders of debt securities arising out of or relating to the Note Claims [and Eurobond Claims], the GUC Trust shall issue additional GUC Trust Distributable Assets to the Indenture Trustees [and agents under the agreements governing the Eurobond Claims], to the extent necessary to provide each such beneficial holder with a number of GUC Trust Distributable Assets equal to the amount of GUC Trust Distributable Assets such holder would receive had its claim been treated as an Initial Allowed General Unsecured Claim hereunder.

5.3.     Distributions to Holders of Resolved Allowed General Unsecured Claims.

(a)     Each calendar quarter following the Effective Date, as promptly as practicable following the beginning of such calendar quarter, the GUC Trust Administrator shall deliver to each holder, if any, of a Disputed General Unsecured Claim that has become a Resolved Allowed General Unsecured Claim during the prior calendar quarter a distribution consisting of:

(i)     (x) the amount of GUC Trust Distributable Assets in proportion to the amount of such Resolved Allowed General Unsecured Claim as prescribed by the Plan, as if such Resolved Allowed General Unsecured Claim had been an Initial Allowed General Unsecured Claim, and (y) all Subsequent GUC Trust Dividend Assets received by the GUC Trust since the Effective Date in respect of the GUC Trust Securities Assets distributed pursuant to clause (x);

(ii)     a number of Units equal to the product of (x) the amount of such Resolved Allowed General Unsecured Claim multiplied by (y) the Unit Issuance Ratio, rounded up or down to the nearest whole Unit; and

(iii)     the aggregate amount of Allowed Excess GUC Trust Distributable Assets that the holder would have received had it been the holder of Units referred to in clause (ii) above on each Excess Distribution Record Date for any calendar quarter prior to the date of such distribution.

(b)     On any Distribution Date where the GUC Trust does not hold sufficient GUC Trust Distributable Assets to satisfy all Disputed General Unsecured Claims or other Claims that became Resolved Allowed General Unsecured Claims during the prior calendar quarter, the GUC Trust Administrator shall (following the reservation of the Protective Holdback in accordance with section 6.1(d) of this Trust Agreement, and/or the sale of any GUC Trust Distributable Assets to the extent necessary and approved by the Bankruptcy Court) distribute all GUC Trust Distributable Assets that remain in the GUC Trust to the holders of such Resolved Allowed General Unsecured Claims pro rata by Claim amount. Following such distribution, any remaining unsatisfied portion of such Resolved Allowed General Unsecured Claims, together with all remaining Disputed General Unsecured Claims and other Claims (including, without limitation, the Asbestos Trust Claim, the Term Loan Avoidance Action Claims and the Other Avoidance Action Claims) shall be discharged and forever barred from assertion against the GUC Trust.

5.4.    Distribution of Excess GUC Trust Distributable Assets.

(a)    Following the Effective Date, as and to the extent Disputed General Unsecured Claims are disallowed, the GUC Trust Administrator shall determine for each calendar quarter the Excess GUC Trust Distributable Assets and the Allowed Percentage as of the last date of such calendar quarter, if any.

(b)    During each calendar quarter, beginning with the second calendar quarter following the Effective Date, the GUC Trust Administrator shall, as promptly as practicable following the beginning of such calendar quarter, distribute the Allowed Excess GUC Trust Distributable Assets, in each case determined as of the last date of the prior calendar quarter, to the holders of Units outstanding on the Excess Distribution Record Date for that calendar quarter, and the holders of Units distributed to holders of Resolved Allowed General Unsecured Claims during that calendar quarter, pro rata.  For the avoidance of doubt, the pro rata amount of Allowed Excess GUC Trust Distributable Assets distributable in respect of a Unit shall be a pro rata share of each type of asset comprising the Allowed Excess GUC Trust Distributable Assets (whether such assets consist of Cash, New GM Common Stock and/or each series of New GM Warrants).

(c)    Anything to the contrary herein notwithstanding, the GUC Trust Administrator shall not make a distribution of any Allowed Excess GUC Trust Distributable Assets during any calendar quarter if the amount of Allowed Excess GUC Trust Distributable Assets of any particular category, determined as of the last date of the prior calendar quarter, does not exceed its relevant Distribution Threshold.  In such case, any Allowed Excess GUC Trust Distributable Assets then available for distribution shall be held by the GUC Trust until the next calendar quarter for which the amount of Allowed Excess GUC Trust Distributable Assets of every category exceeds the Distribution Threshold.

(d)    Notwithstanding the foregoing, the GUC Trust Administrator, may, with the consent of the GUC Trust Monitor, withhold distribution of Excess GUC Trust Distributable Assets to the holders of Units if the GUC Trust Administrator becomes aware of previously unknown potential Allowed General Unsecured Claims, in an amount that the GUC Trust Administrator estimates to be the maximum amount reasonably allowable in respect of such claims.

5.5.    Retention of GUC Trust Assets.   Notwithstanding anything in this Trust Agreement to the contrary, the GUC Trust Administrator shall at all times, to the extent practicable, retain

(a)                                sufficient GUC Trust Distributable Assets as the GUC Trust Administrator shall determine, in consultation with the GUC Trust Monitor and subject to the Budget, as would be distributable (I) to all holders of Disputed General Unsecured Claims at the time outstanding as if all Disputed General Unsecured Claims were allowed at the Maximum Amount, but only until such Disputed General Unsecured Claims are resolved, (II) to the holders of all Resolved Allowed General Unsecured Claims at the time outstanding, to the extent not previously distributed, (III) in respect of the Asbestos Trust Claim, at the Maximum Amount thereof but only until such claim becomes a Resolved Allowed General

Unsecured Claim (IV) in respect of the Term Loan Avoidance Action Claims, at the Maximum Amount thereof but only until the Term Loan Avoidance Action is dismissed by Final Order or the Term Loan Avoidance Action Claims become Resolved Allowed General Unsecured Claims, (V) in respect of Other Avoidance Action Claims at the Maximum Amount thereof but only until the other Avoidance Actions are dismissed by Final Order or the Avoidance Action Claims become Resolved Allowed General Unsecured Claims and (VI) in respect of the Protective Holdback, at the Maximum Amount thereof.

(b) sufficient GUC Trust Administrative Cash as the GUC Trust Administrator shall determine, in consultation with the GUC Trust Monitor and subject to the Budget, are necessary (x) to pay reasonable incurred or anticipated expenses (including any taxes imposed on the GUC Trust or in respect of the GUC Trust Assets) and (y) to satisfy other liabilities incurred or anticipated by the GUC Trust in accordance with the Plan, the Confirmation Order and this Trust Agreement.

5.6. <u>Minimum Distributions and Fractional Shares</u>.

(a) The provisions of this Section 5.6(a) shall apply with respect to distributions made in respect of Allowed General Unsecured Claims (but not to distributions in respect of Units). Subject to the following sentence, (i) no cash payment in an amount less than $25 shall be made by the GUC Trust Administrator to any holder of an Allowed General Unsecured Claim, and (ii) no fractional shares of New GM Common Stock or fractional New GM Warrants shall be distributed by the GUC Trust hereunder to any holder of an Allowed General Unsecured Claim. Any fractional shares of New GM Common Stock or fractional New GM Warrants shall be rounded down to the next whole number, as applicable; provided that for the purposes of determining the amount of cash or the number of shares of New GM Common Stock or the number of New GM Warrants that any holder of an Allowed General Unsecured Claim shall be entitled to receive on any Distribution Date, the GUC Trust Administrator shall aggregate the GUC Trust Distributable Assets that such holder of an Allowed General Unsecured Claim is entitled to receive in respect of all Allowed General Unsecured Claims at the time held by such holder of an Allowed General Unsecured Claim. If a holder of an Allowed General Unsecured Claim would not receive any shares of New GM Common Stock or New GM Warrants because of the rounding down of fractional shares of New GM Common Stock or New GM Warrants as provided in the previous sentence, such holder shall receive one share of New GM Common Stock and one New GM Warrant of each series if such fraction is closer to one than to zero (with one-half being closer to one for these purposes).

(b) The provisions of this <u>Section 5.6(b)</u> shall apply with respect to distributions made in respect of Units (but not to distributions in respect of Allowed General Unsecured Claims). Subject to the following sentence, no fractional shares of New GM Common Stock or fractional New GM Warrants shall be distributed by the GUC Trust hereunder to any holder of a Unit. Prior to the final distribution of GUC Trust Distributable Assets, the GUC Trust Administrator shall aggregate and sell for cash, to the extent practicable, all fractional shares of New GM Common Stock and all fractional New GM Warrants that would otherwise have been distributable on the relevant Distribution Date but for the provisions of this <u>Section 5.6(b)</u>. The GUC Trust Administrator shall distribute the net

cash proceeds of the sale of such New GM Common Stock and the New GM Warrants, after deduction of brokerage commissions and other expenses of sale, to each holder of Units pro rata, *provided, however*, that if the Cash proceeds from the sale of the New GM Common Stock and New GM Warrants is less than $150,000, such Cash shall be distributed to an organization described in section 501(c)(3) of the Tax Code and exempt from U.S. federal income tax under section 501(a) of the Tax Code to be selected by, and unrelated to, the GUC Trust Administrator. If there shall exist at the time a public market for the New GM Common Stock or the New GM Warrants, the GUC Trust Administrator shall sell the New GM Common Stock or the New GM Warrants, as the case may be, in the public market, unless the GUC Trust Monitor approves of the sale in a privately-negotiated transaction.

5.7.    Sale of Expiring New GM Warrants.

(a)    If there shall remain as part of the GUC Trust Assets New GM Warrants of any series as of a date that is 120 days prior to the expiration date of the New GM Warrants of that series, the GUC Trust Administrator shall be authorized, but not required, at any time thereafter to sell for cash all such remaining New GM Warrants. Following such sale, the net proceeds received after deduction of brokerage commissions and other expenses shall constitute and be held by the GUC Trust Administrator as GUC Trust Distributable Cash. If there shall exist at the time a public market for the New GM Warrants and the GUC Trust Administrator elects to sell the expiring New GM Warrants, the GUC Trust Administrator shall sell the New GM Warrants in the public market, unless the GUC Trust Monitor approves of the sale in a privately-negotiated transaction or such sale would require registration under the Securities Act of 1933, as amended, or applicable state securities laws and the New GM Warrants could not be so registered timely or at all; provided that in all circumstances any such sale shall be made in compliance with applicable federal and state securities laws.

(b)    If any New GM Warrants of a particular series shall be sold pursuant to Section 5.7(a), such proceeds, after deduction of brokerage and commissions and other expenses of sale, plus any interest actually earned thereon by the GUC Trust, shall be distributed to the GUC Trust Beneficiaries who otherwise would have entitled to receive such New GM Warrants, at such times as the GUC Trust Beneficiaries would have been entitled to receive the same.

5.8.    Additional Shares. If any Additional Shares are received by the GUC Trust, then such Additional Shares, together with any dividends declared thereon, shall be distributed on the final Distribution Date to all holders of Units pro rata.

5.9.    Distributions Not in Compliance with this Article. In the event that the GUC Trust Administrator determines in good faith that it is necessary in order to carry out the intent and purposes of the Plan, Confirmation Order and this Trust Agreement to make any distribution in a manner that is not in technical compliance with this Article V , the GUC Trust Administrator shall be permitted to make such distributions, but only with the approval of the GUC Trust Monitor; *provided, however*, that no such distribution shall result in any holder of an Allowed General Unsecured Claim receiving a distribution in excess of the distribution that such holder would have received had such claim been an Initial Allowed General Unsecured Claim or shall discriminate among the holders of Units.

5.10.   Approval.  Except as provided in Section 5.10, no payment or distribution of GUC Trust Assets shall be made to, or on behalf of, a GUC Trust Beneficiary or any other person except in strict accordance with the terms of this Trust Agreement, the Plan, and the Confirmation Order, unless such payment or distribution shall have been approved by the Bankruptcy Court.  Except as aforesaid or as otherwise provided in the Plan, the Confirmation Order or this Trust Agreement, nothing shall require the GUC Trust Administrator to file any accounting or seek approval of any court with respect to the administration of the GUC Trust or as a condition for making any payment or distribution out of the GUC Trust Assets or as a condition to the sale of fractional New GM Securities pursuant to Section 5.6 or expiring New GM Warrants pursuant to Section 5.7.

## ARTICLE VI
## ADMINISTRATION OF THE GUC TRUST

6.1.   Payment of Costs, Expenses and Liabilities.

(a)   Subject to the Budget, the GUC Trust Administrator shall use the Wind-Down Budget Cash:

(i)   to pay reasonable costs and expenses of the GUC Trust that are incurred in connection with the administration thereof (including any taxes imposed on the GUC Trust, actual reasonable fees and out-of-pocket expenses incurred by Trust Professionals retained by the GUC Trust Administrator in connection with the administration of the GUC Trust Assets and preservation of books and records);

(ii)   to satisfy other obligations or other liabilities incurred or assumed by the GUC Trust (or to which the GUC Trust Assets are otherwise subject) in accordance with the Plan, the Confirmation Order, or this Trust Agreement, including fees and expenses incurred in connection with the protection, preservation, and distribution of the GUC Trust Assets and the costs of investigating, defending against and resolving any Disputed General Unsecured Claims and the costs and fees of the Indenture Trustees out of the Indenture Trustee Reserve Cash pursuant to the Plan (including Section [NUMBER] of the Plan); and

(iii)   to satisfy any other obligations of the GUC Trust expressly set forth in the Plan, the Confirmation Order or this Trust Agreement to be satisfied out of the Wind-Down Budget Cash;

provided, however, that any expenses incurred in connection with the liquidation and wind-down of the Debtors or the resolution of the Residual Wind-Down Claims or distribution of the Residual Wind-Down Assets (including expenses related to the indemnification obligations of the GUC Trust under Sections 9.6 and 11.4) shall be paid out of the Residual Wind-Down Assets, and shall not be paid out of the Wind-Down Budget Cash unless and until the complete and final distribution of all the GUC Trust Distributable Assets and the conclusion of all related activities of the GUC Trust Administrator.  In no event shall any Other GUC Trust Administrative Cash be used for such purposes.

(b)   If the Wind-Down Budget Cash is at any time insufficient to satisfy the current and projected future fees and expenses of the GUC Trust (other than those relating to the Residual Wind-Down Assets), then, in consultation with the GUC Trust Monitor and upon approval by the Bankruptcy Court, the Trust Administer may utilize the GUC Trust Distributable Cash, if any, then held by the GUC Trust to satisfy such fees and expenses.  If the GUC Trust Distributable Cash is insufficient for these purposes, the GUC Trust Administrator, in consultation with the GUC Trust Monitor and upon approval by the Bankruptcy Court, may sell an amount of the GUC Trust Common Stock Assets or GUC Trust Warrant Assets, or borrow and pledge as security an amount of such GUC Trust Distributable Assets, as may be reasonably necessary to fund such fees and expenses, with such cash proceeds being designated as Other GUC Trust Administrative Cash.

(c)   The motion of the GUC Trust Administrator seeking Bankruptcy Court approval to utilize GUC Trust Distributable Cash or to sell or borrow and pledge GUC Trust Distributable Assets shall include the position of the GUC Trust Monitor in respect thereof. The GUC Trust Administrator shall provide at least twenty days notice to the GUC Trust Monitor, the holders of Units and the holders of Disputed General Unsecured Claims prior to a hearing on a motion to use, sell and/or borrow against the GUC Trust Distributable Assets. An order of the Bankruptcy Court authorizing the GUC Trust Administrator to borrow against the GUC Trust Distributable Assets may also authorize the GUC Trust Administrator to sell GUC Trust Distributable Assets to repay the amount borrowed without further Order of the Bankruptcy Court.

(d)   If at any time one or more Trust Professional fees and expenses are in excess of its Budget and (except for the Holdback) such Trust Professional(s) are not paid such amounts pursuant to section 2.6(c) of this Trust Agreement, then, in consultation with the GUC Trust Monitor, the GUC Trust Administrator may reserve an amount of GUC Trust Distributable Assets from distribution to the GUC Trust Beneficiaries equal to the aggregate reasonable fees and expenses of such Trust Professional(s) that have been approved by the GUC Trust Administrator and GUC Trust Monitor  but have not been paid (the "Protective Holdback").  To the extent necessary to satisfy in full the fees and expenses of the Trust Professionals, the GUC Trust Administrator may, in consultation with the GUC Trust Monitor and upon approval by the Bankruptcy Court, liquidate the Protective Holdback and apply the proceeds thereof to satisfy the applicable unpaid fees and expenses of the GUC Trust.  The motion of the GUC Trust Administrator seeking Bankruptcy Court approval to liquidate the Protective Holdback shall include the position of the GUC Trust Monitor in respect thereof. The GUC Trust Administrator shall provide at least twenty days notice to the GUC Trust Monitor, the holders of Units and the holders of Disputed General Unsecured Claims prior to a hearing on a motion to liquidate and/or transfer the Protective Holdback.

(e)   Notwithstanding that as a result of the utilization, sale or pledge of GUC Trust Distributable Assets the amount of GUC Trust Distributable Assets shall be less than the assets required to satisfy the Current Maximum Amount then outstanding, the GUC Trust Administrator shall continue to satisfy Disputed General Unsecured Claims, the Asbestos Trust Claim, the Term Loan Avoidance Action Claims and the Other Avoidance Action Claims that become Allowed General Unsecured Claims in the order they are resolved as otherwise provided in this Trust Agreement.

6.2.    <u>GUC Trust Reports</u>.

(a)    The GUC Trust Administrator shall prepare quarterly GUC Trust Reports as provided in this <u>Section 6.2</u>.  The GUC Trust Reports shall be filed with the Bankruptcy Court and provided to the GUC Trust Monitor and DIP Lenders no later than thirty days following the end of each calendar quarter ending after the Effective Date, except that the GUC Trust Report for the end of any calendar year may be filed, provided and posted no later than forty-five days following the end of the calendar year.  The GUC Trust Administrator shall arrange to have each GUC Trust Report posted to a generally accessible website at the time it is filed with the Bankruptcy Court and shall take reasonable steps to inform the beneficial holders of Units of the existence of the website and the availability of the GUC Trust Reports thereon.

(b)    The GUC Trust Reports shall include financial statements consisting of:

(i)    a balance sheet as of the end of the calendar quarter or calendar year for which the report is made and as of the end of the next preceding calendar year;

(ii)    a statement of cash flows for the Wind-Down Budget Cash for the calendar quarter and the balance remaining in the GUC Trust at the end of the given calendar quarter; and

(iii)    a statement of income and expense for the calendar quarter or calendar year for which the report is made and for the comparable period of the next preceding calendar year.

The financial statements shall be prepared in accordance with generally accepted accounting principles [except as indicated in the notes thereto], and need not be audited except for the calendar year financial statements.

(c)    The GUC Trust Reports shall also disclose, which disclosure shall be as of the end of the calendar quarter or calendar year for which the report is made unless otherwise specified:

(i)    the total number of Units outstanding;

(ii)    the Current Maximum Amount outstanding (including the components thereof);

(iii)    the total amount of Resolved Allowed General Unsecured Claims allowed (A) during the calendar quarter for which the report is made and, if the report is made for a calendar year, during such calendar year and (B) since the Effective Date;

(iv)    the Maximum Amount of Disputed General Unsecured Claims disallowed (A) during the calendar quarter for which the report is made and, if the report is made for a calendar year, during such calendar year and (B) since the Effective Date;

(v)    the Allowed Percentage;

(vi)     the total amount held by the GUC Trust of each of (u) the GUC Trust Common Stock Assets, (v) each class of the GUC Trust Warrant Assets, (w) the GUC Trust Dividend Assets, (x) the GUC Trust Distributable Cash (y) the Wind-Down Budget Cash and (z) the Other GUC Trust Administrative Cash, if any;

(vii)     the Excess GUC Trust Distributable Assets;

(viii)     the Excess GUC Trust Distributable Assets distributed to holders of Units (A) during the calendar quarter for which the report is made and (B) since the Effective Date;

(ix)     if the GUC Trust Administrator withholds distributions as provided for in the penultimate paragraph of Section 5.4, the amount of such withholding and an explanation of the basis therefore in reasonable detail; and

(x)     such other information as the GUC Trust Administrator, in consultation with the Trust Professionals deems advisable or as the GUC Trust Monitor or DIP Lenders may reasonably request from time to time or as may be required by the Bankruptcy Court.

(d)     The GUC Trust Administrator shall also timely prepare and file and/or distribute such additional statements, reports and submissions as may be necessary to cause the GUC Trust and the GUC Trust Administrator to be in compliance with applicable law, and shall prepare and deliver to the GUC Trust Monitor such statements, reports and other information as may be otherwise reasonably requested from time to time by the GUC Trust Monitor.

6.3.     Budget.  The GUC Trust Administrator shall prepare and submit to the GUC Trust Monitor and DIP Lenders for approval a reasonably detailed annual plan and budget (the "Budget") at least thirty (30) days prior to the commencement of each calendar year; *provided, however*, that the first such Budget shall be agreed to as of the Effective Date.  Such annual plan and Budget shall set forth (on a quarterly basis) in reasonable detail: (A) the GUC Trust Administrator's anticipated actions to administer the GUC Trust Assets; and (B) the anticipated fees and expenses, including professional fees, associated with the administration of the GUC Trust, a separate amount representing the anticipated fees and expenses of the GUC Trust Monitor and detail as to how the GUC Trust will budget and spend the Wind-Down Budget Cash.  Such annual Budget shall be updated and submitted to the GUC Trust Monitor and DIP Lenders for review on a quarterly basis, and each such quarterly update shall reflect the variances (with explanations) between (x) the annual Budget, (y) any updated Budget, and (z) the actual results for the same period.  For the avoidance of doubt, U.S. Treasury may object in the Bankruptcy Court with respect to any quarterly update that materially changes the annual budget and the Bankruptcy Court shall resolve such dispute.  All actions by the GUC Trust Administrator shall be consistent with Budget, (as updated).  The GUC Trust Administrator may obtain any required approval of the annual Budget on reasonable negative notice (which shall be not less than 15 days after receipt of the Budget) and approval of the Budget shall not be unreasonably withheld.   In the event of any dispute concerning the Budget (or the taking of

actions consistent with the Budget), the GUC Trust Administrator, the GUC Trust Monitor or the DIP Lenders may petition the Bankruptcy Court to resolve such dispute.

6.4. <u>Setoff</u>. The GUC Trust Administrator may, but shall not be required to, setoff against or recoup from any payments to be made pursuant to the Plan in respect of any Allowed General Unsecured Claim, including in respect of any Units, any claims of any nature whatsoever that the GUC Trust, as successor to the Debtors, may have against the claimant, but neither the failure to do so nor the allowance of any General Unsecured Claim hereunder shall constitute a waiver or release by the Debtors or the GUC Trust Administrator of any such claim they may have against such claimant.

6.5. <u>Compliance with Laws</u>. Any and all distributions of GUC Trust Assets shall be in compliance with applicable laws, including applicable federal and state tax and securities laws.

6.6. <u>Fiscal Year</u>. Except for the first and last years of the GUC Trust, the fiscal year of the GUC Trust shall be the calendar year. For the first and last years of the GUC Trust, the fiscal year of the GUC Trust shall be such portion of the calendar year that the GUC Trust is in existence.

6.7. <u>Books and Records</u>.

(a) The GUC Trust Administrator shall maintain and preserve the Debtors' books, records and files that shall have been delivered to or created by the GUC Trust Administrator.

(b) The GUC Trust Administrator shall maintain books and records relating to the assets, liabilities, income and expense of the GUC Trust, all distributions made by the GUC Trust and the payment of fees and expenses of, and satisfaction of claims against or assumed by, the GUC Trust and the GUC Trust Administrator, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions of this Trust Agreement and otherwise to comply with applicable provisions of law, including tax law.

6.8. <u>Cash Payments</u>. All distributions of GUC Trust Cash required to be made by the GUC Trust Administrator may be made in cash denominated in U.S. dollars by checks drawn on a United States domestic bank selected by the GUC Trust Administrator or, at the option of the GUC Trust Administrator, by wire transfer from a United States domestic bank selected by the GUC Trust Administrator or as otherwise required or provided in applicable agreements; *provided*, *however*, that cash payments to foreign persons may be made, at the option of the GUC Trust Administrator, in such funds as and by such means as are necessary or customary in a particular foreign jurisdiction.

6.9. <u>Insurance</u>. The GUC Trust shall maintain customary insurance coverage for the protection of the GUC Trust Administrator, the GUC Trust Monitor and any such other persons serving as administrators and overseers of the GUC Trust on and after the Effective Date, in all cases in accordance with a Budget. The GUC Trust Administrator may also obtain such insurance coverage as it deems necessary and appropriate with respect to real and personal property which may become GUC Trust Assets, if any, in accordance with such Budget.

# ARTICLE VII
## TAX MATTERS

7.1.    Tax Treatment.  For all U.S. federal income tax purposes, all parties (including the GUC Trust Beneficiaries) will treat the GUC Trust as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-9, which is taxable as a "qualified settlement fund," within the meaning of Treasury Regulations section 1.468B-2, except to the extent otherwise provided by Treasury Regulations section 1.468B-9 or in a private letter ruling issued by the IRS, or as determined by a court of competent jurisdiction.  The "administrator" of the GUC Trust, within the meaning of Treasury Regulations section 1.468B-9, shall be the GUC Trust Administrator.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

7.2.    Valuation of Assets.  As soon as possible after the Effective Date, the GUC Trust Administrator shall make a good-faith valuation of the GUC Trust Assets (using the Fair Market Value of any New GM Securities contained therein), and such valuation shall be made available from time to time to the extent relevant for tax reporting purposes, and shall be used consistently by all parties (including the Debtors, the GUC Trust Administrator and the GUC Trust Beneficiaries) for all U.S. federal and applicable state and local income tax purposes.

7.3.    Payment of Taxes.  The GUC Trust Administrator shall be responsible for payment, out of the GUC Trust Assets, of any taxes imposed on the GUC Trust or the GUC Trust Assets.

7.4.    Tax Reporting.  The GUC Trust Administrator shall prepare and timely file (or cause to be prepared and timely filed) tax returns for the GUC Trust treating the GUC Trust as a qualified settlement fund pursuant to Treasury Regulations section 1.468B-9(c)(1)(ii), except to the extent provided otherwise in a private letter ruling issued by the IRS or as determined by a court of competent jurisdiction.  The GUC Trust Administrator shall also prepare and timely file (or cause to be prepared and timely filed), and/or provide to GUC Trust Beneficiaries, any other statements, returns or disclosures relating to the GUC Trust that are required by any governmental unit.

7.5.    Tax Withholdings.  The GUC Trust Administrator shall withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code, Treasury Regulations or other applicable requirements, including any provision of any foreign, state or local tax law, with respect to any payment or distribution to the holders of Allowed General Unsecured Claims and/or Units.  All such amounts withheld, and paid to the appropriate taxing authority, shall be treated as amounts distributed to such holders of Allowed General Unsecured Claims and/or Units for all purposes of this Trust Agreement.  The GUC Trust Administrator shall be authorized to collect such tax information from the holders of Allowed General Unsecured Claims and/or Units (including social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate the Plan, the Confirmation Order and this Trust Agreement, or to comply with any applicable withholding or reporting requirement.  The GUC Trust Administrator may refuse to make a distribution to any holder of an Allowed General Unsecured Claim and/or Units that fails to furnish such information in a timely fashion, until such information is furnished; _provided_, _however_, that upon

the holder of an Allowed General Unsecured Claim and/or Units furnishing such information, the GUC Trust Administrator shall make such distribution to which such holder is entitled, without interest. The GUC Trust Administrator may also hold back and retain Units otherwise issuable pursuant to Section 3.3 hereof with respect to Allowed General Unsecured Claims that are subject to withholding, and the GUC Trust Administrator shall apply amounts distributed in respect of such retained Units to satisfy such withholding obligations.

7.6.    Expedited Determination of Taxes. The GUC Trust Administrator may request an expedited determination of taxes of the GUC Trust or the Debtors under Section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the GUC Trust or the Debtors for any or all taxable periods (or part thereof) through the dissolution of the GUC Trust.

7.7.    Debtor Tax Matters.

(a)    Following the filing of a certificate of cancellation or dissolution for MLC, subject to Section 6.16(a) of the MSPA, the GUC Trust Administrator shall prepare and timely file (or cause to be prepared and timely filed), on behalf of the Debtors, the Tax Returns required to be filed or that the GUC Trust Administrator otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds, for all taxable periods ending on, prior to, or after the Effective Date.

(b)    Each of the Debtors and the GUC Trust Administrator shall cooperate fully with each other regarding the implementation of this Section 7.7 (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records, and documents relating to taxes governed by this Section 7.7 until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals, or litigation with respect to such taxes. Without limiting the generality of the foregoing, the Debtors shall execute on or prior to the filing of a certificate of cancellation or dissolution for MLC a power of attorney authorizing the GUC Trust Administrator to correspond, sign, collect, negotiate, settle, and administer tax payments and Tax Returns for the taxable periods described in Section 7.7(a) hereof.

(c)    Following the filing of a certificate of cancellation or dissolution for MLC, subject to Sections 6.16(a) and (d) of the MSPA, the GUC Trust Administrator shall have the sole right, at its expense, to control, conduct, compromise and settle any tax contest, audit, or administrative or court proceeding relating to any liability for taxes of the Debtors and shall be authorized to respond to any tax inquiries relating to the Debtors (except with respect to any property and *ad valorem* taxes relating to the Environmental Response Trust Assets).

(d)    Following the filing of a certificate of cancellation or dissolution for MLC, subject to the MSPA, the GUC Trust Administrator shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of any Debtors, including for any taxable period ending on, prior to, or after the Effective Date (except with respect to any property and *ad valorem* taxes relating to the Environmental Response Trust Assets), and such refunds and credits shall constitute Other GUC Trust Administrative Cash.

(e)  In the event of any conflict between this Trust Agreement and the MSPA relating to the allocation of rights and responsibilities with respect to the Debtors' tax matters, or in the event the MSPA addresses any such matter that is not addressed in this Trust Agreement, the provisions of the MSPA shall control; *provided, however*, that the provisions of the MSPA applicable to the Debtors shall apply, *mutatis mutandis*, to the GUC Trust Administrator following the filing of a certificate of cancellation or dissolution for MLC.

7.8.  <u>Delivery of Statement of Transfers</u>.  Following the funding of the GUC Trust (and in no event later than February 15th of the calendar year following the funding of the GUC Trust), MLC shall provide a "§ 1.468B-9 Statement" to the GUC Trust Administrator in accordance with Treasury Regulations section 1.468B-9(g).

7.9.  <u>Allocation of Distributions Between Principal and Interest</u>.  All distributions in respect of any Allowed General Unsecured Claim shall be allocated first to the principal amount of such Allowed General Unsecured Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Allowed General Unsecured Claim, if any.

## ARTICLE VIII
## POWERS OF AND LIMITATIONS ON THE GUC TRUST ADMINISTRATOR

8.1.  <u>Powers of the GUC Trust Administrator</u>.

(a)  Pursuant to the terms of the Plan and the Confirmation Order, the GUC Trust Administrator shall have various powers, duties and responsibilities concerning the prosecution of claims, the disposition of assets, the resolution of claims, and other obligations relating to maximizing the property of the GUC Trust Assets and the administration of the GUC Trust.  In addition, the GUC Trust Administrator shall coordinate with the Avoidance Action Trust Administrator to maximize efficiency in distributions to general unsecured creditors in any situation where such coordination would be beneficial.

(b)  The GUC Trust Administrator shall have only such rights, powers and privileges expressly set forth in the Plan, the Confirmation Order and this Trust Agreement and as otherwise provided by applicable law.  Subject to the Plan, the Confirmation Order and other provisions herein, including the provisions relating to approvals of the GUC Trust Monitor and the DIP Lenders in <u>Section 11.2</u> hereof, the GUC Trust Administrator shall be expressly authorized to undertake the following actions, in the GUC Trust Administrator's good faith judgment, in the best interests of the GUC Trust Beneficiaries and in furtherance of the purpose of the GUC Trust:

(i)  hold legal title to any and all rights of the GUC Trust Beneficiaries in, to or arising from the GUC Trust Assets, for the benefit of the GUC Trust Beneficiaries that are entitled to distributions therefrom under the Plan, whether their General Unsecured Claims are Allowed on or after the Effective Date and whether they are the original holders of Units or the transferees of such holders;

(ii)  manage and supervise the GUC Trust Assets;

(iii) execute all agreements, instruments and other documents, and effect all other actions necessary or appropriate to dispose of the GUC Trust Assets;

(iv) in the GUC Trust Administrator's reasonable business judgment, object to and/or withdraw objections to Disputed General Unsecured Claims, and manage, control, prosecute and/or settle on behalf of the GUC Trust, objections to Disputed General Unsecured Claims on account of which the GUC Trust Administrator (as a disbursing agent) will be responsible (if Allowed) for making distributions under the Plan and pursuant to this Trust Agreement, subject to the consent of the GUC Trust Monitor, if applicable, in accordance with Section 11.3 hereof;

(v) monitor and enforce the implementation of the Plan insofar as relating to this Trust Agreement, the GUC Trust Assets or the GUC Trust;

(vi) calculate and implement distributions of the GUC Trust Distributable Assets obtained through the exercise of its power and authority as contemplated by the Plan, the Confirmation Order and this Trust Agreement and in accordance with the interests of the holders of Allowed General Unsecured Claims;

(vii) retain and pay Trust Professionals in accordance with Section 8.3 hereof to carry out its duties and obligations hereunder, in all cases in accordance with the Budget;

(viii) pay the reasonable fees and expenses of the GUC Trust Administrator and GUC Trust Monitor (including any Trust Professionals), in all cases in accordance with the Budget;

(ix) pay the reasonable fees and expenses of the Indenture Trustees out of the Indenture Trustee Reserve Cash;

(x) incur and pay all reasonable expenses, satisfy ordinary course liabilities and make all other payments reasonable and necessary to administer and dispose of the GUC Trust Assets, in all cases in accordance with the Budget;

(xi) invest monies received by the GUC Trust, the GUC Trust Administrator or otherwise held by the GUC Trust or the GUC Trust Administrator in accordance with Section 8.4 hereof;

(xii) protect and enforce the rights to the GUC Trust Assets vested in the GUC Trust Administrator by this Trust Agreement by any method deemed reasonably appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(xiii) vote any claim or interest held by the GUC Trust in a case under the Bankruptcy Code and receive any distribution therefrom for the benefit of the GUC Trust;

(xiv)   to the extent required, vote or make elections with respect to the GUC Trust Securities, provided that, in the event a vote or election is required, the GUC Trust Administrator, unless otherwise directed by the GUC Trust Monitor or the Bankruptcy Court, shall vote or make elections with respect to the GUC Trust Securities held in the GUC Trust on the record date for such vote or election in the same manner and proportion as all other relevant securities of the same class(es) are voted or with respect to which elections are made by holders other than the GUC Trust;

(xv)   make all necessary filings in accordance with any applicable law, statute or regulation;

(xvi)   purchase customary insurance coverage in accordance with Section 6.9 hereof;

(xvii)   pay out of the GUC Trust Administrative Cash any fees to the U.S. Trustee, to the extent required in respect of this Trust Agreement, the GUC Trust Assets or the GUC Trust;

(xviii)  assert and/or waive any applicable privileges (legal or otherwise) on behalf of the GUC Trust, or with respect to the GUC Trust Assets held by the Debtors at any time (prepetition or postpetition);

(xix)   maintain the books and records of the GUC Trust; and

(xx)   perform such functions and take such actions as are provided for or permitted in the Plan, the Confirmation Order, this Trust Agreement or any other agreement executed pursuant to the Plan and take any other actions as it may deem to be reasonably necessary or appropriate to dispose of the GUC Trust Assets.

(c)   In addition, if the Residual Wind-Down Assets are transferred to the GUC Trust upon the dissolution of the Debtors, the GUC Trust Administrator shall be responsible for the administration and distribution of the Residual Wind-Down Assets, in accordance with the Plan, the Confirmation Order and this Trust Agreement.  Without limiting the powers and responsibilities set forth in Section 8.1(b), the GUC Trust Administrator shall also be expressly authorized to undertake the following actions, in the GUC Trust Administrator's good faith judgment, in furtherance of such liquidation and wind-down of the Debtors:

(i)   Object to and satisfy the Residual Wind-Down Claims out of the Residual Wind-Down Assets; *provided that* if there are insufficient Residual Wind-Down Assets to satisfy all Disputed Residual Wind-Down Claims that became Resolved Residual Wind-Down Claims during the prior calendar quarter, the GUC Trust Administrator shall distribute the remaining Residual Wind-Down Assets to the holders of such Resolved Residual Wind-Down Claims pro rata by Claim amount.  Following such distribution, any remaining unsatisfied portion of such Resolved Residual Wind-Down Claims, together with all remaining Disputed Residual Wind-Down Claims shall be discharged and forever barred from assertion against the GUC Trust;

(ii) monitor and enforce the implementation of the Plan insofar as relating to the liquidation and wind-down of the Debtors;

(iii) subject to Section 7.7 and the MSPA, file, if necessary, any and all tax and regulatory forms, returns, reports and other documents with respect to the Debtors and pay taxes properly payable by the Debtors insofar as relating to the Residual Wind-Down Assets;

(iv) take all actions, file any pleadings with the Bankruptcy Court, and create any documents necessary to wind up the affairs of the Debtors and their affiliates, implement the Plan, and close the bankruptcy cases;

(v) execute all agreements, instruments and other documents, and effect all other actions necessary or appropriate to dispose of the Residual Wind-Down Assets;

(vi) vote any claim or interest included in the Residual Wind-Down Assets;

(vii) make all necessary filings in accordance with any applicable law, statute or regulation insofar as relating to the liquidation and wind-down of the Debtors;

(viii) purchase customary insurance coverage in accordance with Section 6.9 hereof insofar as relating to the liquidation and wind-down of the Debtors;

(ix) act as a signatory on behalf of the Debtors for all purposes, including those associated with the novation of contracts and the liquidation and wind-down of the Debtors;

(x) cause the reduction, reinstatement or discharge of any intercompany claim and any claim held against any non-Debtor subsidiary or Affiliate by any Debtor or by any other non-Debtor subsidiary or Affiliate;

(xi) pay out of the Residual Wind-Down Assets any fees to the U.S. Trustee, to the extent required in respect of the liquidation and wind-down of the Debtors;

(xii) pay out of the Residual Wind-Down Assets the reasonable fees and expenses incurred in connection with the liquidation and wind-down of the Debtors and the resolution of the Residual Wind-Down Claims and distribution of the Residual Wind-Down Assets; and

(xiii) perform such functions and take such actions as are provided for or permitted in the Plan, the Confirmation Order, this Trust Agreement or any other agreement executed pursuant to the Plan and take any other actions as it may deem to be reasonably necessary or appropriate to effectuate the liquidation and wind-down of the Debtors, obtain an order closing the Chapter 11 Cases, and exercise the GUC Trust Administrator's powers granted herein in respect thereof.

KL2 2677419.4

(d)  In all circumstances other than with respect to the matters addressed in Section 8.1(c), the GUC Trust Administrator shall act in the best interests of all GUC Trust Beneficiaries and in furtherance of the purpose of the GUC Trust, and, with respect to the matters addressed in Section 8.1(c), in a manner not inconsistent with the best interests of the GUC Trust Beneficiaries and consistent with the Budget.  The GUC Trust Administrator shall not take any action inconsistent with the purpose of the GUC Trust, or take (or fail to take) any action that would cause the GUC Trust to fail to qualify as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-9.

(e)  Notwithstanding any provision herein to the contrary, the GUC Trust Administrator shall not serve on the board of directors, management committee or any similar governing body of any non-Debtor subsidiary of MLC, where the charter, limited liability company agreement, partnership agreement or other similar constituent document of such subsidiary does not provide for a liquidating purpose for such subsidiary.  Except as otherwise provided in this Trust Agreement, the GUC Trust Administrator will not be required to obtain the order or approval of the Bankruptcy Court, or any other court of competent jurisdiction in, or account to the Bankruptcy Court or any other court of competent jurisdiction for, the exercise of any right, power or privilege conferred hereunder.  Notwithstanding the foregoing, where the GUC Trust Administrator determines, in its reasonable discretion, that it is necessary, appropriate or desirable, the GUC Trust Administrator will have the right to submit to the Bankruptcy Court or any other court of competent jurisdiction any question or questions regarding any specific action proposed to be taken by the GUC Trust Administrator with respect to this Trust Agreement, the GUC Trust, or the GUC Trust Assets, including the administration and distribution of the GUC Trust Assets and the termination of the GUC Trust.  Pursuant to the Plan, the Bankruptcy Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the GUC Trust Administrator.

8.2.  Limitations on the GUC Trust Administrator.  The GUC Trust Administrator shall not be authorized to engage, in its capacity as GUC Trust Administrator, in any trade or business with respect to the GUC Trust Assets or any proceeds therefrom except to the extent reasonably necessary to, and consistent with, the purpose of the GUC Trust.  The GUC Trust Administrator shall take such actions consistent with the prompt orderly disposition of the GUC Trust Assets as required by applicable law and consistent with the treatment of the GUC Trust as a disputed ownership fund under Treasury Regulations section 1.468B-9, to the extent such actions are permitted by this Trust Agreement.  The GUC Trust Administrator shall, in its capacity as GUC Trust Administrator and on behalf of the GUC Trust, hold the GUC Trust out as a trust in the process of liquidation and not as an investment company.  The GUC Trust Administrator shall not, and shall not cause the GUC Trust to, become, engage or encourage the services of a market-maker for the Units, list the Units on a national securities exchange or a quotation service or system, place any advertisements in the media promoting investment into the Units, collect or publish information about prices at which Units have been or may be transferred or otherwise take actions intended to facilitate or encourage the development of an active trading market in the Units.  For the avoidance of doubt, any actions permitted, required or contemplated by the Plan, the Confirmation Order or this Trust Agreement shall not be considered actions that facilitate or encourage the development of an active trading market.  The GUC Trust Administrator shall, in its capacity as GUC Trust Administrator, be restricted to the liquidation

of the GUC Trust on behalf, and for the benefit, of the GUC Trust Beneficiaries and the distribution and application of GUC Trust Assets for the purposes set forth in, and the conservation and protection of the GUC Trust Assets and the administration thereof, and to the matters addressed in <u>Section 8.1(c)</u>, in each case in accordance with, the provisions of the Plan, the Confirmation Order and this Trust Agreement.

8.3.  <u>Agents and Professionals</u>.

(a)  The GUC Trust Administrator on behalf of the GUC Trust may, but shall not be required to, from time to time enter into contracts with, consult with and retain Trust Professionals, on such terms as the GUC Trust Administrator deems appropriate in accordance with <u>Section 11.2</u> hereof and in accordance with the Budget.  None of the professionals that represented parties-in-interest in the Chapter 11 Cases shall be precluded from being engaged by the GUC Trust Administrator solely on account of their service as a professional for such parties-in-interest prior to the Effective Date.  Notwithstanding anything herein to the contrary, if the Trust Professionals will be paid from the Wind-Down Budget Cash, prior to such retention, the GUC Trust Administrator shall identify the Trust Professionals to the DIP Lenders.  The DIP Lenders shall not object to the retention of Trust Professionals so long as the payment structure for such Trust Professionals is consistent with the Budget, the provisions of the Plan including section 6.2 thereof, the Confirmation order and this Trust Agreement.

(b)  After the Effective Date, Trust Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the GUC Trust Administrator, the GUC Trust Monitor and the DIP Lenders, including in such invoices a description of the work performed, the individuals who performed such work, and, if billing on an hourly basis, the hourly rate of such person, plus an itemized statement of expenses.  Subject to withholding the applicable Holdback for each Trust Professional, the GUC Trust Administrator shall timely pay all such invoices that are not disputed by the GUC Trust Administrator and as to which the GUC Trust Monitor or the DIP Lenders do not object within fifteen days after their receipt thereof, and shall not require approval of the Bankruptcy Court in order to do so; *provided that* the GUC Trust Administrator shall not pay any amounts in excess of the Budget, measured on a quarterly basis, as set forth in Section [11.3(a)(iv)] without the express written consent of the DIP Lenders or with Bankruptcy Court approval, in accordance with Section 2.6(c) of this Trust Agreement, unless such Trust Professionals shall be paid from amounts other than the Wind-Down Budget Cash.   In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Trust Professionals, either the GUC Trust Administrator or the affected Trust Professional may petition the Bankruptcy Court to resolve the dispute.

(c)  All payments to Trust Professionals shall be paid out of the GUC Trust Administrative Cash or the Residual Wind-Down Assets, as applicable.

(d)  The GUC Trust Administrator shall pay the respective Holdback amounts to the applicable Trust Professionals, in accordance with section 2.6(c) of this Trust Agreement.

8.4.    Investment of GUC Trust Cash.

(a)    The GUC Trust Administrator shall set up segregated accounts for the GUC Trust Cash as follows: (i) GUC Trust Distributable Cash which shall be held in trust for the benefit of GUC Trust Beneficiaries; (ii) Other GUC Trust Administrative Cash which shall be used to first pay the administrative expenses of the GUC Trust, and to the extent not required for such payment, shall be held in trust for the benefit of GUC Trust Beneficiaries; (iii) Wind-Down Budget Cash which shall be used to pay the administrative expenses of the GUC Trust, and over which the DIP Lenders have a lien and (iv) Residual Wind-Down Assets, which shall be used to satisfy the Residual Wind-Down Claims and pay the reasonable fees and expenses incurred in connection with the liquidation and wind-down of the Debtors, the resolution of the Residual Wind-Down Claims and distribution of the Residual Wind-Down Assets, and over which the DIP Lenders have a lien.

(b)    The GUC Trust Administrator shall invest the GUC Trust Cash (including any earnings thereon or proceeds thereof) in the manner set forth in this Section 8.4, but shall otherwise be under no liability for interest or income on any monies received by the GUC Trust hereunder and held for distribution or payment to the GUC Trust Beneficiaries, except as such interest shall actually be received.  Investment of any GUC Trust Cash shall be administered in accordance with the general duties and obligations hereunder.  The right and power of the GUC Trust Administrator to invest the GUC Trust Cash and the proceeds thereof, or any income earned by the GUC Trust, shall be limited to investing such GUC Trust Cash (pending distribution or disbursement in accordance with the Plan or this Trust Agreement) in Permissible Investments; *provided*, *however*, that such Permissible Investments shall be limited to include only those investments that a disputed ownership fund, within the meaning of Treasury Regulations section 1.468B-9, may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

(c)    For the avoidance of doubt, the GUC Trust is not, and will not hold itself out as, an "investment company" as such term is understood under the Investment Company Act of 1940, and is prohibited from investing, reinvesting or trading in securities (other than making any Permissible Investments or holding and administering the GUC Trust Securities Assets as contemplated by the Plan, the Confirmation Order and this Trust Agreement) or conducting any trade or business other than implementing the Plan, distributing GUC Trust Distributable Assets under the Plan and effectuating the liquidation and wind-up of MLC and the other Debtors.

8.5.    Termination.  The duties, responsibilities and powers of the GUC Trust Administrator will terminate when the GUC Trust is dissolved pursuant to Article IV hereof and the GUC Trust Administrator has performed all of its obligations under Section 4.3, by an order of the Bankruptcy Court or by entry of a final decree closing the Debtors' cases before the Bankruptcy Court; *provided*, *however*, that Sections 9.4, 9.5 and 9.6 hereof shall survive such termination, dissolution and entry.

# ARTICLE IX
## ADDITIONAL MATTERS CONCERNING THE GUC TRUST ADMINISTRATOR

9.1.    Reliance by GUC Trust Administrator.  Except as otherwise provided in the Plan, the Confirmation Order or this Trust Agreement, the GUC Trust Administrator may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request, consent, order or other paper or document reasonably believed by the GUC Trust Administrator to be genuine and to have been signed or presented by the proper party or parties.

9.2.    Liability to Third Persons.

(a)    No GUC Trust Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person in connection with the GUC Trust Assets, the Residual Wind-Down Assets or the affairs of the GUC Trust Administrator; *provided*, *however*, that, other than as set forth in the Plan or in the Confirmation Order, nothing in this Section 9.2 shall be deemed to release any GUC Trust Beneficiary from any actions or omissions occurring prior to the Effective Date.

(b)    The GUC Trust Administrator Parties shall not be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person (including, in the case of the GUC Trust Administrator, to any Trust Professionals retained by the GUC Trust Administrator in accordance with this Trust Agreement) in connection with the GUC Trust Assets, the Residual Wind-Down Assets or the affairs of the GUC Trust and shall not be liable with respect to any action taken or omitted to be taken in good faith, except for actions and omissions determined by a Final Order of the Bankruptcy Court to be due to their respective willful misconduct, gross negligence, bad faith, self-dealing, or *ultra vires* acts, and all such persons shall look solely to the GUC Trust Assets or Residual Wind-Down Assets, as applicable, for satisfaction of claims of any nature arising in connection with affairs of the GUC Trust.

9.3.    Non-liability of GUC Trust Administrator for Acts of Others.  Except as provided herein, nothing contained in the Plan, the Confirmation Order or this Trust Agreement shall be deemed to be an assumption by the GUC Trust Administrator of any of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the GUC Trust Administrator to assume or accept any such liability, obligation or duty.  Any successor GUC Trust Administrator may accept and rely upon any accounting made by or on behalf of any predecessor GUC Trust Administrator hereunder, and any statement or representation made as to the assets comprising the GUC Trust Assets or the Residual Wind-Down Assets, or as to any other fact bearing upon the prior administration of the GUC Trust, so long as it has a good faith basis to do so.  The GUC Trust Administrator shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue.  Neither the GUC Trust Administrator nor any successor GUC Trust Administrator shall be liable for any act or omission of any predecessor GUC Trust Administrator, nor have a duty to enforce any claims against any predecessor GUC Trust Administrator on account of any such act or omission, unless directed to do so by the GUC Trust Monitor.

9.4.     Exculpation.  As of the Effective Date, the GUC Trust Administrator Parties shall be and hereby are exculpated by all Persons, including holders of General Unsecured Claims, Units and Residual Wind-Down Claims relating to the Residual Wind-Down Assets and other parties-in-interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of their respective powers and duties conferred by the Plan, the Confirmation Order, this Trust Agreement or any Order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by Final Order of the Bankruptcy Court to have arisen out of their own respective willful misconduct, gross negligence, bad faith, self-dealing, or *ultra vires* acts.  In no event will the GUC Trust Administrator Parties be liable for punitive, exemplary, consequential, special or other damages for a breach of, or otherwise in connection with, this Trust Agreement under any circumstances.  No holder of a General Unsecured Claim or other party-in-interest will have or be permitted to pursue any claim or cause of action against the GUC Trust Administrator Parties or the GUC Trust, for making payments and distributions in accordance with the Plan, the Confirmation Order or the this Trust Agreement or for implementing the provisions thereof.  Any action taken or omitted to be taken with the express approval of the Bankruptcy Court or the GUC Trust Monitor will conclusively be deemed not to constitute willful misconduct, gross negligence, bad faith, self-dealing, or *ultra vires* acts; *provided*, *however*, that notwithstanding any provision herein to the contrary, the GUC Trust Administrator shall not be obligated to comply with a direction of the GUC Trust Monitor, whether or not express, which would result in a change to the distribution provisions of the Plan, the Confirmation Order or this Trust Agreement.

9.5.     Limitation of Liability.  In no event shall the GUC Trust Administrator and its principals, directors, officers, employees, agents, representatives, attorneys, accountants, advisors and other professionals (including the Trust Professionals) be liable for punitive, exemplary, consequential, special or other damages for a breach of, or otherwise in connection with, this Trust Agreement under any circumstances.

9.6.     Indemnity.  The GUC Trust Administrator Parties shall be indemnified by the GUC Trust solely from the GUC Trust Assets or the Residual Wind-Down Assets, as applicable, for any losses, claims, damages, liabilities and expenses occurring after the Effective Date, including reasonable attorneys' fees, disbursements and related expenses which the GUC Trust Administrator Parties may incur or to which the GUC Trust Administrator Parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against one or more of the GUC Trust Administrator Parties on account of the acts or omissions in their capacity as, or on behalf of, the GUC Trust Administrator; *provided*, *however*, that the GUC Trust shall not be liable to indemnify any GUC Trust Administrator Party for any act or omission arising out of such GUC Trust Administrator Party's respective actions that are determined by a Final Order of the Bankruptcy Court to be willful misconduct, gross negligence, bad faith, self-dealing, or *ultra vires* acts.  Notwithstanding any provision herein to the contrary, the GUC Trust Administrator Parties shall be entitled to obtain advances from the GUC Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of an GUC Trust Administrator Party in its capacity as such, except for any actions or omissions arising from their own respective willful misconduct, gross negligence ,bad faith, self-dealing, or *ultra-vires* acts.; *provided*, *however*, that the GUC Trust Administrator Parties receiving such advances shall repay the amounts so

advanced to the GUC Trust immediately upon the entry of a final, non-appealable judgment or order finding that such GUC Trust Administrator Parties were not entitled to any indemnity under the provisions of this <u>Section 9.6</u>.  Any amounts payable to any GUC Trust Administrator Party pursuant to this Section 9.6 shall be satisfied as follows:  (i) first from the Wind-Down Budget Cash, (ii) second from the Other GUC Trust Administrative Cash, and (iii) third from the GUC Trust Distributable Cash, if any; <u>*provided*</u>, <u>*however*</u>, that the use of GUC Trust Distributable Cash or the sale and/or borrowing against GUC Trust Distributable Assets as contemplated in clauses (ii) and (iii) of the foregoing shall be subject to the prior approval by the Bankruptcy Court, as provided in <u>Section 6.1(c)</u>.  The foregoing indemnity in respect of any GUC Trust Administrator Party shall survive the termination of such GUC Trust Administrator Party from the capacity for which they are indemnified; <u>*provided further*</u> that any claim relating to the Residual Wind-Down Assets shall only be satisfied from the Residual Wind-Down Assets.

    9.7.    <u>Compensation and Expenses</u>.  The GUC Trust Administrator shall receive fair and reasonable compensation for its services, to be paid out of the GUC Trust Administrative Cash or Residual Wind-Down Assets, as applicable, in accordance with the compensation schedule [provided to, and approved by, the Bankruptcy Court] prior to the Effective Date.  The GUC Trust Administrator shall be entitled, without the need for approval of the Bankruptcy Court, to reimburse itself from the GUC Trust Administrative Cash or Residual Wind-Down Assets, as applicable, on a monthly basis for such compensation and all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement and a Budget.

    9.8.    <u>No Personal Financial Liability</u>.  No provision of the Plan, Confirmation Order or this Trust Agreement shall be construed as requiring the GUC Trust Administrator to expend or risk its own funds or otherwise to incur any personal financial liability (x) in the performance of any of its duties thereunder or hereunder, including but not limited to any situation where the GUC Trust Assets and/or the Residual Wind-Down Assets are insufficient to permit the administration of the GUC Trust or distributions as contemplated herein, or (y) in the exercise of any of its rights or powers afforded hereunder or thereunder.

**ARTICLE X**
**<u>SUCCESSOR GUC TRUST ADMINISTRATORS</u>**

    10.1.    <u>Resignation</u>.  The GUC Trust Administrator may resign from the GUC Trust by giving at least sixty (60) days' prior written notice thereof to the GUC Trust Monitor.  Such resignation shall become effective on the later to occur of (x) the date specified in such written notice and (y) the effective date of the appointment of a successor GUC Trust Administrator in accordance with <u>Section 10.4</u> hereof and such successor's acceptance of such appointment in accordance with <u>Section 10.5</u> hereof.

    10.2.    <u>Removal</u>.  The holders of a majority of the Units may at any time petition the Bankruptcy Court for the removal of the GUC Trust Administrator, but only for good cause shown. Such removal shall become effective on the date ordered by the Bankruptcy Court.  The services of the GUC Trust Administrator shall also terminate upon its bankruptcy or insolvency.

10.3.   Effect of Resignation or Removal.  The resignation, removal, bankruptcy or insolvency of the GUC Trust Administrator shall not operate to terminate the GUC Trust or to revoke any existing agency created pursuant to the terms of the Plan, the Confirmation Order or this Trust Agreement or invalidate any action theretofore taken by the GUC Trust Administrator. The exculpation, indemnity and limitation of liability provisions of Article Nine of this Trust Agreement shall survive the resignation, removal, bankruptcy or insolvency of the GUC Trust Administrator.  All fees and expenses properly incurred by the GUC Trust Administrator prior to the resignation, incompetency or removal of the GUC Trust Administrator shall be paid from the GUC Trust Administrative Cash, or Residual Wind-Down Assets, as applicable, unless such fees and expenses are disputed by (x) the GUC Trust Monitor or (y) the successor GUC Trust Administrator, in which case the Bankruptcy Court shall resolve the dispute and any disputed fees and expenses of the predecessor GUC Trust Administrator that are subsequently allowed by the Bankruptcy Court shall be paid from the GUC Trust Administrative Cash or Residual Wind-Down Assets, as applicable.  In the event of the resignation or removal of the GUC Trust Administrator, such GUC Trust Administrator shall:

(a)   promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor GUC Trust Administrator or directed by the Bankruptcy Court to effect the termination of such GUC Trust Administrator's capacity under this Trust Agreement;

(b)   promptly deliver to the successor GUC Trust Administrator all documents, instruments, records and other writings related to the GUC Trust as may be in the possession of such GUC Trust Administrator; and

(c)   otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor GUC Trust Administrator.

10.4.   Appointment of Successor.  In the event of the resignation, removal, incompetency, bankruptcy or insolvency of the GUC Trust Administrator, the GUC Trust Monitor shall promptly appoint a successor GUC Trust Administrator, *provided* *that* such appointment shall not take effect unless approved by the Bankruptcy Court upon the petition of the GUC Trust Monitor and until the successor Trustee Administrator shall have delivered written acceptance of its appointment as described Section 10.5 below.  If a successor Trustee Administrator does not take office within thirty (30) days after the resignation, removal, incompetency, bankruptcy or insolvency of the retiring Trustee, the Bankruptcy Court, upon its own motion or the motion of the retiring GUC Trust Administrator or any GUC Trust Beneficiary, shall appoint a successor GUC Trust Administrator.

10.5.   Acceptance of Appointment by Successor GUC Trust Administrator.  Any successor GUC Trust Administrator appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Bankruptcy Court for filing and to the GUC Trust Monitor and, in case of the GUC Trust Administrator's resignation, to the resigning GUC Trust Administrator.  Thereupon, such successor GUC Trust Administrator shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor in the GUC Trust with like effect as if originally named GUC Trust Administrator and shall be deemed appointed pursuant to Bankruptcy Code

Section 1123(b)(3)(B). The predecessor GUC Trust Administrator shall duly assign, transfer and deliver to such successor GUC Trust Administrator all GUC Trust Assets held by such predecessor GUC Trust Administrator hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor GUC Trust Administrator, execute and deliver an instrument or instruments conveying and transferring to such successor GUC Trust Administrator upon the trusts herein expressed, all the liabilities, duties, powers, rights, title, discretion and privileges of predecessor GUC Trust Administrator.

## ARTICLE XI
## GUC TRUST MONITOR

11.1. <u>General</u>.

(a) The GUC Trust Monitor shall oversee the activities of the GUC Trust Administrator as set forth in this Trust Agreement. In all circumstances, the GUC Trust Monitor shall act in the best interests of all GUC Trust Beneficiaries, in furtherance of the purpose of the GUC Trust, and in accordance with this Trust Agreement.

(b) In furtherance of its rights and responsibilities under this Trust Agreement, the GUC Trust Monitor shall have access, on reasonable advance notice and during regular business hours, to all such books and records of the GUC Trust and the GUC Trust Administrator, shall have the right to consult with all such professionals engaged by the GUC Trust Administrator and shall participate in all such meetings of the GUC Trust Administrator and the Trust Professionals as the GUC Trust Monitor deems reasonably necessary or appropriate. Any documents shared between the GUC Trust Administrator and the GUC Trust Monitor shall be subject to joint privilege, and such sharing shall not be deemed to waive any attorney-client or work product privilege in respect of such documents.

(c) Without limiting the access rights of the GUC Trust Monitor generally, for each of the first twelve calendar months following the Effective Date, the GUC Trust Administrator shall provide to the GUC Trust Monitor a monthly report containing the information set forth in Sections 6.2(b) and (c), mutatis mutandis, with respect to such month, to be delivered as follows: (i) with respect to the first and second month of each calendar quarter, reports shall be delivered within 14 days after the end of the month; (ii) with respect to the third month of each calendar quarter, reports shall be delivered within 30 days following the end of the month; and (iii) with respect to the last month of the fiscal year of the GUC Trust, the report shall be delivered within 45 days following the end of the month.

(d) Notwithstanding anything in this <u>Section 11.1</u> or <u>Section 11.2</u> hereof, the GUC Trust Monitor shall not take (or fail to take) any action which will cause the GUC Trust to fail to qualify as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9 for U.S. federal or applicable state or local income tax purposes.

11.2. <u>Appointment and Removal of the GUC Trust Monitor</u>.

(a) Subject to Section 11.2(d), the GUC Trust Monitor shall serve until the earlier of (w) the final distribution of all GUC Trust Distributable Assets, (x) its resignation

pursuant to subsection (b) of this Section 11.2, (y) its removal pursuant to subsection (c) of this Section 11.2 or (z) its bankruptcy or insolvency.

(b)     The GUC Trust Monitor may resign at any time by written notice of resignation to the GUC Trust Administrator, a copy of which shall also be filed by the GUC Trust Monitor with the Bankruptcy Court.  Such resignation shall be effective no earlier than sixty (60) days from the date of such notice or such earlier time as a successor is appointed in accordance with the provisions of subsection (d) of this Section 11.2.

(c)     The holders of a majority of the Units may at any time petition the Bankruptcy Court for the removal of the GUC Trust Monitor, but only for good cause shown. Such removal shall become effective on the date ordered by the Bankruptcy Court.

(d)     In the event of the resignation, removal, bankruptcy or insolvency of the GUC Trust Monitor, the GUC Trust Administrator shall promptly appoint a successor GUC Trust Monitor, *provided that* such appointment shall not take effect unless approved by the Bankruptcy Court upon the petition of the GUC Trust Administrator and until the successor Trustee Monitor shall have delivered written acceptance of its appointment as described in clause (e) of this Section 11.2 below; and *provided further that* until a new GUC Trust Monitor's appointment is effective, the resigning GUC Trust Monitor's appointment shall remain in effect, and the resigning GUC Trust Monitor shall fulfill all obligations and duties of the GUC Trust Monitor.  If a successor Trustee Monitor does not take office within thirty (30) days after the resignation, removal, incompetency, bankruptcy or insolvency of the retiring GUC Trust Monitor, the Bankruptcy Court, upon its own motion or the motion of the retiring GUC Trust Monitor or any GUC Trust Beneficiary, shall appoint a successor GUC Trust Monitor.

(e)     Any successor GUC Trust Monitor appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Bankruptcy Court for filing and to the GUC Trust Administrator.

(f)     Immediately upon effectiveness of the appointment of a successor GUC Trust Monitor, all rights, powers, duties, authority, and privileges of the predecessor GUC Trust Monitor hereunder will be vested in and undertaken by the successor GUC Trust Monitor without any further act.  The successor GUC Trust Monitor shall not be liable personally for any act or omission of the predecessor GUC Trust Monitor.

11.3.     Approval of and Consultation with the GUC Trust Monitor.

(a)     Notwithstanding anything in this Trust Agreement to the contrary, the GUC Trust Administrator shall submit to the GUC Trust Monitor for its review and prior approval the following matters, in addition to any other matters that expressly require the approval of the GUC Trust Monitor pursuant to the terms of the Plan, the Confirmation Order or this Trust Agreement:

(i)     Any decision to settle or otherwise resolve any objections to Disputed General Unsecured Claims against the Debtors where the amount sought to be Allowed equals or exceeds $10,000,000 or , pursuant to Section 8.1(b)(iv) hereof;

(ii)     Any decision to refrain from making any distributions to the holders of Allowed General Unsecured Claims or Units, as the case may be, in accordance with the Trust Agreement, except as expressly permitted herein;

(iii)     Any decision to retain and/or to terminate the retention of Trust Professionals (other than legal counsel retained to represent the GUC Trust Administrator in connection with its role as GUC Trust Administrator, which shall be in the GUC Trust Administrator's sole discretion);

(iv)     The incurrence of any cost or expense of the GUC Trust in excess of 10% of any individual line item therefor in the approved Budget, measured on a quarterly basis; *provided*, *however*, that approval of the GUC Trust Monitor shall not be required in the case of any cost or expense authorized by further order of the Bankruptcy Court;

(v)     The reports and Budget described in Sections 6.2 and 6.3 hereof and any changes thereto;

(vi)     Any amendment of this Trust Agreement as provided in Section 13.13 hereof;

(vii)     Any privately-negotiated transaction to sell the New GM Securities for the sole purpose of liquidating fractional shares or expiring warrants pursuant to Sections 5.6 and 5.7, respectively; and

(viii)     Any distribution that is not made in accordance with the provisions of Article V as contemplated by Section 5.10; *provided*, *however*, that any deviation from the provisions of Article V other than as contemplated by Section 5.10 shall also require approval of the Bankruptcy Court.

Notwithstanding anything herein to the contrary, the provisions of this section 11.3 shall not supercede or modify the rights of the DIP Lenders to approve or review the expenditure of the Wind-Down Budget Cash or the Budget.

(b)     In addition to any other matters that expressly require consultation with the GUC Trust Monitor pursuant to the terms of the Plan, the Confirmation Order or this Trust Agreement, the GUC Trust Administrator shall consult with the GUC Trust Monitor in advance of an application to the Bankruptcy Court to sell or borrow against the GUC Trust Distributable Assets in order to satisfy expenses of the GUC Trust, as contemplated by Section 6.1(b) hereof; *provided that*, the GUC Trust Administrator shall not be required to obtain the approval of the Bankruptcy Court or consult with or obtain the consent of the GUC Trust Monitor in connection with the sale of any New GM Securities in the public market for the sole purpose of liquidating fractional shares or expiring warrants pursuant to Sections 5.6 and 5.7 respectively.

(c)     In the event of any disagreement between the GUC Trust Administrator and the GUC Trust Monitor regarding any matter requiring the approval or direction of the GUC Trust Monitor under this Trust Agreement, the GUC Trust Administrator and the GUC

Trust Monitor shall consult and negotiate diligently and in good faith to resolve such disagreement.  If despite their good faith efforts, the GUC Trust Administrator and the GUC Trust Monitor are unable to resolve any disagreement, or the GUC Trust Administrator cannot otherwise obtain approval or direction from the GUC Trust Monitor as required by this Trust Agreement, the GUC Trust Administrator may petition the Bankruptcy Court, with a copy to the GUC Trust Monitor, requesting such approval or direction.

11.4.  <u>Exculpation and Indemnification; Limitation of Liability</u>.  The GUC Trust Monitor Parties shall not be subject to personal liability, and shall be exculpated and indemnified, to the same extent as the GUC Trust Administrator Parties pursuant to <u>Section 9.2</u>, <u>Section 9.4</u> and <u>Section 9.6</u>.  In no event will the GUC Trust Monitor Parties be liable for punitive, exemplary, consequential, special or other damages for a breach of, or otherwise in connection with, this Trust Agreement under any circumstances.

11.5.  <u>Compensation and Expenses</u>.  The GUC Trust Monitor shall receive fair and reasonable compensation for its services, to be paid out of the GUC Trust Administrative Cash, in accordance with a compensation schedule provided to, and approved by, the Bankruptcy Court and in accordance with the Budget.  The GUC Trust Monitor shall be entitled, without the need for approval of the Bankruptcy Court, to direct the GUC Trust Administrator to reimburse the GUC Trust Monitor from the GUC Trust Administrative Cash on a monthly basis, for all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement, consistent with the Budget prepared pursuant to <u>Section 6.3</u> hereof.

**ARTICLE XII**
**ACTION BY MAJORITY OF HOLDERS OF UNITS**

Holders of a majority of the Units from time to time outstanding may petition the Bankruptcy Court to remove the GUC Trust Administrator in accordance with <u>Section 10.2</u> or to remove the GUC Trust Monitor in accordance with Section 11.1, but in each case only for good cause shown.  In determining whether the holders of a majority of the Units have concurred in any such petition, Units held by the GUC Trust Administrator or the GUC Trust Monitor or any of their respective Affiliates shall be disregarded.

**ARTICLE XIII**
**MISCELLANEOUS PROVISIONS**

13.1.  <u>Actions Taken on Other Than Business Day</u>.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

13.2.  <u>Governing Law</u>.  This Trust Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to rules governing conflicts of law.

13.3.  <u>Jurisdiction</u>.  Subject to the proviso below, the parties agree that the Bankruptcy Court shall have exclusive and continuing jurisdiction over the GUC Trust and the GUC Trust Administrator, including the administration and activities of the GUC Trust and the GUC Trust

Administrator; *provided*, *however*, that notwithstanding the foregoing, the GUC Trust Administrator shall have power and authority to bring any action in any court of competent jurisdiction to prosecute any claims or Causes of Action assigned to the GUC Trust.

13.4.    <u>Third Party Beneficiary</u>.  GUC Trust Beneficiaries are third party beneficiaries of this Trust Agreement.  The GUC Trust Administrator Parties (other than the GUC Trust Administrator) are third party beneficiaries of the provisions of <u>Section 9.2</u>, <u>Section 9.4</u> and <u>Section 9.6</u> of this Trust Agreement. The GUC Trust Monitor Parties (other than the GUC Trust Monitor) are third party beneficiaries of the provisions of <u>Section 11.4</u> of this Trust Agreement, and, to the extent incorporated therein, Section <u>9.2</u>, <u>Section 9.4</u> and <u>Section 9.6</u> of this Trust Agreement.  The DIP Lenders are third party beneficiaries of this Trust Agreement to the extent of their rights of approval contained herein and their residual interests in the Wind-Down Budget Cash and the Residual Wind-Down Assets.  Except as aforesaid, there are no other third party beneficiaries of this Trust Agreement.

13.5.    <u>Severability</u>.  In the event any provision of this Trust Agreement or the application thereof to any person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the fullest extent permitted by law.

13.6.    <u>Notices</u>.  Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, by email, facsimile, sent by nationally recognized overnight delivery service or mailed by first-class mail:

(A)    if to the GUC Trust Administrator, to:

Wilmington Trust Company
**[CONTACT INFORMATION]**

(B)    if to the GUC Trust Monitor, then to each of;

**[NAME OF INITIAL GUC TRUST MONITOR AND CONTACT INFORMATION]**

(C)    if to any GUC Trust Beneficiary, in the case of a holder of an Allowed General Unsecured Claim, to the last known address of such GUC Trust Beneficiary according to the Debtors' Schedules, such GUC Trust Beneficiary's proof of claim, and, in the case of holder of Units (i) if and for so long as the Units are held in book-entry form through DTC, in accordance with the practices and procedures of DTC; and otherwise (ii) to such address as appears on the books and records of the GUC Trust Administrator, or such other address as may be designated from time to time by notice

given in accordance with the provisions of this <u>Section 13.6</u>.

13.7.  <u>Headings</u>.  The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

13.8.  <u>Plan</u>.  The terms of this Trust Agreement are intended to supplement the terms provided by the Plan and the Confirmation Order.  To the extent that the terms of sections 5.6 and 6.2 of the Plan are inconsistent with the terms set forth in this Trust Agreement with respect to the GUC Trust, then the terms of the Trust Agreement shall govern.  All other provisions of the Plan shall supersede the provisions of this Trust Agreement, including section 6.15 of the Plan, which provides that the restrictions set forth in paragraph 20 of the Final Order approving the DIP Credit Agreement (ECF No. 2529) shall continue to apply.

13.9.  <u>Ambiguities and Construction</u>.

(a)  This Trust Agreement is intended to create a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9 for U.S. federal and applicable state and local income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Trust Agreement may be amended to comply with such U.S. federal and applicable state and local income tax laws, which amendments may apply retroactively.

(b)  Unless the context otherwise requires:

(i)  a term has the meaning assigned to it;

(ii)  "or" is not exclusive;

(iii)  words in the singular include the plural, and in the plural include the singular;

(iv)  the words "hereof," "herein," "hereunder" and similar words refer to this Trust Agreement as a whole and not to any particular provisions of this Trust Agreement and any subsection, Section, and Article references are to this Trust Agreement unless otherwise specified;

(v)  any pronoun shall include the corresponding masculine, feminine and neuter forms; and

(vi)  "including" means including without limitation.

13.10.  <u>Entire Trust Agreement</u>.  This Trust Agreement contains the entire agreement between the parties and supersedes all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof.

KL2 2677419.4

13.11.  Cooperation.  The Debtors shall turn over or otherwise make available to the GUC Trust Administrator at no cost to the GUC Trust or the GUC Trust Administrator, all books and records reasonably required by the GUC Trust Administrator to carry out its duties hereunder, and agree to otherwise reasonably cooperate with the GUC Trust Administrator in carrying out its duties hereunder, subject to the obligation to preserve the confidential nature of the Debtors' books and records, as provided in Section 13.12.

13.12.  Confidentiality.  The GUC Trust Administrator and the GUC Trust Monitor, and their respective employees, members, agents, professionals and advisors, including the Trust Professionals (each a "Confidential Party" and collectively the "Confidential Parties") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor to which any of the GUC Trust Assets relates or which is otherwise received from the Debtors by the GUC Trust; provided, however, that such information may be disclosed if

(i)  it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties; or

(ii)  such disclosure is required of the Confidential Parties pursuant to legal process, including subpoena or other court order or other applicable laws or regulations.

In the event that any Confidential Party is requested to divulge confidential information pursuant to clause (ii), such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the GUC Trust Administrator (or the GUC Trust Monitor in case the GUC Trust Administrator is the disclosing party) to allow sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the GUC Trust Administrator (or the GUC Trust Monitor, as applicable) in making any such objection, including but not limited to appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

13.13.  Amendment and Waiver.

(a)  The GUC Trust Administrator, with the approval of the GUC Trust Monitor, may amend or supplement this Trust Agreement without notice to or consent of the Bankruptcy Court or any GUC Trust Beneficiary for the purpose of (x) curing any ambiguity, omission, inconsistency or correcting or supplementing any defective provision; (y) evidencing and providing for the acceptance of the appointment of a successor GUC Trust Administrator; or (z) making any other changes to this Trust Agreement that does not adversely affect the interests of the GUC Trust beneficiaries in any material respect.

(b)  The GUC Trust Administrator may amend or supplement this Trust Agreement for any other purpose, but only on petition to, and with the approval of, the Bankruptcy Court; provided that (x) no amendment or supplement to this Trust Agreement shall be inconsistent with the purpose and intent of the GUC Trust to dispose of in an expeditious but orderly manner the GUC Trust Assets in accordance with the terms of the Plan, the Confirmation Order and this Trust Agreement, and (y) this Trust Agreement shall not

be amended in a manner that is inconsistent with the Plan in the form confirmed by the Bankruptcy Court, subject to any post-confirmation modifications to the Plan pursuant to Section 1127 of the Bankruptcy Code.

(c)     Any amendment to this Trust Agreement shall be posted on the website contemplated by Section 6.2(a).

(d)     The GUC Trust Administrator may not amend sections 2.6(a), (b) & (c), 6.3, 8.3, or 13.8 without the written consent of the DIP Lenders.

13.14.  Counterparts.  This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.  A facsimile or portable document file (PDF) signature of any party shall be considered to have the same binding legal effect as an original signature.

**[Remainder of Page Blank — Signature Pages Follows]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

**MOTORS LIQUIDATION COMPANY**

By:_____
    Name:
    Title:

**MLC OF HARLEM, INC.**

By:_____
    Name:
    Title:

**MLCS, LLC**

By:_____
    Name:
    Title:

**MLCS DISTRIBUTION CORPORATION**

By:_____
    Name:
    Title:

**REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC.**

By:_____
    Name:
    Title:

**ENVIRONMENTAL CORPORATE REMEDIATION COMPANY, INC.**

By:_____
    Name:
    Title:

**WILMINGTON TRUST COMPANY, as GUC Trust Administrator**


By:_____
    Name:
    Title:


– and –

**FTI CONSULTING, INC., as GUC Trust Monitor**


By:_____
    Name:
    Title:

**EXHIBIT E**

**PRIORITY ORDER SITES**

# PRIORITY ORDER SITES

Wheeler Pit, Intersection of County Highway O and County Highway J, LaPrairie Township, WI

Scatterfield Road/Columbus Avenue, 2900 South Scatterfield Road, 2401 Columbus Avenue, Anderson, IN

Harvey & Knott, Old County Road, Kirkwood, DE

Sioux City, 1805 Zenith Drive, Sioux City, IA

Delphi Dayton, 300 Taylor Street, Dayton, OH

Garland Road, Frederick Garland Road, West Milton, OH

**EXHIBIT F**

**FIXED ALLOWED NOTE CLAIMS**

# FIXED ALLOWED NOTE CLAIMS

| *Wilmington Trust 1990 Indenture* | *Fixed Allowed Amount* |
|---|---|
| 9.40% Debentures due July 15, 2021 | $309,680,298 |
| 8.80% Notes due March 1, 2021 | $536,202,711 |
| 7.40% Debentures due September 1, 2025 | $507,066,072 |
| 9.4% Medium-Term Notes due July 15, 2021 | $15,010,245 |
| 9.45% Medium-Term Notes due November 1, 2011 | $48,808,100 |

| *Wilmington Trust 1995 Indenture* | |
|---|---|
| 7.75% Discount Debentures due March 15, 2036 | $213,338,714 |
| 7.70% Debentures due April 15, 2016 | $504,711,704 |
| 8.10% Debentures due June 15, 2024 | $414,135,144 |
| 63/4% Debentures due May 1, 2028 | $599,250,820 |
| 7.20% Notes due January 15, 2011 | $1,540,836,389 |
| 7.25% Quarterly Interest Bonds due April 15, 2041 | $580,326,736 |
| 7.25% Senior Notes due July 15, 2041 | $725,408,420 |
| 7.375% Senior Notes due October 1, 2051 | $698,481,250 |
| 7.25% Senior Notes due February 15, 2052 | $877,819,444 |
| 4.50% Series A Convertible Senior Debentures due March 6, 2032 | $39,866,281 |
| 5.25% Series B Convertible Senior Debentures due March 6, 2032 | $2,634,125,000 |
| 7.375% Senior Notes due May 15, 2048 | $1,118,654,722 |
| 7.375% Senior Notes due May 23, 2048 | $425,696,528 |
| 8.375% Senior Debentures due July 15, 2033 | $3,061,758,700 |
| 6.25% Series C Convertible Senior Debentures due July 15, 2033 | $4,401,527,778 |
| 8.25% Senior Debentures due July 15, 2023 | $1,281,933,413 |
| 7.125% Senior Notes due July 15, 2013 | $1,024,152,876 |
| 7.5% Senior Notes due July 1, 2044 | $729,000,000 |
| 1.50% Series D Convertible Senior Debentures due June 1, 2009 | $1,009,112,882 |

| *Law Debenture Trust Company of New York Indentures* | |
|---|---|
| Industrial Revenue Bond-City Of Moraine, Ohio (616449AB0) | $10,282,500 |
| Industrial Revenue Bond-City Of Moraine, Ohio (616449AA2) | $12,851,563 |
| Industrial Revenue Bond-City of Indianapolis, Indiana (455329AB8) | $1,413,125 |
| Industrial Revenue Bond-Michigan Strategic Fund (594693AQ6) | $59,711,400 |
| Industrial Revenue Bond-Ohio Water Development Authority (67759ABC2) | $47,449,000 |
| Industrial Revenue Bond-State of Ohio (677596AU2) | $20,321,813 |
| Industrial Revenue Bond-City of Fort Wayne (349272AT1) | $31,961,000 |